UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
FERNANDO HERNANDEZ, KENNETH CHOW,                    Case No.:
BRYANT WHITE, DAVID WILLIAMS, MARQUIS                12-CV-4339 (ALC)(JLC)
ACKLIN, CECILIA JACKSON, TERESA JACKSON,
MICHAEL LATTIMORE, and JUANY GUZMAN, each
individually, and on behalf of all other persons similarly
situated,

                                        Plaintiffs,

                        -against-

THE FRESH DIET, INC., LATE NIGHT EXPRESS
COURIER SERVICES, INC. (FL), FRESH DIET
EXPRESS CORP. (NY), THE FRESH DIET – NY INC.
(NY), FRESH DIET GRAB & GO, INC. (FL) a/k/a YS
CATERING HOLDINGS, INC. (FL) d/b/a YS CATERING,
INC. (FL), FRESH DIET EXPRESS CORP. (FL), SYED
HUSSAIN, Individually, JUDAH SCHLOSS, Individually,
and ZALMI DUCHMAN, Individually,

                                        Defendants.
------------------------------------------------------------------------X


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56, AND IN SUPPORT OF
THEIR MOTION FOR DECERTIFICATION OF THE COLLECTIVE ACTION**


KAUFMAN DOLOWICH & VOLUCK, LLP
*Attorneys for Defendants*
By: Jeffery A. Meyer, Esq.
Yale Pollack, Esq.
135 Crossways Park Drive, Suite 201
Woodbury, New York 11797
Phone: (516) 681-1100

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iv

PRELIMINARY STATEMENT ....................................................................................1

RELEVANT PROCEDURAL BACKGROUND .........................................................2

STATEMENT OF FACTS ............................................................................................3

ARGUMENT.................................................................................................................9

STANDARD FOR SUMMARY JUDGMENT.............................................................9

POINT I .......................................................................................................................10

PLAINTIFFS WERE PROPERLY CLASSIFIED AS INDEPENDENT CONTRACTORS.......10

    A. Plaintiffs Were Properly Classified as Independent Contractors Under the FLSA .....10

        1. Defendants Did Not Exercise a Degree of Control Over Plaintiffs Sufficient
           To Create an Employer-Employee Relationship ...................................................13

        2. Plaintiffs Made Substantial Investments to Perform Deliveries for Late Night ....14

        3. Plaintiffs Used Their Skills to Perform Their Services For Late Night.................15

        4. Plaintiffs Did Not Have a Permanent Business Relationship with Late Night......16

        5. The "Integral" Factor Under the Economic Realities Test Does Not Alter
           The Independent Contractor Relationship Between the Parties ............................16

    B. Plaintiffs Were Properly Classified as Independent Contractors Under the NYLL ....17

        1. Plaintiffs Worked at Their Own Convenience......................................................19

        2. Plaintiffs Did Not Receive Fringe Benefits and Were Not On Payroll ................21

        3. Plaintiffs Were Free to Engage in Other Employment .........................................21

        4. Plaintiffs Received Substantial Tax Benefits Associated
           With Their Independent Contractor Status ............................................................22

POINT II ...........................................................................................................................23

THE COLLECTIVE ACTION SHOULD BE DECERTIFIED......................................................23

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

Anderson v. Liberty Lobby, Inc.
477 U.S. 242 (1986)..................................................................................................................... 9

Barfield v. New York City Health and Hospitals Corp.
537 F.3d 132 (2d Cir. 2008)........................................................................................................ 10

Bhanti v. Brookhaven Memorial Hosp. Med. Ctr., Inc.,
260 A.D.2d 334, 687 N.Y.S.2d 667 (2d Dep't 1999) .................................................................. 21

Bonnetts v. Arctic Exp., Inc.
7 F. Supp.2d 977 (S.D. Ohio 1998) ............................................................................................ 16

Browning v. Ceva Freight, LLC
885 F. Supp.2d 590 (E.D.N.Y. 2012) ................................................................................... passim

Bynog v. Cipriani Group, Inc.
1 N.Y.3d 193, 770 N.Y.S.2d 692 (2003) .................................................................................... 17

Celotex Corp. v. Catrett
477 U.S. 317 (1986)...................................................................................................................... 9

Deboissiere v. American Modification Agency
2010 WL 4340642 (E.D.N.Y. Oct. 22, 2010)......................................................................... 17-18

Dole v. Amerilink Corp.
729 F. Supp. 73 (E.D. Mo. 1990)........................................................................................... 15, 17

Edwards v. Publrs. Circulation Fulfillment, Inc.
268 F.R.D. 181 (S.D.N.Y. 2010) .............................................................................. 14, 18-19, 20

Eng-Hatcher v. Sprint Nextel Corp.
2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009)............................................................................ 23

Freund v. Hi-Tech Satellite, Inc
185 Fed. App'x 782 (11th Cir. 2006) ......................................................................................... 14

Godoy v. Rest. Opportunity Ctr. Of N.Y., Inc.
615 F. Supp.2d 186 (S.D.N.Y. 2009)......................................................................................... 10

Goldberg v. Whitaker House Coop., Inc.
366 U.S. 28 (1961)...................................................................................................................... 10

Hart v. Rick's Cabaret Intern., Inc.
2013 WL 4822199 (S.D.N.Y. Sept. 10, 2013)...........................................................................22

Herman v. Mid-Atlantic Installation Servs., Inc.
164 F. Supp.2d 667 (D. Md. 2000) .................................................................................. 15, 17

Hicks v Baines
593 F.3d 159 (2d Cir. 2010)................................................................................................... 9

In re Hertz, Corp.
2 N.Y.3d 733, 778 N.Y.S.2d 743 (2004) .......................................................................... 18, 19

In re Jarzabek
292 A.D.2d 668, 738 N.Y.S.2d 742 (3d Dep't 2002) ......................................................... 20

Laroque v. Domino's Pizza, LLC
557 F. Supp.2d 346 (E.D.N.Y. 2008) ................................................................................ 24

Matter of 12 Cornelia Street
56 N.Y.2d 895 (1982) ......................................................................................................... 20

Morgenweck v. Vision Capital Advisors, LLC
2010 WL 9478990 (S.D.N.Y. June 3, 2010) ..................................................................... 21

Myers v. Hertz Corp.
624 F.3d 537 (2d Cir. 2010)................................................................................................ 23

Nichols v. All Points Transp. Corp.
364 F. Supp.2d 621 (E.D. Mich. 2005)......................................................................... 16, 17

Norris-Wilson v. Delta-T Group, Inc.
2010 WL 2196066  (S.D. Cal. June 1, 2010)................................................................... 23

Sellers v. Royal Bank of Can.
2014 WL 104682 (S.D.N.Y. Jan. 8, 2014) ...................................................................... 22

Shabazz v Morgan Funding Corp.
269 F.R.D. 245 (S.D.N.Y. 2010) ........................................................................................ 2

Tracy v NVR, Inc.
293 F.R.D. 395 (W.D.N.Y. 2013)...................................................................................... 25

United States v. Silk
331 U.S. 704 (1947).............................................................................................. 10, 12-13

Velu v. Velocity Express, Inc.
666 F. Supp.2d 300 (E.D.N.Y. 2009) ..................................................................................... *passim*

Zivali v AT&T Mobility, LLC
784 F Supp.2d 456 (S.D.N.Y. 2011)...................................................................................... 23, 25

**Statutes**

29 U.S.C. § 216(b) ............................................................................................................... 23

Fed. R. Civ. P. 41(b). ............................................................................................................ 1

Fed. R. Civ. P. 56.......................................................................................................... 1, 9, 25

## PRELIMINARY STATEMENT

Defendants[1] respectfully submit this Memorandum of Law, along with the supporting Declaration of Jeffery A. Meyer ("Meyer Decl.") and exhibits annexed thereto, in support of their motion for: (a) summary judgment pursuant to Fed. R. Civ. P. 56; and (b) decertification of the collective action. The undisputed material facts in Defendants' Local Rule 56.1 Statement of Material Facts (the "Statement") is filed herewith and incorporated herein by reference.

In their Complaint, Plaintiffs allege claims for relief under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"), claiming that they were improperly classified as independent contractors when performing deliveries for Defendant Late Night Express Courier Services, Inc. ("Late Night") to customers of Defendant The Fresh Diet, Inc. ("Fresh Diet").[2] Therefore, the dispositive issue in this case is whether Plaintiffs provided services to Defendants as independent contractors or employees. This issue turns on the degree of control which Defendants exercised over them, and whether Plaintiffs were dependent on Defendants for the opportunity to render services or were in business for themselves. In this case, Late Night only had one expectation of Plaintiffs performing deliveries – to have the meals delivered to Fresh Diet's customers by the following morning – which is not the type of control to transform the relationship between the parties to that of an employer-employee.

As more fully discussed herein, Plaintiffs in this action were properly classified as independent contractors under both the FLSA and NYLL because they: (a) made investments in

---

[1] This Memorandum of Law is respectfully submitted on behalf of all Defendants identified in the caption of this action. However, Plaintiffs have only prosecuted their claims against Fresh Diet, Late Night and the individual defendants so that corporate defendants Fresh Diet Express Corp., The Fresh Diet – NY Inc., Fresh Diet Grab & Go, Inc. a/k/a YS Catering Holdings, Inc. d/b/a YS Catering, Inc., and Fresh Diet Express Corp., should be dismissed from the action based on the failure to prosecute pursuant to Fed. R. Civ. P. 41(b).

[2] While the Complaint seeks relief for residents of New Jersey under New Jersey Wage and Hour Law (*Complaint,* ¶¶*77-81*), and for residents of Connecticut under Connecticut's Wage and Hour Law (*Complaint,* ¶¶*82-86*), Plaintiffs have only pursued their claims in discovery under the FLSA and NYLL, which, according to their own Complaint, are only being sought on behalf of New York residents (*Complaint,* ¶¶*72-76*).

the delivery vehicles they used to provide delivery services for Defendants; (b) used their own vehicles, for which they paid their own expenses, to perform the delivery services; (c) chose the times they began and finished their delivery routes; (d) maintained positions with other companies while performing delivery services for Defendants; (e) were permitted to and did, in fact, engage others to assist them in their deliveries for Defendants; (f) did not receive fringe benefits from Defendants; (g) were not on Defendants' payroll; and (h) affirmatively held themselves out as independent contractors in their tax filings and/or did not file tax returns declaring the compensation they received from Late Night.

Assuming, *arguendo*, that Defendants' motion for summary judgment is denied, there is no question that their motion for decertification of the collective action be granted as Plaintiffs have not satisfied the more "stringent standard" of proof in determining that they are similarly situated to maintain a collective action.

## RELEVANT PROCEDURAL BACKGROUND

On or about November 21, 2012, the Court issued an Order to disseminate notice to putative collective action members no later than November 30, 2012. *See ECF Docket No. 50.* Ultimately, the deadline for putative collective action members to opt-in the action was February 19, 2013. *See ECF Docket No. 60.* There are twenty-nine (29) Plaintiffs as part of the collective action.

On or about February 7, 2013, Plaintiffs moved for class certification, which was denied by the Court on July 28, 2013.[3]

All discovery was closed on December 20, 2013. *See ECF Docket No. 126.*

---

[3] Based on Plaintiff Edwin Perez's failure to appear for his deposition, he should be dismissed from the case. (*Meyer Decl., Exs. "P" and "Q"*). *See Shabazz v Morgan Funding Corp.*, 269 F.R.D. 245, 248 (S.D.N.Y. 2010) ("Rule 37 of the Federal Rules of Civil Procedure provides that a court may dismiss an action in whole or part where a party fails to appear for its own deposition after being served with proper notice.").

2

## STATEMENT OF FACTS

Fresh Diet provides its clients with fresh daily-prepared meals that are never frozen, freeze-dried or vacuum packed. (*Statement ("Stmt."), ¶1*).[4] Plaintiffs were drivers engaged as independent contractors by Late Night to perform deliveries in the Tri-State area (and in some cases deliveries to Boston, Philadelphia or Baltimore) to Fresh Diet's customers. (*Stmt., ¶3*).

Drivers generally entered into an "Independent Contractor Agreement" at the time they were engaged to provide delivery services for Late Night, which established the parties' respective rights governing their business relationships and the terms by which Plaintiffs were to provide delivery services for Late Night. (*Stmt., ¶5*). Late Night did not pay drivers based on the amount of time they worked, but rather, paid them based on the number of stops they made or number of miles they drove, or both, depending on the area in which the driver performed deliveries. (*Stmt., ¶6*).

Late Night did not withhold taxes from the compensation paid to the Plaintiffs, but rather, issued IRS Form 1099s to them at year end. (*Meyer Decl., Ex. "N"*). Plaintiffs were solely responsible for filing local, state, provincial, and federal income tax returns related to their earnings. (*Stmt., ¶7*). Most Plaintiffs testified that they did not file tax returns declaring the compensation they received from Late Night. (*Stmt., ¶8*). Those that did classified themselves as independent contractors. (*Stmt., ¶9*).

Syed Hussain was the Delivery Manager for Late Night, who oversaw deliveries in the Tri-State area, hired drivers, created routes, and assigned drivers to routes based on their availability and preference. (*Stmt., ¶10*). Drivers were free to deliver the meals in their vehicles in any manner they saw fit as Late Night was not concerned with how the drivers delivered the

---

[4] References to the Statement incorporate by reference the documents cited therein supporting the facts set forth therein, including affidavits and exhibits.

3

meals, but only wanted to ensure that all meals provided to the drivers were delivered to Fresh Diet's clients. *(Stmt., ¶11)*.

Plaintiffs arrived at Fresh Diet's facility in Brooklyn, where they would pick up packages that were already prepared by packers so that they could be delivered by the drivers. *(Stmt., ¶12)*. After Plaintiffs were finished with completing their delivery routes, many went home as they were not required to go back to the facility or otherwise report to Late Night after the completion of their deliveries. *(Stmt., ¶13)*. For example, Plaintiff Acklin testified that after completing his delivery routes, he would "go home" and that he was not required to call Mr. Hussain after he completed his deliveries. *(Meyer Decl., Ex. "I" (Acklin Dep.), at 37:23-38:13)*. When Plaintiff Chow was asked "What would you do after you completed your last delivery?" he responded that "I would go home." *(Meyer Decl., Ex. "E" (Chow Dep.), at 58:22-59:3)*. Similarly, Plaintiff T. Jackson testified as follows:

> Q.   Where would you go after you were done?
> A.   Home.
> Q.   Would you have the empty bags in your car?
> A.   Yes.
> Q.   Did you report to anyone at The Fresh Diet when you finished your route?
> A.   Sometimes Syed.
> Q.   Were there times that you did not report?
> A.   Sometimes, yes.

*(Meyer Decl., Ex. "G" (T. Jackson Dep.), at 36:25-37:11 (see also 46:6-11, 47:13-23))*.

Plaintiffs testified that they would show up to the facility where the meals were ready anywhere between 3:00 p.m. and midnight to begin their deliveries. *(Stmt., ¶14)*. Plaintiff Chow made clear that he had the ability to show up to work whenever he was ready, as evidenced by text messages from him to Mr. Hussain, and that there were no consequences of him showing up as he saw fit – he still received the same delivery routes regardless of when he arrived at the

facility. (*Meyer Decl., Ex. "E" (Chow Dep.), at 92:8-93:14, 104:18-105:7, 106:15-24, 171:4-181:15; Meyer Decl., Ex. "F"*). Since Defendants were only concerned with the deliveries arriving at the Fresh Diet's clients by the following morning, the fact that Plaintiffs were allowed to show up to work when they saw fit is consistent with their treatment of Plaintiffs as independent contractors. (*Stmt., ¶11*). Plaintiffs testified that they completed their delivery routes anywhere between 2:00 a.m. and 7:00 a.m. (*Stmt., ¶15*).

During their delivery routes, Plaintiffs took breaks for meals, the restroom and gas, which breaks were not reported to Late Night. (*Stmt., ¶16*). Plaintiffs were not disciplined by Late Night for failing to hand in paperwork, arriving late to pick up deliveries, or otherwise in connection with performing the duties expected of them as independent contractors. (*Stmt., ¶17*).

Plaintiffs were allowed to make deliveries for other drivers, and Late Night had no objection to same. (*Stmt., ¶18*). At the deposition of Plaintiff Acklin, he testified that "sometimes I did stops for other drivers." (*Meyer Decl., Ex. "I" (Acklin Dep.), at 59:17-18*). Similarly, Plaintiff Chow testified as follows:

> Q.   What did you ever do without [Mr. Hussain's] permission?
> A.   Adding stops from other drivers if they need help, adding stop without letting him know that they running late.
> Q.   "Adding stops from other drivers," what does that mean?
> A.   Like getting extra stops from other drivers from other routes.
> Q.   You would take one of their stops?
> MR. ANDREWS: Objection.
> A.   Yes.
> Q.   You would take one of their stops?
> A.   Yes.
> Q.   How would you do that?
> A.   Oh, just meet up in person.
> Q.   You would take the meal bag from their car?
> A.   Yes.

5

(*Meyer Decl., Ex. "E" (Chow Dep.), at 119:20-120:14*).

Additionally, Plaintiffs were permitted to bring others in their vehicles to assist them in performing deliveries and Late Night had no objection to same. (*Stmt., ¶19*). At her deposition, Plaintiff T. Jackson testified to the following:

> Q.   Is that your handwriting on 3497?
> A.   No, but this does look like my husband's handwriting.
> Q.   Who is your husband?
> A.   Delroy McNeil.
> Q.   He performed –
> A.   No.  Sometimes he would go with me.
> Q.   He would go with you?
> A.   Yes.
> Q.   He would fill out the manifest?
> MR. ANDREWS:  Objection.
> A.   Yes.  It looks like he filled this one out for me.
> Q.   Would he ever take any of the meals to the doors when he was with you?
> A.   Yes, sometimes he did.
> Q.   How often did he go with you?
> A.   I can't really answer that.
> Q.   Every week? Would he go with you once a night?
> MR. ANDREWS:  Objection.
> A.   No, more than that.
> Q.   More than that?
> A.   Uh-huh.
> Q.   Three nights a week?
> MR. ANDREWS:  Objection.
> A.   I can't be specifically sure how many nights.
> Q.   Would he be with you the entire time?
> MR. ANDREWS:  Objection.
> A.   Of the route?
> Q.   Yes.
> A.   The entire time that I'm on the route?
> Q.   Yes.
> A.   Yes.
> Q.   Did he go to the facility with you?
> A.   Yes.
> Q.   Did Syed ever see him?
> A.   Yes.
> Q.   Did Syed ever tell you you can't have your husband --
> A.   No.
> Q.   -- performing deliveries with you?

6

A.    No.

(*Meyer Decl., Ex. "G" (T. Jackson Dep.), at 82:7-83:23*).  When similar questions were posed to

Plaintiff DeLarosa, he testified as follows:

> Q.    Did you ever have any other people work with you performing deliveries?
> A.    I have a friend that comes along with me.
> Q.    What's his name?
> A.    Ambiori Paez.
> Q.    Do you know the spelling?
> A.    A-M-B-I-O-R-I, and last name is, P-A-E-Z.
> Q.    Do you pay Ambiori?
> A.    I give him something to come along with me.  Sometimes I do.
> Q.    Does he come with you to the facility to pick up the bags?
> A.    No.  Yes, sometimes he goes with me, or we meet.
> Q.    Do you know if he's ever met Syed?
> MR. ANDREWS: Objection. Objection.
> A.    He's seen Syed.  He's seen him and Owen.
> Q.    And Owen?
> A.    Yes, because he sometimes rides along with me, so -- or he waits for me over there, so --
> Q.    Does he have his own car?
> A.    No.  He takes the train.
> Q.    How frequently would he come with you on the routes?
> A.    When I do long routes, that's the far away, I like to be with somebody because it's a risk that I could fall asleep, so he keeps me awake.
> Q.    Have Syed or Owen ever told you not to bring him with you?
> A.    No, they've never told me that.
> Q.    Does he ever help you deliver the bags when he comes along with you?
> MR. ANDREWS: Objection.
> A.    Yes, he sometimes helps me.

(*Meyer Decl., Ex. "K" (DeLarosa Dep.), at 53:17-55:7*).

Furthermore, Plaintiffs maintained other jobs while performing deliveries for Late Night.

(*Stmt., ¶20*).  Plaintiffs Acklin and T. Jackson testified that they maintained a job doing paper

deliveries during the day when they started performing deliveries for Late Night. (*Meyer Decl.,*

Ex. "I" (Acklin Dep.), at 70:3-7; Meyer Decl., Ex. "G" (T. Jackson Dep.), at 28:19-22). In addition, Plaintiff Williams' tax returns indicate that he was working for Cerebral Palsy of Westchester, and Plaintiffs Guzman's tax returns indicate that he was working for Gold Star Salon in 2012, during the time they were performing deliveries for Late Night. (Meyer Decl., Ex. "O," FD004574, FD004618-FD004643). Similarly, Plaintiff Chow testified that he engaged in numerous business opportunities during the time he was performing deliveries for Late Night, including operating a cruise planning franchise, cell phone business and towel business. (Meyer Decl., Ex. "E" (Chow Dep.), at 15:10-18:20, 20:14-21:10, 59:4-21). In fact, not only was Plaintiff Chow operating these other businesses, he was also overlapping his time in performing newspaper deliveries for another company while performing deliveries for Late Night as evidenced by the following testimony:

> Q.   What would you do after you completed your last delivery?
> A.   I would go home.
> Q.   With the bags?
> A.   Yeah, with the empty cooler (indicating).
> Q.   Did you report to anyone after you were done with your deliveries in November 2008?
> A.   With that, with the newspaper, it can overlap too at the same time.
> Q.   Were you performing meal deliveries and newspaper deliveries on the same nights in November 2008?
> A.   It happens a few times.
> Q.   Did that happen until a certain time?
> A.   I went to Fresh Diet first. If I finish Fresh Diet, I would report to newspaper delivery.
> Q.   You had newspapers and meals in your car --
> MR. ANDREWS: Objection.
> Q.   -- for deliveries?
> MR. ANDREWS: Objection.
> A.   Yes.

(Meyer Decl., Ex. "E" (Chow Dep.), at 59:4-21).

Plaintiffs did not receive health insurance from Late Night while performing delivery services for Late Night. (*Stmt.*, *¶21*). Plaintiffs did not receive any other fringe benefits from Late Night during the time they performed delivery services for Late Night. (*Stmt.*, *¶22*).

Plaintiffs used their own delivery vehicles to provide delivery services for Late Night. (*Stmt.*, *¶23*). Plaintiffs maintained their own insurance for the vehicles they used to perform deliveries for Late Night. (*Stmt.*, *¶24*). Plaintiffs paid for their own maintenance for the vehicles they used to perform deliveries for Late Night. (*Stmt.*, *¶25*). Plaintiffs paid for their own gas for the vehicles they used to perform deliveries for Late Night. (*Stmt.*, *¶26*). Plaintiffs paid for their own repairs for the vehicles they used to perform deliveries for Late Night. (*Stmt.*, *¶27*).

## ARGUMENT

### STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper when a movant demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A genuine issue of fact means that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive summary judgment, the opposing party must establish a genuine issue of material fact and "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," since "mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).

## POINT I

### PLAINTIFFS WERE PROPERLY CLASSIFIED AS INDEPENDENT CONTRACTORS

**A.     Plaintiffs Were Properly Classified As Independent Contractors Under The FLSA**

"Under the FLSA, the question of whether an employee-employer relationship exists is

one of 'economic reality.'" *Velu v. Velocity Express, Inc.*, 666 F. Supp.2d 300, 305 (E.D.N.Y.

2009) (*citing Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)).  Federal courts

analyze five (5) factors to distinguish employees from independent contractors, being:

> (1) the degree of control exercised by the employer over the
> workers, (2) the workers' opportunity for profit or loss and their
> investment in the business, (3) the degree of skill and independent
> initiative required to perform the work, (4) the permanence or
> duration of the working relationship, and (5) the extent to which
> the work is an integral part of the employer's business.

*Godoy v. Rest. Opportunity Ctr. Of N.Y., Inc.*, 615 F. Supp.2d 186, 192-93 (S.D.N.Y. 2009)

(*citing United States v. Silk*, 331 U.S. 704, 716 (1947)).  A worker's status as an employee or

independent contractor under the FLSA is "a flexible concept to be determined on a case-by-case

basis by review of the totality of the circumstances . . . ." *Barfield v. New York City Health and*

*Hospitals Corp.*, 537 F.3d 132, 141-42 (2d Cir. 2008).

The facts at bar are directly on point with those in *Browning v. Ceva Freight, LLC*, 885 F.

Supp.2d 590 (E.D.N.Y. 2012), a case in which Judge Spatt granted summary judgment to the

defendants on the same misclassification issue at bar in this action.  In *Browning*, the plaintiffs

were drivers who performed pick-ups and drop offs for the defendants.  *Id.* at 592.  The

*Browning* court analyzed the factors under both the FLSA and NYLL and found that the drivers

were properly classified as independent contractors as a matter of law under both statutes.  This

conclusion was found despite the fact that the drivers in *Browning* were required to: (1) cover

10

their vehicles with the defendant's logo; (2) wear the defendant's uniforms while working; (3) work within the parameters of the schedule provided to them by the dispatcher and follow the decisions by the dispatcher; (4) remain in constant contact with the defendants by using a cellular device tied to the defendants' computer system; and (5) attend monthly meetings. *Id.* at 611.

In addressing their status under the FLSA, the *Browning* court first noted that although the defendants possessed some degree of control over the drivers (as discussed in the preceding paragraph), "the degree of control is not so great as to weigh in favor of finding the Plaintiffs to be employees as opposed to independent contractors." *Browning*, 885 F. Supp.2d at 608. Second, the court noted that, "[o]f importance," the drivers made "substantial investments in their businesses" because "[t]hey utilized their own vehicles and all of their own tools and supplies, which of course supports a finding of independent contractor status." *Id.* Another factor supporting the finding of independent contractor status was that the drivers "were responsible for the costs and expenses associated with the vehicle, including maintenance and repair." *Id.*

In addressing the level of skill, despite the plaintiffs' claim that they had limited skill, the *Browning* court noted that the drivers "needed to have professional driving skills, business management skills, knowledge of Department of Transportation regulations, and freight-handling skills," which favored an independent contractor finding. *Browning*, 885 F. Supp.2d at 609. As for the duration of the working relationship, the court examined the independent contractor agreement finding that the relationship was terminable at will by either party, a factor weighing in favor of independent contractor status. *Id.* at 609-10. Finally, although the court found that the drivers' services were integral to the defendants' business, it noted that the drivers were easily replaceable and that "this factor only weighs slightly in favor of finding that the

11

Plaintiffs should qualify as employees under the FLSA, and would not prevent this Court from finding, as a matter of law, that the Plaintiffs are independent contractors." *Id.* at 610.

A similar result was reached in *Velu, supra*, another case involving a delivery driver's classification as an independent contractor. The *Velu* court noted that the factors under the FLSA weighed in favor of an independent contractor and granted summary judgment to the defendants. *Velu*, 666 F. Supp.2d at 307. Of significance, the *Velu* court explained:

> In this case, if either party were to terminate the Agreement today, Plaintiff could go out the next day with the same van, clothes, equipment, computer, printer, and other supplies, and immediately work for another shipping company. Accordingly, the Court finds that Plaintiff is in business for himself and is an independent contractor for purposes of the FLSA.

*Id.* at 610. This same factor was recognized in the *Browning* court in determining an independent contractor relationship existed between the parties. *Browning*, 885 F. Supp.2d at 610 ("If either party were to terminate the Agreement, the Plaintiffs could essentially go out the next day with their trucks and equipment and immediately work for another shipping company. The Court agrees with the Defendants that the Plaintiffs were essentially small businessmen who owned their trucks; hired their own helpers; and had responsibility for their own investment and management.").

Both *Browning* and *Velu* cited the United States Supreme Court decision in *Silk, supra*, which also found delivery drivers to be independent contractors. In *Silk*, the plaintiffs were truck drivers who performed pick-up and delivery services for a trucking company (Greyvan Lines). The drivers performed services in trucks painted with "Greyvan Lines," provided their own tools and labor, and paid their own operating expenses. *Silk*, 331 U.S. at 708. Dispatchers employed by Greyvan Lines "issued orders for the [drivers'] movements, although not the routes to be used, and to which the [drivers], at intervals, reported their positions." *Id.* Drivers were also

12

provided with "directions [by the company] as to where and when to load the freight," and were "obligat[ed] to notify the company" when "freight was tendered." *Id.* Based on those facts, the Supreme Court held that the drivers were independent contractors. *Id.* at 719.

In this action, like the drivers in *Browning, Velu* and *Silk,* Plaintiffs were in business for themselves and, based on a totality of the circumstances, were properly classified as independent contractors under the FLSA's economic reality test.

### 1. Defendants Did Not Exercise A Degree Of Control Over Plaintiffs Sufficient To Create An Employer-Employee Relationship

The first factor of the economic realities test under the FLSA looks to the degree of control the exercised over the workers. At bar, Plaintiffs were given the freedom to engage others to assist them in performing their services so that they were not personally required to service their contracts, and also performed work for other drivers by taking their stops. Plaintiffs testified that Late Night was aware that they had others performing deliveries for them and that Late Night never made any issue of that arrangement. (*Stmt., ¶¶18-19*).

Moreover, while performing deliveries for Late Night, many Plaintiffs maintained other jobs, whether it was performing deliveries for newspapers companies or creating franchise companies for themselves. (*Stmt., ¶20*). For example, during the time they performed deliveries for Late Night, Plaintiffs Acklin and Jackson worked for a newspaper delivery company; Plaintiff Chow worked for a newspaper delivery company and franchises he operated; Plaintiff Guzman worked for a beauty salon; and Plaintiff Williams worked for Cerebral Palsy of Westchester. (*Meyer Decl., Ex. "I" (Acklin Dep.), at 70:3-7; Meyer Decl., Ex. "G" (T. Jackson Dep.), at 28:19-22; Meyer Decl., Ex. "E" (Chow Dep.), at 15:10-18:20, 20:14-21:10, 59:4-21; Meyer Decl., Ex. "O"*).

13

Additionally, Plaintiffs were free to arrive at the facility to begin their deliveries as they saw fit, as some did not arrive to the facility until midnight to begin their deliveries. (*Stmt.,* *¶14*). Again, this was of no concern to Late Night as it simply wanted to ensure that meals were delivered to Fresh Diet's clients by the morning – a factor that does not evidence the type of "control" needed over an employee to establish an employer-employee relationship. *See, e.g., Browning,* 885 F. Supp.2d at 602 ("While there were certain time limits imposed upon the Plaintiffs as to when they should pick-up or deliver packages, these constraints stemmed from the nature of the business, as opposed to CEVA in particular. It is reasonable that a company such as CEVA would impose boundaries of this nature in the shipping business."); *Velu,* 666 F.Supp.2d at 307 ("Plaintiff worked at his own convenience, subject to the demands of the clients."); *Edwards v. Publrs. Circulation Fulfillment, Inc.,* 268 F.R.D. 181, 186 (S.D.N.Y. 2010). While performing the deliveries, Plaintiffs took breaks for meals, the restroom and gas without reporting the breaks to Late Night. After completing their deliveries, Plaintiffs were not required to report to Late Night, and many simply went home until they started their deliveries the following evening. (*Stmt.,* *¶¶13, 15-16*).

In sum, Defendants did not exercise a degree of control over Plaintiffs to warrant a finding of an employer-employee relationship.

### 2. Plaintiffs Made Substantial Investments To Perform Deliveries For Late Night

In addressing the second factor under the economic realities test, the record conclusively demonstrates that Plaintiffs made substantial investments to perform deliveries for Late Night. When evaluating investments in driver classification cases, courts have found that if the driver uses his or her own vehicle to perform services, this factor will support independent contractor status. *See, e.g., Freund v. Hi-Tech Satellite, Inc.,* 185 Fed. App'x 782, 783-84 (11th Cir. 2006)

14

(finding that a cable installer was an independent contractor because, *inter alia*, he "drove his own vehicle and provided his own tools and supplies); *Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F. Supp.2d 667, 675 (D. Md. 2000) (stating that investment by installers who used their own trucks supported independent contractor status); *Dole v. Amerilink Corp.*, 729 F. Supp. 73, 76 (E.D. Mo. 1990) (cable installers made "substantial" investment in their business when they "spen[t] significant amounts of money on their trucks and tools.").

Here, Plaintiffs used their own vehicles in performing deliveries on behalf of Late Night, which they maintained and repaired at their own expense. (*Stmt.,* ¶*23*). Plaintiffs paid their own insurance for their vehicles and for their own gas. (*Stmt.,* ¶¶*24-26*). As well, if Plaintiffs took others along with them to provide deliveries, it was up to them how to compensate the assistant (if at all). (*Stmt.,* ¶*19*). Moreover, Plaintiffs had the opportunity for profit or loss in their business relationship with Late Night as each driver's route depended on his or her availability and capability to perform the amount of deliveries in a certain location. This additional factor supports a finding that Plaintiffs were properly classified as independent contractors under the FLSA.

### 3.    Plaintiffs Used Their Skills To Perform Their Services For Late Night

In order to perform deliveries for Late Night, drivers had to have the ability to drive either long or short distances (depending on whether they were performing deliveries within New York City, in more rural areas in the Tri-State area or "over the road" type deliveries to Boston, Philadelphia, or Baltimore) and navigate the roads to ensure that deliveries were made in a timely fashion. In addition, for those who made deliveries in residential buildings, Plaintiffs had to have customer service skills to ensure that meals were properly left for Fresh Diet's customers the following day.

In *Nichols v. All Points Transp. Corp.*, 364 F. Supp.2d 621 (E.D. Mich. 2005), the court found that the drivers were independent contractors because, *inter alia*, "the drivers must exercise entrepreneurial skills often associated with small business owners" and "must manage their operating costs and expenses and navigate the regulatory landscape associated with hauling freight." *Id.* at 632. The court further noted that the drivers' work required their knowledge of roads and ability to make long trips without fatigue, similar to the drivers at bar. *Id.* Accordingly, this factor also weighs in favor of independent contractor status.

### 4. Plaintiffs Did Not Have A Permanent Business Relationship With Late Night

In addressing the fourth factor under the economic realities test, where a driver is under an arrangement that is terminable at will by either party, independent contractor status is supported. Here, there is no dispute that Plaintiffs were entitled to terminate their relationship with Late Night at any time, and that Late Night could stop assigning routes to them. Therefore, since there was no permanent business relationship between the parties, independent contractor status is again supported. *See, e.g., Browning*, 885 F. Supp.2d at 609-610; *Velu*, 666 F. Supp.2d at 308; *Nichols*, 364 F. Supp.2d at 631; *Bonnetts v. Arctic Exp., Inc.*, 7 F. Supp.2d 977, 981 (S.D. Ohio 1998) ("[T]he relationship between the parties was not one of a permanent nature, and, therefore, indicative of an independent contractor relationship.").

### 5. The "Integral" Factor Under The Economic Realities Test Does Not Alter The Independent Contractor Relationship Between The Parties

As for the final factor under the economic realities test, it must be noted that the pick-up and delivery services are just one aspect of Fresh Diet's business. However, even if Plaintiffs' delivery work were deemed an integral part of Fresh Diet's business, courts have held that delivery drivers are still properly classified as independent contractors as a matter of law even if the services provided are "integral" to the putative employer's business. *See Browning*, 885 F.

16

Supp.2d at 610; *Velu*, 666 F. Supp.2d at 307-08; *Nichols*, 364 F. Supp.2d at 634; *Mid-Atlantic*, 164 F. Supp.2d at 677; *Amerilink*, 729 F. Supp. at 77.

In sum, based on a totality of circumstances in examining the factors under the FLSA's economic realities test, Plaintiffs were properly classified as independent contractors as a matter of law.

**B.      Plaintiffs Were Properly Classified As Independent Contractors Under The NYLL**

A finding that Plaintiffs were properly classified as independent contractors as a matter of law is also warranted under the NYLL. The test under the NYLL turns, in large part, to the control exercised by the putative employer, which, as established above, supports an independent contractor relationship in this case.

Under the NYLL, the New York State Court of Appeals has held that the "factors relevant to assessing control include whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Bynog v Cipriani Group, Inc.*, 1 N.Y.3d 193, 198, 770 N.Y.S.2d 692 (2003); *see also Velu*, 666 F. Supp.2d at 307.

In addressing the NYLL, as set forth in *Deboissiere v. American Modification Agency*, 2010 WL 4340642 (E.D.N.Y. Oct. 22, 2010):

> In addition, it is a "significant consideration" if the person classifies himself or herself as an independent contractor for income tax purposes. *Gagen*, 27 A.D.3d at 1043-44, 812 N.Y.S.2d at 690-91. Indeed, though not quite rising to the level of estoppel, if a plaintiff signs a tax return "under penalty of perjury" that declares independent contractor status and seeks "numerous deductions for business purposes associated with independent contractor status, such as travel, entertainment, lodging, supplies, telephone and depreciation of business assets," such a tax return may significantly impede the plaintiff's ability to claim employee status for purposes of filing an overtime or minimum wage claim. Id.

17

*Id.* at 8-9; *see also Browning, supra.*

In *Deboissiere*, the court, ***sua sponte***, denied the plaintiffs' **unopposed** class certification

motion, stating the following:

> The Court is mindful that, at this stage, the relevant inquiry
> considers whether common questions predominate over
> individualized issues, not the merits of Plaintiffs' claims. And it is
> true that, notwithstanding whether they support or weaken
> Plaintiffs' claims, Plaintiffs have at least shown that three factors
> are subject to common proof. **But, given that certain factors**
> **suggest an employment relationship while other factors reflect**
> **a legitimate independent contractor classification, any**
> **particular proposed class member's status might be a close**
> **question that depends upon the "significant consideration" of**
> **how the proposed class member defined himself or herself on**
> **tax returns, and whether the class member sought tax benefits**
> **associated with independent contractor status.** *Gagen*, 27
> A.D.3d at 1043-44, 812 N.Y.S.2d at 690-91. **So this single**
> **important individualized issue might prove outcome**
> **determinative for many, if not all, of the proposed class**
> **members.** .... Moreover, Plaintiffs have submitted nothing at all
> concerning two of the factors: (2) whether the proposed class
> members had freedom to engage in other employment; and (5)
> whether they worked a fixed schedule. **Thus, Plaintiffs have not**
> **shown that these factors depend upon common instead of**
> **individualized questions. Nor have Plaintiffs provided any**
> **policy or personnel documents to otherwise supplement their**
> **allegations of an employment relationship between Defendants**
> **and the proposed class members.**

*Id.* at 10-11 (emphasis supplied) (citations omitted).

Under the NYLL, the degree of control is critical to the independent contractor analysis

as courts have recognized that "[i]ncidental control over the results produced—without further

evidence of control over the means employed to achieve the results—will not constitute

substantial evidence of an employer-employee relationship." *In re Hertz Corp.*, 2 N.Y.3d 733,

735, 778 N.Y.S.2d 743 (2004). As discussed in *Edwards, supra*:

18

> [T]he requirements that a specified number of deliveries be made
> 365 days a year during specified times to specified locations,
> merely reflect—in an entirely appropriate and understandable
> way—the intended results of the PCF-deliverer relationship. It is
> undisputed that they are the requirements imposed upon PCF by its
> clients. As these requirements concern the results to be achieved,
> not the means to accomplish those results, and as PCF may
> properly dictate its desired results to both employees and
> independent contractors, they do not affect the deliverers'
> employment classification.

*Edwards*, 268 F.R.D. at 186.

In this action, the business relationship between Plaintiffs and Late Night was fully consistent with the distinction recognized under New York law between control over results and the means used to accomplish them. Again, Late Night was only concerned with one thing – that Fresh Diet's customers received their meals by the following morning. Plaintiffs were free to: (a) show up at the facility at a time that they believed they could perform their deliveries by the following morning; (b) deliver the meals in any order they saw fit on their route; (c) bring others with them to assist in performing deliveries; and (d) take breaks during their deliveries for any reason, all factors consistent with an independent contractor relationship. *See Hertz*, 2 N.Y.3d at 735 ("The requirement that the work be done properly is a condition just as readily required of an independent contractor as of an employee and not conclusive as to either.").

## 1. Plaintiffs Worked At Their Own Convenience

As discussed above, Plaintiffs were entitled to work at their own convenience as there were no set hours mandated by Late Night. Indeed, Plaintiff Chow frequently used text messages to advise Mr. Hussain when he was going to be at the facility to begin deliveries. For example, Plaintiff Chow often texted Mr. Hussain after 7:00 p.m. to advise that he would be at the facility anywhere between 8:00 p.m. and midnight. (*Meyer Decl., Ex. "E" (Chow Dep.), at*

19

171:4-181:15; *Meyer Decl., Ex. "F"*).  Plaintiff Chow still received the same delivery routes regardless of when he arrived to the facility.

Furthermore, as discussed above, Plaintiffs would sometimes take other drivers' deliveries and perform them on their behalf, or bring others in their vehicles to assist them in performing their deliveries.  (*Stmt.,* ¶¶*18-19*).  This clearly supports an independent contractor finding as employees do not have the freedom to hire others to do their jobs or take over the jobs of others without consequence. *See In re Jarzabek*, 292 A.D.2d 668, 669, 738 N.Y.S.2d 742 (3d Dep't 2002) ("Despite the exercise of incidental control essential to [the defendant's] conduct of its business, there is substantial evidence to support the Board's conclusion that the business relationship between claimant and [the defendant] allowed him to operate independently and that he was not an employee.").

Indeed, New York courts have held that customer-oriented requirements that may impact when a contractor must perform services or requesting that drivers work certain hours – e.g. requesting that drivers deliver meals so that they are received by Fresh Diet's customer by the following morning – does not create an employment relationship. *See Browning*, 885 F.Supp.2d at 602 ("While there were certain time limits imposed upon the Plaintiffs as to when they should pick-up or deliver packages, these constraints stemmed from the nature of the business, as opposed to CEVA in particular. It is reasonable that a company such as CEVA would impose boundaries of this nature in the shipping business."); *Velu,* 666 F.Supp.2d at 307 ("Plaintiff worked at his own convenience, subject to the demands of the clients."); *Edwards*, 268 F.R.D. at 186; *In re Matter of 12 Cornelia Street,* 56 N.Y.2d 895, 897-98 (1982) (finding that salespeople were independent contractors because, *inter alia*, they were free to work whatever hours they chose, even though they voluntarily adhered to a schedule they created for themselves).

20

Therefore, Plaintiffs' ability to provide deliveries at their convenience and lack of a fixed schedule supports their status as independent contractors.

### 2. Plaintiffs Did Not Receive Fringe Benefits And Were Not On Payroll

In addressing the next factors under the NYLL, there is no dispute that Plaintiffs did not receive fringe benefits from Defendants and were not on their payroll. Courts have found that independent contractor status is supported where a worker does not receive benefits and is not on the putative employer's payroll. *See Bhanti v. Brookhaven Memorial Hosp. Med. Ctr., Inc.*, 260 A.D.2d 334, 335, 687 N.Y.S.2d 667 (2d Dep't 1999); *Morgenweck v. Vision Capital Advisors, LLC*, 2010 WL 9478990 (S.D.N.Y. June 3, 2010) *aff'd*, 410 Fed. App'x 400 (2d Cir. 2011).

Here, Plaintiffs were paid as non-employees, receiving compensation based on the number of deliveries and/or miles, depending on the location of their route. Late Night did not withhold any taxes from the payments to Plaintiffs and issued IRS Form 1099s for the compensation paid, which Plaintiffs were responsible for reporting (and, for the most part, did not).

### 3. Plaintiffs Were Free To Engage In Other Employment

In addition to the above factors supporting an independent contractor relationship, Plaintiffs ability to take on other work also supports independent contractor status. Here, while performing deliveries for Late Night, many Plaintiffs maintained other jobs, such performing deliveries for newspapers companies or operating franchise companies for themselves. (*Stmt., ¶¶18-20*).

To the extent Plaintiffs try and claim that the hours they worked made it impossible for them to maintain other jobs, this does not change their status. As set forth in *Browning*:

> As an initial matter, the Court finds that the fact that the Plaintiffs did not actually take on additional employment, does not

21

> automatically result in a denial of the Defendants' motion for
> summary judgment. *See, e.g., Velu,* 666 F.Supp.2d at 307
> ("Plaintiff has not chosen to avail himself to the opportunity to
> work for other shipping companies, but that is by choice."). More
> importantly, the Court finds that the Plaintiffs could perform work
> for other companies, even if it was practically difficult to do so.
> There are no disputed issues of material fact in this regard and the
> Court finds that, in light of the totality of the circumstances
> analyzed here, the fact that the Plaintiffs worked exclusively for
> the Defendants does not necessarily lead to the conclusion that
> they qualify as employees under the NYLL when few, if any, other
> factors support that determination.

*Browning,* 885 F. Supp.2d at 603.

Thus, Plaintiffs freedom to work for others only further supports their independent

contractor status. *See, e.g., Sellers v. Royal Bank of Can.,* 2014 WL 104682, at *6 (S.D.N.Y.

Jan. 8, 2014)

### 4.    Plaintiffs Received Substantial Tax Benefits Associated With Their Independent Contractor Status

As set forth above, one of the most important considerations examined by courts in

classifications cases is how plaintiffs treat themselves for tax purposes. *See Browning, supra;*

*Deboissiere, supra.* To be sure, Defendants are aware that this Court has recently found that less

weight should be afforded to tax treatment than was afforded in *Browning* and *Deboissiere. See*

*Hart v. Rick's Cabaret Intern., Inc.,* 2013 WL 4822199, at *17 (S.D.N.Y. Sept. 10, 2013).

However, the facts in *Hart* were not as egregious as the facts in this case – where Plaintiffs admit

that they did not file tax returns reporting the compensation they received for any of the work

they performed for Late Night.[5]   Certainly there is a distinction between statutory employees

who are taxed on their gross wages as opposed to independent contractors who are required to

report their income on their own to seek certain tax benefits (if they choose to report their

---

[5] After numerous conferences with Magistrate Cott concerning the production of Plaintiffs' tax returns, Plaintiffs only produced returns for four (4) individuals, inferring that returns were not filed for the remaining twenty-five (25) named or opt-in Plaintiffs.

income at all). Thus, Plaintiffs' failure to pay taxes on any compensation they received from Late Night supports a finding that Plaintiffs were properly classified as independent contractors.

In sum, Plaintiffs were properly classified as independent contractors as a matter of law. Like the plaintiffs in *Browning* and *Velu*, if either party was to terminate the relationship, Plaintiffs "could essentially go out the next day with their [vehicles] and equipment and immediately work for another [food delivery] company." *Browning*, 885 F. Supp.2d at 610; *Velu*, 666 F. Supp.2d at 307.

**POINT II**

**THE COLLECTIVE ACTION SHOULD BE DECERTIFIED**

If the Court denies Defendants' summary judgment motion, then Defendants' motion to decertify the collective action should be granted.

Plaintiffs may proceed on a collective basis in an FLSA case only if they are similarly situated to those whom they seek to represent. 29 U.S.C. § 216(b). Following discovery, "courts must apply a more 'stringent standard' of proof in determining whether plaintiffs are similarly situated." *Eng-Hatcher v. Sprint Nextel Corp.*, 2009 WL 7311383, at *2 (S.D.N.Y. Nov. 13, 2009); *see also Myers v. Hertz Corp.*, 624 F.3d 537, 55 (2d Cir. 2010). "The burden is on the named plaintiff to prove that the other employees are similarly situated." *Zivali v AT&T Mobility, LLC*, 784 F. Supp.2d 456, 460 (S.D.N.Y. 2011).

"Because of the heavier burden of proof [at the second stage] for deciding whether the group is 'similarly situated,' courts have recognized that few actions will be certified at this stage." *Norris-Wilson v. Delta-T Group, Inc.*, 2010 WL 2196066, at *2 (S.D. Cal. June 1, 2010). In other words, Plaintiffs can no longer rely on unsubstantiated assertions of Defendants' alleged policy or practice to misclassify drivers. Rather, they must present substantial evidence of a

23

uniform, unlawful policy that permits these claims to be adjudicated in a collective action. Relevant factors include: (1) the disparate factual and employment settings of the opt-ins, (2) the various defenses available to Defendants that may be individual to each plaintiff, and, (3) fairness and procedural considerations. *Laroque v. Domino's Pizza*, LLC, 557 F. Supp.2d 346, 352 (E.D.N.Y. 2008). Courts regularly decertify FLSA cases where opt-ins make individualized allegations of non-compensated work. Decertification is likewise compelled here.

First, there are a number of dissimilarities between the Plaintiffs in this action. They allege that they worked a varying number of hours, whether it would be to start or complete their deliveries. Some Plaintiffs claimed they arrived at the facility at 3:00 p.m., while others testified that they did not arrive until midnight at the facility to begin deliveries. (*Stmt., ¶14*). Similarly, Plaintiffs finished their deliveries at different times, some finishing shortly after midnight, while others claim they would not finish until 7:00 a.m. the next morning. (*Stmt., ¶15*). Furthermore, Plaintiffs were paid a different rate depending on where they performed deliveries. For example, those who performed deliveries within Manhattan only received compensation based on the number of stops made, while those who performed deliveries outside of Manhattan received compensation based on the number of stops as well as miles driven. (*Stmt., ¶6*).

Second, if summary judgment is denied, Defendants still may be able to establish that some Plaintiffs were properly classified as independent contractors, demonstrating that there are defenses available particular to each plaintiff. Moreover, Defendants may be able to establish that some Plaintiffs were exempt under the motor carrier exemption since they performed inter-state deliveries in the Tri-State area and up and down the East Coast. Should Plaintiffs establish that they were misclassified and non-exempt, each still "must ultimately each prove that

[Defendants] had actual or constructive knowledge that they were working more than forty hours a week." *Tracy v NVR, Inc.*, 293 F.R.D. 395, 399 (W.D.N.Y. 2013).

Finally, fairness and procedural considerations support decertification of the collective action. As set forth in *Zivali*:

> The testimony of the plaintiffs is not representative and cannot fairly be extrapolated to the 4,100 individuals who have opted into this action. .... Bifurcation of the trial would not resolve the issue as there is no consistent evidence as to either liability or damages. .... Resolution of the many fact-specific issues in this case would essentially require 4,100 mini-trials in which each individual plaintiff could present evidence that he or she in fact failed to receive proper overtime compensation – evidence that would then be subject to cross-examination and similar challenge by the defendant. "Such a result is the antithesis of collective action treatment and would overwhelm the judicial system and eliminate any judicial efficiency that might be gained through a collective approach." ....

*Zivali*, 784 F. Supp.2d at 468-69 (citations omitted).

At bar, Plaintiffs have failed to produce any evidence warranting that the matter is proper to proceed as a collective action to trial.   This would entail a mini-trial of each Plaintiff concerning whether that Plaintiff worked overtime, for which he or she would be subject to cross-examination.   Additionally, given that Plaintiffs reside in different states and are claiming different relief based on the state in which they reside, there can be no uniform implementation of damages against Defendants if Plaintiffs were ultimately to succeed at trial.

Accordingly, the matter should be decertified if summary judgment is denied.

## CONCLUSION

Defendants respectfully request that the Court grant Defendants' motion for summary judgment, or, if the Court denies the motion for summary judgment, grant Defendants' motion for decertification of the collective action, together with an award to Defendants for attorneys' fees and costs and such other relief as the Court deems proper.

Dated:         Woodbury, New York
                   January 24, 2014

Respectfully submitted,

KAUFMAN DOLOWICH & VOLUCK, LLP

By: _____

Jeffery A. Meyer, Esq.
Yale Pollack, Esq.
*Attorneys for Defendants*
135 Crossways Park Drive, Suite 201
Woodbury, New York 11797
(516) 681-1100

4838-7386-1912, v. 1

26