1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  -------------------------------------x
   FERNANDO HERNANDEZ, KENNETH CHOW,
3  BRYANT WHITE, DAVID WILLIAMS,
   MARQUIS ACKLIN, CECILIA JACKSON,
4  TERESA JACKSON, MICHAEL LATTIMORE,
   and JUANY GUZMAN, each individually,
5  and on behalf of all other persons
   similarly situated,
6
                        Plaintiffs,     Case No.
7                                       12-CV-4339
       -against-                        (ALC)(JLC)
8
   THE FRESH DIET, INC., LATE NIGHT
9  EXPRESS COURIER SERVICES, INC. (FL),
   FRESH DIET EXPRESS CORP. (NY), THE
10 FRESH DIET - NY INC. (NY), FRESH
   DIET GRAB & CO, INC. (FL) a/k/a YS
11 CATERING HOLDINGS, INC. (FL) d/b/a
   YS CATERING INC. (FL), FRESH DIET
12 EXPRESS CORP. (FL), SYED HUSSAIN,
   individually, JUDAH SCHLOSS,
13 individually, and ZALMI DUCHMAN,
   individually,
14
                        Defendants.
15 -------------------------------------x

16        Deposition of SYED HUSSAIN, taken on behalf of

17 Plaintiffs, at THE HARMAN FIRM, 1776 Broadway, Suite

18 2030, New York, New York 10019, commencing at 10:16

19 a.m., Thursday, October 10, 2013, before Deborah

20 Huntsman, a Shorthand Reporter and Notary Public of

21 the State of New York.

22
   ATKINSON-BAKER, INC.
23 COURT REPORTERS
   (800) 288-3376
24 www.depo.com
   REPORTED BY:  DEBORAH HUNTSMAN
25 FILE NO.:  A70ACAE

1    A.  For Late Night, no.
2    Q.  Were you doing it for any other company?
3    A.  For Balance for Life, I think I was.  I am not
4  sure.
5    Q.  I don't want to talk about Balance for Life.
6  That was a long time ago.  Let's just stick with Late
7  Night.  Do you recall the circumstances under which
8  you acquired this responsibility for payment?
9    A.  No.
10   Q.  Did someone ask you to start doing this?
11   A.  I don't recall.
12   Q.  Did somebody explain to you how you were to do
13  this?
14   A.  Yes, I am sure.
15   Q.  But you don't recall who that person was?
16   A.  No.
17   Q.  But it is your recollection that the way you
18  were supposed to do this was to determine the stops
19  and miles of each driver?
20   A.  Correct.
21   Q.  You would determine this by reviewing
22  manifests?
23   A.  Yes.
24   Q.  Anything else that you would look at to make
25  this determination?

106

1    A.  It depends.  It would also depend on if the
2  manifest was incorrect as far as the stops and the
3  miles, and the drivers could correct it and let me
4  know.
5    Q.  So were there instances where the manifests
6  were incorrect?
7    A.  Yes.
8    Q.  In what ways would a manifest be incorrect?
9    A.  If there are two stops in one building in
10  Manhattan and the system would recognize it only as
11  one stop.
12   Q.  Any other ways in which a manifest might be
13  incorrect?
14   A.  If there is a roadblock and the driver detours,
15  the miles change.
16   Q.  Sometimes drivers would bring these errors to
17  your attention?
18   A.  Yes.
19   Q.  You would investigate what they told you about
20  the problems with the manifests?
21   A.  Yes.
22   Q.  If you determined that the manifests were,
23  indeed, incorrect with respect to either the number of
24  stops or the miles driven, you would make adjustments?
25   A.  Yes.

107

1    Q.  You would calculate their pay based on what you
2  determined to be their stops and their miles for that
3  week?
4    A.  Yes.
5    Q.  Were the drivers paid once a week?
6    A.  Yes.
7    Q.  Once you calculated the stops and miles that a
8  particular driver had made or had driven in a
9  particular week, what did you do with that
10  information?
11   A.  What do you mean?
12   Q.  Did you have to enter it into a computer?
13   A.  Yes.
14   Q.  Did Late Night use a payroll processing
15  company?
16   A.  Not that I am aware of.
17   Q.  So you would look at the number of stops and
18  the miles driven for each driver, and you would enter
19  this data into a computer.  Is it your testimony, on
20  the basis of that entry, that a check was generated
21  for the driver?
22   A.  That information would then be e-mailed.
23   Q.  To whom?
24   A.  It changed over time.
25   Q.  When you first had this responsibility, who

108

1  were you e-mailing?
2    A.  I think it was Camillo Tobon and Carlo Ritchie.
3  Then it changed to Sandy Ornelas.
4    Q.  Were these people all in Florida?
5    A.  No.
6    Q.  Was anybody in New York?
7    A.  No.
8    Q.  They were in different parts of the country?
9    A.  Yes.
10   Q.  The information that you had to e-mail to these
11  people were the number of stops and the number of
12  miles driven per driver?
13   A.  Yes.
14   Q.  Any other data that you would have to report?
15   A.  No.
16   Q.  Just the number of stops and the number of
17  miles driven?
18       MR. POLLACK:  Objection.
19   Q.  For payroll?
20   Q.  For payroll, yes.
21   A.  Yes.
22   Q.  Just limiting ourselves now to talking about
23  how payroll was done.  What would happen after that
24  point?
25   A.  I am sorry.  Let me correct that.  For payroll

109

**Page 110**

1 it was the stops they made, the miles they drove, and
2 bags that were delivered.
3    Q.   And the number of bags that were delivered?
4    A.   Yes.
5    Q.   You would e-mail that information to one of
6 several people?
7    A.   Correct.
8    Q.   Then what would happen after you would e-mail
9 that information to them?
10         MR. POLLACK:  Objection.
11    A.   I don't know.
12    Q.   Would checks be generated for the drivers?
13         MR. POLLACK:  Objection.
14    A.   I don't know the process.
15    Q.   Would checks eventually arrive at Siegel
16 Street?
17    A.   Yes.
18    Q.   Were you given the checks to distribute to the
19 drivers at Siegel Street?
20    A.   Yes.
21    Q.   Do you recall how you received those checks?
22    A.   No.
23    Q.   Did they come in the mail?
24    A.   FedEx.
25    Q.   Was the FedEx addressed to you?

**Page 111**

1    A.   I do not remember.
2    Q.   Would you open the FedEx box?
3    A.   Usually.
4    Q.   So you would open the FedEx package where the
5 checks were?
6    A.   Yes.
7    Q.   Did you review the checks before distributing
8 them to the drivers?
9    A.   No.
10    Q.   Were they sealed or in envelopes?
11    A.   Yes.
12    Q.   They had the driver's name on them?
13    A.   Yes.
14    Q.   On payday, how would you distribute the checks
15 to the drivers?
16    A.   I would just hand it to them.
17    Q.   You would see a driver and say, "I have your
18 check"?
19    A.   Yes.
20    Q.   But you didn't actually review the checks
21 yourself?
22    A.   No.
23    Q.   Did drivers ever come to you with questions
24 about their checks?
25    A.   Yes.

**Page 112**

1    Q.   This began at Siegel Street?
2    A.   Yes.
3    Q.   Do you recall what types of questions you
4 received from drivers?
5    A.   Discrepancy in pay, if the stops and miles
6 didn't add up.
7    Q.   If you got such an inquiry from a driver, what
8 would you do to respond to it?
9    A.   I would investigate it and see if it was
10 correct or not.  If their math was correct or if my
11 math was incorrect, whatever the case would be.
12    Q.   How would you do that?
13    A.   I would do that based upon the information on
14 the manifest and the information that I would input
15 into the computer.
16    Q.   So you would still have the manifest in your
17 possession at the time that the checks were
18 distributed for that week?
19    A.   Yes.
20    Q.   You wouldn't have thrown out any manifests
21 before checks were distributed for the week?
22    A.   I had digital files.
23    Q.   You had digital files?
24    A.   Yes.
25    Q.   When you say you had digital files, were the

**Page 113**

1 return manifests scanned?
2    A.   No.
3    Q.   So how was the information on the return
4 manifests maintained?
5    A.   In the report for the night.
6    Q.   In your report for the night to whom?
7    A.   For inventory purposes, for customer service
8 purposes, and we also used it for payroll.
9    Q.   So if you got an inquiry from a driver about
10 his or her paycheck, you might not have had each day's
11 manifest available to you at the time?
12    A.   Which manifest are we talking about?
13    Q.   The manifest for the week being covered by the
14 pay?
15    A.   I would have them in my computer.
16    Q.   Would you have the entire manifest for each day
17 reproduced or scanned on your computer?
18    A.   No.
19    Q.   How would you transfer the information from the
20 manifest onto your computer?
21    A.   In a report.
22    Q.   But my question is:  what information would you
23 take from the manifest and enter into your computer?
24    A.   The number of bags the driver delivered, the
25 miles they drove, the stops they did, and the number

**Page 114**

1  of bags they picked up.

2    Q.  So it was a tabulation of figures?

3    A.  Yes.

4    Q.  It wasn't the actual manifest itself that was

5  uploaded into your computer?

6    A.  No.

7    Q.  So if a driver came to you and said, "I don't

8  think my check is right," you would investigate by

9  looking at the information that you just described

10  that you had taken off of the manifest and entered

11  into your computer?

12    A.  In the beginning, yes.

13    Q.  And you would make a determination as to

14  whether there might be an error?

15    A.  Correct.

16    Q.  If there was, in fact, an error and the driver

17  had been undercompensated, what would you do?

18    A.  I would rectify it.

19    Q.  How would you rectify it?

20    A.  In the following week's payroll.  Adjust it.

21    Q.  You would do that by reporting the revised

22  figures by e-mail to other people?

23    A.  Correct.

24    Q.  The new checks would come in the following week

25  that had the adjusted amounts in them?

**Page 115**

1    A.  Yes.

2    Q.  Now, you said in the beginning before, what did

3  you mean by that?

4    A.  Eventually I started saving the physical

5  manifests.

6    Q.  For how long would you save them?

7    A.  Until the checks came and there were no

8  discrepancies.

9    Q.  Is there a reason why you started keeping the

10  physical manifests when you had not been doing so

11  before?

12    A.  I do not remember the reason.

13    Q.  Then after the paychecks were distributed, the

14  manifests would ultimately be discarded?

15    A.  Yes.

16    MR. ANDREWS:  I think this a good place to stop

17  for lunch.

18    (Whereupon, from 12:38 p.m. to 1:35 p.m. a

19  recess was taken.)

20    MR. POLLACK:  I want to clarify for the record

21  that Mr. Hussain is being produced individually and as

22  the corporate representative, 30B(6) witness, for Late

23  Night today, and I am going to request a copy of his

24  transcript for him to review and make changes to

25  pursuant to Rule 30B.

**Page 116**

1  BY MR. ANDREWS:

2    Q.  Mr. Hussain, we are back on the record after a

3  lunch break.  I hope you will be a little warmer this

4  afternoon than you were this morning.

5    Mr. Hussain, what do you do presently?

6    A.  Presently I am the director of logistics for

7  The Fresh Diet.

8    Q.  Director of logistics for The Fresh Diet?

9    A.  Yes.

10    Q.  When did you assume that position?

11    A.  September 1st.

12    Q.  Of this year, 2013?

13    A.  Yes.

14    Q.  Prior to September 1st, what were the position

15  that you held?

16    A.  I was the New York regional manager for Late

17  Night.

18    Q.  That was your title, New York regional manager?

19    A.  Yes.

20    Q.  Do you know why the change was made as of

21  September 1st?

22    A.  There was a promotion.

23    Q.  It was a promotion.  How are your duties now

24  different than they were prior to September 1st?

25    A.  I oversee the logistics of the entire North

**Page 117**

1  American distribution for Fresh Diet.

2    Q.  You are based in New York City now?

3    A.  Yes.

4    Q.  So you are no longer responsible just for the

5  New York tri-state area?

6    A.  No.

7    Q.  Do you still work out of the Baltic Street

8  facility?

9    A.  Yes.

10    Q.  Do you still assign deliveries to drivers?

11    A.  No.

12    Q.  So you are no long responsible for handing out

13  deliveries or routes to drivers?

14    A.  No.

15    Q.  Do you know who in the tri-state area is doing

16  that now?

17    A.  Yes.

18    Q.  Who is that?

19    A.  Owen Dacres.

20    Q.  Does Mr. Dacres report to you?

21    A.  Yes.

22    Q.  Does Late Night Express still exist as an

23  active company?

24    A.  I don't know.

25    Q.  Does Mr. Dacres work for Late Night Express or

**Page 118**

```
 1  for The Fresh Diet?
 2      A.  I don't know.
 3      Q.  As of September 1st, how are you compensated in
 4  your current position?
 5      A.  A salary.
 6      Q.  That is an annual salary?
 7      A.  Yes.
 8      Q.  Who do you report to today?
 9      A.  I report to Asif Syed.
10      Q.  Who is that?
11      A.  I would have to give you his information.  I
12  don't have it off the top of my head.
13      Q.  Is it someone who works for The Fresh Diet?
14      A.  Yes.
15      Q.  Do you know where he is located?
16      A.  Yes.
17      Q.  Is he located in Florida?
18      A.  Yes.
19      Q.  Do you report to anyone else other than Asif
20  Syed?
21      A.  Currently, no.
22      Q.  I would like to go back to the time before
23  September 1st, when you were New York regional
24  manager, was that New York regional manager for Late
25  Night Express?
```

**Page 120**

```
 1      A.  I don't know her exact title.
 2      Q.  Do you recall what she was responsible for?
 3      A.  No.
 4      Q.  Was she the human resources director?
 5          MR. POLLACK:  Objection.
 6      A.  If she was, not to my knowledge.
 7      Q.  Did she work for The Fresh Diet or for Late
 8  Night?
 9          MR. POLLACK:  Objection.
10      A.  I don't know.
11      Q.  Ms. Ornelas, she was in Florida at the time?
12      A.  No.
13      Q.  Where was she working at the time?
14      A.  In California.
15      Q.  She told you that Fresh Diet had decided that
16  you would become the New York regional manager for
17  Late Night?
18          MR. POLLACK:  Objection.
19      A.  No.
20      Q.  Do you recall what she told you?
21      A.  I don't recall the conversation.
22      Q.  But you do recall that she told you that you
23  would be becoming the New York regional manager?
24      A.  Yes.
25      Q.  When you became the New York regional manager,
```

**Page 119**

```
 1      A.  Yes.
 2      Q.  How long were you New York regional manager for
 3  Late Night Express?
 4      A.  I don't remember the amount of time.
 5      Q.  What was the position that you held with Late
 6  Night before becoming regional manager?
 7      A.  There was no position.
 8      Q.  There was no position before that?
 9      A.  No title.
10      Q.  Did you ever hold the title of delivery
11  manager?
12      A.  I don't recall.  I do know that it was New York
13  regional manager.
14      Q.  Do you recall when you became the New York
15  regional manager?
16      A.  Sometime in Siegel Street.
17      Q.  Do you recall who told you that you would
18  become the New York regional manager?
19      A.  Yes.
20      Q.  Who was that?
21      A.  Sandy Ornelas.
22      Q.  Who was Sandy Ornelas at the time that she told
23  you of that decision?
24          MR. POLLACK:  Objection.
25      Q.  If you know?
```

**Page 121**

```
 1  how were you compensated?
 2      A.  Salary.
 3      Q.  It was an annual salary?
 4      A.  Yes.
 5      Q.  It was a fixed annual salary?
 6      A.  Yes.
 7      Q.  Do you recall what your first salary was as
 8  regional manager for Late Night?
 9      A.  No.
10      Q.  Do you recall if it was over $60,000 a year?
11      A.  No.
12      Q.  Do you recall if was under $60,000 a year?
13      A.  Yes.
14      Q.  It was under $60,000.  Did your salary change
15  at any point as regional manager?
16      A.  Yes.
17      Q.  Did you get a raise?
18      A.  Yes.
19      Q.  Do you recall how much the raise was?
20      A.  No.
21      Q.  Was it more than $10,000?
22      A.  I am not sure.
23      Q.  Do you recall what your last salary was as
24  regional manager immediately prior to September 1st of
25  this year?
```

1    A.  Yes.

2    Q.  What was that salary?

3    A.  $52,000.

4    Q.  That is a higher figure than the salary you

5  started with when you became New York regional

6  manager?

7    A.  Yes.

8    Q.  When you first became New York regional

9  manager, and you testified that it was sometime at

10  Siegel Street, what were the responsibilities that you

11  had as New York regional manager?

12    A.  The same responsibilities as I stated before.

13  The manifest.

14    Q.  Preparation of the manifest?

15    A.  Yes.  Preparation of the manifests, the reports

16  to customer service, coordinating with customer

17  service, assisting in case there were any delivery

18  issues, and the pay for the drivers.

19    Q.  The payroll?

20    A.  Yes.

21    Q.  Calculating the payroll or entering the data?

22    A.  Entering the data.

23    Q.  Entering the data, responding to inquiries from

24  drivers about their paychecks?

25    A.  Yes.

1    Q.  And investigating complaints of missed

2  deliveries?

3    A.  Yes.

4    Q.  Now, as New York regional manager, it was also

5  your responsibility to ensure that the meals, in fact,

6  were delivered each night?

7    A.  Yes.

8    Q.  If meals were not being delivered to the

9  customers, that would be ultimately your

10  responsibility?

11    A.  Yes.

12    Q.  You would be accountable to The Fresh Diet

13  management if there were problems with meals not being

14  delivered?

15        MR. POLLACK:  Objection.

16    A.  I am not sure how that would work corporate

17  structure-wise.

18    Q.  I am not asking about the corporate structure.

19  I am asking about your responsibility.  Your

20  responsibility was to make sure that the meals got

21  delivered?

22    A.  Yes.

23    Q.  That was part of your job?

24    A.  Yes.

25    Q.  At the time you became New York regional

1  manager, did you know what the relationship was

2  between Late Night and Fresh Diet?

3    A.  No.

4    Q.  Do you know if Fresh Diet owns Late Night?

5    A.  No, I don't know.

6    Q.  Do you know if Zalmi Duchman owns Late Night?

7    A.  I don't know for sure.

8    Q.  You said you don't know for sure.  Do you think

9  Zalmi Duchman owns Late Night?

10        MR. POLLACK:  Objection.

11    A.  I would rather not speculate.

12    Q.  During the entire time that you have done work

13  for Late Night up until September 1st, did you ever

14  have to report to anyone at Late Night above you?

15    A.  Not to my knowledge.  I don't know who was at

16  Late Night above me, so I would not know how to answer

17  that question.

18    Q.  Do you know if there was anyone at Late Night

19  above you?

20    A.  I don't know.

21    Q.  Is it possible that there was no one at Late

22  Night above you?

23        MR. POLLACK:  Objection.

24    A.  I don't know and I don't want to speculate.

25    Q.  During the time that you were New York regional

1  manager and a salaried employee, did you have a

2  contract with Late Night?

3        MR. POLLACK:  Objection.

4    A.  No.

5    Q.  Did you have a contract with The Fresh Diet?

6    A.  No.

7    Q.  Were you an employee at will?

8        MR. POLLACK:  Objection.

9    A.  I don't understand the question.

10    Q.  If Late Night wanted to terminate your

11  employment, is it your understanding that they could?

12    A.  I don't know.

13    Q.  If you wanted to quit your job, could you have

14  quit?

15    A.  Yes.

16    Q.  Did there come a point in time during your time

17  at Late Night where you became responsible for

18  assigning specific routes to drivers?

19    A.  I don't understand what you mean by "specific

20  routes to drivers."

21    Q.  Well, you testified earlier that early in your

22  career with Late Night one of the things that you had

23  to do was receive e-mails of the different delivery

24  routes, print them out, and make them available to

25  drivers who were interested.  Do you recall that

**Page 126**

1  testimony?
2      A.  Yes.
3      Q.  You testified, I believe, that it was handled
4  on a first come, first serve basis?
5      A.  Yes.
6      Q.  You testified that you yourself were not
7  responsible for actually evaluating drivers'
8  performance?
9      A.  Yes.
10     Q.  At that time?
11     A.  Yes.
12     Q.  That all you did was print out the routes and
13  hand them to drivers?
14     A.  Yes.
15         MR. POLLACK:  Objection.
16     Q.  You recall that testimony?
17     A.  Yes.
18     Q.  Did there come a time when you became
19  responsible for ensuring that drivers were actually
20  completing their routes in the proper manner?
21         MR. POLLACK:  Objection.
22     A.  Like I said, drivers -- if the driver completed
23  their route and there were no complaints, that would
24  be it.  There would be no reason for me to get any
25  information or check up on them.

126

**Page 127**

1      Q.  I want to go back to what you said earlier
2  about how the routes were handed out or given to
3  drivers on a first come, first serve basis.  Did there
4  come a time when that system changed?
5      A.  It didn't change.  It became a system where
6  drivers were comfortable with the routes they were
7  driving, and so they were taking the same routes.
8      Q.  But did you have the discretion to alter those
9  routes, if you wanted to?
10         MR. POLLACK:  Objection.
11     A.  Alter?
12     Q.  Assign another driver to a route?
13         MR. POLLACK:  Objection.
14     A.  It would depend on the circumstances.
15     Q.  If a driver wasn't performing the route's
16  duties properly, could you assign another driver to
17  that route?
18         MR. POLLACK:  Objection.
19     A.  Yes.
20     Q.  Now, you said drivers became comfortable with
21  particular routes?
22     A.  Correct.
23     Q.  When you began preparing the manifests, did you
24  determine which driver should be given which manifest?
25         MR. POLLACK:  Objection.

127

**Page 128**

1      A.  No.
2      Q.  How was it determined which driver would
3  receive which manifest?
4      A.  Based on the driver's preference.
5      Q.  What would happen if two drivers wanted the
6  same route?
7      A.  The driver that was there first would have the
8  route.
9      Q.  But if you felt that the driver was not
10  performing adequately, you could change the
11  assignment?
12         MR. POLLACK:  Objection.
13     A.  Then the driver would no longer be driving for
14  Late Night.
15     Q.  So you could terminate a driver's assignment?
16         MR. POLLACK:  Objection.
17     A.  I could cancel their contract.
18     Q.  Have you ever done that to a driver?
19     A.  Yes.
20     Q.  How would you go about doing that?
21     A.  I would tell them that their services were
22  inadequate, and we would no longer have them under
23  contract.
24     Q.  Would this be verbally or in writing?
25     A.  Verbally.

128

**Page 129**

1      Q.  When you first began preparing the manifests,
2  did you hand them out to the specific drivers?
3         MR. POLLACK:  Objection.
4      A.  Yes.
5      Q.  So you knew which driver to hand which manifest
6  to?
7         MR. POLLACK:  Objection.
8      A.  Yes.
9      Q.  How did you know which driver to hand which
10  manifest to?
11     A.  Because the drivers were comfortable with doing
12  those routes.
13     Q.  But you also had to be comfortable with their
14  performance on those routes; isn't that correct?
15         MR. POLLACK:  Objection.
16     A.  It is not about my comfort.  I don't understand
17  the question.
18     Q.  If you were not satisfied that they were
19  performing their routes properly, you would make a
20  change?
21         MR. POLLACK:  Objection.
22     A.  If they weren't delivering the bags per the
23  contract, then they would no longer be under contract
24  to work for Late Night.
25     Q.  Did you ever change drivers' routes?

129

1      MR. POLLACK:  Objection.
2      A.  Yes.
3      Q.  What would be the circumstances under which you
4  would change a driver's route?
5      A.  If they requested it.
6      Q.  Would there be circumstances where you would
7  change a driver's route where they had not requested a
8  change?
9      A.  Yes.
10     Q.  Under what circumstances would you change a
11 driver's route where the driver himself or herself had
12 not requested a change?
13     A.  If their performance of the route was
14 inadequate.
15     Q.  When you say "inadequate," what types of issues
16 would constitute inadequate performance?
17     A.  Missed deliveries.
18     Q.  Anything else?
19     A.  Late deliveries.
20     Q.  Anything else?
21     A.  Not that I am aware of right now.
22     Q.  What about poor attendance?
23         MR. POLLACK:  Objection.
24     A.  No.
25     Q.  Lateness?

130

---

1  with you, wouldn't you?
2      MR. POLLACK:  Objection.
3      A.  I would look for drivers that would do the job
4  that they were contracted to do.
5      Q.  You were responsible for making sure that they
6  were, in fact, doing the job that they were contracted
7  to do?
8         MR. POLLACK:  Objection.
9      A.  I don't understand the question.
10     Q.  I mean, you were in charge in making sure that
11 meals got delivered?
12     A.  Yes.
13     Q.  Your concern as far as the drivers go was that
14 they were, in fact, delivering the meals?
15     A.  Yes.
16     Q.  Therefore, you had to make sure that drivers
17 were doing what they needed to be doing to deliver the
18 meals on time?
19         MR. POLLACK:  Objection.
20     A.  That would be evident the next day, if there
21 were no complaints.
22     Q.  If a driver who was scheduled to make
23 deliveries on a particular route sent you a text or an
24 e-mail saying that he was going to be three hours
25 late, would that concern you that evening?

132

---

1      MR. POLLACK:  Objection.
2      A.  Late deliveries.
3      Q.  Would it be fair to say that as the New York
4  regional manager for Late Night you were looking for
5  drivers you considered to be reliable?
6      A.  Yes.
7      Q.  You wouldn't want to work with drivers who were
8  unreliable?
9         MR. POLLACK:  Objection.
10     A.  Yes.
11     Q.  You preferred drivers who were responsive to
12 you?
13         MR. POLLACK:  Objection.
14     A.  What do you mean by "responsive"?
15     Q.  That they would listen to what you asked them
16 to do?
17         MR. POLLACK:  Objection.
18     A.  No.
19     Q.  No?
20     A.  No.
21     Q.  You weren't looking for drivers that would
22 listen to what you asked them to do?
23     A.  No.  I would be looking for drivers that would
24 be delivering the bags with no issues.
25     Q.  You would look for drivers who were cooperative

131

---

1      MR. POLLACK:  Objection.
2      A.  No.
3      Q.  You would let them still come in and make their
4  scheduled route?
5      A.  As long as the food was delivered by the
6  contracted time, yes.
7      Q.  So if you had a driver who you had expected to
8  deliver meals on a particular route and he had a
9  certain number of meals that he needed to deliver, and
10 he texted and said, "I am going to be three hours late
11 tonight," would you have attempted to get somebody
12 else to deliver the meals that night for that route?
13         MR. POLLACK:  Objection.
14     A.  That would depend on the circumstances.
15     Q.  What factors would you take into account in
16 determining whether to give someone else that
17 responsibility for that night?
18         MR. POLLACK:  Objection.
19     A.  If a driver takes five hours to deliver 30
20 bags, and they are telling me that they are going to
21 be late and we deemed that they wouldn't be able to
22 finish it in time, then I would have to find a driver
23 to take some of those bags.  So the driver would still
24 come in late, but we would adjust the route to make
25 sure that the bags were delivered by the time that

133

1 they were supposed to be.
2    Q.  How would you make a determination as to
3 whether or not the driver would be able to complete
4 the deliveries in time?
5    A.  Based on my conversation with that driver.
6    Q.  Is it fair to say that over your experience you
7 have acquired some sense of how long it would take a
8 certain number of deliveries to be made on particular
9 routes?
10    A.  In certain areas, yes.
11    Q.  So would it be fair to say that in certain
12 circumstances for certain routes, if a driver
13 contacted you and told you that he was going to be
14 several hours late, you would know that there would be
15 at least a risk that the meals would not be delivered
16 on time?
17       MR. POLLACK:  Objection.
18    A.  Depending on the route, yes.
19    Q.  This was based on your own experience as
20 somebody working at Late Night?
21    A.  This was based on my experience working with
22 the routes and assessing drivers how long it takes
23 them to deliver.
24    Q.  If a driver was going to be late on a
25 particular night, was he expected to contact you?

134

1       MR. POLLACK:  Objection.
2    A.  Was he expected to contact me?
3    Q.  Yes.
4    A.  I am not sure I understand the question.
5    Q.  Well, if a driver was assigned to a particular
6 route on a particular evening, and you had an idea of
7 how long it typically took the driver to complete that
8 route, and you had gotten to know the driver over
9 time, and the driver was going to be several hours
10 late on one particular evening, is that the type of
11 information you would expected him to let you know
12 about earlier in the day?
13       MR. POLLACK:  Objection.
14    A.  Not really.  It is not something that they are
15 required to do.  It is just a professional courtesy.
16    Q.  If someone showed up three hours late and they
17 had not let you know that they were showing up three
18 hours late and they had a large route to complete,
19 would that have concerned you?
20       MR. POLLACK:  Objection.
21    A.  Yes.  Depending on the time and depending on
22 the size of the route.
23    Q.  Depending on the size of the route and
24 depending on the time, it could concern you?
25    A.  Yes.

135

1    Q.  Depending on the route and depending on the
2 time, you would have preferred to have known that the
3 person was going to be coming in very late?
4       MR. POLLACK:  Objection.
5    A.  Like I said, it is a professional courtesy.
6    Q.  But if drivers are late and can't complete
7 their routes in time, it is also your problem; isn't
8 it?
9       MR. POLLACK:  Objection.
10    A.  If the complaints come in from customers, then
11 it is a problem.
12    Q.  For you?
13       MR. POLLACK:  Objection.
14    A.  For the company.
15    Q.  And for you?
16       MR. POLLACK:  Objection.
17    A.  I would be accountable for it, yes.
18    Q.  That is what I mean.  It would fall within your
19 area of accountability?
20    A.  Yes.
21    Q.  Because you were responsible for ensuring that
22 the meals got delivered on time?
23       MR. POLLACK:  Objection.  Asked and answered.
24    A.  I was responsible for trying to make sure all
25 the meals got delivered on time.

136

1    Q.  As New York regional delivery manager, did you
2 hold meetings with drivers at Baltic Street?
3    A.  Yes.
4    Q.  How often would you hold meetings with drivers?
5    A.  I don't remember how often.
6    Q.  Were they group meetings?
7    A.  Yes.
8    Q.  What types of things were discussed at these
9 meetings?
10    A.  Changes in routes, seasonal delivery.  The
11 deliveries are seasonal.  They drop in the summer and
12 they drop again at Christmas.  They go up in the new
13 year.  So just to give drivers a heads up that there
14 was more work available or less work available.
15    Q.  Now you said you were accountable for trying to
16 get the meals delivered on time?
17    A.  Yes.
18    Q.  Would it be fair to say that in order to meet
19 that objective, you wanted to know which drivers were
20 available to make deliveries on a particular evening?
21       MR. POLLACK:  Objection.
22    A.  Yes.  I would like to know if all the routes
23 would be covered.
24    Q.  If there were an issue with absenteeism or
25 lateness, you would have to make adjustments to make

137

**Page 138**

```
 1   sure the routes were covered; is that correct?
 2        MR. POLLACK:  Objection.
 3     A.  That would depend on the driver.
 4     Q.  But you would be responsible for finding other
 5   drivers or assigning other drivers if a driver
 6   couldn't make all his deliveries on a particular
 7   night?
 8        MR. POLLACK:  Objection.
 9     A.  Yes.
10     Q.  Is that something you, in fact, had to do from
11   time to time?
12     A.  Yes.
13     Q.  As New York regional manager, do you recall
14   texting drivers during the day, asking them about
15   their availability for the evening?
16     A.  I am sure sometimes I did.
17     Q.  Do you recall drivers texting you about their
18   availability for the evening?
19     A.  Yes.
20     Q.  Were drivers expected to tell you of their
21   availability for the evening by text?
22     A.  Again, like I said, it is a professional
23   courtesy.  If somebody is contracted to do a job, it
24   is just a courtesy that they let you know if they
25   can't come in.
```

**Page 139**

```
 1     Q.  Now, if you were trying to contact someone
 2   during the day to assess his availability for that
 3   evening and they were not responding to your texts,
 4   could you make changes based on that lack of response?
 5        MR. POLLACK:  Objection.
 6     A.  It would depend at what time.
 7     Q.  If it got to be fairly late in the afternoon
 8   and you had not heard from a particular driver, would
 9   there be circumstances under which you would make
10   changes in the assignments?
11        MR. POLLACK:  Objection.
12     A.  It would have to be fairly late at night.
13     Q.  Did you ever reprimand a driver for not
14   communicating his availability to you?
15     A.  I wouldn't use the word "reprimand."
16     Q.  Did you ever speak to a driver about his
17   failure to communicate his lack of availability to
18   you?
19     A.  Yes.
20     Q.  Under what circumstances would you speak to a
21   driver regarding his lack or failure to communicate
22   his lack of availability to you?
23     A.  If they failed to communicate their
24   availability.
25     Q.  If they failed to communicate --
```

**Page 140**

```
 1     A.  I am sorry.  Their lack of availability.
 2     Q.  If they failed to communicate their lack of
 3   availability, and then they show up to work the next
 4   day, would you speak to them about that?
 5     A.  Yes.
 6     Q.  Do you recall what you would tell them?
 7     A.  I don't recall what I would tell them.
 8     Q.  Would you tell them that you would have wanted
 9   them to have been communicative?
10        MR. POLLACK:  Objection.
11     A.  Yes.
12     Q.  Is it fair to say you would be disappointed if
13   a driver didn't show up to make his deliveries?
14        MR. POLLACK:  Objection.
15     A.  No.
16     Q.  You wouldn't be disappointed if a driver didn't
17   show up?
18        MR. POLLACK:  Objection.
19     A.  No.
20     Q.  But it would be your responsibility to arrange
21   for his route to be covered, if he did not show up?
22        MR. POLLACK:  Objection.
23     A.  If he didn't have his route covered, and I
24   hadn't heard from the driver and a certain amount of
25   time had passed, then I would have to find coverage
```

**Page 141**

```
 1   for that route.
 2     Q.  As the New York regional manager, you could
 3   take stops away from drivers if you felt that they
 4   were unlikely to make all of their stops; is that
 5   correct?
 6        MR. POLLACK:  Objection.
 7     A.  If there were problems on the routes.  If they
 8   weren't delivering on time, then I could make the
 9   route smaller.
10     Q.  Do you recall ever doing so?
11     A.  No.
12     Q.  Could you ask drivers to make additional stops
13   besides those on their regularly scheduled routes?
14     A.  Yes.
15     Q.  So if a driver did not come in and his or her
16   stops needed to be covered, you could ask other
17   drivers to make those stops?
18     A.  Yes.
19     Q.  You could adjust drivers' routes based on their
20   past performance?
21        MR. POLLACK:  Objection.
22     A.  Yes.
23     Q.  Would it be fair to say, if someone had proven
24   to be a very reliable driver, you would be inclined to
25   ask them to make more stops?
```

1     MR. POLLACK:  Objection.
2    A.  No.
3    Q.  Was good performance something that was taken
4 into account by you in determining whether a driver
5 should keep his route?
6     MR. POLLACK:  Objection.
7    A.  When you say "keep his route," what do you
8 mean?
9    Q.  You said that you sometimes would reduce the
10 number of stops, if a driver had experienced
11 difficulty in making these stops?
12    A.  Yes.
13    Q.  If a driver in contrast proved to be a very
14 reliable driver and was, in your opinion, capable of
15 making lots of stops, you had the ability to ask them
16 to make additional stops; is that correct?
17    A.  Yes.
18    Q.  If a driver proved to be unreliable, you could
19 give them less work?
20     MR. POLLACK:  Objection.
21    A.  Are you asking me if a driver is unreliable,
22 would I not ask them to take additional stops?
23    Q.  No.  I asked if a driver had proven to be
24 unreliable and had missed lots of deliveries, you
25 could reduce the number of their stops?

142

1     MR. POLLACK:  Objection.
2    A.  Yes.
3    Q.  And you could in certain instances just stop
4 using them altogether?
5    A.  Yes.
6    Q.  You would do that by terminating their
7 contract?
8     MR. POLLACK:  Objection.
9    A.  Yes.
10    Q.  Now, you testified that at some point you
11 assumed responsibility for preparing or helping to
12 prepare the payroll?
13    A.  Yes.
14    Q.  That is correct?
15    A.  Yes.
16    Q.  The way you did that was by taking information
17 off of manifests and entering them into a computer?
18     MR. POLLACK:  Objection.
19    A.  Yes.
20    Q.  The information that you entered was the number
21 of stops and miles driven?
22     MR. POLLACK:  Objection.
23    A.  Correct.
24    Q.  Was there any other information that you would
25 enter for payroll purposes?

143

1     MR. POLLACK:  Objection.
2    A.  The number of bags delivered.
3    Q.  Any other information that you would enter?
4    A.  For payroll purposes?
5    Q.  Yes.
6    A.  No.
7    Q.  Were the hours the drivers actually worked
8 entered for payroll purposes?
9     MR. POLLACK:  Objection.
10    A.  Not by me.
11    Q.  Do you know if they were entered by anyone
12 else?
13    A.  Not to my knowledge.
14    Q.  Were the drivers' hours of work tracked in any
15 way?
16     MR. POLLACK:  Objection.
17    A.  Not to my knowledge.
18    Q.  Do you know of any way that you could
19 reconstruct the number of hours actually worked by
20 drivers?
21     MR. POLLACK:  Objection.
22    A.  Are you talking about the drivers at Siegel
23 Street?
24    Q.  Let's stick with Siegel Street.  I am sorry.
25 The current location is Baltic Street?

144

1    A.  Yes.
2    Q.  Let stick with Baltic Street.
3    A.  Okay.
4    Q.  If a driver who had worked with you or for you
5 at Baltic Street asked you to reconstruct the number
6 of hours he had worked at a particular time, is there
7 any way you could do that?
8     MR. POLLACK:  Objection.
9    A.  It wouldn't be accurate.
10    Q.  Why wouldn't it be accurate?
11    A.  Because they don't have a schedule.  They are
12 not clocking in and out.
13    Q.  So there would be no records that would enable
14 you to reconstruct the time?
15    A.  Like I said, not accurately.
16    Q.  Now, in general at Baltic Street, by what time
17 of day were the meals supposed to have been delivered
18 to all customers?
19    A.  By 5:00 a.m.
20    Q.  If meals were being delivered after 5:00 a.m.,
21 these would be considered late deliveries, wouldn't
22 they?
23    A.  Yes.
24    Q.  Do you recall customers ever complaining about
25 late deliveries?

145

1  A.  Yes.

2  Q.  Now, I am talking about late deliveries, not

3  missed deliveries?

4  A.  Yes.

5  Q.  So sometimes customers would call in and

6  complain that their meal did not get to their home

7  until 7:00 a.m.?

8     MR. POLLACK:  Objection.

9  A.  Yes.

10  Q.  If such a complaint was made, it was your

11  responsibility to investigate that complaint?

12  A.  Yes.

13  Q.  And to find out what had happened as to why the

14  meal had not been delivered by 5:00 a.m.?

15     MR. POLLACK:  Objection.

16  A.  Yes.

17  Q.  You were accountable for trying to make sure

18  that all meals were delivered by 5:00 a.m.?

19     MR. POLLACK:  Objection.

20  A.  Yes.

21  Q.  Do you ever recall warning drivers who were not

22  delivering their meals on time?

23     MR. POLLACK:  Objection.

24  Q.  That was poorly phrased.  Do you recall ever

25  warning drivers who had failed to deliver meals by

146

---

1     MR. POLLACK:  Objection.

2  A.  Yes.

3  Q.  Would that be a factor that you would take into

4  account in deciding whether the driver should even

5  continue to work with Late Night Express?

6     MR. POLLACK:  Objection.

7  A.  Yes.

8  Q.  Did you ever ask a driver to stop working as a

9  driver because that driver was not able to deliver his

10  meal by 5:00 a.m.?

11  A.  Yes.

12  Q.  How many times did that happen?

13  Q.  How many times?

14  Q.  Did you have to ask a driver to stop working

15  with Late Night --

16  A.  To terminate their contract?

17  Q.  That is correct.

18  A.  I don't know how many times.

19  Q.  It did happen, however?

20  A.  Yes.

21  Q.  It did happen because they were not able to

22  complete their deliveries by 5:00 a.m.?

23     MR. POLLACK:  Objection.

24  A.  That probably might have been one of the

25  circumstances.  I do not remember.

148

---

1  5:00 a.m.?

2     MR. POLLACK:  Objection.

3  A.  I recall talking to drivers about delivering

4  after 5:00 a.m.

5  Q.  What would happen if a driver was delivering

6  meals after 5:00 a.m.?

7  A.  That would depend on if we had a complaint from

8  the client or not.

9  Q.  If you had a complaint from a customer, what

10  would happen if it was determined that a driver had,

11  in fact, delivered a meal after 5:00 a.m.?

12  A.  Then it would depend if they actually got the

13  meals or they didn't.

14  Q.  If they got the meals, but they were delivered

15  after 5:00 a.m., how would you deal with that

16  situation?

17  A.  Then I would let the driver know that the

18  customer complained, and under contract they are

19  supposed to deliver by 5:00 a.m.

20  Q.  Would the drivers be penalized financially?

21  A.  No.

22  Q.  If a driver had difficulty consistently

23  completing his deliveries by 5:00 a.m., would that be

24  a factor that you might take into account in deciding

25  to change the driver's route?

147

---

1  Q.  Now, I want to go back to the driver meetings

2  that you held.  Where did these meetings take place?

3  A.  Where?

4  Q.  Yes.

5  A.  In the facility.

6  Q.  Was there a room at Baltic Street that you

7  would use for the driver meetings?

8  A.  Sometimes.  Sometimes out in the packing area.

9  It depends.

10  Q.  Now, Mr. Hussain, do you have an understanding

11  of what the lawsuit you are being deposed in today is

12  about?

13  A.  No.

14  Q.  Do you know what claims have been made in this

15  lawsuit?

16  A.  No.

17  Q.  Do you have any understanding that this lawsuit

18  is one in which certain former drivers are seeking

19  monetary relief?

20  A.  Yes.

21  Q.  How do you know that?

22  A.  By the papers that were served.

23  Q.  Do you recall being served with papers?

24  A.  Yes.

25  Q.  Do you recall when that happened?

149

```
 1   A.  No.
 2   Q.  Can you describe what happened the day you were
 3 served with the papers?
 4   A.  I wasn't physically there.  Someone else
 5 accepted the papers on my behalf.
 6   Q.  When you got to work after that, did someone
 7 bring those papers to your attention?
 8   A.  I think so, yes.
 9   Q.  Do you recall who that was?
10   A.  No.
11   Q.  Did they tell you what had been served?
12   A.  No.
13   Q.  Did they show you what had been served?
14   A.  I think so.  I don't know if somebody was
15 actually served on my behalf in the office or if it
16 came to me in the mail.  So I am not sure how I got
17 the paper, but I did get them.
18   Q.  Did you read them when you got them?
19   A.  I tried to read what I could and tried to
20 understand what I could.
21   Q.  Did you acquire an understanding based on
22 reading the papers as to what the lawsuit was about?
23   A.  Not really.
24   Q.  Did you have any reason to believe that this
25 lawsuit was going to be filed before you were served
```

150

```
 1 with papers?
 2      MR. POLLACK:  Objection.
 3   A.  I don't understand the question.
 4   Q.  Had anyone told you that some of the drivers
 5 were thinking about filing a lawsuit against Late
 6 Night?
 7   A.  Yes.
 8   Q.  When did you first hear that?
 9   A.  I don't know the exact date or time.
10   Q.  What did you first hear?
11   A.  I heard that drivers were trying to recruit
12 other drivers to join them in a lawsuit.
13   Q.  Do you recall who told you that?
14   A.  Yes.
15   Q.  Who told you that?
16   A.  I would rather not say.
17   Q.  I understand you would rather not say, but I
18 have to ask the question anyway.  If you refuse to
19 answer, it will be up to the court to determine
20 whether you should answer the question.
21   A.  I would rather wait until the court determines
22 that, because whoever told me that, told me in
23 confidence.
24   Q.  So someone told you?
25   A.  Yes.
```

151

```
 1   Q.  Was that person a driver?
 2   A.  Yes.
 3   Q.  Obviously, if you are not going to tell me,
 4 there is nothing I can do about that today.
 5   A.  I am sorry.
 6   Q.  Was this person a driver?
 7      MR. POLLACK:  Objection.
 8   Q.  Do you recall the conversation?
 9   A.  Not the specifics, but I recall the
10 conversation, yes.
11   Q.  So this driver came to you and told you that he
12 had heard something about a possible lawsuit?
13   A.  Yes.
14   Q.  And what do you recall him telling you?
15   A.  She did not want to be involved, and she did
16 not want to be pressured into it.  And she felt like
17 she was being pressured.
18   Q.  Did she tell you what type of lawsuit people
19 were considering filing?
20   A.  No.
21   Q.  Did she tell you that it was a lawsuit against
22 Late Night?
23   A.  Against the company, yes.
24   Q.  Did she tell you that she was being asked to
25
```

152

```
 1 join the lawsuit?
 2   A.  Yes.
 3   Q.  She told you that she didn't want to be a part
 4 of it; is that correct?  Is that your testimony?
 5      MR. POLLACK:  Objection.
 6   A.  She didn't use the word "asked."  So she wasn't
 7 being asked, according to her.
 8   Q.  Correct me, if I am mistaken.  You testified
 9 that she felt she was being pressured to participate
10 in a lawsuit?
11   A.  Yes.  She wasn't being asked.  She was being
12 pressured.
13   Q.  Did she explain how she was being pressured to
14 participate in a lawsuit?
15   A.  She just said that they were approaching her
16 multiple times.
17   Q.  When she said "they," did she identify who they
18 were?
19   A.  Yes.
20   Q.  Who were those individuals?
21   A.  Fernando Hernandez.
22   Q.  Anybody else?
23   A.  That was the only name she gave me.
24   Q.  Did you report this conversation to anyone?
25   A.  Not to my knowledge.  I don't recall reporting
```

153

1    it to anyone.
2        Q.   Did you tell anyone at Fresh Diet about this
3    conversation?
4        A.   Not that I recall.
5        Q.   What did you tell her when she told you this
6    information?
7        A.   He told her that I would talk to him about not
8    harassing her.
9        Q.   You told this lady that you would speak to
10   Fernando about not harassing her?
11       A.   Yes.
12       Q.   Did you do that?
13       A.   Yes.
14       Q.   Do you recall doing that?
15       A.   Yes.
16       Q.   What do you recall about that conversation?
17       A.   I recall talking to him and telling him to stop
18   bothering the drivers about the lawsuit.  I don't
19   recall the specific words I used.
20       Q.   Did you tell him that he shouldn't talk to
21   other drivers about a possible lawsuit?
22       A.   I told him that he shouldn't be harassing
23   drivers if they didn't want to be involved.  Something
24   to that effect.
25       Q.   Do you recall what Mr. Hernandez told you at

                                                         154

1    that time?
2        A.   No.  He probably just feigned ignorance.  It
3    was kind of a "I don't know what you are talking
4    about," response, I think.
5        Q.   Is that the only conversation you had with
6    Mr. Hernandez about the lawsuit?
7        A.   As far as I remember, yes.
8        Q.   Besides Mr. Hernandez, was there anyone else
9    that this person indicated was talking about a
10   lawsuit?
11       A.   Not that I remember.
12       Q.   When you said "they," it was just
13   Mr. Hernandez?
14       A.   Yes.
15       Q.   Who was Mr. Hernandez?
16            MR. POLLACK:  Objection.
17       A.   He was a delivery driver.
18       Q.   At the time that this lady approached you with
19   this information, what was your relationship with
20   Mr. Hernandez like?
21       A.   There was no relationship.  I don't understand
22   the question.
23       Q.   Well, he worked as a driver?
24            MR. POLLACK:  Objection.
25       A.   Yes.

                                                         155

1        Q.   And you knew he worked as a driver?
2        A.   Yes.
3        Q.   Did the two of you get along?
4        A.   Yes.
5        Q.   Had you had any problems with his performance
6    up until that time?
7            MR. POLLACK:  Objection.
8        A.   He had some questionable issues.
9        Q.   What types of issues did he have?
10       A.   Are you looking for a specific?
11       Q.   I will ask a different question.  Was he making
12   his deliveries in a timely manner?
13            MR. POLLACK:  Objection.
14       A.   Sometimes.
15       Q.   Did he have a problem with missed deliveries?
16            MR. POLLACK:  Objection.
17       A.   Sometimes.
18       Q.   Did he have a problem with late deliveries?
19            MR. POLLACK:  Objection.
20       A.   Sometimes.
21       Q.   Had you ever imposed a financial penalty on him
22   for late or missed deliveries?
23       A.   If there was a missed delivery, I don't recall,
24   but I might have.
25       Q.   But you don't recall specifically either way?

                                                         156

1        A.   No.
2        Q.   Was Mr. Hernandez one of your better drivers?
3            MR. POLLACK:  Objection.
4        A.   Can you rephrase the question.  I don't know
5    how to answer that.
6        Q.   It was your responsibility to try to make sure
7    meals were being delivered on time and by 5:00 a.m.,
8    and everyone that needed to get a meal got his meal?
9        A.   Yes.
10       Q.   In attempting to meet that responsibility, you
11   had to determine how drivers were performing?
12            MR. POLLACK:  Objection.
13       Q.   Is that correct?
14       A.   Yes.
15       Q.   Assessing drivers' performance was part of your
16   job, as far as determining whether they were
17   delivering the meals?
18            MR. POLLACK:  Objection.  It is not a question.
19       A.   It is not assessing driver performance.  It
20   would be if we received complaints from their routes.
21       Q.   It would be assessing whether or not meals were
22   being delivered on time properly and by 5:00 a.m.?
23            MR. POLLACK:  Objection.
24       A.   Yes.
25       Q.   My question is:  was Mr. Hernandez someone who

                                                         157

1  appeared to be having difficulty meeting those
2  objectives?
3          MR. POLLACK:  Objection.
4      A.  He had difficulties just like every other
5  driver at certain times.  So it wasn't anything
6  extraordinary for him.
7      Q.  So you didn't think he had extraordinary
8  problems meeting the delivery expectations?
9      A.  Not usually, no.
10     Q.  You weren't planning to terminate
11  Mr. Hernandez's contract, were you?
12         MR. POLLACK:  Objection.
13     A.  No.
14     Q.  Were you surprised when this lady told you this
15  information?
16         MR. POLLACK:  Objection.
17     A.  Yes.
18     Q.  Prior to this discussion with this woman, did
19  you have any other reason to believe that anyone was
20  considering filing a lawsuit against Late Night or
21  Fresh Diet?
22     A.  No.
23     Q.  This lady explained to you what Mr. Hernandez
24  was going to be seeking in the lawsuit?
25         MR. POLLACK:  Objection.

158

1  this discussion with Mr. Hernandez and the time the
2  lawsuit actually came in?
3          MR. POLLACK:  Objection.
4      A.  I can't be specific with the time.
5      Q.  Was it a month?
6      A.  Maybe more.
7      Q.  Maybe more.  Do you recall ultimately receiving
8  a lawsuit?
9          MR. POLLACK:  Objection.
10     A.  I am sorry?
11     Q.  You recall ultimately receiving papers in
12  connection with a lawsuit?
13         MR. POLLACK:  Objection.
14     A.  Yes.
15     Q.  Do you recall seeing the names of the
16  Plaintiffs in the lawsuit on the papers you received?
17     A.  Yes.
18     Q.  Do you recall whose names they were?
19     A.  No.
20     Q.  Do you recall the names of anyone who was on
21  the lawsuit?
22     A.  Fernando, Kenneth Chow, Teresa Jackson, Bryant
23  White.  That is all I remember.
24     Q.  Do you remember Juany Guzman's name being on
25  the lawsuit?

160

1      A.  No.
2      Q.  Did you hear any other reference to a possible
3  lawsuit prior to the time the company was served?
4          MR. POLLACK:  Objection.
5      A.  Not that I recall, no.
6      Q.  Do you recall speaking with any other driver
7  besides Mr. Hernandez and this lady about this issue
8  prior to the time the company was served?
9          MR. POLLACK:  Objection.
10     A.  Not that I recall.
11     Q.  Do you recall asking any other drivers whether
12  they had been asked to participate in a lawsuit?
13     A.  Not that I recall.
14     Q.  Did you discourage any drivers to not
15  participate in a lawsuit against the company?
16     A.  If I had known about it, I would not discourage
17  anybody.
18     Q.  Well, you did know about it, isn't that
19  correct?
20     A.  I didn't know about it.  It was a rumor.  It
21  wasn't substantial.  It was hearsay more or less.
22     Q.  You knew of the woman's complaint to you?
23         MR. POLLACK:  Objection.
24     A.  Yes.
25     Q.  How much time passed between the time you had

159

1      A.  Now I do.
2      Q.  Once you saw this paper or these papers, how
3  did you respond?
4          MR. POLLACK:  Objection.
5      A.  I don't understand the question.
6      Q.  What did you do after you received the lawsuit?
7      A.  Nothing, to my knowledge.  To my recollection,
8  nothing.
9      Q.  Did you contact anyone at The Fresh Diet?
10         MR. POLLACK:  Objection.
11     A.  Yes.
12     Q.  Who did you contact?
13     A.  Judah Schloss.
14     Q.  Do you recall telling him that you had received
15  the lawsuit?
16     A.  Yes.
17     Q.  Do you recall what he told you?
18     A.  No.
19     Q.  Did he tell you that the company would be
20  handling the lawsuit?
21         MR. POLLACK:  Objection.
22     A.  I do not remember what he told me.
23     Q.  Did you believe at the time that you had any
24  responsibility to respond to the lawsuit?
25         MR. POLLACK:  Objection.

161

**Page 162**

1    A.  I don't understand the question.

2    Q.  Did you see that you yourself were named

3  individually in the lawsuit?

4    A.  Yes.

5    Q.  Did you understand that you were named as a

6  defendant in the lawsuit?

7    A.  Yes.

8    Q.  Did you do anything in response to seeing your

9  name listed as a defendant in the lawsuit?

10       MR. POLLACK:  Objection.

11   A.  Yes.  I spoke to Judah.

12   Q.  What did you ask or what did you tell Judah?

13   A.  I do not remember the conversation we had.

14   Q.  Did Judah tell you that the company would be

15  defending the lawsuit?

16       MR. POLLACK:  Objection.

17   A.  I don't remember what he told me.

18   Q.  Did you ever have to hire a lawyer to defend

19  you in the lawsuit?

20   A.  No.

21   Q.  Did you ever think that you needed to hire a

22  lawyer to defend you in the lawsuit?

23       MR. POLLACK:  Objection.

24   A.  What I thought is irrelevant.  It is what

25  happened.  I didn't have to.

**Page 163**

1    Q.  After you received the lawsuit papers, did you

2  speak to anyone else about the lawsuit?

3    A.  I am sure I did.  I don't remember who.

4    Q.  Do you recall speaking to any of the drivers

5  about the lawsuit?

6    A.  I don't think I did.

7    Q.  Do you remember speaking to any of the drivers

8  who had been named in the lawsuit about the lawsuit?

9        MR. POLLACK:  Objection.

10   A.  Not to my recollection.

11   Q.  Do you recall discussing it with Juany Guzman?

12   A.  Not to my recollection.

13       (Whereupon, from 2:36 p.m. to 2:44 p.m. a

14  recess was taken.)

15  BY MR. ANDREWS:

16   Q.  Mr. Hussain, you weren't the person who made

17  the decision as to whether the drivers would be

18  classified as independent contractors, were you?

19       MR. POLLACK:  Objection.

20   A.  No.

21   Q.  That was something that you were told?

22       MR. POLLACK:  Objection.

23   A.  Yes.

24   Q.  You do not recall who specifically told you

25  that?

**Page 164**

1    A.  No.

2    Q.  But you had no discretion to change that?

3        MR. POLLACK:  Objection.

4    A.  No.

5    Q.  Do you yourself have an understanding of the

6  differences between employees and independent

7  contractors?

8    A.  I am sure not as extensive as you.

9    Q.  But that is not my question.  I just want to

10  know what your understanding is.  Before you answer, I

11  just want to remind you that at the beginning of the

12  deposition I told you that the deposition is not a

13  test.  There is no right answer or wrong answer.  I am

14  just asking for your understanding.

15   A.  To my understanding, the difference is to do

16  with the taxes.  Independent contractors file their

17  own taxes, and they have control over their own

18  schedules, their jobs.

19   Q.  Were you done?

20   A.  Yes.

21   Q.  When you say they have control over their own

22  jobs, what do you mean by that?

23   A.  That means that they don't work under direct

24  supervision.  They are not working with schedules or

25  time clocks.

**Page 165**

1    Q.  Have you yourself been an independent

2  contractor in the past?

3        MR. POLLACK:  Objection.

4    A.  Yes.

5    Q.  Have you been an independent contractor for

6  Late Night?

7        MR. POLLACK:  Objection.

8    A.  Yes.

9    Q.  When were you an independent contractor for

10  Late Night?

11       MR. POLLACK:  Objection.

12   A.  I do not remember the dates or the times.

13   Q.  When you started working with Late Night, were

14  you an independent contractor?

15       MR. POLLACK:  Objection.

16   A.  Yes.

17   Q.  Did you also work as an employee for Late

18  Night?

19       MR. POLLACK:  Objection.

20   A.  No.

21   Q.  So all of the work you did with Late Night was

22  as an independent contractor?

23       MR. POLLACK:  Objection.

24   A.  Yes.  To my knowledge, yes.

25   Q.  But now for The Fresh Diet, do you consider

1  yourself an employee?

2      MR. POLLACK:  Objection.

3    A.  Yes.

4    Q.  That is a change that occurred as of September

5  1st?

6      MR. POLLACK:  Objection.

7    A.  Yes.

8      MR. ANDREWS:  I will introduce as Exhibit 1 to

9  Mr. Hussain's deposition a document that was

10  previously introduced or filed by the Defendants in

11  this litigation.

12      (Whereupon, Affidavit of Syed Hussain in

13  Opposition to Plaintiffs' Motion for Injunctive Relief

14  was marked as Hussain's Exhibit 1 for identification,

15  this date.)

16  BY MR. ANDREWS:

17    Q.  Mr. Hussain, you have been shown what has been

18  marked as Exhibit 1, and I will just ask you to take a

19  couple of minutes and look at it.  My first question

20  is whether you have seen this document previously?

21    A.  Yes.

22    Q.  Can you identify what this document is?

23    A.  It's an affidavit.

24    Q.  Is it your affidavit?

25    A.  Yes.

166

---

1    Q.  Do you see that on the seventh page of the

2  affidavit it is signed?

3    A.  Yes.

4    Q.  Is that your signature?

5    A.  Yes.

6    Q.  Do you see it was signed on or about July 30,

7  2012?

8    A.  Yes.

9    Q.  Do you recall signing this affidavit at or

10  around that time?

11    A.  I am sure I did.  I don't recall.

12    Q.  Do you recall how this affidavit was prepared?

13      MR. POLLACK:  Objection.

14    A.  No.

15    Q.  Did you prepare this affidavit?

16      MR. POLLACK:  Objection.

17    A.  I do not remember.

18    Q.  I would like to focus your attention on the

19  first page of the affidavit, paragraph 1, where it

20  says: "Syed Hussain, being duly sworn, does hereby

21  depose and say:  I am the Delivery Manager for Late

22  Night Express, Inc."  Do you see that, sir?

23    A.  Yes.

24    Q.  Is delivery manager the same thing as regional

25  manager?

167

---

1    A.  Yes.

2    Q.  So in this deposition today, when you were

3  talking about the term "regional manager," it also

4  means delivery manager?

5    A.  Yes.

6    Q.  Is there any reason why you would have used the

7  term "delivery manager" rather than regional manager?

8    A.  No.  No particular reason.

9    Q.  Now, I want to direct your attention to

10  paragraph 5 on the second page:  "My Duties with Late

11  Night Express."  Paragraph 5 says:  "I have been

12  employed by Late Night Express since 2007."  Is that

13  the year you recall coming to Late Night?

14    A.  I am sure that is correct.

15    Q.  Paragraph 6 says:  "In that capacity, my duties

16  include overseeing deliveries in the Tri-State area,

17  hiring drivers, creating routes, and assigning drivers

18  to routes and new clients."  Do you see that

19  paragraph, Mr. Hussain?

20    A.  Yes.

21    Q.  Do you agree that that is an accurate

22  description of your duties with Late Night Express?

23    A.  Yes.

24    Q.  That would have been true up to September 1st

25  of this year?

168

---

1    A.  Yes.

2    Q.  It would have been true as of the date you

3  became regional manager or delivery manager?

4    A.  Yes.

5    Q.  You do not recall what that date was though?

6    A.  No.

7    Q.  Were you regional manager or delivery manager

8  for more than two years?

9    A.  Yes.

10    Q.  Was it more than three years?

11    A.  I am not sure.

12    Q.  Paragraph 7 says:  "I have worked with Guzman

13  since his hire on or about February 1, 2012.

14  Similarly, I have known Hernandez since his hire in or

15  about April 2010."  Do you see that?

16    A.  Yes.

17    Q.  Did you hire Mr. Hernandez in or about April

18  2010?

19    A.  I guess so, yes.

20    Q.  Do you recall hiring Mr. Hernandez?

21    A.  No.

22    Q.  Do you recall hiring Mr. Guzman in 2012?

23    A.  Yes.

24    Q.  Paragraph 9 says:  "Until I was informed that

25  the company had been served with a copy of a

169

**Page 170**

1  complaint, I had no idea whatsoever that a few
2  employees were considering such an action."  Do you
3  see that paragraph, sir?
4      A.  Yes.
5      Q.  Do you agree with that statement?
6      A.  Yes.
7      Q.  I want to direct your attention to paragraph
8  22, which states:  "Thereafter, Guzman called out of
9  work on June 29 and June 30, 2012.  Since then, Guzman
10  has been a 'no call no show' -- in other words, he has
11  simply failed to report to work."  Do you see that,
12  sir?
13      A.  Yes.
14      Q.  Directing your attention to paragraph 3 on page
15  6:  The paragraph underneath "Conclusion."  "The Fresh
16  Diet and Late Night Express have taken no action
17  whatsoever against Hernandez or Guzman that is
18  retaliatory.  Both Plaintiffs simply have failed to
19  report to work and/or make themselves available for
20  routes which they have been assigned."  Do you see
21  that paragraph, sir?
22      A.  Yes.
23      Q.  Would you agree with that paragraph today?
24      A.  Yes.
25      Q.  Are drivers assigned to routes?

---

**Page 171**

1      A.  Like I said, if they become comfortable with
2  the routes, then those become their routes.
3      Q.  Those become their assignments?
4          MR. POLLACK:  Objection.
5      Q.  Would that be a fair statement?
6      A.  I would not say assignments.  I would say that
7  those are the routes that they are -- how do I word
8  this?  That is the understanding that we have, that
9  that is the routes that they would be doing going
10  forward.
11      Q.  It was a mutual understanding between you and
12  each driver?
13      A.  Yes.
14      Q.  Apart from the manifests, were there written
15  schedules for drivers?
16          MR. POLLACK:  Objection.
17      A.  No.
18      Q.  So the manifests would have been the only
19  documents indicating which drivers were making which
20  deliveries?
21          MR. POLLACK:  Objection.
22      A.  No.  My report would say it as well.
23      Q.  Your report would say it as well?
24      A.  Yes.
25      Q.  This report would be an electronic report?

---

**Page 172**

1      A.  Yes.
2      Q.  Now, each day's manifest was given to the
3  driver that day?
4      A.  Yes.
5      Q.  So only one manifest at a time was given out to
6  a driver?
7          MR. POLLACK:  Objection.
8      A.  I don't understand the question.  If they were
9  covering more than one route, they would get two
10  manifests.
11      Q.  Well, I am talking about route per day?
12          MR. POLLACK:  Objection.
13      A.  Could you --
14      Q.  I will rephrase the question.  You would not
15  give a driver manifests for several days at one time,
16  would you?
17      A.  No.
18      Q.  That was never done, to your knowledge?
19      A.  No.
20      Q.  So each day a driver would receive one or more
21  new manifests just for that day?
22      A.  Yes.
23      Q.  Now, apart from the manifests and the reports
24  you had to turn in --
25      A.  Yes.

---

**Page 173**

1      Q.  -- were drivers' assignments or routes
2  documented anywhere else, to your knowledge?
3      A.  Not that I can recall right now, no.
4      Q.  So you don't recall any weekly or monthly
5  schedules that existed?
6          MR. POLLACK:  Objection.
7      A.  No monthly.  We didn't have any weekly
8  schedules.  We had a paper with the drivers' names and
9  their routes, and that was to stagger the way they
10  came in and loaded their cars.  Because we couldn't
11  have everybody in such a small space at the same time.
12      Q.  Who prepared this paper?
13      A.  I did.
14      Q.  How often was this paper updated?
15      A.  It wasn't updated.  It was just a one time
16  thing.
17      Q.  You only created it once?
18      A.  Yes.
19      Q.  It was never changed?
20      A.  To my knowledge, no.  Unless there was a change
21  in drivers.
22      Q.  If there was a change in drivers, would a new
23  paper be created?
24      A.  I would assume so, yes.
25      Q.  Do you recall creating new papers when drivers

1   changed?
2       A.  No.  But I am sure I did.
3       Q.  Where was this paper hanging?
4       A.  It was by the area where the bags were.
5       Q.  And did this paper have a title or a name?
6       A.  Not that I know.
7       Q.  What did this paper look like, to your
8   recollection?
9       A.  It just had the drivers, the routes, and the
10  order in which they should be coming in to get their
11  bags.
12      Q.  Do you recall having any discussions with
13  Mr. Hernandez about changing his route?
14      A.  Yes.
15      Q.  What discussions do you recall with
16  Mr. Hernandez about changing his route?
17      A.  A lot of discussions.  Is there a particular
18  one you want to talk about?
19      Q.  I will ask the questions as best I can.  How
20  many discussions did you have with Mr. Hernandez about
21  changing his route?
22      A.  Maybe two or three.
23      Q.  Do you recall why you and Mr. Hernandez were
24  having discussions about changing his route?
25      A.  He didn't like his route.

174

---

1       Q.  So he had complained to you that he didn't like
2   his route?
3       A.  Yes.
4       Q.  What about his route did he not like?
5       A.  I think the first one was going too far uptown,
6   if I recall.  I could be wrong.  It might have been a
7   downtown one and he just couldn't deal with the Wall
8   Street financial area.  That might have been it.  One
9   of the other instances was when he was working in
10  midtown and the west side, and it was commercial
11  parking, and he had trouble parking his car.  Another
12  instance was when he was doing a route and giving me
13  more stops than he had actually done.
14      Q.  Could you explain what you mean by that?
15      A.  He was making deliveries in buildings and
16  adding that he was doing bag pick ups in those
17  buildings as well, which we pay the drivers for, which
18  turned out to be a false claim.
19      Q.  How did you determine that it was a false
20  claim?
21      A.  Because he told about the building and the
22  client, and I called the client to determine if the
23  client had left the bag out for him to pick up.  The
24  client was actually out of town.
25      Q.  So you determined that he was not being

175

---

1   truthful when he reported that he had picked up a bag
2   from that location?
3       A.  Yes.
4       Q.  Was that just one instance or was there more
5   than one instance?
6       A.  That was the instance -- that was the one
7   instance where I found proof, but it wasn't the first
8   time it happened.
9       Q.  You thought there might have been other
10  instances where that happened?
11      A.  Yes.
12      Q.  When you found out about this specific
13  instance, what was your response to that?
14      A.  I adjusted the route so that there would be no
15  more double deliveries in the same building on his
16  route to eliminate that issue.
17      Q.  Did you reprimand him about making a false
18  representation to you?
19          MR. POLLACK:  Objection.
20      A.  I spoke to him about it.
21      Q.  Do you recall what you told him?
22      A.  I told him that his route would be adjusted due
23  to the information that I had received.
24      Q.  Did you tell him that you thought that he had
25  made a false representation to you?

176

---

1       A.  Yes.
2       Q.  Were you angry about that at the time?
3           MR. POLLACK:  Objection.
4       A.  I do not remember.
5       Q.  Do you remember what he said to you when you
6   told him that?
7       A.  No.
8       Q.  Did he deny making the false representation?
9       A.  I would imagine so.  I am not sure one hundred
10  percent.
11      Q.  Do you recall Mr. Hernandez ever complaining to
12  you about your cutting his route?
13      A.  Yes.  That would probably be because of what
14  had happened.
15      Q.  You recall his protesting the fact that you had
16  made a decision to cut his route?
17      A.  I don't recall it, but if he did, it would
18  probably be in response to that.
19      Q.  Do you recall whether drivers ever attempted to
20  ask other drivers to make deliveries for them?
21      A.  Yes.  I am sure it has happened.  I don't
22  recall specifics.
23      Q.  Do you recall any specific instance where that
24  happened?
25      A.  No.

177

1  Q.  If a driver was going to ask another driver to
2  make deliveries for him, did you want that driver to
3  tell you about it?
4  A.  I wouldn't need to know about it.
5  Q.  You would not need to know about it?
6  A.  No.
7  Q.  If you found out that one driver had, in fact,
8  asked another driver to make his deliveries for him,
9  and the other driver was, in fact, the other driver
10 making the deliveries for him, would you speak to
11 either driver about that?
12 A.  Not unless there was a delivery issue.
13 Q.  So if the deliveries had been properly made,
14 you would not even discuss that with either driver?
15 A.  I wouldn't see it necessary to.
16 Q.  Do you recall drivers asking you whether they
17 could switch assignments with other drivers?
18    MR. POLLACK:  Objection.
19 A.  No.  I don't recall them asking me.
20 Q.  Did you ever discourage a driver from switching
21 routes with another driver?
22 A.  Not to my knowledge.
23 Q.  If a driver had gotten someone else to make his
24 deliveries for him, was that driver still responsible
25 for the deliveries that he had been assigned to make?

178

---

1     MR. POLLACK:  Objection.
2  A.  No.  I don't think so.
3  Q.  If Mr. Hernandez was doing a particular route
4  and a complaint had come in that a delivery had not
5  been made or had been made late, and you investigated
6  and you determined that, in fact, Mr. Hernandez had
7  given the meal to Mr. Chow and asked him to make the
8  delivery and for one reason or another the delivery
9  was not made, would you speak to Mr. Hernandez about
10 that?
11    MR. POLLACK:  Objection.
12 A.  No.
13 Q.  No?
14 A.  It would be Mr. Chow's responsibility.
15 Q.  Even though you had not assigned Mr. Chow to
16 make that delivery?
17    MR. POLLACK:  Objection.
18 A.  Yes.
19 Q.  So if Mr. Hernandez had been assigned a route,
20 and then without consulting you asked Mr. Chow to make
21 those deliveries and the deliveries had not been made
22 and a client or clients called to complain that the
23 deliveries had not been made, you would not feel that
24 Mr. Hernandez was responsible for that problem?
25    MR. POLLACK:  Objection.

179

---

1  A.  No.  Mr. Chow would be responsible for it.
2     MR. ANDREWS:  I would like to introduce a
3  document as Hussain's Exhibit 2.
4     (Whereupon, Affidavit in Opposition to
5  Plaintiffs' Motion for Class Certification was marked
6  as Hussain's Exhibit 2 for identification, this date.)
7  BY MR. ANDREWS:
8  Q.  My first question is whether you recall having
9  seen this document previously?
10 A.  Yes.
11 Q.  Can you identify what this document is?
12    MR. POLLACK:  Objection.
13 A.  An affidavit.
14 Q.  Is it your affidavit?
15 A.  Yes.
16 Q.  I want to direct your attention to the fifth
17 page.
18 A.  Yes.
19 Q.  Do you see the signature on the fifth page?
20 A.  Yes.
21 Q.  Is that your signature?
22 A.  Yes.
23 Q.  Do you see that there is a notarization of your
24 signature from June 13, 2013?
25 A.  Yes.

180

---

1  Q.  Do you recall signing this affidavit on or
2  about June 13, 2013?
3  A.  I don't recall it, but I am sure I did.
4  Q.  Do you know who prepared this affidavit?
5     MR. POLLACK:  Objection.
6  A.  No.
7  Q.  Did you prepare this affidavit?
8  A.  No.
9  Q.  I would like to direct your attention to
10 paragraph 5 on the second page:  "The drivers would
11 pick up meal bags from The Fresh Diet's facility in
12 Brooklyn.  The earliest time the meal bags are ready
13 to go out for delivery in the Tri-State area is 7:00
14 p.m.  However, for those meals being delivered on New
15 York City routes, the meals do not go out until 9:00
16 p.m."  Do you see that paragraph, Mr. Hussain?
17 A.  Yes.
18 Q.  Do you agree that that paragraph is an accurate
19 statement?
20 A.  I am sure it was at the time.
21 Q.  Do you have any reason to believe it is no
22 longer accurate?
23 A.  It is probably no longer accurate, because the
24 time of the meals being prepared have changed.
25 Q.  In what way have they changed?

181

1   A.   They are being prepared earlier.

2   Q.   This affidavit is from June 2013.  Do you

3   recall when the change took place?

4   A.   Very recently.

5   Q.   Why was the change made?

6   A.   Why was the change made, I am not sure.

7   Q.   Was the change made because drivers were unable

8   to complete their routes before 5:00 a.m.?

9   A.   No.

10   Q.   So as of June 2013, it is your testimony that

11   this statement was accurate?

12   A.   Yes.

13   Q.   It says, again:  "The earliest time the meal

14   bags are ready to go out for delivery in the Tri-State

15   area is 7:00 p.m."?

16   A.   Yes.

17   Q.   Do you recall whether drivers would arrive to

18   the facility before 7:00 p.m.?

19   A.   Yes.  Sometimes they would.

20   Q.   If they arrived before 7:00 p.m., did they have

21   any functions to perform before 7:00 p.m.?

22   A.   No.

23   Q.   So if they arrived before 7:00 p.m., they would

24   just wait for the meals to be ready?

25   A.   Unless they were already ready, yes.

182

---

1   Q.   Were meals sometimes ready earlier than 7:00

2   p.m.?

3   A.   They might be sometimes, yes.

4   Q.   Would you ever tell a driver that the meals

5   were ready before 7:00 p.m.?

6   A.   Not necessarily, no.

7   Q.   I am not asking whether it was necessarily

8   true.  I am asking would you ever tell a driver that

9   meals were ready prior to 7:00 p.m.?

10   A.   Only if they asked, and if it was.

11   Q.   If drivers got there before the meals were

12   ready, it is your testimony that they would have no

13   function to perform?

14       MR. POLLACK:  Objection.

15   A.   No.

16   Q.   They would have no function?

17   A.   They would have no function.

18   Q.   So they would just wait until the meals were

19   ready?

20       MR. POLLACK:  Objection.

21   A.   Yes.

22   Q.   I want to direct your attention to paragraph 9.

23   Paragraph 9 says:  "It is my understanding that some

24   of the drivers even took their family members with

25   them during deliveries, or gave certain meals to

183

---

1   family members to provide the deliveries on their

2   behalf.  Again, this was of no concern to Late Night

3   so long as the meals were delivered."  Do you see that

4   paragraph, sir?

5   A.   Yes.

6   Q.   As of June 2013 would you agree that this is an

7   accurate description of your understanding?

8   A.   Yes.

9   Q.   What is the basis for your understanding that

10   some of the drivers even took their family members

11   with them during deliveries?

12   A.   Are you asking me how I know that?

13   Q.   How do you know that, yes.

14   A.   Because I have seen them.

15   Q.   You have seen drivers with family members?

16   A.   Yes.

17   Q.   The same sentence concludes:  "or gave certain

18   meals to family members to provide the deliveries on

19   their behalf."  Do you see that?

20   A.   Yes.

21   Q.   How did you know that to be the case?

22   A.   Because I have seen that as well.

23   Q.   How have you seen it?

24   A.   I will give you an example.  If a driver comes

25   in and he has 20 bags to deliver, I have seen him

184

---

1   bring his brother in and then give him 5 or 10 bags to

2   deliver on his behalf while he delivers the other 5 or

3   10.

4   Q.   That would be his brother in a separate car?

5   A.   Yes.

6   Q.   So you would see drivers bring people in other

7   cars?

8   A.   Yes.

9   Q.   And give meals to them?

10   A.   Yes.

11   Q.   I would like to direct your attention to

12   Exhibit 1 to the affidavit, which starts with Bates

13   number FD000048, which is "Late Night Courier

14   Services, Inc., Independent Contractor Agreement."  Do

15   you see that?

16   A.   Yes.

17   Q.   Would this be the type of document that you

18   would ask new drivers to sign?

19   A.   Yes.

20   Q.   But again, just to be clear, you did not

21   prepare this type of document yourself?

22   A.   That is correct.

23   Q.   It was given to you by other people, and you

24   were asked to give it to drivers to sign?

25       MR. POLLACK:  Objection.

185

1   A.  Yes.

2   Q.  I would like to direct your attention several

3   pages into that document.  There is a "Schedule A.

4   Duties, Terms, and Compensation."

5   A.  Yes.

6   Q.  Do you see that page, which is Bates numbered

7   FD000052?

8   A.  Yes.

9   Q.  Do you see at the bottom, it says:  "Fees:

10  Contractor will be fined $25.00 for at fault, missed

11  deliveries, and other specific assignment(s)

12  instructed by the Regional Delivery Manager.  If

13  contractor is unable to perform the assigned route,

14  contractor must provide _____ hours notice (varies by

15  region).  Failure to comply will result in a penalty

16  fee of 50% of that day's route (based on miles and

17  stops).  All fees will be deducted from Invoice

18  (payment of service)."  Do you see that, Mr. Hussain?

19  A.  Yes.

20  Q.  Is this the fee or penalty schedule that you

21  testified about earlier today?

22  A.  Yes.  I suppose so.

23  Q.  Again, this is not something that you developed

24  yourself?

25      MR. POLLACK:  Objection.

186

1   A.  No.

2   Q.  Now, you mentioned a gentleman named Cesar

3   Ricci earlier today?

4       MR. POLLACK:  Objection.

5   A.  Did I?  I don't recall.

6   Q.  Strike that.  Do you know somebody named Cesar

7   Ricci?

8   A.  Yes.

9   Q.  Who is Cesar Ricci?

10  A.  He works for The Fresh Diet.  I don't know his

11  current position.

12  Q.  Have you ever worked with Mr. Ricci?

13  A.  Yes.

14  Q.  Can you describe how you have worked with

15  Mr. Ricci in the past?

16  A.  He was my manager.

17  Q.  You reported to him?

18  A.  Yes.

19  Q.  During what period of time was he your manager?

20  A.  I would say the last year -- the last two

21  years, up until September 1st.

22  Q.  Up until September 1st?

23  A.  Yes.

24  Q.  Does he have a brother who also works for the

25  company?

187

1       MR. POLLACK:  Objection.

2   A.  Yes.

3   Q.  Is that Carlo Ricci?

4   A.  Yes.

5   Q.  Do you know Carlo Ricci?

6   A.  Yes, I do.

7   Q.  Have you worked with Carlo Ricci?

8   A.  I mean, yes, but not as directly as I have

9   worked with Cesar Ricci.

10  Q.  In what manner have you worked with Carlo

11  Ricci?

12  A.  When we first moved to New Jersey, Carlo was

13  present there.

14  Q.  Do you recall what Carlo was doing when the

15  company first moved to New Jersey?

16  A.  No.

17  Q.  Do you recall whether any drivers or former

18  drivers at Late Night ever filed claims for

19  unemployment insurance benefits?

20      MR. POLLACK:  Objection.

21  A.  Yes.

22  Q.  How many times do you recall that happening?

23      MR. POLLACK:  Objection.

24  A.  Once.

25  Q.  Do you recall who the driver was who filed the

188

1   claim?

2   A.  Juan Correa.

3   Q.  That is the only instance that you recall?

4   A.  Yes.

5   Q.  Do you recall what the company's position was

6   with respect to that complaint?

7       MR. POLLACK:  Objection.

8   A.  No.

9   Q.  Do you know whether the company challenged

10  Mr. Correa's claim in any way?

11      MR. POLLACK:  Objection.

12  A.  I don't know.

13  Q.  Did you participate in responding to

14  Mr. Correa's claim?

15      MR. POLLACK:  Objection.

16  A.  No.

17  Q.  Do you know how Mr. Correa's claim was

18  resolved?

19  A.  No.

20  Q.  Do you know of any instance where the company

21  has opposed a driver's claim on the grounds that the

22  driver was an independent contractor?

23      MR. POLLACK:  Objection.

24  A.  Not to my recollection.

25  Q.  Is it fair to say that you have not been

189

1  personally involved in any unemployment insurance
2  claim filed by a driver for Late Night?
3     A.  That would be correct.
4     Q.  You have never had to appear at a hearing in
5  connection with an unemployment insurance claim for
6  Late Night?
7     A.  Not that I remember, no.
8     Q.  Apart from this specific lawsuit we are in now,
9  do you recall any other claims or lawsuits brought
10 against the company by any driver or former driver?
11        MR. POLLACK:  Objection.
12    A.  Yes.
13    Q.  What other lawsuits or claims do you recall?
14    A.  I can't specify, because I am not sure exactly
15 what it was.
16    Q.  Can you just tell me what your understanding
17 is?  Again, it is not a test.  I am just interested in
18 what you understand.
19    A.  I think it was Bryant White, a worker's comp
20 hearing.  I am not sure if that is exactly what it
21 was.
22    Q.  Bryant White was a former driver?
23    A.  Yes.
24    Q.  Again, I understand it is your understanding.
25 It is your understanding that he may have brought a

190

---

1  worker's compensation claim?
2        MR. POLLACK:  Objection.
3     A.  That is my understanding, yes.
4     Q.  Were you in any way involved in responding to
5  that claim?
6        MR. POLLACK:  Objection.
7     A.  Yes.
8     Q.  What did you have to do in response to that
9  claim?
10    A.  I had to -- I didn't end up doing anything.  I
11 went and appeared.  They didn't really ask me any
12 questions, so I didn't do anything in the end.
13    Q.  But you were available at a hearing?
14    A.  Yes.
15    Q.  So you recall there being a hearing on his
16 claim?
17    A.  Yes.
18    Q.  Do you recall when you went to that hearing?
19    A.  No.
20    Q.  Had you prepared to testify at that hearing, if
21 you were called to testify?
22        MR. POLLACK:  Objection.
23    A.  No.
24    Q.  Do you recall why you had been asked to be
25 available for that hearing?

191

---

1        MR. POLLACK:  Objection.
2     A.  No.
3     Q.  Do you recall what happened to Mr. White's
4  claim?
5     A.  No.
6     Q.  Do you know if the company was contesting
7  Mr. White's claim?
8        MR. POLLACK:  Objection.
9     A.  I don't know.
10    Q.  Do you know a lady by the name of Ana Mateo?
11    A.  Yes.
12    Q.  Who is Ana Mateo?
13    A.  I don't know her position in the company.
14    Q.  Where does Ms. Mateo work?
15    A.  In New York.
16    Q.  At Baltic Street?
17    A.  Yes.
18    Q.  Have you worked with her directly at all?
19    A.  I don't understand the question.  We don't work
20 together.  So I wouldn't say I worked with her
21 directly.
22    Q.  You don't know what she does for the company?
23    A.  I don't know her title.
24    Q.  Do you know what her duties are for the
25 company?

192

---

1     A.  Not specifically.
2     Q.  Do you have a general understanding?
3     A.  I think she has bounced around from office
4  manager to HR.  I am not absolutely sure.
5     Q.  Currently in your new position as of September
6  1st, do you have a HR person reporting to you?
7     A.  No.
8     Q.  Do you report to any HR staff?
9     A.  I haven't so far.
10    Q.  Now, we talked before about Ms. Sandy Ornelas.
11 Do you recall that?
12    A.  Yes.
13    Q.  What was her role again, to your recollection?
14        MR. POLLACK:  Objection.
15    A.  I am not sure.
16    Q.  Is she with the company still?
17        MR. POLLACK:  Objection.
18    A.  No.
19    Q.  Do you know whether any drivers ever helped
20 package the food prior to the food going out for
21 delivery?
22    A.  Yes.
23    Q.  Is that, yes, you recall drivers helping
24 package the food?
25    A.  Yes.

193

**Page 194**

```
 1    Q.  Under what circumstances did drivers help
 2  package the food?
 3    A.  If the kitchen was taking too long to pack.
 4    Q.  There were times that you recall where the
 5  kitchen was taking too long to prepare the food?
 6    A.  Not specific times, but I remember it
 7  happening, yes.
 8    Q.  You remember it being an issue?
 9    A.  Yes.
10    Q.  What do you remember about those instances?
11    A.  Just that the food was being packed late and
12  drivers were waiting.
13    Q.  So drivers had already arrived at the facility
14  and were waiting to begin making deliveries and the
15  meals were not ready?
16    A.  Yes.
17    Q.  On those occasions what would the drivers do?
18    A.  They would either wait or assist in packing the
19  bags.
20    Q.  How many times do you remember that happening?
21    A.  I can't specify how many times, but it happened
22  a few times.
23    Q.  What was the earliest you recall in the day a
24  driver's showing up to the Baltic Street facility?
25    A.  Maybe 3:00 or 4:00.
```

**Page 195**

```
 1    Q.  Do you know why a driver would show up that
 2  early in the day?
 3    A.  Entirely up to them.
 4    Q.  Do you recall ever telling a driver that meals
 5  were ready for him by 3:00 or 4:00 p.m.?
 6    A.  I am sure it must have happened, if the meals
 7  were ready.
 8    Q.  So if meals were ready, you would have let
 9  drivers know?
10    A.  If they wanted me to let them know, then yes.
11    Q.  So some drivers wanted you to let them know
12  when the meals would be ready?
13    A.  Yes.
14    Q.  Sometimes they were ready by 3:00 or 4:00?
15    A.  Yes.
16    Q.  In those instances, you would let those drivers
17  know that their meals were ready?
18        MR. POLLACK:  Objection.
19    A.  Yes.
20    Q.  In certain instances drivers would come at 3:00
21  or 4:00?
22    A.  Correct.
23    Q.  Do you recall any drivers arriving before 3:00
24  in the afternoon?
25    A.  Not to my knowledge.
```

**Page 196**

```
 1    Q.  Do you recall ever speaking to any drivers
 2  about arriving at the facility too early in the day?
 3    A.  Not that I remember.
 4    Q.  Did you ever discourage drivers from coming to
 5  the facility early in the day?
 6    A.  Not that I recall, no.
 7    Q.  When you were a regional manager, at what time
 8  of day did you begin communicating with drivers for
 9  that evening's deliveries?
10        MR. POLLACK:  Objection.
11    A.  I couldn't give you a specific answer on that.
12    Q.  But the communications would start at some
13  point during the day?
14        MR. POLLACK:  Objection.
15    A.  I don't know.  I don't know.
16    Q.  But you do recall communicating with drivers
17  during the day about the evening's deliveries?
18        MR. POLLACK:  Objection.
19    A.  Not really.  Like I said, the only time there
20  would be a communication is if the driver would
21  request it, or if the driver called or sent a text
22  message asking if the food was ready.  That is how it
23  would usually go.
24    Q.  How would you know which drivers were coming in
25  that evening?
```

**Page 197**

```
 1        MR. POLLACK:  Objection.
 2    A.  I would take it that they were coming in until
 3  they told me they weren't.
 4    Q.  I understand.  You said you would take it that
 5  they were coming in?
 6    A.  Yes.
 7    Q.  How would you know who you were expecting to
 8  come in that evening?
 9    A.  Because the drivers had already been -- I don't
10  know how to explain it.  But it was just an
11  understanding that the drivers were assigned to those
12  routes for those days for that week.  Unless I heard
13  otherwise, that would just be the way it went.
14    Q.  I understand.  Do you recall, either before or
15  after this lawsuit was filed, ever being advised to
16  preserve any documents or records that you might have
17  pertaining to the lawsuit?
18    A.  No.
19    Q.  Have you done anything to preserve documents or
20  records that you might have had pertaining to this
21  lawsuit?
22    A.  I submitted what I was asked to submit what I
23  had.
24    Q.  But my question was:  apart from that, have you
25  done anything else to preserve any documents or
```

1   records pertaining to this lawsuit?
2       A.   No.
3       Q.   Do you currently use a cellphone or Smartphone
4   in connection with your work?
5       A.   Yes.
6       Q.   How long have you had your current phone?
7       A.   Maybe four months.
8       Q.   Before that time, did you have another phone?
9       A.   Yes.
10      Q.   What type of phone did you have?
11      A.   A Google G2.
12      Q.   How long did you have that one for?
13      A.   Maybe a few months.
14      Q.   Did you have one before that one?
15      A.   The same phone before that one.
16      Q.   A Google G2 as well?
17      A.   Yes.
18      Q.   What happened to the prior Google G2?
19      A.   I had three of them.  They all had a defect
20  where they just turn off.
21      Q.   Have you maintained the same cellphone number?
22      A.   Yes.
23      Q.   What is that cellphone number?
24      A.   646-436-3846.
25      Q.   For how long have you maintained that number?

198

---

1       A.   I am not sure.  It has been years.
2       Q.   It has been several years?
3       A.   Yes.
4       Q.   The Google phones, and what is your current
5   phone?
6       A.   HTC 1.
7       Q.   The three Google phones that you had and the
8   HTC ones, are these phones that you would use in
9   connection with your work?
10      A.   Yes.
11      Q.   Would you have sent and received text messages
12  using these phones?
13      A.   Yes.
14      Q.   Would you have received and sent messages to
15  and from drivers using these phones?
16      A.   Yes.
17      Q.   Are there any other phones that you would have
18  used?
19      A.   There was another one before the Google phone.
20  That screen just stopped working.  It went blank.  I
21  don't recall the model of the phone.  I think it was a
22  HTC.  I am not sure.
23      Q.   Now, you testified before that you supplied to
24  your attorneys what you were asked to provide?
25      A.   Yes.

199

---

1       Q.   Do you recall what those documents were?
2       A.   Any text messages I had, manifests, documents.
3   I guess manifests and that kind of stuff, activity
4   reports.
5       Q.   How did you go about collecting this
6   information?
7       A.   Well, the manifests are stored in the computer.
8       Q.   So it is not the manifests themselves.  It is
9   the information from the manifests that are stored in
10  the computer?
11      A.   Yes.
12      Q.   The manifests themselves would have been
13  discarded after a week?
14      A.   Correct.
15      Q.   Do you recall searching for any other
16  documents?
17      A.   No.
18          MR. ANDREWS:  I am going to take a five-minute
19  break, and then I am going to try to wrap up.
20          (Whereupon, from 3:35 p.m. to 3:44 p.m. a
21  recess was taken.)
22  BY MR. ANDREWS:
23      Q.   Mr. Hussain, do you recall whether any drivers
24  ever complained to you about their independent
25  contractor status?

200

---

1       A.   No.
2       Q.   If a driver had complained, there wasn't
3   anything you could do about it either way, was there?
4           MR. POLLACK:  Objection.
5       A.   No.
6       Q.   Were the drivers given anything that would
7   identify them as being associated with The Fresh Diet?
8           MR. POLLACK:  Objection.
9       A.   Yes.
10      Q.   What types of items would they have been given?
11      A.   They were given magnets for their cars that
12  said "Fresh Diet."  They were given badges with their
13  picture on it that said "Fresh Diet."
14      Q.   Did they have any clothing that said "Fresh
15  Diet"?
16      A.   No.
17      Q.   Shirts?
18      A.   No.
19      Q.   Hats?
20      A.   No.
21      Q.   Bags themselves that the meals were in said
22  "Fresh Diet"?
23          MR. POLLACK:  Objection.
24      A.   Yes.
25      Q.   Did you distribute these items to the drivers?

201

1    A.   Yes.
2         MR. POLLACK:   Objection.
3    Q.   Where did you get these items from?
4    A.   They were sent to me.
5    Q.   Do you know who sent them to you?
6    A.   From Florida.
7    Q.   From The Fresh Diet's offices in Florida?
8         MR. POLLACK:   Objection.
9    A.   I would assume so.
10   Q.   Were drivers required to use these items?
11   A.   No.
12   Q.   It was optional on their part?
13   A.   They asked for it.
14   Q.   The drivers asked for it?
15   A.   Yes.
16   Q.   Do you know why the drivers asked for it?
17   A.   Yes.
18   Q.   What was the reason why?
19   A.   Well, the drivers asked for magnets for the
20   cars, because they were driving around affluent
21   neighbors in Connecticut, and New Jersey, and Long
22   Island at night, and they were getting pulled over by
23   the police almost every night.  So they asked us if we
24   could give them something to identify their cars as a
25   delivery car so that they wouldn't be harassed by law

202

---

1    enforcement every single night.  So The Fresh Diet or
2    Late Night, I don't know, they made the magnets for
3    the drivers for that reason.
4    Q.   Do you recall which drivers asked for these
5    items?
6    A.   No.
7    Q.   Was it more than one driver?
8    A.   Yes.  As far as the badges, that was also
9    something that the drivers had asked for entering
10   gated communities, or buildings with security, or
11   doormen.
12   Q.   Besides the drivers with their own cars, did
13   Late Night or The Fresh Diet own or lease any vehicles
14   that were used to make meal deliveries?
15        MR. POLLACK:   Objection.
16   A.   I don't know if they owned or leased.
17   Q.   Were there vehicles that were used for
18   deliveries other than the drivers' own vehicles?
19        MR. POLLACK:   Objection.
20   A.   Yes.
21   Q.   How many such vehicles were there?
22        MR. POLLACK:   Objection.
23   A.   I think there were three to begin with, if I am
24   not mistaken.
25   Q.   How were these vehicles used?

203

---

1    A.   They were used to transport bags from New York
2    to different locations.
3    Q.   Were they vans?
4    A.   Yes.
5    Q.   All three of them?
6    A.   Yes.
7    Q.   You said three at the beginning.  Were there
8    more after that?
9    A.   I mean, as the vehicles became old, they
10   brought in more vehicles.  They just started piling
11   up.
12   Q.   Were these vans or other vehicles used to take
13   meals to another distribution point?
14   A.   Yes.
15   Q.   Were these vehicles used to actually deliver
16   meals to individual customer's homes?
17   A.   Not the vans, no.
18   Q.   Were any other vehicles used to deliver meals
19   to customer's homes other than the driver's own
20   vehicles?
21        MR. POLLACK:   Objection.
22   A.   Yes.
23   Q.   What vehicles were those?
24   A.   Ford Transit Connects.
25   Q.   How many of those vehicles were there?

204

---

1    A.   Three.
2    Q.   Did certain drivers use these vehicles?
3         MR. POLLACK:   Objection.
4    A.   Yes.
5    Q.   Were certain specific drivers assigned to use
6    these vehicles?
7         MR. POLLACK:   Objection.
8    A.   Yes.
9    Q.   Do you recall who was assigned to drive these
10   vehicles?
11   A.   Yes.
12   Q.   Can you name those people?
13   A.   Alexander Zapata, Danny Delarossa, Drew
14   Traverzo.  Those are the ones I remember.
15   Q.   Did any driver, to your recollection, who ever
16   used his own vehicle ever get assigned to use one of
17   these other vehicles?
18   A.   Did they get assigned to use these vehicles,
19   no.
20   Q.   Were they ever asked to use these vehicles?
21        MR. POLLACK:   Objection.
22   A.   No.  They could request to use it if their car
23   was not working, and they wanted to work.  And if a
24   car was available, I would let them use it.
25   Q.   That brings me to my next question.  If a

205

1  driver's car had broken down, or was in an accident,
2  or otherwise unavailable, did drivers request
3  assistance from the company in dealing with those
4  situations?
5      MR. POLLACK:  Objection.
6  A.  Yes.
7  Q.  What types of requests do you recall drivers
8  making?
9  A.  If they could use the cars that we had.
10  Q.  Do you recall any drivers ever asking the
11  company for loans to use to purchase replacement
12  vehicles?
13  A.  No.
14  Q.  Do you recall the drivers ever asking for money
15  to use to repair their own vehicles that had been
16  damaged?
17  A.  I am sure it has happened.
18  Q.  Do you recall it happening?
19  A.  No.
20  Q.  Do you recall ever giving a driver money to
21  help him repair a vehicle?
22  A.  No.
23  Q.  Now, why are you sure it has happened?
24  A.  Because I know the drivers, and I am sure they
25  have asked.  Just because -- it is just something I

1  A.  Yes.
2  Q.  How did the company compensate drivers for the
3  tolls?
4  A.  They reimbursed them for the tolls.
5  Q.  How were they reimbursed for tolls?
6  A.  I don't understand what you mean by "how."
7  Q.  How was the money given to them for the tolls
8  that they had incurred?
9  A.  In their weekly checks.
10  Q.  They were not separate reimbursement checks?
11  A.  Not to my knowledge, no.
12  Q.  When you began handling payroll, was requesting
13  reimbursement for tolls part of that responsibility?
14  A.  Yes.
15      MR. POLLACK:  Objection.
16  Q.  How did you enter that information?
17  A.  Based on the receipts that the drivers would
18  bring me for the tolls they used on the nights they
19  worked.
20  Q.  So if drivers had paid tolls, they would bring
21  you receipts?
22  A.  Yes.
23  Q.  And they would show them to you?
24  A.  Yes.
25  Q.  And you would look at them and add that

1  know.  I can't explain it.  It is just something I
2  know.
3  Q.  No driver ever asked you for money to repair a
4  vehicle?
5  A.  I am sure they have.  I don't remember it.
6  Q.  You don't remember ever giving a driver money
7  to repair a vehicle?
8  A.  No.  Not in any particular instance, no.
9  Q.  Do you remember ever doing it at any point?
10  A.  Yes.  But don't ask me when.
11  Q.  I am not asking when.  I am just saying do you
12  recall ever doing it?
13  A.  Yes.
14  Q.  You remember giving a driver money to repair a
15  vehicle?
16  A.  Yes.
17  Q.  Do you recall that happening more than one
18  time?
19  A.  No.
20  Q.  Do you recall how the issue of tolls incurred
21  by drivers was handled by the Late Night Express?
22  A.  I am not sure what you mean by "issue"?
23  Q.  When drivers would incur tolls in the course of
24  delivering meals, was that an expense that the company
25  paid for?

1  information into the payroll data entry?
2  A.  Correct.
3  Q.  And request reimbursement for those tolls for
4  those drivers?
5      MR. POLLACK:  Objection.
6  A.  Yes.
7  Q.  Was this a consistent practice throughout the
8  time you were regional manager?
9  A.  Yes.
10  Q.  Do you recall any situation where a driver
11  requested money for gas from you?
12  A.  From me personally?
13  Q.  From you in your capacity as manager?
14  A.  There is a difference.  If you are asking me as
15  a manager or if you are asking me personally?
16  Q.  I am not asking whether they asked you
17  personally for a personal loan.  As their manager, do
18  you recall any drivers ever asking for money as their
19  manager to buy gas?
20      MR. POLLACK:  Objection.
21  A.  I recall drivers asking me for money for gas,
22  yes.
23  Q.  Under what circumstances would drivers ask for
24  money for gas?
25  A.  If they didn't have money to fill up their

**Page 210**

```
1   cars.
2       Q.  What do you remember doing on those occasions?
3       A.  I don't remember the occasions.  I am sure I
4   turned some of them down.  I am sure I helped some of
5   them out.
6       Q.  What would be the circumstances under which you
7   helped some of them out?
8       A.  I don't know.  I don't know what the
9   circumstances would be.
10      Q.  But the money used to help them out would come
11  from the company?
12          MR. POLLACK:  Objection.
13      A.  Not necessarily.  Sometimes it would be a
14  personal loan.
15      Q.  Sometimes it would be a personal loan?
16      A.  Yes.
17      Q.  Sometimes you would personally give drivers
18  money for gas?
19      A.  Yes.
20      Q.  And they would pay you back?
21      A.  Yes.
22      Q.  Do you recall a situation where funds were ever
23  provided by the company for the purpose of purchasing
24  gas?
25          MR. POLLACK:  Objection.
```

210

**Page 211**

```
1       A.  I don't recall a situation.
2       Q.  Do you recall whether it ever happened?
3       A.  It has happened.
4       Q.  It has happened?
5       A.  Yes.
6       Q.  There have been instances where the company has
7   paid for a driver's gas?
8          MR. POLLACK:  Objection.
9       A.  There have been instances when the company has
10  loaned drivers money for gas.
11      Q.  And the drivers were expected to pay the money
12  back?
13      A.  Yes.
14      Q.  Did they do so?
15      A.  Yes.
16      Q.  In every instance?
17          MR. POLLACK:  Objection.
18      A.  To my knowledge.
19      Q.  Did Late Night have any company credit cards?
20      A.  Yes.
21      Q.  Were any of those company credit cards ever
22  given to drivers for any reason?
23      A.  Possibly, yes.
24      Q.  What were the circumstances under which a
25  credit card might be given to a driver?
```

211

**Page 212**

```
1       A.  For the drivers driving the vans to the other
2   distributions, they might have been given the cards to
3   fill up the vans.
4       Q.  Do you recall any drivers who used their own
5   personal vehicles ever being provided with company
6   credit cards for any reason?
7          MR. POLLACK:  Objection.
8       A.  Not that I recall, no.
9       Q.  Do you recall the company, and when I say "the
10  company," either Late Night for The Fresh Diet, ever
11  trying to find replacement vehicles for the drivers in
12  instances where their cars had been damaged?
13          MR. POLLACK:  Objection.
14      A.  No.
15      Q.  Now, the former owner of Balance for Life was
16  Mr. Sutter.
17          MR. POLLACK:  Objection.
18      A.  Yes.
19      Q.  Have you actually met him in person?
20          MR. POLLACK:  Objection.
21      A.  Yes.
22      Q.  This is while you were working for Balance for
23  Life?
24      A.  Yes.
25      Q.  Did he ever tell you that he was selling his
```

212

**Page 213**

```
1   company to The Fresh Diet?
2          MR. POLLACK:  Objection.
3       A.  I do not remember the conversation.
4          MR. ANDREWS:  I don't have any further
5   questions for you at this time, Mr. Hussain.  Thank
6   you.
7          (Time noted:  3:58 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

213