UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------x

FERNANDO HERNANDEZ, KENNETH CHOW, BRYANT WHITE, DAVID WILLIAMS, MARQUIS ACKLIN, CECILIA JACKSON, TERESA JACKSON, MICHAEL LATTIMORE, and JUANY GUZMAN, Each Individually, And On Behalf Of All Other Persons Similarly Situated,

Plaintiffs,

-against-

Index No:
12 CV 4339 (ALC)(JLC)

THE FRESH DIET, INC., LATE NIGHT EXPRESS COURIER SERVICES, INC. (FL), FRESH DIET EXPRESS CORP. (NY), THE FRESH DIET - NY INC. (NY), FRESH DIET GRAB & GO, INC. (FL) a/k/a YS CATERING HOLDINGS, INC. (FL) d/b/a YS CATERING, INC. (FL), FRESH DIET EXPRESS CORP. (FL), SYED HUSSAIN, Individually, JUDAH SCHLOSS, Individually, and ZAIMI DUCHMAN, Individually,

Defendants.

-----------------------------------------x

EXAMINATION BEFORE TRIAL of the Plaintiff, DAVID A. WILLIAMS, taken by the Defendant, pursuant to Notice, held at the offices of Kaufman, Dolowich, Voluck & Gonzo LLP, 100 William Street, Suite 215, New York, New York 10038, on October 3, 2013, at 10:05 a.m., before a Notary Public of the State of New York.

[Page 2]

APPEARANCES:

THE HARMAN FIRM, PC
Attorney for Plaintiffs
200 West 57th Street, Suite 900
New York, New York 10019

BY: PETER J. ANDREWS, ESQ.

KAUFMAN, DOLOWICH, VOLUCK & GONZO LLP
Attorneys for Defendants
100 William Street, Suite 215
New York, New York 10038

BY: JEFFERY A. MEYER, ESQ.

FILE #: 055611-0002

[Page 3]

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court and that a copy of this examination shall be furnished without charge to the attorney representing the witness testifying herein.

[Page 4]

DAVID A. WILLIAMS, the witness herein, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. MEYER:

**Q.** State your name for the record, please.
A. David A. Williams.
**Q.** State your address for the record, please.
A. 39 Convent Avenue, Apartment 1, Yonkers, New York 10703.

(Whereupon, Receipts were marked as Defendant's Exhibit 55, for identification, as of this date.)

(Whereupon, 2010 1099 form was marked as Defendant's Exhibit 56, for identification, as of this date.)

(Whereupon, Verification was marked as Defendant's Exhibit 57, for identification, as of this date.)

(Whereupon, Independent contractor agreement was marked as Defendant's Exhibit 58, for

[Page 5]

D. Williams

identification, as of this date.)

(Whereupon, Manifests were marked as Defendant's Exhibit 59, for identification, as of this date.)

**Q.** Mr. Williams, my name is Jeff Meyer. I'm an attorney for the defendants in an action that you're one of the named plaintiffs in against, amongst other parties, Late Night Express and The Fresh Diet.
A. Yes, sir.
**Q.** I'm going to be asking you some questions today about your relationship with those companies and the work you performed for those companies. I'm going to use them interchangeably, so when I say "the company," unless I specifically say either The Fresh Diet or Late Night Express, I'll let you know, but otherwise, when I say "company," I mean, in a global sense, the work you performed.

MR. ANDREWS: David, when Jeff is speaking, wait for him to finish. You don't have to keep saying yes or okay so that each one of you speaks separately.

[Page 6]

D. Williams

Q. Just a couple of ground rules before we get started.

If I ask a question and you don't understand or you didn't hear me, just ask me, and I will either reiterate the question or rephrase it.

I ask that you verbalize your answers. The court reporter cannot pick up nods of your head or shaking of your head. It has to be a verbal answer. Yes or no or whatever the answer may be, it has to be spoken.

As your counsel did advise, please allow me to finish my question, and then you will answer, and I'll let you answer, and then I'll ask another question so the court reporter can pick it all up on the transcript.

Before we get started, are there any questions you have about the procedure today?

A. No.

Q. Mr. Williams, have you taken any drugs, any prescription drugs, or under the influence of alcohol or any other substance that would inhibit your ability to tell the truth today?

A. No.

[Page 7]

D. Williams

Q. I'll also add too, if you need to take a break at any point, just let us know, and we will gladly break. This is not an endurance test. It's not a marathon. The one proposition I do have is that if I've asked you a question that you answer it, and then we can take the break. We're not going to take a break once the question has been asked but not answered.

With that, let's get started.

Have you ever been deposed before?

A. Deposed? Explain it to me.

Q. Have you ever sat in a room similar to this and had an attorney ask you questions --

A. Yes.

Q. -- on the record?

When was that?

A. That was like about -- approximately -- about ten years ago.

Q. What was it, a lawsuit? What type of --

A. Yeah, it was a lawsuit. I was in an accident.

Q. What type of lawsuit?

A. I was in an accident.

[Page 8]

D. Williams

Q. You were suing a company or somebody who hit you?

A. Yeah. I was in a car when the accident take place, so I have to go to court for it.

Q. Who was the defendant in that case, if you can recall?

A. That was -- I don't remember a name.

Q. It was an individual?

A. Yeah, it was an individual.

Q. Were you a plaintiff in that case?

A. Yes, sir.

Q. Was it during working time, or was this --

A. We were going to work.

Q. It did not involve the company you worked for or any other company?

A. No.

Q. Besides that case, have you ever been a plaintiff in any other lawsuit --

A. No.

Q. -- besides this case?

A. No.

Q. Have you been a defendant in any other lawsuit?

[Page 9]

D. Williams

A. No.

Q. Aside from a deposition, have you ever given any other testimony under oath, whether it be in a court proceeding or any sort of administrative hearing?

A. Yes, sir.

Q. When was that?

A. Citizenship.

Q. How long ago was that?

A. That was about like -- about two months ago.

Q. Congratulations.

A. Thank you.

Q. What government agency was that before?

A. This was a Federal agency. That over there at Federal Plaza.

Q. The reason why we're here today is because you worked for and provided services to either Late Night Express or The Fresh Diet for a period of time.

Can you tell us that period of time that you performed those services?

A. Well, I worked with them in Jersey when they just start the company, and that was in --

[Page 10]

D. Williams

I work with them for two years. That was 2008.

Q. Do you know the month you started in?

A. No, I'm not going to remember the month, but it was in 2008.

Q. When was the last day you performed services for the company?

A. I work with them -- we're in 2013 now, so that would be 2010.

Q. Do you know when in 2010 you stopped providing services?

A. It was -- not precisely, but I think it was somewhere in June, July, something like that.

Q. Did you have a title or a job description of the services you were to provide?

A. Well, when I worked with them, I work with other independent contractor, as they said, so when we get in in the evening, we have a special time to get there, but sometime we get there even earlier than the time we supposed to get there.

Q. What type of services though did you provide?

[Page 11]

D. Williams

A. Well, the --

Q. What kind of work were you doing?

A. Well, at first, I did -- I was like doing delivery, but at the same time, we have to go in early parts of the day sometimes. Like sometimes start work like 4:00. We be there like 12:00 sometimes just help them, help to pack the stuff in, put them together, to get them in the bag because you have to separate them and put them together to get them out for delivery. You have to deliver them too.

Q. Aside from the delivery work, you're saying you actually packed the bags?

A. Yeah.

Q. What else would you do other than delivery work?

A. Well, one time Mr. Hussain was on a vacation and --

Q. Who was on vacation?

A. Syed Hussain.

MR. ANDREWS: Syed Hussain.

A. And they asked me to just fill in for him for a couple of weeks. I was like help to run company just for like about two weeks.

[Page 12]

D. Williams

Q. You took over Mr. Hussain's --

A. Yeah.

Q. -- position for a couple of weeks --

A. Yeah.

MR. ANDREWS: Objection.

Q. -- is that correct?

A. Yes, sir.

Q. You believe that was approximately two weeks or so that you worked in Mr. Hussain's position?

A. Yeah.

MR. ANDREWS: Objection.

Q. Do you recall what year that was?

A. The year? I think it was 2011 because we -- at the time, we just leave from the company because the company start in Jersey, and then they move from Jersey to Connecticut, and then he was taking a vacation at that time.

Then when he was on vacation, they moved the company from Connecticut to Brooklyn, and I went to help them move everything over to Brooklyn so we build the company.

Q. You said that was in 2011?

A. Yeah, I think it's 2011.

[Page 13]

D. Williams

Q. You testified previously that you worked for the company for about two years from 2008 to 2010.

A. Yes, sir.

Q. Were you still working for the company in 2011?

A. Mistake. Mistake. Sorry about that. It was 2000 -- 2010. Yeah. No. I started in 2008. It was 2009.

Q. 2009?

A. 2009. Sorry about that.

Q. No problem.

Aside from the delivery work, you said you packed bags, and for a two-week period or so, you worked in Mr. Hussain's role?

A. Yeah.

Q. What other jobs, if any, did you perform?

A. Well, it's help to supervise the company, everything they did, deliver out, come back in, and all that we had, had to get their delivery done on time.

Q. On those days when you were helping supervise the company, would you stay in the

[Page 14]

D. Williams
building, or would you still be out making deliveries?
A. Sometime after, if there a delivery that get out, I have to take it out and deliver it.
**Q.** On those days, you weren't scheduled to make deliveries, but you would fill in for somebody --
MR. ANDREWS: Objection.
**Q.** -- is that correct?
A. Yeah.
**Q.** You didn't have a set schedule as to when you were making deliveries; isn't that correct?
MR. ANDREWS: Objection.
A. Yes.
**Q.** You mentioned before a couple times you were supposed to start.
When you were doing deliveries, what time would you arrive at the facility, generally?
A. Well, in the beginning, I was supposed to be like 4:00 in the evening, but I was coming like 12:00, 1:00 so that I help the packers stuff them to leave.

[Page 15]

D. Williams
**Q.** If you were packing, you were told to come in around noon or 1:00?
A. Yeah.
**Q.** Were you told that you had to come in to pack early, or would you just show up at 12:00, 1:00?
A. They asked us to come in.
MR. ANDREWS: Objection.
You can answer when I object. It's just for the record, but let me state the word objection.
A. Because sometimes they don't cook in time to get packed for us to leave to go on delivery.
**Q.** When you say "us," you mean the delivery drivers?
A. All the delivery drivers.
**Q.** There was somebody else there who should be doing the packing in the facility?
MR. ANDREWS: Objection.
A. Somebody supposed to be there. Somebody don't turn up. They're not enough of them there.
**Q.** They wouldn't show up?

[Page 16]

D. Williams
MR. ANDREWS: Objection.
A. They don't have enough there. Sometime they have two people to do the packing, but the amount to delivery that they have, sometime people can't get it out fast enough, so we got to go in and help.
**Q.** How would you know to come in early --
A. They called.
**Q.** -- to do the packing?
MR. ANDREWS: Objection.
A. Mr. Syed would call us and ask us to come in.
**Q.** How many days a week would you come in early?
A. Well, sometimes -- we end up coming in sometimes like six days a week early because it was like -- most work like dedicated themselves to the company. That's like the only job some of us have at the time.
**Q.** How many days a week would you work in general?
A. Six days a week.
**Q.** You're saying every day you would come in early?

[Page 17]

D. Williams
MR. ANDREWS: Objection.
A. Yes, sir.
**Q.** That 4:00 start time really didn't mean much, right, because you were always coming in between 12:00 and 1:00?
A. Yep.
**Q.** When you were coming in at 12:00 to 1:00, was it to the Brooklyn facility?
A. No. That was in Jersey. That's where we start from first, in Jersey.
MR. ANDREWS: Remember, let Jeff finish each question, and then answer.
**Q.** How long was the company in New Jersey for?
A. Well, the time when I start there, it was there for like about -- approximately -- about six months before they leave.
**Q.** The company was already there for six months --
A. Yeah.
**Q.** -- before you started?
A. It was there before I started.
**Q.** Then you started?
A. Yeah.

D. Williams

Q. How long were you working in New Jersey for?
A. About six months.
Q. For that entire six-month period, you were coming in around noon or 1:00?
A. Yeah.
Q. After those six months, what happened?
A. That's when they transfer to Connecticut.
Q. The move to Connecticut, was that in 2008, 2009, do you recall?
A. I think it was in 2009.
Q. When you were in Connecticut, when would you show up to the facility?
A. Well, things got a little better over there. Yeah.
Q. There were more people doing the packing?
A. Yeah.
Q. You wouldn't have to come in early?
A. In a sense, we -- we employee other packers, so we have more packers over there to help pack the stuff, and so other driver wouldn't have that pressure on them to come in

D. Williams

to pack it up to leave. They couldn't get them out in time because there would be a longer route for them to go on.
Q. What time would you come in to work when you were in Connecticut?
A. Well, sometime we get there like 4:00, sometimes 5:00.
Q. How long was the company based in Connecticut for?
A. You know, for the record, I don't -- it wasn't there for a long time though. I don't remember exactly how long it was there, but it wasn't there for a long time.
Q. Less than a year?
A. Less than a year, yeah. Less than a year.
Q. Would the company have moved to Brooklyn still in 2009, or was that 2010?
A. No, it was in 2009. They didn't spend a long time in Jersey. I mean Connecticut.
Q. In Connecticut?
A. Yeah.
Q. Once the company moved to Brooklyn, was it similar to Connecticut where there was a

D. Williams

larger number of packers?
MR. ANDREWS: Objection.
A. Yeah.
Q. How often would you pack the bags when you were in Brooklyn?
A. In Brooklyn, what happens, sometime -- no. It -- they have a wide variety of clients. Now we got to do like different states, Connecticut, Boston, and New Jersey, Washington D.C. and some other place. I don't remember the other place over there, but you have -- drivers got to go out there and wait for other workers to get them to do the delivery, and then we got to drive back to Boston to meet the other guys up there to give them delivery to go and do the delivery.
Q. Did you ever make that Boston delivery?
A. Yeah.
MR. ANDREWS: Objection.
Q. Did you ever make the delivery run to Washington?
A. No.
Q. Did you ever make any other deliveries --

D. Williams

A. Yeah, I deliver --
Q. -- outside of the tristate area?
Meaning, other than New York, New Jersey, Connecticut, did you ever drive down to, say, Philadelphia or Baltimore?
A. No.
Q. Just the Boston run?
A. Yeah.
Q. How many times did you make the Boston run?
A. I did it like every day for about six months.
Q. Every day for six months?
A. Yeah.
Q. Was this when the company was in Brooklyn?
A. Yes, sir, when it was in Brooklyn.
Q. How did the Boston run work then?
When you were doing the Boston run, what time would you get to the facility?
A. You would get there like -- like the latest you get there like 6:00.
Q. Say you get there around 6:00 p.m.
Would the bags already be packed for

[Page 22]

D. Williams

you?

A. Yeah, all be packed.

MR. ANDREWS: Objection.

**Q.** Would you load the bags into your car, or would somebody else do that?

A. I got to load them inside.

**Q.** Was this your vehicle?

A. No.

**Q.** What vehicle were you driving?

A. There was a vehicle. There was a company vehicle over there.

**Q.** Did you ever drive your own vehicle to make deliveries?

A. Yeah, when I was going to -- when I was doing the New York route and I do the Connecticut route and the run in Jersey, I use my own vehicle.

**Q.** Would you say the local deliveries --

A. Yeah.

**Q.** -- in the tristate area, you would use your own vehicle?

A. Own vehicle, yeah.

**Q.** When you were going to Boston, you would get to work somewhere around 6:00. You would

[Page 23]

D. Williams

then load the vehicle.

How long would it take you to load the vehicle up?

MR. ANDREWS: Objection.

A. Well, it take like about an hour.

**Q.** How many bags, on average, would you be loading in your vehicle?

A. Well, it all depend on the amount of delivery that you got to take there, so sometime it end up like -- sometime like -- sometime like 150, 200 bags.

**Q.** That 150 to 200 bags, was that the range every day?

A. Not -- not every day, but it could be more, it could be less.

**Q.** How much more less could it be?

A. Could be like about -- it all depends. It all depends. It all depends. Sometime it could be like fifty less. Sometime it can be two less, can be ten more.

**Q.** What was the minimum number of bags you would drive up to Boston on any given day?

MR. ANDREWS: Objection.

A. Well, most likely, to be like up to 200,

[Page 24]

D. Williams

the minimum.

**Q.** 200 is the minimum?

A. Yeah.

**Q.** What would be the maximum?

A. Well, the maximum -- well, the maximum would be 200. The minimum would be 200.

**Q.** You said the minimum was 200 and the maximum was 200?

A. The thing about that, it going to be always like that. Sometimes might be go up to like about 220. That would be the maximum, and the minimum would be like about 180.

**Q.** Would be the minimum, 180?

A. Yeah.

**Q.** What days of the week would you make these deliveries?

A. From Sunday to Friday.

**Q.** Sunday at 6:00 p.m. --

A. Yeah.

**Q.** -- you would show up?

A. Yeah.

**Q.** You would do that through Friday?

A. Through Friday.

MR. ANDREWS: Objection.

[Page 25]

D. Williams

**Q.** You would not make deliveries on Saturdays, correct?

A. No.

**Q.** I want to break this out into three different periods.

You have the New Jersey time when you were based in New Jersey for about six months.

A. Yes.

**Q.** The Connecticut time, which was -- was it about six months?

About how much time do you think the company was --

A. It wasn't for that much time. I think it was over there for about -- probably about -- about four months. It wasn't there for a long time.

**Q.** The company then, while you were performing services for the company, would have been in New York for a little over a year?

A. Yeah.

**Q.** About a year or so?

A. Yeah.

**Q.** Let's finish up this Boston run, and we'll go back to the three breakouts then.

[Page 26]

D. Williams

When you make the Boston run, you're talking somewhere between 180 to 220 bags on average six days a week. You would get to the facility around 6:00. It would take you about an hour to load.

You're saying around 7:00 or so, roughly 7:00, you would be on the road heading up to Boston?

MR. ANDREWS: Objection.

A. Yes, sir.

**Q.** How many delivery stops would you have going to Boston?

A. Well, I wouldn't have a delivery stop going to Boston. I would go straight to Boston and meet up on -- they call it King Street in Boston. Then meet in a gas station with other clients -- with other workers to give them their bags to do their deliveries. So I would meet them, like three, four of them sometimes to get them their delivery for them to do their delivery.

**Q.** You would go to one stop?

A. One stop.

**Q.** Would you physically then hand the bags

[Page 27]

D. Williams

out to everybody?

A. Yeah, because I got to get them their own route. Everybody have their own route, so it come in letters and numbers.

**Q.** You said about four to five drivers?

A. No. Over there, you got like about -- approximately like four drivers. Four drivers.

**Q.** There's four routes in Boston, in other words?

A. Yeah, four routes in Boston.

**Q.** Once you handed out the four routes to the drivers, would you just head back then?

A. Yeah.

**Q.** Would you head home?

Where would you go?

A. No. I got to head back to the facility, drop off those returns and ice.

**Q.** When you say the "returns," what are those?

A. Those are the bags and the ice.

**Q.** The bags, those are insulated bags?

A. Yeah.

**Q.** These would be the empty ones that the delivery guys would bring back to you --

[Page 28]

D. Williams

A. Yes.

**Q.** -- is that correct?

A. Yes, sir.

**Q.** What's the ice? What is that?

A. That's some plastic things that are frozen and put them inside.

**Q.** The companies would keep those and reuse those?

A. Yeah.

**Q.** Approximately how long would it take you to drive to Boston around 7:00 every day?

MR. ANDREWS: Objection.

A. Well, it take like sometime four hours or more.

**Q.** Was it always the same gas station --

A. Yeah.

**Q.** -- where you would make the drop-offs at?

A. Yes.

**Q.** How long would it take you once you were there to hand out the routes and the bags?

A. Well, it would take about like -- over about an hour or more. It depends on when the other workers come to deliver because they're

[Page 29]

D. Williams

not going to be there waiting for you. Some of them you got to wait for them, so whatever time they turn up, you give them their route.

**Q.** If they were all there waiting for you, how long would that take? Would that be quicker obviously?

MR. ANDREWS: Objection.

A. It take like -- yeah. It take about like an hour to do all of those.

**Q.** What time would you finish up distributing all these bags?

MR. ANDREWS: Objection.

A. Would take like about -- probably about an hour.

**Q.** What time of night or day?

A. If I leave like 7:00, I be getting there like -- if I leave at 7:00, I would get there like 11:00 at night.

**Q.** Then it would take from 11:00 to 12:00 approximately?

A. 12:00, 12:30, yeah.

**Q.** Then you would drive back to Brooklyn, you said?

A. Yeah, drive back to Brooklyn.

D. Williams

**Q.** How long would the drive back take you?
A. Well, the drive back take you like up to five and a half to six hours.
**Q.** You're saying that the drive starting at 7:00 p.m. on a Monday or a Tuesday or a Wednesday would take you four hours to get to Boston?
A. Yeah.
**Q.** But then leaving at midnight, 12:30, in the middle of night, would take five or six hours --
A. Yeah.
MR. ANDREWS: Objection.
**Q.** -- to get back to Brooklyn?
A. Yeah.
**Q.** That's correct?
A. Yeah.
**Q.** You would get back to Brooklyn at around 5:00, 5:30, 6:00 in the morning?
A. Yes, sir.
**Q.** Why would that drive coming back take an hour or two longer than the drive up during rush hour?
MR. ANDREWS: Objection.

D. Williams

A. Because after that time of the night, roadwork, construction work on the road. Takes up all the traffic. Sometimes sit in traffic for an hour or more sometimes. That's what take you longer to get down. Going up, it don't start there, but coming down, it starts, so any route you take, you're going to be at it coming down.
**Q.** During the six months or so that you were doing the Boston run, there was always construction?
MR. ANDREWS: Objection.
A. Always construction work.
**Q.** Which way would you travel?
Would you always go 95?
A. I take 95 sometimes, or I take the Merritt to the 91.
**Q.** There's construction on both, either way?
A. Yes, sir.
MR. ANDREWS: Objection.
**Q.** At least on the return?
A. Yes, sir.
**Q.** Let's go back to when you first started

D. Williams

with the company and you were in New Jersey.
Where were you making deliveries?
A. I make deliveries in Jersey and some part of New York, like Upstate New York.
**Q.** Do you recall the address of the company's facility when it was in New Jersey?
A. You know, the thing about -- I don't remember the address. I do not remember the address.
**Q.** What time, again, would you get there when it was in New Jersey? What time would you have to show up?
A. Sometime I would get there like 12:00 or 1:00 sometime.
**Q.** What time would you leave the facility to start making your deliveries?
A. Well, it all depends on the time that we finish pack and get to deliver out, so we don't have a special time to leave when you have to pack the stuff in. No special time. So sometime we end up leaving there like -- sometime like 4:00, 5:00.
**Q.** When you were making deliveries in New Jersey, was there a specific route name or

D. Williams

number?
A. Yeah.
MR. ANDREWS: Objection.
A. Well, the thing about that, you don't have a special route. You have the route that is print out already for you to go, but like that would take like up to sometime ten -- sometime leave at like 4:00 in the evening or 5:00 in the evening. You don't get -- by the time you get back home, it's like sometime like 6:00, 7:00, 8:00 in the morning because the amount of delivery we got to do.
**Q.** You're saying getting "home," meaning in your house?
A. Yeah, get back to your house.
**Q.** When you were working in New Jersey, you would start your route, make your deliveries, and then you would go straight home afterwards?
A. Yeah.
MR. ANDREWS: Objection.
**Q.** When you were making these deliveries in New Jersey, approximately how many stops would you have?
MR. ANDREWS: Objection.

[Page 34]

D. Williams

A. Sometime have like thirty-five, forty, forty-five. It all depends.

**Q.** What areas of New Jersey were you delivering to?

MR. ANDREWS: Objection.

**Q.** If you can recall the towns.

A. Some of the towns -- you know -- so one of them is Orange. I know I did go over there in New York to the Bear Mountain Bridge, somewhere out that side.

**Q.** The New Jersey route and, you said, Upstate New York, would that be the same route?

A. Yeah, the same -- everything's on the same manifest, same manifest.

**Q.** Was it Northern New Jersey for the most part that you would be making deliveries in?

MR. ANDREWS: Objection.

A. You know, come by north and south, it's like -- I don't really remember it like that, but I know it's delivering in New Jersey.

**Q.** Do you recall any of the other towns in New Jersey, other than Orange, that you made deliveries to?

A. I don't remember. I know it's other

[Page 35]

D. Williams

place in Jersey. I don't remember the towns, town to town. I don't remember them like that.

**Q.** Do you remember any of them in New York other than the Bear Mountain area?

A. In New York? Well, in New York, it's like places like from -- you know, come up with it right now, I can't remember all them, but I know I used to deliver all the way to New York area.

**Q.** Upstate New York?

A. Upstate New York.

**Q.** When the company moved to Connecticut, you said you would show up later, around, I believe, 5:00 or 6:00 p.m.

MR. ANDREWS: Objection.

**Q.** When you were in Connecticut, where would you make deliveries to?

A. Still in Jersey delivery.

**Q.** Was it the same locations that you were delivering to while you were based in New Jersey?

A. Yeah.

**Q.** It would be New Jersey and Upstate New York?

[Page 36]

D. Williams

A. Upstate New York.

**Q.** If you were in Connecticut, were you still delivering between thirty-five and forty-five bags a night?

A. Yeah. Yeah. It all depends.

**Q.** How long would that take you to make those thirty-five to forty-five deliveries each night?

A. It take like the same amount of time or even more because you got to go down. Like even going down, you got to drive down on 287 and go down and get off at exit -- I think it was exit off the Palisades Mall. I don't remember the exit down there, but you get into Jersey, and you start deliver down there. You can take around Jersey and bring it back into New York.

**Q.** What time would you finish when you were based in Connecticut?

A. Well, in Connecticut, you finish like about -- approximate, like 6:00, 630, 7:00 sometime in the morning.

**Q.** Is that when you would be home --

A. Yes.

[Page 37]

D. Williams

**Q.** -- around 6:30 or 7:00?

Was there a deadline or time given to you by the companies that said you have to make all your deliveries by X?

A. Yeah. They say you got to get all delivery done before 7:00 in the morning.

**Q.** Was that 7:00 a.m. rule in effect --

A. 7:00 a.m.

**Q.** That was in effect when the company was based in New Jersey?

A. Repeat that, sir.

**Q.** Was the 7:00 a.m. deadline in place when the company was based in New Jersey?

A. No.

**Q.** Was there a deadline to make deliveries by when you were working out of New Jersey?

MR. ANDREWS: Objection.

A. No.

**Q.** There was none?

A. (Witness shakes head.)

**Q.** When did this 7:00 a.m. deadline come into place then?

A. When I get into the Connecticut.

**Q.** When the company then moved to Brooklyn,

[Page 38]

D. Williams

into New York, what time would you show up at the facility?

A. Well, when get into New York, that's when they put on the -- start to put on a lot of restriction now because they got to say you got to get in a certain time, and after, get back to the facility at certain times, and if you don't get back there at that certain time or don't get delivered on that certain time, you can end up loss a route, and they put you on a different route.

**Q.** What type of restrictions are you taking about, deadlines, certain periods of time?

MR. ANDREWS: Objection.

A. Yeah.

**Q.** What is that?

MR. ANDREWS: Objection.

A. They said you got to get there like 4:00 in the evening. If we don't get there at 4:00, it's like -- Syed would just like start curse, all kind of words and all those things, you know.

**Q.** You're saying you had to show up at the facility around 4:00 p.m.?

[Page 39]

D. Williams

MR. ANDREWS: Objection.

A. Yeah.

**Q.** When it was in Brooklyn?

MR. ANDREWS: Objection.

A. Yes, sir.

**Q.** What time then would you leave the facility to start making your deliveries?

A. Well, it depends on -- you get there -- some days you get there at 4:00, and you be there sometimes until like 6:00 because you got to get far route out first. So anybody in the tristate area have to wait.

**Q.** Those other routes you were talking about was the Boston route and the Washington and Baltimore route?

A. Yes, sir.

**Q.** The ones going out?

A. Yeah. Yeah.

**Q.** Your testimony is that you wouldn't be able to start your route in the tristate area until around 6:00 p.m. or so?

MR. ANDREWS: Objection.

A. It could be later than that too.

**Q.** How much later?

[Page 40]

D. Williams

A. Could be like -- sometime could be like three, four hours later.

**Q.** There's a possibility that you wouldn't leave --

A. Until like 7:00, 8:00, 9:00 sometime.

MR. ANDREWS: Objection. Again, let the question be asked, and then answer.

**Q.** When the company was based in New York and you were working there, you said for about six months you were doing this Boston run.

Correct me if I'm wrong, but from the date you were giving me, that would be about another six months that you were doing other routes; is that correct?

A. Yeah.

**Q.** In those other six months, you were doing routes in the tristate area, what we would call local routes?

A. Yes, sir.

**Q.** What would those routes be?

Do they have numbers or letters that you can recall?

MR. ANDREWS: Objection,

[Page 41]

D. Williams

compound question.

A. They were -- they were like numbers and letters because they have -- go by address, so you got to take them to the address that is stated on the manifest.

**Q.** Those addresses that show up on the manifest, would you always be in Manhattan, would you be New Jersey? Where would your routes be?

MR. ANDREWS: Objection.

**Q.** If you had more than one.

A. The route would be like -- area like close to Connecticut and New York. Like you would have like Hartford, down there, and you have Port Chester right there. You have King Street. Got one over there on -- it's various routes around that area too. Even on Scarsdale, White Plains.

**Q.** All the locations you just named, those are all routes you made deliveries to?

A. Yeah, and more.

**Q.** It was mostly Upstate New York --

A. Yeah.

**Q.** -- Westchester, and up north?

[Page 42]

D. Williams
A. Yeah.
Q. Did you ever make any deliveries in Manhattan?
A. No.
Q. Did you ever make any deliveries in Queens?
A. One time.
Q. One time?
A. Yeah.
Q. Where was that in Queens?
A. In a delivery -- there was a delivery that missing. Somebody was supposed to deliver there and didn't get there in time, so when -- they leave before someone get that delivery, so on my way out, I just drop the delivery off and then head out.
Q. It was just one bag?
A. Yeah, just one bag.
Q. Did you ever make any deliveries in Brooklyn?
A. No.
Q. Did you ever make deliveries in Staten Island?
A. No.

[Page 43]

D. Williams
Q. Long Island?
A. No.
Q. Did you make any deliveries in New Jersey when you were based in New York?
A. Yes, sir.
Q. Where in New Jersey would you make those deliveries?
A. Jersey City.
Q. How often would you make this New Jersey run?
MR. ANDREWS: Objection.
A. Like probably every day before I started Boston route.
Q. Let's just focus on the time when the company was based in New York --
A. Yeah.
Q. -- and prior to you making the Boston run.
A. Yeah.
Q. I presume, then, the Boston run was the last thing you did --
A. Yes, sir.
Q. -- before your relationship with the company ended?

[Page 44]

D. Williams
A. Yes, sir.
Q. Is the New Jersey run also part of that Upstate, Scarsdale, Port Chester run, or are they two different things?
MR. ANDREWS: Objection.
A. Two different things.
Q. You said you made the Jersey City run almost every day.
A. Yeah.
Q. You also said you were making deliveries to Scarsdale, Port Chester, et cetera, correct?
A. Yes, sir, but because -- I used to work in Jersey first. Then they change the route. They changed the route, but that way you started work Upstate.
Q. What dates or for how long a period of time were you making deliveries to Jersey City?
A. That was like -- that was my route when I just start with the company, and after I went in an accident -- I was in a bad accident with the company that I lost my car, and I was out for like a couple of months, and when I came back, they said -- I started do the route going back to Boston.

[Page 45]

D. Williams
Q. You had an accident?
A. Yes, sir.
Q. Were you making a delivery when you had this accident?
A. Yes, sir.
Q. When was that?
A. That was back in -- I think it was 2009.
Q. Do you recall the month?
A. No, I don't remember the month.
Q. You were out for, you said, a period of time?
A. Yeah, like about -- probably about three -- three to four months.
Q. During those three or four months, you didn't make any deliveries at all?
A. No, sir.
Q. Was it wintertime, spring, summer?
A. The wintertime.
Q. The winter of 2009 going into 2010 --
A. Yeah.
MR. ANDREWS: Objection.
Q. -- or '08 into '09?
MR. ANDREWS: Objection.
A. No, 2009 into 2010.

[Page 46]

D. Williams

Q. Once you returned, that's when you started the Boston route?

A. I didn't start the Boston route exactly when I returned. I was doing the route going to Port Chester and other parts -- some part in Connecticut and Upstate New York, the Westchester area.

Q. How long did you do that Upstate run before you were moved to the Boston run?

A. It was like about -- probably about a month or two.

MR. ANDREWS: Objection.

A. It wasn't for long.

Q. How many months then would you say you did the New Jersey route before the accident?

A. New Jersey route was the route I do for approximately -- about -- about a year and two months.

Q. You said you were only in the New York facility for about a year, correct?

A. Yes, sir.

Q. You said, out of that year or so, six months was dedicated to the Boston run, a month or two was dedicated to the Upstate run. That

[Page 47]

D. Williams

would only leave about four months or so, if you were based in New York for only a year, to do the Jersey City run. You just said it was a about a year and a half you did the Jersey City run for.

MR. ANDREWS: Objection.

A. What happened, the New Jersey route, I've been doing it from when they were in New Jersey.

Q. Let me rephrase the question then.

While based in New York or out of Brooklyn --

A. Yeah.

Q. -- how long did you do the Jersey City run while based out of Brooklyn?

A. Well, when they based in Brooklyn, I did the route for about approximately -- I think it was about like four months or something like that because I remember when I get over there, it's -- shortly after that, I was -- I get in the accident.

Q. You got in the accident during the time you were doing the Jersey City run?

A. Yes, sir.

[Page 48]

D. Williams

Q. You were driving your own car at that time?

A. Yes, sir.

Q. During the full two years or so that you worked for the company, did you ever submit any expenses, travel expenses, gas, car repairs, any of those, to the company?

A. Yes, sir.

Q. You did?

A. Repeat that for me, please.

Q. During the time that you were making deliveries --

A. Yes, sir.

Q. -- driving your own vehicle --

A. Yes, sir.

Q. -- for the company, did you ever submit any expenses to the company for either gas, tolls, car repairs, any of those things?

A. Only for tolls and gas.

Q. When did you submit those?

A. Like before the pay period.

Q. Was it while you were in New Jersey, Connecticut, or Brooklyn?

A. Well, all the time. Where the facility

[Page 49]

D. Williams

be and you work, before the pay period, you got to give them your gas receipts and the toll receipt, that's it. And repair your car, that's on you.

Q. I'm going to show you Defendant's 55. These were documents produced by your attorney to us. If you can take a look at those, we'll call that Defendant's 55 (handing).

MR. ANDREWS: Take your time. Have a look.

Are there Bate numbers? There are Bate numbers. Okay.

Q. Mr. Williams, once you've had a chance to review those, let me know. Then I'll start the questioning.

MR. ANDREWS: He'll have specific questions, so get a general familiarity with what those are.

THE WITNESS: All right.

MR. ANDREWS: He's ready.

Q. Mr. Williams, do you recall submitting those receipts to the company?

A. Yes, sir.

Q. Do you recall what period of time those

[Page 50]

D. Williams

were submitted, in other words, which location you were working at?

MR. ANDREWS: Objection.

**Q.** Were you based in New Jersey, Connecticut, or New York at the time?

MR. ANDREWS: Objection.

A. New York.

**Q.** Those are all New York?

A. Yes, sir.

**Q.** Do you recall ever submitting any receipts to the company while you were based in New Jersey or Connecticut?

MR. ANDREWS: Objection.

A. Yes, sir.

**Q.** You did?

A. Yeah.

**Q.** Have you produced those?

A. If I produce them to the company?

**Q.** No.

Have you produced those to your attorneys, which were then provided to us? Well, it should have been provided to us.

MR. ANDREWS: Objection.

A. Not everything that -- not all of them

[Page 51]

D. Williams

we have because some of those receipts that when we give them to the company, they don't give us back some of them. You know, It didn't work out to be that we got to keep them, you know, because we got to throw them away. We don't use them no more. It's just something that we have in the cars, something like that.

**Q.** What name, if you can recall, was on your compensation check, on your paycheck? Was there a name of a company that you can recall?

A. I know it's The Fresh Diet on the check. It's sent from different company coming from Florida.

**Q.** Do you recall the name of the company?

A. No, I don't recall the name of the company.

**Q.** At the end of every year, do you recall receiving a tax form from one of these companies?

A. For the tax return?

**Q.** Yes.

A. Yeah. You get a 9 -- 9-W. That's what you file. You got to pay back taxes. Yeah.

**Q.** I'm going to show you now what we'll

[Page 52]

D. Williams

mark as Defendant's 56. Take a look at that (handing).

MR. ANDREWS: Around 11:00, we'll break for five minutes.

MR. MEYER: That's fine. Let me finish up this line of questioning.

MR. ANDREWS: That's fine. I don't want to disrupt you, but once an hour, we should break.

**Q.** Mr. Williams, is that document familiar to you?

A. I'm trying to look at it. It's a form. What type of form is this? It's a tax return form.

MR. ANDREWS: The question is, does the document look familiar to you.

A. Yes, sir.

**Q.** Do you recall receiving this document --

A. Yes, sir.

**Q.** -- from the company?

A. Yes, sir.

**Q.** If you could look at box 7 right here, there's a dollar figure there of about $16,000 (indicating).

[Page 53]

D. Williams

Was that your earnings from the company that you were paid by the company in 2010?

MR. ANDREWS: Objection.

A. Yes, sir.

**Q.** Did you file a 2010 tax return?

A. Yes, sir.

**Q.** Where on your 2010 tax return did you indicate these earnings?

MR. ANDREWS: Objection.

A. (No verbal response given.)

**Q.** Let me ask you a different question.

Do you recall if you classified them as wages, these earnings, or did you classify them as non-employee compensation?

MR. ANDREWS: Objection.

A. I think they come as non -- I think -- you know, on the thing about that, I never really look over it like that. I never really take real note of the tax return. I just know that when I filed my tax, they say, you know, you owe certain amount of money, and you got to pay it back, so I wasn't looking at like that.

MR. MEYER: So we can confirm that, I request production of the 2010

[Page 54]

D. Williams

tax return so that we can identify where you classified these earnings.

A. Yes, sir.

Q. Do you recall receiving any other form similar to this for other years from the companies?

A. Yeah. You get it for two years.

Q. What was the other year?

A. Well, you get one for 2000 -- 2009 and one for 2010, that's it.

Q. Did you file a tax return in 2009?

A. Yes, sir.

Q. Do you recall on the 2009 tax return where you classified or where you categorized whatever earnings you had on that 2009 form?

MR. ANDREWS: Objection.

A. Sir, as I said, I never really look at it like that. Now you're saying to me, I like taking note of it now. I didn't look at it like that before.

MR. MEYER: I would also demand production of the 2009 returns so we can classify where these earnings were categorized.

[Page 55]

D. Williams

A. Okay.

MR. MEYER: Do you want to take a break?

MR. ANDREWS: Sure.

(Whereupon, a recess was taken at this time.)

Q. Mr. Williams, there's something I just wanted to go back and touch on before we get into some other things here.

I had asked you before about any company policies or any instructions to have the route finished by a certain deadline in the day.

You had said that while the company was based in New Jersey, there was a 7:00 a.m. deadline to get all the bags delivered; is that correct?

A. Yes, sir.

Q. Was there a similar deadline when the company was in Connecticut?

A. Yes, sir.

Q. Do you recall what time that was?

A. Well, it was the same routine that you got to get the bags and deliver -- I have to finish deliver by 7:00 in the morning.

[Page 56]

D. Williams

Q. When the company and, hence, you were working out of Brooklyn, was there a similar deadline?

A. Yes.

Q. What time was that?

A. Same, 7:00.

Q. It was 7:00 a.m.?

A. Yes.

Q. Were you ever told that there was a different time when the company was based in New York, at 3:00 a.m. or 5:00 a.m., to get all the routes delivered, all the bags delivered?

MR. ANDREWS: Objection.

A. Well, it change because some clients say they would want to get done at certain time at the morning, but it mostly like in New York. I don't work on those route.

Q. You're saying that the route or the routes that you worked in New York up until the time you stopped working for the company in 2010, you had a 7:00 a.m. deadline --

MR. ANDREWS: Objection.

A. Yes, sir.

Q. -- for your specific route?

[Page 57]

D. Williams

A. Yes, sir.

Q. You're testifying that there were routes that had earlier deadlines?

MR. ANDREWS: Objection.

A. Yes.

Q. Were there certain times you recall?

A. Got to deliver, by latest, 6:00 in the morning.

Q. Was that the earliest deadline that you can recall?

MR. ANDREWS: Objection.

He didn't say deadlines.

A. Yes.

Q. You're saying the bags had to be delivered by 6:00 a.m. on other routes, correct?

MR. ANDREWS: He said clients had expectations.

Q. Were there routes that had specific deadlines other than 7:00 a.m.?

A. Yes, sir.

Q. Do you recall what routes those were?

A. What I can recall is about the routes I did. That's all I really can talk about.

[Page 58]

D. Williams

Q. If you knew that there was client expectations on other routes that deliveries be made by 6:00 --

A. The reason for that because when Mr. Hussain was out on vacation and I was sitting for him within those couple of weeks, I have to take all the calls that come in and deliver that food that make, so I would know -- that's how I know some of those things. They require that they would be done at certain time of the morning, before certain of the morning.

Q. It's your testimony that you were unaware of any 5:00 a.m. deadline to make deliveries?

A. Well, it's not as a deadline, but that's what they -- some clients would call it.

Q. It's what the clients wanted?

A. It's what they want.

Q. By 5:00 a.m.?

A. No. I didn't -- they didn't say 5:00. They say 6:00.

Q. You have no recollection of any 5:00 a.m. --

A. No.

[Page 59]

D. Williams

Q. -- delivery deadlines or expectations?

MR. ANDREWS: Let him finish.

A. No.

Q. Mr. Williams, I'm going to show you what we're going to mark as Defendant's 57.

Can you take a moment and look at that and let me know if you've seen that document before (handing)?

MR. MEYER: For reference, it's a verification.

A. Yes, sir.

Q. Is that your signature on that document?

A. Yes, sir (indicating).

Q. Do you know why you were asked to sign that document?

MR. ANDREWS: Don't disclose any communications you've had with your attorney.

MR. MEYER: That's right.

MR. ANDREWS: If you can answer the question without disclosing, try.

Q. I'll rephrase.

Do you know what the purpose of that document is?

[Page 60]

D. Williams

A. Yes.

Q. What is that?

A. For purpose of the attorney.

Q. When you signed that document, did you review any other documents or discovery documents in this case?

MR. ANDREWS: Objection.

A. Repeat it. Explain it to me.

Q. Let's do this.

Read the document again, and I'll ask you a question.

MR. ANDREWS: You read it?

THE WITNESS: Yes, sir.

Q. After reading the document, which is titled "Verification," do you know what the purpose of that document is?

A. Yes, sir.

Q. What is that?

A. It's that -- where we get our wages that we work overtime and didn't get paid for.

Q. I'm going to show you now what has already been marked as Defendant's Exhibit 4. It is Plaintiff's response to Defendant's first set of interrogatories. I'll give you the

[Page 61]

D. Williams

document (handing). Review that.

MR. ANDREWS: Flip through it, and he'll have specific questions.

Q. If you can, focus on, right now, question number four and the response to interrogatory number four. If you could, read that as well as the answer, and let me know.

MR. ANDREWS: This is the question, and this is the answer, and Jeff is going to ask you about both the question and the answer (indicating).

Are you ready?

THE WITNESS: Yeah.

Q. Again, I'm not interested in any conversations you've had with any of your attorneys, whether it be Mr. Harman, Mr. Andrews, Mr. Moss, anybody.

A. Yes, sir.

Q. Do you recall being asked to respond to that question by your attorneys? It's a yes or no answer.

A. No.

Q. Do you recall ever providing those names or providing those names to your attorneys

[Page 62]

D. Williams

about potential witnesses --
A. Yes, sir.
Q. -- the names on the bottom there?
A. Yes, sir.
Q. Who is Mr. Spence?
A. Mr. Spence is a worker. He work with the company, and he stopped working for them.
Q. What was his title?
Was he a driver?
A. He was a driver. He was the first driver started drive to D.C.
Q. What about Mr. Williams, Earl Williams?
A. Earl Williams? That's a friend of mines.
Q. How do you know him?
How did his name show up in this answer?
MR. ANDREWS: Objection.
A. Because he is a friend of mine. Sometime he come over there. He come over there to look at job over there.
Q. Did he ever perform services for the company?
A. No, sir.
Q. Mr. Grey, how do you know Mr. Grey?

[Page 63]

D. Williams

A. That's my brother-in-law.
Q. Did your brother-in-law, Mr. Grey, ever perform services for the company?
A. No, sir.
Q. We'll come back to that.
Mr. McLean, David McLean, who is that?
A. That's a friend of mines.
Q. Did Mr. McLean ever perform services for the company?
A. No, sir.
Q. Now I'm going to ask you about each of them.
Your friend, Mr. McLean --
A. Yes, sir.
Q. -- you said he never performed services for either The Fresh Diet or Late Night Express; is that correct?
A. No, sir.
MR. ANDREWS: I think you misunderstood.
Yes, that is correct.
Q. Did he ever perform work --
A. Perform service for them?
Q. Yes.

[Page 64]

D. Williams

A. No.
Q. No, he never --
MR. ANDREWS: No, he didn't perform service?
THE WITNESS: No.
MR. ANDREWS: Thank you.
Q. What would Mr. McLean know about your hours or rate of pay or your relationship with The Fresh Diet or Late Night Express?
MR. ANDREWS: Objection.
A. Because they know the hours when I leave and when I get back, and they would ask me, and I would explain to them how long I stay out there.
Q. Mr. McLean would know the hours that you would leave your apartment --
A. Yeah, my apartment.
Q. -- and the hours you would come back to your apartment?
A. Yes, sir.
Q. Would he know anything else about your job other than what you told him?
A. No.
Q. Mr. Grey, you said, was your

[Page 65]

D. Williams

brother-in-law?
A. Yeah.
Q. What would Mr. Grey know about the companies other than what you told him?
MR. ANDREWS: Objection.
A. He know nothing unless I told him.
Q. Mr. Williams --
A. Yeah.
Q. -- Earl Williams --
A. Yes, sir.
Q. -- what would he know about the company other than what you would tell him?
A. Because he was trying to get a job there.
Q. You said he never actually --
A. Worked there.
Q. -- performed services for the company?
A. No.
Q. Do you know if he sent in an application?
What steps did he take to try to get a job there?
MR. ANDREWS: Objection.
A. Well, he just go there, and he ask

[Page 66]

D. Williams

like -- he ask if he could get a job. He didn't like fill out application. Said like if there is an opening, let him know.

**Q.** Do you know if Mr. Williams ever got a call after that?

A. Mr. Williams didn't work there.

**Q.** Do you know if he ever received a call from the company for any reason?

A. No.

**Q.** Mr. Spence, you said, was employed by the company.

A. Yes, sir.

**Q.** He was the one who made the Washington, D.C. --

A. Yes, sir.

**Q.** -- drive?

Was that while the company was based in New Jersey?

A. No, sir.

**Q.** When was that?

A. When it was based in Brooklyn.

**Q.** Do you know when Mr. Spence started working for the company?

A. He started work for them when they were

[Page 67]

D. Williams

in Brooklyn.

**Q.** If Mr. McLean was called to testify in this case, would he have any independent knowledge on his own that he would add to this case other than what you've told him?

MR. ANDREWS: Objection.

A. No.

**Q.** I'm going to ask the same question about Mr. Williams.

Does he have any independent knowledge of the inner workings of the company and your relationship with the company other than what you've told him?

MR. ANDREWS: Objection.

A. Yes.

**Q.** What would that be?

Aside from his application process, would he know anything else about the company?

MR. ANDREWS: Objection.

A. I don't know.

**Q.** As to Mr. Grey, if he were called to testify in this case, other than what you've told him, does he have any independent knowledge of how the company works and how the

[Page 68]

D. Williams

company operates?

A. No.

MR. ANDREWS: Objection.

**Q.** Besides Mr. Spence, who we've already talked about, are there any other employees that you have discussed this litigation with, employees of the company?

A. Yes, sir.

**Q.** Who are they?

A. Marquis, Teresa, Kenneth.

**Q.** If you could give me first and last name, it would be easier.

A. Some of the guys I don't know by the last name, but I know Teresa Jackson.

MR. ANDREWS: Say the first and last name.

A. Yeah. Teresa Jackson, Marquis Acklin, Cecilia Jackson, Andrew Spence. I don't remember the rest of them by their last name.

**Q.** Was there anybody else you know by the first name?

A. Yes, sir.

**Q.** Who is that that you discussed this litigation with?

[Page 69]

D. Williams

A. Kenneth, Fernando. Those are the guys that I remember by their names, by first names.

**Q.** I'm going to give this back to you again. This is Defendant's Exhibit 4, which you had previously reviewed (handing).

Do you recall reading those responses, and specifically your responses incorporated into that answer, prior to them being served upon the defendants in this case?

MR. ANDREWS: Objection.

A. Yes.

**Q.** Do you recall when you did that?

A. No.

MR. ANDREWS: Are you moving to another document now?

MR. MEYER: I will be in a second, yes.

**Q.** Mr. Williams, I'm going to show you now what's already been marked as Defendant's Exhibit 5. It is entitled "Plaintiff's First Corrected and Supplemented Response To Defendant's First Set of Requests For the Production of Documents (handing)".

Can you take a look at that?

[Page 70]

D. Williams

MR. ANDREWS: Again, just familiarize yourself with it. Jeff will have specific questions.

**Q.** Mr. Williams, does that document look familiar to you?

A. Yes, sir.

**Q.** If I could direct your attention specifically to, starting on page 39, document request number 116 to 147 and the responses thereto, again, I don't want to know about conversations with you and your counsel, but did you produce documents to your attorneys responsive to request number 116?

MR. ANDREWS: Objection.

A. Yes.

**Q.** The same thing with regard to 117.

MR. ANDREWS: Do you understand the question?

**Q.** Did you produce any documents responsive to document request number 117 to your attorneys?

A. Yes, sir.

**Q.** What did you produce in response to that specific request?

[Page 71]

D. Williams

A. Well, they asked me -- what I asked to bring in, I bring in.

**Q.** What document do you recall producing?

A. Like for the -- I bring in document for the route and pay stubs.

**Q.** I'm going to show you, Mr. Williams, a document which is Bate stamped FD000959 to 964 (handing).

If you could take a look at that, we'll call this Defendant's 58.

A. This document, I never seen this document.

**Q.** You've never seen it?

A. Never see this before.

**Q.** Can you please reread document request number 117, and then also read the response to the same?

MR. ANDREWS: Have you read it?

THE WITNESS: Yes.

**Q.** If I could direct your attention, Mr. Williams, to document request number 118, do you recall producing to your attorneys any documents responsive to that request, being request number 118?

[Page 72]

D. Williams

A. No.

**Q.** In the response, it says there are certain documents that are responsive, being documents Bate stamped FD002956 to FD003414. I'm going to show you now those documents (handing).

This is the entire stack (indicating). I'm not going to ask you to go through page by page because we'd be here the next six hours if we did it that way.

Just by looking at the first page here, does that document look familiar to you?

A. Yes, sir.

**Q.** How does it look familiar?

What do you recognize it from?

MR. ANDREWS: Objection.

A. From the company. It's where we get to do the delivery.

**Q.** Would this be, I guess in common company terms, the manifest?

A. Yes, sir.

**Q.** Up on top, the first notation above the grid says, "NY-R2".

A. Yes, sir.

[Page 73]

D. Williams

**Q.** Can you explain what that is?

A. That's for the route you're going to go on.

**Q.** Did you ever deliver the New York R2 route?

A. No, sir.

**Q.** Do you recall the route numbers or names of any of the routes you did deliver to?

A. Yes, sir.

**Q.** What were those?

A. If it's in this document, I could tell you.

**Q.** If you can recall first.

MR. ANDREWS: The question is do you recall the names of the routes that you covered.

A. No, I can't recall the name right now.

**Q.** You know you did not deliver to New York R2?

A. No, sir.

**Q.** Did you ever deliver to route BN?

A. No, sir.

**Q.** What about route NZ?

A. Yes, sir.

[Page 74]

D. Williams

**Q.** Looking specifically at this page, which is FD002959 --
A. Yes, sir.
**Q.** -- there are handwritten notations on here.
A. Yeah.
**Q.** Is that your handwriting?
A. Yes, sir.
**Q.** There's a column that says, "268 miles". There's handwritten numbers in each of those boxes.
Do you know what those numbers represent?
A. Yes, sir.
**Q.** What are those handwritten numbers?
A. These are the time you drop off the bag and this -- oh, this is the bag that get dropped off, and when the bag is dropped off is right here (indicating).
MR. ANDREWS: For the record, that's in the column that's titled "268 Miles".
THE WITNESS: Yeah.
MR. ANDREWS: The question is do

[Page 75]

D. Williams

you know what the handwriting is for.
A. This the amount of bags (indicating). This is amount of bags dropped off (indicating). Right here is how many returns I get back, how many bags I pick up (indicating). This is the time you do your delivery (indicating).
**Q.** You're sure the handwritten numbers in the column that says, "268 miles" is the number of bags?
A. No. That's the mileage.
**Q.** The handwritten numbers there, just by looking at it, it looks like it goes one through eight. They're out of order.
Would that be the order in which you made those deliveries?
A. Yes, sir.
**Q.** You made this delivery first, this one second, third, fourth (indicating)?
A. No.
**Q.** No?
A. No, amount of bags you drop off.
**Q.** One place was one bag?
A. Yeah.

[Page 76]

D. Williams

**Q.** Let's start with the one that says the number one here.
A. Yeah.
**Q.** It means you dropped off one, the number one, and you picked up three?
A. Yes, sir.
**Q.** What number is this (indicating)?
A. Twelve.
**Q.** That's a twelve?
A. Yeah.
**Q.** This says you dropped off twelve, picked up two?
A. Yeah.
**Q.** This one's seven (indicating).
It means you dropped off seven, picked up two?
A. Yes, sir.
**Q.** This is another page that says 2009, August 3, 2009 (indicating).
There's no handwriting in that "268 Miles" column; is that correct?
A. Yes, sir.
**Q.** Looking at these two, the first time appears to be 7:00.

[Page 77]

D. Williams

Would that be the time you made your first delivery?
MR. ANDREWS: Objection.
A. Not all the pages is right here because -- could be -- this is when I made the first delivery that night, but when you finish the delivery, everything is not right here (indicating).
**Q.** Would you make the deliveries in the order that they appear on the manifest from top to bottom?
A. Not all the time.
**Q.** Did you keep these manifests after your day of work was done?
A. Yes, sir.
**Q.** Of this whole document production, every route in there that's NY-R2, you never delivered to; is that correct?
MR. ANDREWS: Objection.
A. No.
**Q.** In every document in this stack that says route BN, you've never delivered?
A. No.
MR. ANDREWS: Objection.

[Page 78]

D. Williams

Q. NZ you did deliver to?

A. Yes, sir.

Q. At times?

A. Yes, sir.

Q. You're saying for these specific documents, which we've already sited, that is your handwriting?

A. Yes, sir.

Q. It's your testimony that on August 13, 2009 you ran the NZ route?

A. Yes, sir.

Q. This is the same NZ route, August 13 2009?

A. Yes, sir.

Q. There are some clients, in what should be deliveries towards the bottom, the last seven or so, that do not have any cooler bags or times.

Can you explain why that is?

MR. ANDREWS: Objection.

A. Because the thing about it, sometime you end up getting there, and some day I forget it because you try to rush. Sometime try to get to another delivery because time getting up on

[Page 79]

D. Williams

you. Some days you don't get to write them in.

Q. Did you make those deliveries?

A. Yes, sir.

Q. Absolutely 100 percent sure --

A. Yes, sir.

Q. -- you made those deliveries?

A. Yes, sir.

Q. This says route BN --

A. No.

Q. -- but it's your testimony you never did BN.

Did you ever deliver to route CL?

A. Sometimes.

Q. Is that your handwriting on the --

A. No.

MR. ANDREWS: Could you read the Bate numbers in? Otherwise, we'll never know.

MR. MEYER: This is the manifest for August 23, 2009 for route CL. We'll just do it that way because there's going to be multiple pages.

Q. This route, NZ, for April 28, 2009, is that your handwriting on the right?

[Page 80]

D. Williams

A. Yes, sir.

Q. You ran this route on August 28, 2009?

A. Yes, sir.

Q. Again, there are some deliveries that do not have any annotations in the "Cooler" category.

A. Some of them you don't get to write them in because of the time schedule when you try to rush sometimes. Some day just forget to just write it in.

Q. Towards the bottom of the next page, FD002969, it just looks like the copying got messed up. It says BN. It's a different date, May 6, 2009.

Is that your handwriting?

A. No, sir.

Q. Is that your handwriting on 2970?

A. Yes, sir.

Q. Just note, there's no other annotations other than one delivery time, correct?

A. Yes, sir.

Q. ND was a route you did run?

A. Yes, sir.

Q. This is your handwriting on --

[Page 81]

D. Williams

A. Yes, sir.

Q. -- 6/22/2009?

A. Yes, sir.

Q. This is route CL on August 23, 2009. There's some handwriting at the top.

Is that yours?

A. No, sir.

Q. NZ --

A. Yes, sir.

Q. -- on April 14, 2009.

That is your handwriting?

A. Yes, sir.

Q. This is route NZ for April 16, 2009.

Is that your handwriting?

A. No, that's not my handwriting right here (indicating).

Q. Would that indicate that you did not make that delivery route that day?

A. No, I did not --

MR. ANDREWS: Let him finish.

Q. It's your testimony on April 16, 2009 you did not deliver the NZ route?

MR. ANDREWS: Objection.

A. I did deliver it. What happen, sometime

[Page 82]

D. Williams

they cut a route because of sometime if it's too much -- if too much bags to deliver on the route, they got to cut it up and fit somebody else in.

Q. You only did a portion of the --

A. Sometime, yeah.

Q. -- NZ route --

MR. ANDREWS: Objection.

Q. -- on April 16, 2009?

MR. ANDREWS: Objection.

A. Yes, sir.

Q. Are there any annotations on any of the manifests from April 16, 2009 that show your handwriting?

A. Yes, sir.

Q. Where is that?

It's a three-page manifest for that one day. That's April 27th?

A. (Indicating.)

MR. ANDREWS: Just on these three pages, do you see your handwriting?

THE WITNESS: No, my handwriting's not on those.

[Page 83]

D. Williams

Q. You're absolutely positive that you made deliveries on that route that day?

MR. ANDREWS: Objection.

A. Yes, sir.

Q. Is there any indication on this three-page manifest that would prove that?

MR. ANDREWS: Objection.

A. No, not on these, sir.

MR. MEYER: Let me skip through these real quick to see if there's anything else.

FD002955 through, it should be, 3414 we'll mark as manifests.

Q. Mr. Williams, I'm going to show you what is a manifest for April 6, 2009 for route CL (handing). It seems to be a two-page document, at least what was produced.

Does that handwriting look familiar to you?

A. No, sir.

Q. That's not your route --

A. No.

Q. -- CL?

MR. ANDREWS: Objection.

[Page 84]

D. Williams

A. No.

Q. Did you ever make any deliveries on the CL route?

A. Coincidence, yes.

Q. Did you regularly make deliveries --

A. No.

Q. -- on the CL route?

A. No.

Q. When did you make deliveries on the CL route?

A. Not recall. I don't remember exactly when because not something you do all the time.

Q. Who delivered on the CL route?

A. Teresa.

Q. Teresa Jackson?

A. Yes, sir.

Q. Besides the NZ route, are there any other routes that you delivered to regularly?

MR. ANDREWS: Objection.

A. You know, there's other routes, but I don't remember it because often time they cut them up in different names and word, so some of them I don't recall them because I stop work with them for like two years now, so --

[Page 85]

D. Williams

Q. Do you recall the name of the Boston route?

A. No. It's -- it's one place I go and drop-off, so I don't -- don't know deliver up there.

Q. Do you recall ever making deliveries on the RT route?

A. RT?

MR. ANDREWS: Objection.

The question is do you recall that.

A. No, I don't remember for that.

Q. Would you have any reason to have manifests from the RT route in your possession?

MR. ANDREWS: Objection.

A. I don't remember if --

Q. You don't remember having any manifests?

A. I don't remember.

Q. Do you currently have any manifests from deliveries you made on behalf of The Fresh Diet or Late Night Express in your possession?

A. No.

Q. Did you produce any manifests in your possession to your attorneys as part of this

[Page 86]

D. Williams

litigation?
A. Yes, sir.
**Q.** To the best of your knowledge, were those all from the NZ route, or were there any other routes also?
MR. ANDREWS: Objection.
A. Could be from other routes, but not -- I can't remember them, all of them, like now. I don't remember all of them.
**Q.** Just so we're clear, because I sort of want to move back to our prior discussion about the different routes that you had here, was the NZ route the New Jersey/Upstate New York route?
A. Yes, sir.
**Q.** Boston was a separate route?
A. Yes, sir.
**Q.** That was a large majority of the routes you delivered to?
MR. ANDREWS: Objection.
A. Yes, sir.
**Q.** The RT route, you said, you did not recall?
A. Not recall.
**Q.** Do you know who did run the RT route,

[Page 87]

D. Williams

what driver?
MR. ANDREWS: Objection.
A. No.
**Q.** CL, you said, was Teresa Jackson's?
A. Yes, sir.
**Q.** While you were making deliveries for the company, did you make deliveries or did you work anywhere else?
A. No, sir.
**Q.** Have you worked for any other delivery companies?
A. No, sir.
**Q.** Aside from making deliveries, did you work for any other companies while you were working for The Fresh Diet --
A. No, sir.
**Q.** -- or Late Night Express?
MR. ANDREWS: The answer's no, right?
THE WITNESS: (Witness nods head.)
**Q.** Route BN, I don't know if we talked about that.
Do you recall ever making deliveries on

[Page 88]

D. Williams

that?
A. No, sir.
MR. ANDREWS: Objection.
**Q.** When you got your manifests, would you set up the delivery route, which place you would deliver to first?
MR. ANDREWS: Objection.
A. No.
**Q.** Would that be your decision?
A. No, company's decision.
**Q.** If you knew a better way, would you change the route?
MR. ANDREWS: Objection.
A. No.
**Q.** Aside from the manifests for route NZ, do you have any other documentation that would show the times that you were working or the times that you made deliveries?
A. No.
**Q.** Were you compensated on a weekly or biweekly basis?
How often were you paid?
MR. ANDREWS: Objection to form.
A. Every two weeks. Rephrase that.

[Page 89]

D. Williams

MR. ANDREWS: Do you want to add to that answer?
THE WITNESS: Yeah.
A. No, I don't think it was every two weeks. We get paid every week. It was a weekly basis.
**Q.** Do you recall ever signing any independent contractor agreement with the company?
A. No.
MR. ANDREWS: You said no, but remember, shaking your head won't work for the court reporter.
THE WITNESS: She heard me.
MR. ANDREWS: She heard you, I know. I'm just stressing that, that's all. In case you, unfortunately, ever have to be in a deposition again, you'll know what to do.
**Q.** You said you were injured in a car accident. You missed three to four months of time.
Was there any other time that you took off --

[Page 90]

D. Williams

A. No.
Q. -- in terms of vacation?
A. Don't get vacation time here.
Q. Did you ever take a vacation?
A. Can't get no vacation.
MR. ANDREWS: The question is --
A. No.
MR. ANDREWS: -- did you ever take vacation.
A. No.
Q. I'm not asking if you were paid for it. I'm asking if you ever took any.
A. No.
Q. Other than the time you were injured, did you ever take any sick or personal time?
A. No.
Q. Never?
A. No.
Q. Besides the one incident we've already talked about, was there any other time where you were unable to work?
A. No.
MR. ANDREWS: Objection.
MR. MEYER: Off the record.

[Page 91]

D. Williams

(Whereupon, a discussion was held off the record.)
Q. Mr. Williams, you had previously told the court reporter your address in Yonkers, and that's what's on your 1099 as well for 2010.
A. You said my address wasn't on the --
Q. On your 1099 form, it was a Convent Avenue --
A. Convent Avenue, yes, sir.
Q. -- in Yonkers, New York.
A. Yes, sir.
Q. How long have you been at that address?
A. I've been there for a long time, like about over ten years.
Q. Did you ever live in New Jersey?
A. No, sir.
Q. When you would show up to work or prior to showing up for work, in deciding the routes, the manifests in this case, did you ever decline a route?
Did you ever tell the company no, I'm not going to do that route, I want to do something else?
A. No, sir.

[Page 92]

D. Williams

Q. Going back to the bags.
You said that for a period of time you would actually pack the bags themselves.
A. Yes, sir.
MR. ANDREWS: Objection.
Q. Would you pack the food?
The food comes in small containers, I would imagine.
A. Yes, sir.
Q. Would you actually perform that work or just putting those containers into the bags themselves?
MR. ANDREWS: Let him finish. Okay. Go.
A. They would come out, and you got to separate them, put them where all the -- where they going to go, on the route that it going to go on. It would come up in a tray.
Q. When you say "they," you mean the food?
A. The food.
The food come out on a tray, but like different package of food, so when it comes out, you got to separate them out for the route they going on, put them together, then after

[Page 93]

D. Williams

put all them together, then you're going to pack the bags on the route that those things supposed to go.
Q. You said you did this a lot more when you were in New Jersey --
A. Yes, sir.
Q. -- rather than Connecticut and New York --
A. Yes, sir.
MR. ANDREWS: Objection.
Q. -- because there were people, correct?
MR. ANDREWS: Objection.
A. Yes, sir.
Q. When you packed the bags into your car. How would you do that?
A. Pack them by the route you're going on. So you got to pack them -- the first delivery, you put that last one that go inside, the delivery you know where you start from.
Q. You would always pack your car --
A. Yes, sir.
Q. -- or would somebody else ever do that?
A. Pack the car.
Q. You?

[Page 94]

D. Williams

MR. ANDREWS: You'd pack it yourself?

THE WITNESS: Yes sir.

Q. How long would that take you? Talking about packing the car, not packing the bags, packing the car itself.

A. Take about like twenty minutes, twenty-five minutes.

Q. You said that that was somewhere between -- where'd you say how many bags that would be?

MR. ANDREWS: Is that the question?

Q. You said when you had that New Jersey/Upstate New York route it was thirty-five to forty-five stops.

How many bags would that be?

A. Well, Upstate with thirty-five --

Q. Let's go back.

Route NZ, the one you said that you normally delivered to --

A. Yes, sir.

Q. -- how many bags were on that route, generally?

A. Thirty-five.

[Page 95]

D. Williams

MR. ANDREWS: Objection.

Q. Approximately thirty-five bags?

A. Yeah.

Q. Thirty-five bags would take you twenty to twenty-five minutes to pack your car?

A. No. It would take you more than that.

Q. When you said twenty to twenty-five minutes, what were you referring to?

A. Well, in reference is that when you have less bags -- when you have less bags, you take that time, but when you have more bags, like thirty-five bags, you got to take more time to pack the bag, pack the car, because you have to pack it -- when it get to the location, you can know which location take out.

Q. I asked you before when you packed the car how long it would take you to normally pack the car. You said twenty to twenty-five minutes.

A. Yeah, but at the time when you asked me, it was like on the shorter days then. On the shorter days then. That's why I give you that estimate that time.

[Page 96]

D. Williams

Q. I said on average on a regular day.

A. Yeah.

Q. You said twenty to twenty-five.

A. All right. Well --

Q. On a regular day on the NZ route, how long would it take you to pack the car?

A. Take about a half an hour or more to pack your bags.

Q. That would be with approximately thirty-five bags?

A. Yeah.

Q. About a minute a bag, roughly speaking?

A. Yeah.

MR. ANDREWS: Objection.

Q. When you packed the bags, would they be right next to the car, or would they be on a cart?

How would you get them from the kitchen, from the facility, to your car?

A. Sometimes you got to take them like little by little and take them to the car.

Q. Actually carry them?

A. Yeah, and take them to the car, and sometime the car might park -- because it's

[Page 97]

D. Williams

like of -- a lot of you are there. Sometime the cars are parked on the street, so you got to walk out, take them by the route, and pick them up and put them in the car because you don't want to pack them outside because you don't want nobody come and move anything that's out there. So, you know, you take your time and pack them in the car.

Q. If you had to carry them that way, how many could you carry at the same time?

A. About four -- four -- six at a time.

Q. In each hand or together?

A. Yeah, in each -- no. Three in each hand. Yeah.

MR. MEYER: I don't have anything further. Thank you very much.

(Continued on the next page to accommodate the jurat.)

[Page 98]

D. Williams

THE WITNESS: Thank you, sir.

MR. ANDREWS: I don't have any further questions, so we can go off the record.

(Time Noted: 12:18 p.m.)

_______________________

DAVID A. WILLIAMS

Subscribed and sworn to before me this ___ day of ___________, 2013.

_________________________________

Notary Public

[Page 99]

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| David A. Williams | Jeffery Meyer | 4 |

EXHIBITS

| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| 55 | Receipts | 4 |
| 56 | 2010 1099 form | 4 |
| 57 | Verification | 4 |
| 58 | Independent Contractor Agreement | 4 |
| 59 | Manifests | 5 |

REQUESTS FOR PRODUCTION

| DESCRIPTION | PAGE |
|---|---|
| 2010 tax return | 53 |
| 2009 tax returns | 54 |

[Page 100]

CERTIFICATE

I, MELISSA KAHANE, hereby certify that the Examination Before Trial of DAVID A. WILLIAMS was held before me on the 3rd day of October, 2013; that said witness was duly sworn before the commencement of his testimony; that the testimony was taken stenographically by myself and then transcribed by myself; that the party was represented by counsel as appears herein;

That the within transcript is a true record of the Examination Before Trial of said witness;

That I am not connected by blood or marriage with any of the parties; that I am not interested directly or indirectly in the outcome of this matter; that I am not in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 5th day of October, 2013.

_______________________

MELISSA KAHANE

[Page 101]

ERRATA SHEET

PAGE/LINE CORRECTION

---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------
---------------------------------------------

A

**ability** 6:24
**able** 39:21
**absolutely** 79:5 83:2
**accident** 7:23,25 8:4 44:21,21 45:2,5 46:16 47:22,23 89:22
**accommodate** 97:20
**Acklin** 1:4 68:18
**action** 5:7
**add** 7:2 67:5 89:2
**address** 4:10 32:6,9,10 41:4 41:5 91:5,7,13
**addresses** 41:7
**administer** 3:17
**administrative** 9:6
**advise** 6:13
**agency** 9:15,16
**ago** 7:20 9:10,12
**AGREED** 3:5,10 3:14
**agreement** 4:24 89:9 99:13
**ALC** 1:8
**alcohol** 6:23
**allow** 6:13
**amount** 16:5 23:9 33:13 36:10 53:22 75:3,4,23
**Andrew** 68:19
**Andrews** 2:7 5:21 11:22 12:6,13 14:9 14:15 15:9,21 16:2,11 17:2 17:12 20:3,20 22:4 23:5,24 24:25 26:10 28:13 29:8,13 30:14,25 31:13 31:22 33:4,21 33:25 34:6,18 35:16 37:18 38:15,18 39:2 39:5,23 40:7 40:25 41:11 43:12 44:6 45:22,24 46:13 47:7 49:10,17 49:21 50:4,7 50:14,24 52:4 52:8,16 53:4 53:10,16 54:17 55:5 56:14,23 57:5,12,18 59:3,17,21 60:8,13 61:3,9 61:18 62:18 63:20 64:4,7 64:11 65:6,24 67:7,15,20 68:4,16 69:11 69:15 70:2,15 70:18 71:19 72:17 73:15 74:21,25 77:4 77:20,25 78:21 79:17 81:21,24 82:9,11,21 83:4,8,25 84:20 85:10,16 86:7,20 87:3 87:19 88:4,8 88:14,24 89:2 89:12,16 90:7 90:9,24 92:6 92:14 93:11,13 94:2,12 95:2 96:15 98:3
**annotations** 80:6 80:20 82:13
**answer** 6:11,12 6:15,15 7:7 15:10 17:13 40:9 59:21 61:8,10,12,22 62:17 69:9 89:3
**answered** 7:10
**answers** 6:8
**answer's** 87:19
**anybody** 39:12 61:18 68:21
**apartment** 4:12 64:17,18,20
**appear** 77:11
**appears** 76:25 100:11
**application** 65:21 66:3 67:18
**approximate** 36:22
**approximately** 7:19 12:9 17:17 27:8 28:11 29:21 33:23 46:18 47:18 95:3 96:10
**April** 79:24 81:11,14,22 82:10,14,19 83:16
**area** 21:3 22:21 35:5,10 39:13 39:21 40:19 41:13,18 46:8
**areas** 34:4
**arrive** 14:20
**Aside** 9:3 11:13 13:14 67:18 87:14 88:16
**asked** 7:6,9 11:23 15:8 40:9 55:11 59:15 61:20 71:2,2 95:18 95:22
**asking** 5:12 90:12,13
**attention** 70:8 71:21
**attorney** 2:5 3:20 5:7 7:15 49:7 59:19 60:4
**attorneys** 2:10 3:6 50:22 61:17,21,25 70:13,22 71:23 85:25
**August** 76:20 78:11,14 79:21 80:3 81:5
**authorized** 3:16
**Avenue** 4:12 91:9,10
**average** 23:7 26:4 96:2
**a.m** 1:23 37:8,9 37:13,22 55:15 56:8,12,12,22 57:16,21 58:14 58:20,24
**a/k/a** 1:11

B

**B** 99:7
**back** 13:22 20:15 25:25 27:13,17,25 29:23,25 30:2 30:3,15,19,22 31:25 33:11,16 36:17 38:8,9 44:24,25 45:8 51:4,24 53:23 55:9 63:6 64:13,19 69:4 75:6 86:12 92:2 94:19
**bad** 44:21
**bag** 11:10 42:18 42:19 74:17,18 74:19 75:24 95:15 96:13
**bags** 11:14 13:15 20:5 21:25 22:5 23:7,12 23:13,22 26:3 26:19,25 27:21 27:22,22 28:22 29:12 36:5 55:16,24 56:13 57:15 75:3,4,6 75:11,23 78:18 82:3 92:2,4,12 93:3,15 94:6 94:11,17,23 95:3,5,12,12 95:13,14 96:9 96:11,16
**Baltimore** 21:6 39:16
**based** 19:9 25:8 35:21 36:20 37:11,14 40:10 43:5,16 47:3 47:12,16,17 50:5,12 55:15 56:11 66:18,22
**basis** 88:22 89:7
**Bate** 49:12,13 71:8 72:5 79:18
**Bear** 34:10 35:5
**beginning** 14:22
**behalf** 1:5 85:21
**believe** 12:9 35:15
**best** 86:4
**better** 18:16 88:12
**biweekly** 88:22
**blood** 100:15
**BN** 73:22 77:23 79:9,12 80:14 87:23
**Boston** 20:10,15 20:18 21:8,10 21:19,20 22:24 23:23 25:24 26:2,9,13,15 26:15,17 27:9 27:11 28:12 30:8 31:11 39:15 40:12

43:14,18,21 44:25 46:3,4 46:10,24 85:2 86:16
**bottom** 62:4 77:12 78:17 80:12
**box** 52:23
**boxes** 74:12
**break** 7:3,4,8,9 25:5 52:5,10 55:4
**breakouts** 25:25
**Bridge** 34:10
**bring** 27:25 36:17 71:3,3,5
**Brooklyn** 12:21 12:23 17:9 19:18,24 20:6 20:7 21:17,18 29:23,25 30:15 30:19 37:25 39:4 42:21 47:13,16,17 48:24 56:3 66:22 67:2
**brother-in-law** 63:2,3 65:2
**BRYANT** 1:4
**build** 12:23
**building** 14:2

**C**

**C** 2:4 100:1,1
**call** 16:12 26:16 40:20 49:9 58:17 66:6,8 71:11
**called** 16:9 67:3 67:22
**calls** 58:8
**car** 8:4 22:5 44:22 48:2,7 48:19 49:4 89:21 93:15,21 93:24 94:6,7 95:6,15,19,20 96:7,17,20,22 96:24,25 97:5 97:9
**carry** 96:23 97:10,11
**cars** 51:8 97:3
**cart** 96:18
**case** 8:6,11,19,22 60:7 67:4,6,23 69:10 89:18 91:20
**categorized** 54:15,25
**category** 80:7
**CATERING** 1:11,12
**Cecilia** 1:4 68:19
**certain** 38:7,8,9 38:10,14 53:22 55:13 56:16 57:7 58:11,12 72:4
**certification** 3:8
**certify** 100:3
**cetera** 44:12
**chance** 49:14
**change** 44:14 56:15 88:13
**changed** 44:15
**charge** 3:20
**check** 51:10,12
**Chester** 41:16 44:4,12 46:6
**CHOW** 1:3
**Citizenship** 9:9
**City** 43:9 44:8 44:18 47:4,5 47:15,24
**CL** 79:13,21 81:5 83:16,24 84:4,8,10,14 87:5
**classified** 53:13 54:3,15
**classify** 53:14 54:24
**clear** 86:11
**client** 58:2
**clients** 20:8 26:18 56:15 57:18 58:17,18 78:16
**close** 41:14
**Coincidence** 84:5
**column** 74:10,22 75:10 76:22
**come** 13:21 15:3 15:5,8 16:8,13 16:14,24 18:21 18:25 19:5 27:5 28:25 34:19 35:7 37:22 53:17 58:8 62:20,20 63:6 64:19 92:16,19,22 97:7
**comes** 92:8,23
**coming** 14:24 16:16 17:5,8 18:6 30:22 31:7,9 51:13
**commencement** 100:7
**common** 72:20
**communications** 59:18
**companies** 5:14 5:15 28:8 37:4 51:20 54:7 65:5 87:12,15
**company** 5:16 5:19 8:2,16,17 9:25 10:7 11:25 12:17,17 12:21,23 13:3 13:6,21,25 16:19 17:14,19 19:9,18,24 21:16 22:12 25:13,18,19 32:2 35:13 37:10,14,25 40:10 43:16,25 44:20,22 48:6 48:8,17,18 49:23 50:12,19 51:3,11,13,15 51:17 52:21 53:2,3 55:11 55:14,20 56:2 56:11,21 62:8 62:23 63:4,10 65:12,18 66:9 66:12,18,24 67:12,13,19,25 68:2,8 72:18 72:20 87:8 89:10 91:22
**company's** 32:7 88:11
**compensated** 88:21
**compensation** 51:10 53:15
**compound** 41:2
**confirm** 53:24
**Congratulations** 9:13
**connected** 100:15
**Connecticut** 12:18,21 18:10 18:11,14 19:6 19:10,21,22,25 20:10 21:5 22:17 25:10 35:13,17 36:3 36:20,21 37:24 41:14 46:7 48:24 50:6,13 55:20 93:8
**construction** 31:3,12,14,19
**containers** 92:8 92:12
**Continued** 97:19
**contractor** 4:24 10:19 89:9 99:13
**Convent** 4:12 91:8,10
**conversations** 61:16 70:12
**cook** 15:13
**cooler** 78:18 80:6
**copy** 3:19
**copying** 80:13
**CORP** 1:10,12
**correct** 12:7 14:10,14 25:3 28:3 30:17 40:13,16 44:12 46:21 55:17 57:17 63:18,22 76:22 77:19 80:21 93:12
**Corrected** 69:22
**CORRECTION** 101:3
**counsel** 6:13 70:12 100:11 100:19
**couple** 6:2 11:24 12:4 14:17 44:23 58:7
**COURIER** 1:10
**court** 1:2 3:19 6:9,16 8:5 9:5 89:14 91:5
**covered** 73:17
**currently** 85:20
**curse** 38:21
**cut** 82:2,4 84:22
**CV** 1:8

**D**

**D** 4:2,2 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1

31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:2
**date** 4:16,19,22 5:2,5 40:14 80:14
**dates** 44:17
**David** 1:4,18 4:9 5:21 63:7 98:9 99:5 100:5
**day** 10:6 11:6 16:24 21:12,14 23:14,15,23 28:12 29:16 43:13 44:9 55:13 77:15 78:23 80:10 81:19 82:19 83:3 96:2,6 98:12 100:6,21
**days** 13:24 14:6 16:14,17,21,23 24:16 26:4 39:10 79:2 95:23,24
**deadline** 37:3,13 37:16,22 55:13 55:16,19 56:4 56:22 57:10 58:14,16
**deadlines** 38:14 57:4,13,21 59:2
**deciding** 91:19
**decision** 88:10 88:11
**decline** 91:21
**dedicated** 16:18 46:24,25
**defendant** 1:19 8:6,24
**defendants** 1:14 2:10 5:7 69:10
**Defendant's** 4:15,18,21,25 5:4 49:6,9 52:2 59:6 60:23,24 69:5,20,23 71:11 99:9
**deliver** 11:12 13:21 14:5 21:2 28:25 32:19 35:9 36:16 42:13 55:24,25 57:8 58:9 73:5,9,19 73:22 78:2 79:13 81:23,25 82:3 85:5 88:7
**delivered** 38:10 55:16 56:13,13 57:16 77:19,23 84:14,19 86:19 94:21
**deliveries** 14:3,7 14:13,19 20:25 22:14,19 24:17 25:2 26:19 32:3,4,17,24 33:18,22 34:17 34:24 35:18 36:8 37:5,16 39:8 41:21 42:3,6,20,23 43:4,8 44:11 44:18 45:16 48:13 58:3,15 75:17 77:10 78:17 79:3,7 80:5 83:3 84:3 84:6,10 85:7 85:21 87:7,8 87:14,25 88:19
**delivering** 34:5 34:21 35:21 36:4
**delivery** 11:5,12 11:13,17 13:14 13:23 14:4 15:15,16,18 16:5 20:14,16 20:17,18,21 23:10 26:12,14 26:21,22 27:25 33:13 35:19 37:7 42:12,12 42:15,16 45:4 59:2 72:19 75:7,19 77:3,7 77:8 78:25 80:21 81:19 87:11 88:6 93:18,20
**demand** 54:22
**depend** 23:9
**depends** 23:18 23:19,19 28:24 32:18 34:3 36:6 39:9
**deposed** 7:12,13
**deposition** 3:15 9:3 89:19
**description** 10:16 99:9,17
**Diet** 1:9,10,10,11 1:12 5:10,17 9:20 51:12 63:17 64:10 85:21 87:16
**different** 20:9 25:6 38:12 44:5,7 51:13 53:12 56:11 80:14 84:23 86:13 92:23
**direct** 70:8 71:21
**directly** 100:17
**disclose** 59:17
**disclosing** 59:22
**discovery** 60:6
**discussed** 68:7 68:24
**discussion** 86:12 91:2
**disrupt** 52:9
**distributing** 29:12
**DISTRICT** 1:2 1:2
**document** 52:11 52:17,19 59:8 59:13,16,25 60:5,11,15,17 61:2 69:16 70:5,9,21 71:4 71:5,8,12,13 71:16,22 72:13 73:12 77:17,22 83:17
**documentation** 88:17
**documents** 49:7 60:6,7 69:24 70:13,20 71:24 72:4,5,6 78:7
**doing** 11:3,5 14:19 15:20 18:18 21:20 22:16 31:11 40:12,15,19 46:5 47:9,24
**dollar** 52:24
**Dolowich** 1:20 2:10
**drive** 20:15 21:5 22:13 23:23 28:12 29:23,25 30:2,3,5,22,23 36:12 62:12 66:17
**driver** 18:24 62:10,11,12 87:2
**drivers** 15:17,18 20:13 27:6,8,8 27:13
**driving** 22:10 48:2,15
**drop** 27:18 42:16 74:17 75:23
**dropped** 74:19 74:19 75:4 76:5,12,16
**drop-off** 85:5
**drop-offs** 28:18
**drugs** 6:21,22
**DUCHMAN** 1:13
**duly** 4:3 100:7
**D.C** 20:11 62:12 66:15
**d/b/a** 1:11

## E

**E** 2:4,4 99:2,7 100:1,1
**Earl** 62:13,14 65:10
**earlier** 10:22 57:4
**earliest** 57:10
**early** 11:6 15:6 16:8,15,17,25 18:21
**earnings** 53:2,9 53:14 54:3,16 54:24
**easier** 68:13
**effect** 3:18 37:8 37:10
**eight** 75:15
**either** 5:17 6:6 9:20 31:19 48:18 63:17

**employ** 100:19
**employed** 66:11
**employee** 18:22
**employees** 68:6 68:8
**empty** 27:24
**ended** 43:25
**endurance** 7:4
**entire** 18:5 72:8
**entitled** 69:21
**ERRATA** 101:1
**ESQ** 2:7,12
**estimate** 95:25
**et** 44:12
**evening** 10:20 14:23 33:9,10 38:20
**everybody** 27:2 27:4
**everything's** 34:14
**exactly** 19:13 46:4 84:12
**examination** 1:17 3:19 4:6 99:4 100:4,13
**examined** 4:5
**Exhibit** 4:15,18 4:21,25 5:4 60:23 69:5,21
**exit** 36:13,14,15
**expectations** 57:19 58:3 59:2
**expenses** 48:7,7 48:18
**explain** 7:13 60:9 64:14 73:2 78:20
**Express** 1:9,10 1:12 5:10,18 9:20 63:18 64:10 85:22 87:18

**F**

**F** 100:1
**facility** 14:20 15:20 17:9 18:15 21:21 26:5 27:17 32:7,16 38:3,8 38:25 39:8 46:21 48:25 96:20
**familiar** 52:11 52:17 70:6 72:13,15 83:19
**familiarity** 49:19
**familiarize** 70:3
**far** 39:12
**fast** 16:6
**FD000959** 71:8
**FD002955** 83:13
**FD002956** 72:5
**FD002959** 74:3
**FD002969** 80:13
**FD003414** 72:5
**Federal** 9:16,17
**Fernando** 1:3 69:2
**fifty** 23:20
**figure** 52:24
**file** 2:13 51:24 53:6 54:12
**filed** 53:21
**filing** 3:7
**fill** 11:23 14:7 66:3
**fine** 52:6,8
**finish** 5:22 6:14 17:13 25:24 29:11 32:19 36:19,21 52:7 55:25 59:3 77:7 81:21 92:14
**finished** 55:13
**FIRM** 2:5
**first** 4:3 11:4 17:11 31:25 39:12 44:14 60:24 62:11 68:12,16,22 69:3,21,23 72:12,23 73:14 75:19 76:24 77:3,7 88:7 93:18
**fit** 82:4
**five** 27:6 30:4,11 52:5
**FL** 1:10,11,11,12 1:12
**Flip** 61:3
**Florida** 51:14
**focus** 43:15 61:5
**follows** 4:5
**food** 58:9 92:7,8 92:20,21,22,23
**force** 3:17
**forget** 78:23 80:10
**form** 3:11 4:17 51:19 52:13,14 52:15 54:5,16 88:24 91:8 99:11
**forty** 34:2
**forty-five** 34:3 36:5,8 94:16
**four** 25:16 26:20 27:6,8,8,9,11 27:12 28:14 30:7 40:3 45:14,15 47:2 47:19 61:6,7 89:22 97:12,12
**fourth** 75:20
**Fresh** 1:9,10,10 1:11,12 5:10 5:17 9:20 51:12 63:17 64:10 85:21 87:16
**Friday** 24:18,23 24:24
**friend** 62:14,19 63:8,14
**frozen** 28:7
**full** 48:5
**furnished** 3:20
**further** 3:10,14 97:17 98:4

**G**

**gas** 26:17 28:16 48:7,18,20 49:3
**general** 16:22 49:18
**generally** 14:21 94:24
**getting** 29:17 33:14 78:23,25
**give** 20:16 26:18 29:4 49:3 51:3 51:4 60:25 68:12 69:4 95:24
**given** 9:4 23:23 37:3 53:11
**giving** 40:14
**gladly** 7:4
**global** 5:20
**go** 1:11 8:5 11:6 15:14 16:7 19:4 20:13,16 24:11 25:25 26:15,23 27:16 31:16,25 33:7 33:19 34:9 36:11,13 41:4 55:9 65:25 72:9 73:3 85:4 92:15,18,19 93:4,19 94:19 98:4
**goes** 75:14
**going** 5:12,15 7:8 8:15 10:4 22:15,24 24:10 26:13,15 29:2 31:6,8 36:12 39:18 44:24 45:20 46:5 49:6 51:25 59:5,6 60:22 61:11 63:12 67:9 69:4,19 71:7 72:6,9 73:3 79:23 83:15 91:23 92:2,18,18,25 93:2,17
**Gonzo** 1:20 2:10
**government** 9:15
**GRAB** 1:11
**Grey** 62:25,25 63:3 64:25 65:4 67:22
**grid** 72:24
**ground** 6:2
**guess** 72:20
**guys** 20:16 27:25 68:14 69:2
**GUZMAN** 1:5

**H**

**H** 99:7
**half** 30:4 47:5 96:8
**hand** 26:25 28:22 97:13,15 100:21
**handed** 27:12
**handing** 49:9 52:3 59:9 61:2 69:6,24 71:9 72:7 83:17
**handwriting** 74:8 75:2 76:21 78:8 79:15,25 80:16 80:18,25 81:6 81:12,15,16 82:15,23 83:19
**handwriting's** 82:25
**handwritten** 74:5,11,16 75:9,13
**happen** 81:25

**happened** 18:8
47:8
**happens** 20:7
**Harman** 2:5
61:17
**Hartford** 41:15
**head** 6:10,10
27:13,15,17
37:21 42:17
87:22 89:13
**heading** 26:8
**hear** 6:5
**heard** 89:15,16
**hearing** 9:6
**held** 1:19 91:3
100:5
**help** 11:8,8,24
12:22 13:20
14:24 16:7
18:24
**helping** 13:24
**hereunto** 100:20
**HERNANDEZ**
1:3
**he'll** 49:17 61:4
**hit** 8:3
**HOLDINGS**
1:11
**home** 27:15
33:11,14,19
36:24
**hour** 23:6 26:6
28:24 29:10,15
30:23,24 31:5
52:10 96:8
**hours** 28:14 30:4
30:7,12 40:3
64:9,12,16,19
72:10
**house** 33:15,16
**Hussain** 1:12
11:18,21,22
58:6
**Hussain's** 12:2
12:10 13:16

**I**

**ice** 27:18,21 28:5
**identification**
4:16,19,22 5:2
5:5
**identify** 54:2
**imagine** 92:9
**incident** 90:20
**incorporated**
69:8
**independent**
4:23 10:19
67:4,11,24
89:9 99:13
**Index** 1:8
**indicate** 53:9
81:18
**indicating** 52:25
59:14 61:12
72:8 74:20
75:3,5,6,8,20
76:8,15,20
77:9 81:17
82:20
**indication** 83:6
**indirectly**
100:17
**individual** 8:9
8:10
**Individually** 1:5
1:12,13,13
**influence** 6:22
**inhibit** 6:24
**injured** 89:21
90:15
**inner** 67:12
**inside** 22:7 28:7
93:19
**instructions**
55:12
**insulated** 27:22
**interchangeably**
5:16
**interested** 61:15
100:17
**interrogatories**
60:25
**interrogatory**

61:7
**involve** 8:16
**Island** 42:24
43:2

**J**

**J** 2:7
**Jackson** 1:4,4
68:15,18,19
84:16
**Jackson's** 87:5
**Jeff** 5:6,21 17:12
61:11 70:3
**Jeffery** 2:12
99:5
**Jersey** 9:24
12:17,18 17:10
17:11,14 18:2
19:21 20:10
21:5 22:17
25:7,8 32:2,4,7
32:12,25 33:17
33:23 34:4,12
34:16,21,23
35:2,19,22,24
36:16,17 37:11
37:14,17 41:9
43:5,7,9,10
44:3,8,14,18
46:16,17 47:4
47:5,8,10,15
47:24 48:23
50:5,13 55:15
66:19 91:16
93:6
**Jersey/Upstate**
86:14 94:15
**JLC** 1:8
**job** 10:15 16:19
62:21 64:23
65:14,23 66:2
**jobs** 13:18
**JUANY** 1:5
**JUDAH** 1:13
**July** 10:13
**June** 10:13
**jurat** 97:20

**K**

**KAHANE** 100:3
100:24
**Kaufman** 1:20
2:10
**keep** 5:23 28:8
51:5 77:14
**Kenneth** 1:3
68:11 69:2
**kind** 11:3 38:22
**King** 26:16
41:16
**kitchen** 96:19
**knew** 58:2 88:12
**know** 5:18 7:3
10:3,10 16:8
19:11 32:8
34:8,9,19,21
34:25 35:7,9
38:23 49:15
51:4,6,12
53:18,20,21
58:9,10 59:8
59:15,24 60:16
61:8 62:16,25
64:8,12,16,22
65:4,7,12,20
66:4,5,8,23
67:19,21 68:14
68:15,21 70:11
73:19 74:13
75:2 79:19
84:21 85:5
86:25 87:23
89:17,20 93:20
95:17 97:8
**knowledge** 67:5
67:11,25 86:4

**L**

**L** 3:3 4:2,2
**large** 86:18
**larger** 20:2
**Late** 1:9 5:9,18
9:20 63:17
64:10 85:22
87:18

**latest** 21:23 57:8
**LATTIMORE**
1:5
**lawsuit** 7:21,22
7:24 8:20,25
**leave** 12:16
14:25 15:14
17:18 19:2
29:17,18 32:16
32:20 33:9
39:7 40:5
42:15 47:2
64:12,17
**leaving** 30:10
32:22
**letters** 27:5
40:23 41:4
**let's** 7:11 25:24
31:25 43:15
60:10 76:2
94:19
**line** 52:7
**litigation** 68:7
68:25 86:2
**little** 18:16 25:20
96:22,22
**live** 91:16
**LLP** 1:21 2:10
**load** 22:5,7 23:2
23:3 26:6
**loading** 23:8
**local** 22:19
40:20
**location** 50:2
95:16,17
**locations** 35:20
41:20
**long** 9:10 17:14
18:2 19:9,12
19:13,14,21
23:3 25:17
28:11,21 29:6
30:2 36:7 43:2
44:17 46:9,14
47:15 64:14
91:13,14 94:5
95:19 96:7

**longer** 19:3 30:23 31:6
**look** 49:8,11 52:2,13,17,23 53:19 54:18,20 59:7 62:21 69:25 70:5 71:10 72:13,15 83:19
**looking** 53:23 72:12 74:2 75:14 76:24
**looks** 75:14 80:13
**loss** 38:11
**lost** 44:22
**lot** 38:5 93:5 97:2

**M**

**M** 4:2
**majority** 86:18
**making** 14:2,13 32:3,17,24 33:22 34:17 39:8 43:18 44:11,18 45:4 48:12 85:7 87:7,14,25
**Mall** 36:14
**Manhattan** 41:8 42:4
**manifest** 34:15 34:15 41:6,8 72:21 77:11 79:20 82:18 83:7,16
**manifests** 5:3 77:14 82:14 83:14 85:15,18 85:20,24 88:5 88:16 91:20 99:14
**marathon** 7:5
**mark** 52:2 59:6 83:14
**marked** 4:14,18 4:21,24 5:4 60:23 69:20
**Marquis** 1:4 68:11,18
**marriage** 100:16
**matter** 100:18
**maximum** 24:5 24:6,6,9,12
**McLean** 63:7,7 63:9,14 64:8 64:16 67:3
**mean** 5:19 15:16 17:4 19:21 92:20
**meaning** 21:4 33:14
**means** 76:5,16
**meet** 20:15 26:16,17,20
**MELISSA** 100:3 100:24
**mentioned** 14:17
**Merritt** 31:18
**messed** 80:14
**Meyer** 2:12 4:7 5:6 52:6 53:24 54:22 55:3 59:10,20 69:17 79:20 83:10 90:25 97:16 99:5
**MICHAEL** 1:5
**middle** 30:11
**midnight** 30:10
**mileage** 75:12
**miles** 74:10,23 75:10 76:22
**mine** 62:19
**mines** 62:15 63:8
**minimum** 23:22 24:2,3,7,8,13 24:14
**minute** 96:13
**minutes** 52:5 94:8,9 95:6,9 95:21
**missed** 89:22
**missing** 42:13
**Mistake** 13:8,8
**misunderstood** 63:21
**moment** 59:7
**Monday** 30:6
**money** 53:22
**month** 10:3,4 45:9,10 46:12 46:24
**months** 9:11 17:18,20 18:4 18:8 21:13,14 25:8,11,16 31:10 40:12,15 40:18 44:23 45:14,15 46:15 46:19,24 47:2 47:19 89:22
**morning** 30:20 33:12 36:23 37:7 55:25 56:17 57:9 58:12,12
**Moss** 61:18
**Mountain** 34:10 35:5
**move** 12:18,22 18:11 86:12 97:7
**moved** 12:20 19:18,24 35:13 37:25 46:10
**moving** 69:15
**multiple** 79:23

**N**

**N** 2:4 3:3 99:2
**name** 4:8 5:6 8:8 32:25 51:9,11 51:15,16 62:17 68:13,15,17,20 68:22 73:18 85:2
**named** 5:8 41:20
**names** 61:24,25 62:4 69:3,3 73:8,16 84:23
**ND** 80:23
**need** 7:2
**never** 53:18,19 54:18 63:16 64:3 65:16 71:12,14,15 77:18,23 79:11 79:18 90:18
**New** 1:2,21,22 1:24 2:6,6,11 2:11 4:4,13 17:14 18:2 20:10 21:4,4 22:16 25:7,8 25:20 32:2,5,5 32:7,12,25 33:17,23 34:4 34:10,12,13,16 34:21,23 35:4 35:6,6,9,11,12 35:22,24,24 36:2,18 37:11 37:14,17 38:2 38:4 40:10 41:9,14,23 43:5,5,7,10,16 44:3 46:7,16 46:17,20 47:3 47:8,10,12 48:23 50:5,6,8 50:9,13 55:15 56:12,17,20 66:19 73:5,19 86:14,14 91:11 91:16 93:6,8 94:15,15
**night** 1:9 5:9,18 9:20 29:16,19 30:11 31:2 36:5,9 63:17 64:10 77:7 85:22 87:18
**nods** 6:9 87:21
**non** 53:17
**non-employee** 53:15
**noon** 15:3 18:6
**normally** 94:21 95:19
**north** 34:19 41:25
**Northern** 34:16
**Notary** 1:23 4:4 98:14
**notation** 72:23
**notations** 74:5
**note** 53:20 54:20 80:20
**Noted** 98:6
**Notice** 1:19
**number** 20:2 23:22 33:2 61:6,7 70:10 70:14,21 71:17 71:22,25 75:10 76:3,5,8
**numbers** 27:5 40:23 41:3 49:12,13 73:8 74:11,13,16 75:9,13 79:18
**NY** 1:10,10,10
**NY-R2** 72:24 77:18
**NZ** 73:24 78:2 78:11,13 79:24 81:9,14,23 82:8 84:18 86:5,14 88:16 94:20 96:6

**O**

**O** 3:3
**oath** 3:17 9:4
**object** 15:10
**objection** 12:6 12:13 14:9,15 15:9,12,21 16:2,11 17:2 20:3,20 22:4 23:5,24 24:25 26:10 28:13 29:8,13 30:14

30:25 31:13,22 33:4,21,25 34:6,18 35:16 37:18 38:15,18 39:2,5,23 40:7 40:25 41:11 43:12 44:6 45:22,24 46:13 47:7 50:4,7,14 50:24 53:4,10 53:16 54:17 56:14,23 57:5 57:12 60:8 62:18 64:11 65:6,24 67:7 67:15,20 68:4 69:11 70:15 72:17 77:4,20 77:25 78:21 81:24 82:9,11 83:4,8,25 84:20 85:10,16 86:7,20 87:3 88:4,8,14,24 90:24 92:6 93:11,13 95:2 96:15
**objections** 3:11
**obviously** 29:7
**October** 1:22 100:6,21
**officer** 3:16
**offices** 1:20
**oh** 74:18
**okay** 5:24 49:13 55:2 92:15
**once** 7:9 19:24 27:12 28:21 46:2 49:14 52:9
**ones** 27:24 39:18
**one's** 76:15
**opening** 66:4
**operates** 68:2
**Orange** 34:9,23
**order** 75:15,16 77:11
**outcome** 100:18
**outside** 21:3 97:6
**overtime** 60:21
**owe** 53:22

**P**

**P** 2:4,4 3:3
**pack** 11:9 15:6 18:24 19:2 20:5 32:19,21 92:4,7 93:3,17 93:18,21,24 94:2 95:6,15 95:15,16,19 96:7,9 97:6,9
**package** 92:23
**packed** 11:14 13:15 15:14 21:25 22:3 93:15 95:18 96:16
**packers** 14:25 18:23,23 20:2
**packing** 15:2,20 16:4,10 18:19 94:6,6,7
**page** 70:9 72:9 72:10,12 74:2 76:19 80:12 97:19 99:4,9 99:17
**pages** 77:5 79:23 82:22
**PAGE/LINE** 101:3
**paid** 53:3 60:21 88:23 89:6 90:12
**Palisades** 36:14
**park** 96:25
**parked** 97:3
**part** 32:5 34:17 44:3 46:6 85:25
**parties** 3:7 5:9 100:16
**parts** 11:6 46:6
**party** 100:10
**pay** 48:22 49:2 51:24 53:23 64:9 71:6
**paycheck** 51:10
**PC** 2:5
**people** 16:4,6 18:18 93:12
**percent** 79:5
**perform** 13:19 62:22 63:4,9 63:23,24 64:5 92:11
**performed** 5:14 5:20 9:23 10:6 63:16 65:18
**performing** 25:19
**period** 9:21,22 13:15 18:5 44:17 45:11 48:22 49:2,25 92:3
**periods** 25:6 38:14
**personal** 90:16
**Persons** 1:6
**PETER** 2:7
**Philadelphia** 21:6
**physically** 26:25
**pick** 6:9,17 75:6 97:4
**picked** 76:6,12 76:16
**place** 8:5 20:11 20:12 35:2 37:13,23 75:24 85:4 88:6
**places** 35:7
**Plains** 41:19
**plaintiff** 1:18 8:11,20
**plaintiffs** 1:7 2:5 5:8
**Plaintiff's** 60:24
69:21
**plastic** 28:6
**Plaza** 9:17
**please** 4:8,11 6:13 48:11 71:16
**point** 7:3
**policies** 55:12
**Port** 41:16 44:4 44:12 46:6
**portion** 82:6
**position** 12:4,11
**positive** 83:2
**possession** 85:15 85:22,25
**possibility** 40:4
**potential** 62:2
**precisely** 10:12
**prescription** 6:22
**pressure** 18:25
**presume** 43:21
**previously** 13:2 69:6 91:4
**print** 33:7
**prior** 43:18 69:9 86:12 91:18
**probably** 25:15 29:14 43:13 45:13 46:11
**problem** 13:13
**procedure** 6:19
**proceeding** 9:5
**process** 67:18
**produce** 50:19 70:13,20,24 85:24
**produced** 49:7 50:18,21 83:18
**producing** 71:4 71:23
**production** 53:25 54:23 69:24 77:17 99:16
**proposition** 7:6
**prove** 83:7
**provide** 10:17 10:25
**provided** 9:19 50:22,23
**providing** 10:11 61:24,25
**Public** 1:23 4:4 98:14
**purpose** 59:24 60:4,17
**pursuant** 1:19
**put** 11:9,11 28:7 38:5,5,11 92:17,25 93:2 93:19 97:5
**putting** 92:12
**p.m** 21:24 24:19 30:6 35:15 38:25 39:22 98:6

**Q**

**Queens** 42:7,11
**question** 3:12 6:4,6,14,16 7:7 7:9 17:13 40:8 41:2 47:11 52:16 53:12 59:22 60:12 61:6,10,12,21 67:9 70:19 73:15 74:25 85:11 90:7 94:13
**questioning** 49:16 52:7
**questions** 5:13 6:19 7:15 49:18 61:4 70:4 98:4
**quick** 83:11
**quicker** 29:7

**R**

**R** 2:4 100:1
**ran** 78:11 80:3
**range** 23:13

**rate** 64:9
**read** 60:11,13 61:7 71:17,19 79:17
**reading** 60:15 69:7
**ready** 49:21 61:13
**real** 53:20 83:11
**really** 17:4 34:20 53:19,19 54:18 57:25
**reason** 9:18 58:5 66:9 85:14
**recall** 8:7 12:14 18:12 32:6 34:7,22 40:24 45:9 49:22,25 50:11 51:9,11 51:15,16,18 52:19 53:13 54:5,14 55:22 57:7,11,23,24 61:20,24 69:7 69:13 71:4,23 73:8,14,16,18 84:12,24 85:2 85:7,11 86:23 86:24 87:25 89:8
**receipt** 49:4
**receipts** 4:14 49:3,23 50:12 51:2 99:10
**received** 66:8
**receiving** 51:19 52:19 54:5
**recess** 55:6
**recognize** 72:16
**recollection** 58:23
**record** 4:8,10 7:17 15:11 19:11 74:21 90:25 91:3 98:5 100:13
**reference** 59:10 95:11
**referring** 95:9
**regard** 70:17
**regular** 96:2,6
**regularly** 84:6 84:19
**reiterate** 6:6
**relationship** 5:13 43:24 64:9 67:13
**remember** 8:8 10:4 17:12 19:13 20:11 32:9,9 34:20 34:25 35:2,3,4 35:8 36:15 45:10 47:20 68:20 69:3 84:12,22 85:13 85:17,18,19 86:9,10 89:13
**repair** 49:4
**repairs** 48:7,19
**Repeat** 37:12 48:11 60:9
**rephrase** 6:7 47:11 59:23 88:25
**reporter** 6:9,16 89:14 91:5
**represent** 74:14
**represented** 100:10
**representing** 3:21
**request** 53:25 70:10,14,21,25 71:16,22,24,25
**Requests** 69:23 99:16
**require** 58:11
**reread** 71:16
**reserved** 3:12
**respective** 3:6
**respond** 61:20
**response** 53:11 60:24 61:6 69:22 70:24 71:17 72:3
**responses** 69:7,8 70:10
**responsive** 70:14 70:20 71:24 72:4
**rest** 68:20
**restriction** 38:6
**restrictions** 38:13
**return** 31:23 51:21 52:14 53:6,8,20 54:2 54:12,14 99:18
**returned** 46:2,5
**returns** 27:18,19 54:23 75:5 99:19
**reuse** 28:8
**review** 49:15 60:6 61:2
**reviewed** 69:6
**right** 17:5 35:8 41:16 49:20 52:23 59:20 61:5 73:18 74:20 75:5 77:5,8 79:25 81:16 87:20 96:5,17
**road** 26:8 31:3
**roadwork** 31:3
**role** 13:16
**room** 7:14
**roughly** 26:7 96:13
**route** 19:4 22:16 22:17 27:4,4 29:4 31:8 32:25 33:6,6 33:18 34:12,13 38:11,12 39:12 39:15,16,21 41:13 43:14 44:14,15,19,24 46:3,4,5,16,17 46:17 47:8,18 55:12 56:18,19 56:25 71:6 73:3,6,8,22,24 77:18,23 78:11 78:13 79:9,13 79:21,24 80:3 80:23 81:5,14 81:19,23 82:2 82:4,8 83:3,16 83:22 84:4,8 84:11,14,18 85:3,8,15 86:5 86:14,14,16,22 86:25 87:23 88:6,13,16 91:21,23 92:18 92:24 93:3,17 94:15,20,23 96:6 97:4
**routes** 27:9,11 27:12 28:22 39:14 40:16,19 40:20,22 41:10 41:18,21 56:13 56:20 57:3,16 57:20,23,24 58:3 73:9,16 84:19,21 86:6 86:8,13,18 91:19
**routine** 55:23
**RT** 85:8,9,15 86:22,25
**rule** 37:8
**rules** 6:2
**run** 11:25 20:21 21:8,11,19,20 22:17 25:24 26:2 31:11 40:12 43:11,19 43:21 44:3,4,8 46:9,10,24,25 47:4,6,16,24 80:23 86:25
**rush** 30:24 78:24 80:10
**R2** 73:5,20

## S

**S** 2:4 3:3,3 4:2 99:7
**sat** 7:14
**Saturdays** 25:3
**saying** 5:23 11:14 16:24 26:7 30:5 33:14 38:24 54:19 56:19 57:15 78:6
**says** 72:3,24 74:10 75:10 76:2,12,19 77:23 79:9 80:14
**Scarsdale** 41:19 44:4,12
**schedule** 14:12 80:9
**scheduled** 14:6
**SCHLOSS** 1:13
**sealing** 3:7
**second** 69:18 75:20
**see** 71:15 82:22 83:11
**seen** 59:8 71:12 71:14
**sense** 5:20 18:22
**sent** 51:13 65:20
**separate** 11:10 86:16 92:17,24
**separately** 5:25
**served** 69:9
**service** 63:24 64:5
**services** 1:10 9:19,23 10:7 10:11,16,24 25:19 62:22 63:4,9,16 65:18
**set** 14:12 60:25 69:23 88:6

100:20
**seven** 76:15,16
  78:18
**shakes** 37:21
**shaking** 6:10
  89:13
**SHEET** 101:1
**shorter** 95:23,24
**shortly** 47:21
**show** 15:6,25
  18:15 24:21
  32:13 35:14
  38:2,24 41:7
  49:6 51:25
  59:5 60:22
  62:17 69:19
  71:7 72:6
  82:14 83:15
  88:18 91:18
**showing** 91:19
**sick** 90:16
**side** 34:11
**sign** 59:15
**signature** 59:13
**signed** 3:15,18
  60:5
**signing** 89:8
**similar** 7:14
  19:25 54:6
  55:19 56:3
**Similarly** 1:6
**sir** 5:11 8:12 9:7
  12:8 13:5 17:3
  21:18 26:11
  28:4 30:21
  31:21,24 37:12
  39:6,17 40:21
  43:6,23 44:2
  44:13 45:3,6
  45:17 46:22
  47:25 48:4,9
  48:14,16 49:24
  50:10,15 52:18
  52:20,22 53:5
  53:7 54:4,13
  54:18 55:18,21
  56:24 57:2,22

59:12,14 60:14
60:18 61:19
62:3,5,24 63:5
63:11,15,19
64:21 65:11
66:13,16,20
68:9,23 70:7
70:23 72:14,22
72:25 73:7,10
73:21,23,25
74:4,9,15
75:18 76:7,18
76:23 77:16
78:3,5,9,12,15
79:4,6,8 80:2,4
80:17,19,22,24
81:2,4,8,10,13
82:12,16 83:5
83:9,21 84:17
86:3,15,17,21
87:6,10,13,17
88:3 91:10,12
91:17,25 92:5
92:10 93:7,10
93:14,22 94:4
94:22 98:2
**sit** 31:4
**sited** 78:7
**sitting** 58:7
**Situated** 1:6
**six** 16:17,23
  17:18,19 18:4
  18:8 21:12,14
  25:8,11 26:4
  30:4,12 31:10
  40:12,15,18
  46:23 72:10
  97:12
**six-month** 18:5
**skip** 83:10
**small** 92:8
**somebody** 8:2
  14:8 15:19,22
  15:22 22:6
  42:13 82:4
  93:23
**Sorry** 13:8,12

**sort** 9:5 86:11
**south** 34:19
**SOUTHERN**
  1:2
**speaking** 5:22
  96:13
**speaks** 5:24
**special** 10:21
  32:20,21 33:6
**specific** 32:25
  49:18 56:25
  57:20 61:4
  70:4,25 78:6
**specifically** 5:17
  69:8 70:9 74:2
**Spence** 62:6,7
  66:11,23 68:5
  68:19
**spend** 19:20
**spoken** 6:12
**spring** 45:18
**stack** 72:8 77:22
**stamped** 71:8
  72:5
**start** 9:25 11:7
  12:17 14:18
  17:4,11,16
  31:7 32:17
  33:18 36:16
  38:5,21 39:8
  39:21 44:20
  46:4 49:15
  76:2 93:20
**started** 6:3,18
  7:11 10:3 13:9
  17:22,23,24
  31:25 43:13
  44:16,24 46:3
  62:12 66:23,25
**starting** 30:5
  70:9
**starts** 31:7
**state** 1:23 4:4,8
  4:10 15:12
**stated** 41:6
**Staten** 42:23
**states** 1:2 20:9

**station** 26:17
  28:16
**stay** 13:25 64:14
**stenographica...**
  100:9
**steps** 65:22
**STIPULATED**
  3:5,10,14
**stop** 26:14,23,24
  84:24
**stopped** 10:10
  56:21 62:8
**stops** 26:12
  33:23 94:16
**straight** 26:15
  33:19
**street** 1:21 2:6
  2:11 26:16
  41:17 97:3
**stressing** 89:17
**stubs** 71:6
**stuff** 11:9 14:25
  18:24 32:21
**submit** 48:6,17
  48:21
**submitted** 50:2
**submitting**
  49:22 50:11
**Subscribed**
  98:11
**substance** 6:23
**suing** 8:2
**Suite** 1:21 2:6,11
**summer** 45:18
**Sunday** 24:18,19
**supervise** 13:20
  13:25
**Supplemented**
  69:22
**supposed** 10:23
  14:18,22 15:22
  42:13 93:4
**sure** 55:5 75:9
  79:5
**sworn** 3:16,18
  4:3 98:11
  100:7

**Syed** 1:12 11:21
  11:22 16:12
  38:21

**T**

**T** 3:3,3 99:7
  100:1,1
**take** 7:2,8,8 8:5
  14:5 23:3,6,10
  26:5 28:11,14
  28:21,23 29:6
  29:9,9,14,20
  30:2,3,7,11,22
  31:6,8,17,17
  33:8 36:7,10
  36:17 41:5
  49:8,10 52:2
  53:20 55:3
  58:8 59:7
  65:22 69:25
  71:10 90:5,10
  90:16 94:5,8
  95:5,7,12,14
  95:17,19 96:7
  96:8,21,22,24
  97:4,8
**taken** 1:18 6:21
  55:6 100:8
**Takes** 31:3
**talk** 57:25
**talked** 68:6
  87:23 90:21
**talking** 26:3
  39:14 94:5
**tax** 51:19,21
  52:14 53:6,8
  53:20,21 54:2
  54:12,14 99:18
  99:19
**taxes** 51:24
**tell** 6:24 9:22
  65:13 73:12
  91:22
**ten** 7:20 23:21
  33:8 91:15
**Teresa** 1:4 68:11
  68:15,18 84:15

84:16 87:5
**terms** 72:21 90:3
**test** 7:5
**testified** 4:5 13:2
**testify** 67:3,23
**testifying** 3:21 57:3
**testimony** 9:4 39:20 58:13 78:10 79:11 81:22 100:8,8
**Thank** 9:14 64:7 97:17 98:2
**thereto** 70:11
**thing** 24:10 32:8 33:5 43:22 53:18 70:17 78:22
**things** 18:16 28:6 38:22 44:5,7 48:19 55:10 58:10 93:3
**think** 10:12 12:15,25 18:13 25:12,14 36:13 45:8 47:18 53:17,17 63:20 89:5
**third** 75:20
**thirty-five** 34:2 36:4,8 94:16 94:18,25 95:3 95:5,14 96:11
**three** 25:5,25 26:20 40:3 45:14,14,15 76:6 82:22 89:22 97:14
**three-page** 82:18 83:7
**throw** 51:6
**time** 3:12 8:13 9:21,22 10:21 10:22 11:5,18 12:16,19 13:23 14:20 15:14 16:20 17:4,16 19:3,5,12,14 19:21 21:21 25:7,10,12,14 25:17 29:3,11 29:16 31:2 32:11,12,16,18 32:20,21 33:11 36:10,19 37:3 38:2,7,9,10,14 39:7 42:8,9,14 43:15 44:18 45:12 47:23 48:3,12,25 49:10,25 50:6 55:7,22 56:6 56:11,16,21 58:11 74:17 75:7 76:24 77:2,13 78:25 80:9,21 84:13 84:22 89:23,24 90:4,15,16,21 91:14 92:3 95:13,14,22,25 97:8,11,12 98:6
**times** 14:17 21:10 38:8 57:7 78:4,19 88:18,19
**title** 10:15 62:9
**titled** 60:16 74:22
**today** 5:13 6:19 6:24 9:18
**told** 15:2,5 56:10 64:23 65:5,7 67:6,14,24 91:4
**toll** 49:3
**tolls** 48:19,20
**top** 72:23 77:11 81:6
**touch** 55:9
**town** 35:3,3
**towns** 34:7,8,22 35:2
**traffic** 31:4,4
**transcribed** 100:9
**transcript** 6:17 100:12
**transfer** 18:9
**travel** 31:15 48:7
**tray** 92:19,22
**trial** 1:17 3:13 100:4,13
**tristate** 21:3 22:21 39:13,21 40:19
**true** 100:12
**truth** 6:24
**try** 59:22 65:22 78:24,24 80:9
**trying** 52:13 65:14
**Tuesday** 30:6
**turn** 15:23 29:4
**twelve** 76:9,10 76:12
**twenty** 94:8 95:5 95:8,20 96:4
**twenty-five** 94:9 95:6,9,20 96:4
**two** 9:11 10:2 11:25 12:9 13:3 16:4 23:21 30:23 44:5,7 46:12 46:18,25 48:5 54:8 76:13,17 76:24 84:25 88:25 89:5
**two-page** 83:17
**two-week** 13:15
**type** 7:21,24 10:24 38:13 52:14

**U**

**U** 3:3
**unable** 90:22
**unaware** 58:14
**understand** 6:5 70:18
**unfortunately** 89:18
**UNITED** 1:2
**Upstate** 32:5 34:13 35:11,12 35:24 36:2 41:23 44:4,16 46:7,9,25 94:18
**use** 5:15 22:17 22:21 51:7

**V**

**V** 4:2
**vacation** 11:19 11:20 12:19,20 58:6 90:3,4,5,6 90:10
**variety** 20:8
**various** 41:17
**vehicle** 22:8,10 22:11,12,13,18 22:22,23 23:2 23:4,8 48:15
**verbal** 6:11 53:11
**verbalize** 6:8
**verification** 4:20 59:11 60:16 99:12
**Voluck** 1:20 2:10

**W**

**W** 4:2
**wages** 53:14 60:20
**wait** 5:22 20:13 29:3 39:13
**waiting** 29:2,5
**waived** 3:9
**walk** 97:4
**want** 25:5 52:9 55:3 56:16 58:19 70:11 86:12 89:2 91:23 97:6,7
**wanted** 55:9 58:18
**Washington** 20:10,22 39:15 66:14
**wasn't** 19:12,14 25:14,16 46:14 53:23 91:7
**way** 31:15,20 35:9 42:16 44:15 72:11 79:22 88:12 97:10
**Wednesday** 30:7
**week** 16:14,17 16:21,23 24:16 26:4 89:6
**weekly** 88:21 89:7
**weeks** 11:24,25 12:4,10 58:7 88:25 89:6
**went** 12:22 44:20
**weren't** 14:6
**West** 2:6
**Westchester** 41:25 46:8
**we'll** 25:25 49:8 51:25 52:5 63:6 71:10 79:18,21 83:14
**we're** 7:8 9:18 10:8 59:6 86:11
**we've** 68:5 78:7 90:20
**WHEREOF** 100:20
**where'd** 94:11
**White** 1:4 41:19
**wide** 20:8
**William** 1:21 2:11
**Williams** 1:4,18

4:9 5:1,6 6:1 6:21 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1,14 49:22 50:1 51:1 52:1,11 53:1 54:1 55:1 55:8 56:1 57:1 58:1 59:1,5 60:1 61:1 62:1 62:13,13,14 63:1 64:1 65:1 65:8,10 66:1,5 66:7 67:1,10 68:1 69:1,19 70:1,5 71:1,7 71:22 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1,15 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1,4 92:1 93:1 94:1 95:1 96:1 97:1 98:1,9 99:5 100:5
**winter** 45:20
**wintertime** 45:18,19
**witness** 3:21 4:2 37:21 49:20 60:14 61:14 64:6 71:20 74:24 82:24 87:21,21 89:4 89:15 94:4 98:2 99:4 100:6,14,20
**witnesses** 62:2
**word** 15:12 84:23
**words** 27:10 38:22 50:2
**work** 5:14,20 8:15 10:2,8,18 11:3,7,13,17 13:14 16:18,21 19:5 21:19 22:25 31:3,14 44:13,16 49:2 51:5 56:18 60:21 62:7 63:23 66:7,25 77:15 84:24 87:9,15 89:13 90:22 91:18,19 92:11
**worked** 8:17 9:19,24 10:18 12:10 13:2,16 48:6 56:20 65:17 87:11
**worker** 62:7
**workers** 20:14 26:18 28:25
**working** 8:13 13:6 18:2 33:17 37:17 40:11 50:3 56:3,21 62:8 66:24 87:16 88:18
**workings** 67:12
**works** 67:25
**wouldn't** 15:25 18:21,25 26:14 39:20 40:4
**write** 79:2 80:8 80:11
**wrong** 40:13

**X**

**x** 1:3,15 37:5 99:2,7

**Y**

**yeah** 7:22 8:4,10 11:15 12:3,5 12:12,25 13:9 13:17 14:11 15:4 17:21,25 18:7,17,20 19:16,23 20:4 20:19 21:2,9 21:15 22:3,15 22:20,23 24:4 24:15,20,22 25:21,23 27:3 27:11,14,23 28:10,17 29:9 29:22,25 30:9 30:13,16,18 33:3,16,20 34:14 35:23 36:6,6 37:6 38:16 39:3,19 39:19 40:17 41:22,24 42:2 42:10,19 43:17 43:20 44:10 45:13,21 47:14 50:17 51:23,24 54:8 61:14 64:18 65:3,9 68:18 74:7,24 75:25 76:4,11 76:14 82:7 89:4 95:4,22 96:3,12,14,24 97:14,15
**year** 12:14,15 19:15,16,17 25:20,22 46:18 46:21,23 47:3 47:5 51:18 54:9
**years** 7:20 10:2 13:3 48:5 54:6 54:8 84:25 91:15
**Yep** 17:7
**Yonkers** 4:12 91:5,11
**York** 1:2,21,22 1:24 2:6,6,11 2:11 4:4,13 21:4 22:16 25:20 32:5,5 34:10,13 35:4 35:6,6,9,11,12 35:25 36:2,18 38:2,4 40:10 41:14,23 43:5 43:16 46:7,20 47:3,12 50:6,8 50:9 56:12,17 56:20 73:5,19 86:14 91:11 93:8 94:15
**YS** 1:11,12

**Z**

**ZAIMI** 1:13

**$**

**$16,000** 52:24

**0**

**055611-0002** 2:13
**08** 45:23
**09** 45:23

**1**

**1** 4:12
**1:00** 14:24 15:3 15:7 17:6,9 18:6 32:15
**10:05** 1:22
**100** 1:21 2:11 79:5
**10019** 2:6
**10038** 1:22 2:11
**10703** 4:13
**1099** 4:17 91:6,8 99:11
**11:00** 29:19,20 52:4
**116** 70:10,14
**117** 70:17,21 71:17
**118** 71:22,25
**12** 1:8
**12:00** 11:8 14:24 15:6 17:6,8 29:20,22 32:14
**12:18** 98:6
**12:30** 29:22 30:10
**13** 78:11,14
**14** 81:11
**147** 70:10
**150** 23:12,13
**16** 81:14,22 82:10,14
**180** 24:13,14 26:3

**2**

**200** 2:6 23:12,13 23:25 24:3,7,7 24:8,9
**2000** 13:9 54:10
**2008** 10:2,5 13:3 13:10 18:12
**2009** 13:10,11,12 18:12,13 19:19 19:20 45:8,20 45:25 54:10,12 54:14,16,23 76:19,20 78:11 78:14 79:21,24 80:3,15 81:5 81:11,14,22 82:10,14 83:16 99:19
**2010** 4:17 10:9 10:10 13:4,9 19:19 45:20,25 53:3,6,8,25 54:11 56:22 91:6 99:11,18
**2011** 12:15,24,25

13:7
**2013** 1:22 10:8 98:12 100:6,21
**215** 1:21 2:11
**220** 24:12 26:3
**23** 79:21 81:5
**268** 74:10,22 75:10 76:22
**27th** 82:19
**28** 79:24 80:3
**287** 36:12
**2970** 80:18

**3**

**3** 1:22 76:20
**3rd** 100:5
**3:00** 56:12
**3414** 83:14
**39** 4:12 70:9

**4**

**4** 60:23 69:5 99:5,10,11,12 99:13
**4:00** 11:7 14:23 17:4 19:7 32:23 33:9 38:19,20,25 39:10
**4339** 1:8

**5**

**5** 69:21 99:14
**5th** 100:21
**5:00** 19:8 30:20 32:23 33:10 35:15 56:12 58:14,20,21,24
**5:30** 30:20
**53** 99:18
**54** 99:19
**55** 4:15 49:6,9 99:10
**56** 4:18 52:2 99:11
**57** 4:21 59:6 99:12
**57th** 2:6
**58** 4:25 71:11 99:13
**59** 5:4 99:14

**6**

**6** 80:15 83:16
**6/22/2009** 81:3
**6:00** 21:23,24 22:25 24:19 26:5 30:20 33:12 35:15 36:22 39:11,22 57:8,16 58:4 58:22
**6:30** 37:2
**630** 36:22

**7**

**7** 52:23
**7:00** 26:7,8 28:12 29:17,18 30:6 33:12 36:22 37:2,7,8 37:9,13,22 40:6 55:15,25 56:7,8,22 57:21 76:25

**8**

**8:00** 33:12 40:6

**9**

**9** 51:23
**9-W** 51:23
**9:00** 40:6
**900** 2:6
**91** 31:18
**95** 31:16,17
**964** 71:8