UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

FERNANDO HERNANDEZ, KENNETH CHOW, BRYANT WHITE, DAVID WILLIAMS, MARQUIS ACKLIN, CECILIA JACKSON, TERESA JACKSON, MICHAEL LATTIMORE, and JUANY GUZMAN, Each Individually, And On Behalf Of All Other Persons Similarly Situated,

Plaintiffs,

-against-

Index No: 12 CV 4339 (ALC)(JLC)

THE FRESH DIET, INC., LATE NIGHT EXPRESS COURIER SERVICES, INC. (FL), FRESH DIET EXPRESS CORP. (NY), THE FRESH DIET - NY INC. (NY), FRESH DIET GRAB & GO, INC. (FL) a/k/a YS CATERING HOLDINGS, INC. (FL) d/b/a YS CATERING, INC. (FL), FRESH DIET EXPRESS CORP. (FL), SYED HUSSAIN, Individually, JUDAH SCHLOSS, Individually, and ZAIMI DUCHMAN, Individually,

Defendants.

----------------------------------------x

EXAMINATION BEFORE TRIAL of the Plaintiff, TERESA JACKSON, taken by the Defendant, pursuant to Notice, held at the offices of Kaufman, Dolowich, Voluck & Gonzo LLP, 100 William Street, Suite 215, New York, New York 10038, on October 2, 2013, at 1:48 p.m., before a Notary Public of the State of New York.

[Page 2]

A P P E A R A N C E S:

THE HARMAN FIRM, PC
Attorney for Plaintiffs
200 West 57th Street, Suite 900
New York, New York 10019

BY: PETER J. ANDREWS, ESQ.

KAUFMAN, DOLOWICH, VOLUCK & GONZO LLP
Attorneys for Defendants
100 William Street, Suite 215
New York, New York 10038

BY: YALE POLLACK, ESQ.

FILE #: 055611-0002

[Page 3]

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification, and the same are, hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to by an officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

[Page 4]

T E R E S A J A C K S O N, the witness herein, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:
EXAMINATION BY
MR. POLLACK:
**Q.** State your name for the record, please.
A. Teresa Jackson.
**Q.** State your address for the record, please.
A. 21 Dickerman Street, Apartment 3, New Haven, Connecticut 06511.
**Q.** Good afternoon, Ms. Jackson.
A. Hello. How are you?
**Q.** You were here for the deposition --
A. Yes.
**Q.** -- of your nephew, Marquis, right?
A. Yes.
**Q.** It's going to be a similar line of questioning. I'm going to be asking you a series of questions regarding your claims in this action.
A. Okay.
**Q.** If you don't understand any question

[Page 5]

T. Jackson

that I ask, please just let me know.
A. Okay.
**Q.** I'll try to rephrase it until you understand the question.
A. Okay. No problem.
MR. ANDREWS: Teresa, just wait until Yale finishes the question, and then answer the question.
THE WITNESS: Okay.
**Q.** Please just wait for me to finish the question before answering because the court reporter can't take us both speaking at the same time, and please just make sure to answer any question verbally so that the court reporter can take down the answer. She can't take down hand gestures or nods.
Do you understand those instructions?
A. Yes, I did.
MR. ANDREWS: Keep your voice up too.
THE WITNESS: Okay.
**Q.** Are you taking any medications today?
A. I have blood pressure pills. I'm on blood pressure pills and sugar.

[Page 6]

T. Jackson

Q. Do you think that those medications will have --

A. No.

Q. -- any impact --

MR. ANDREWS: Again, that's an example. You have to let him finish. Wait, pause, answer.

Q. -- on your ability to truthfully respond to my questions today?

Do you think that those medications would have any impact on your ability to truthfully respond to my questions today?

A. No.

Q. Are you under the influence of drugs or alcohol right now?

A. No.

Q. Anything else that may impair your ability to truthfully respond to my questions today?

A. No.

Q. Did you review any documents in preparation for today's deposition?

A. Yes.

Q. What did you review?

[Page 7]

T. Jackson

A. Did I review today or prior to today?

Q. Prior to today.

A. Yes.

Q. What did you review?

A. My affidavit.

Q. Anything else?

A. That's it.

Q. Did you speak to anyone in preparation for today's deposition?

A. Just my lawyer.

Q. You didn't speak to Fernando Hernandez?

A. No.

Q. Are you currently employed?

A. Yes, I am.

Q. Where are you employed?

A. PCF.

Q. What do you do for PCF?

A. Deliver newspaper.

Q. How long have you been delivering newspapers for PCF?

A. It's been a couple of months. I don't have an exact date.

Q. Do you know what month?

A. Maybe about March.

[Page 8]

T. Jackson

Q. 2013?

A. Yes.

Q. How are you paid by PCF?

A. Check.

Q. Do you receive an hourly wage?

A. No.

Q. How is your compensation derived?

A. By papers, newspapers.

Q. "By papers," do you mean the number of papers delivered?

A. Yes.

MR. ANDREWS: Again, keep your voice up so she can hear you and take everything down.

Q. Do you know if you're considered an independent contractor by PCF?

MR. ANDREWS: Objection.

Q. You can answer.

MR. ANDREWS: You can answer. That's for the record.

Q. Unless he tells you otherwise, you can answer my question.

MR. ANDREWS: That's for the record.

[Page 9]

T. Jackson

A. Yes.

Q. Did you sign any type of agreement, an independent contractor agreement, with PCF?

MR. ANDREWS: Objection.

A. Yes.

MR. POLLACK: I'm going to ask for a copy of the independent contractor agreement.

A. I don't have it.

Q. What days do you work for PCF, what days of the week?

A. Every day.

Q. What are your hours?

A. Between 2:00 and 6:00 Monday through Friday, and 2:00 to 8:00 Saturdays and Sundays.

Q. We're talking p.m., right, 2:00 in the afternoon to --

A. Morning.

Q. Okay. 2:00 in the morning to 6:00 a.m. 2:00 a.m. to 8:00 p.m. on Saturdays and Sundays?

A. Yes.

MR. ANDREWS: Did you say p.m.?

MR. POLLACK: A.m.

[Page 10]

T. Jackson

MR. ANDREWS: A.m., okay.

Q. Where is PCF located?

A. In Connecticut.

Q. What city?

A. Hamden.

Q. Do you know how much you're paid per newspaper?

A. I think it's between $0.12 and $0.15 a paper, per paper.

Q. Does it vary?

A. By the paper that you're delivering.

Q. What papers do you deliver?

A. New Haven Registers, Connecticut Post, New York Post, Daily News, New York Times, Barron, a few others.

Q. Certain papers delivered may warrant $0.15 while others may warrant $0.12 per delivery?

MR. ANDREWS: Objection.

A. Between that, that range.

MR. ANDREWS: Objection.

Q. Do you know how many papers you deliver between Monday and Friday on one given day?

A. Between 190 to maybe 250.

[Page 11]

T. Jackson

Q. That's Mondays through Fridays?

A. Pretty much, yes.

Q. What about on Saturdays and Sundays?

A. It's about 250, 240. Actually, it's more because I do residential and commercial. Sorry.

Q. It's more when?

A. It's more -- it's more papers. I forgot about my commercial. That's residential.

Q. How many commercial do you deliver for Monday through Friday?

A. Commercial, it's about 200.

Q. What about Saturday and Sunday?

A. Saturday/Sunday, it's about 500.

Q. Do you receive a different rate for the commercial paper deliveries?

A. Yes, you do.

Q. What's that?

A. You get paid by bulk.

Q. Is that pounds?

A. No. Bulk is the amount of paper you're delivering to each door.

Q. Can you give me an example of what the pay structure is?

[Page 12]

T. Jackson

A. It's like if I deliver forty and below, it might be $0.30. Forty and sixty, it'll be maybe $0.40, somewhere like that. The more you deliver, the more the pay rate goes.

Q. The higher the pay rate is?

A. Yeah.

Q. Before March 2013, were you employed?

A. Before March 2013, yes.

Q. By who?

A. By Eli's.

Q. Can you spell that?

A. E-L-I.

Q. What is that?

A. It's a -- sort of like a pizzeria.

Q. What'd you do there?

A. Deliveries.

Q. Where is Eli's located?

A. Hamden, Connecticut.

Q. How far is Hamden from your residence?

A. It's about ten, fifteen minutes.

Q. Drive?

A. Yeah.

Q. How long did you work for Eli's?

A. It was only a couple of months.

[Page 13]

T. Jackson

Q. All in 2013 or also in 2012?

A. I would say end of -- maybe end of 2012 to beginning of 2013.

Q. Was there any gap in employment between Eli's and PCF?

A. No.

Q. You ended Eli's around February 2013?

A. I can't give you a specific date. I don't remember that.

MR. ANDREWS: Try to keep your voice up.

THE WITNESS: Okay.

MR. ANDREWS: You're soft spoken. Try to keep your voice up.

THE WITNESS: Okay.

Q. How were you paid by Eli's?

A. That was an hourly rate and also mileage.

Q. Do you know the hours that you worked at Eli's?

A. That depends if I delivered breakfast, if I delivered lunch, if I delivered dinner.

Q. Did you work anywhere between Late Night and Eli's?

[Page 14]

T. Jackson

MR. ANDREWS: Objection.

A. No. Oh, I did do a flower delivery. I don't remember the dates for that.

Q. Do you remember the name of the --

A. It was Bloom's.

Q. Bloom's?

A. Bloom's Flower.

Q. B-L-O-O-M-S?

A. B-L -- yes.

Q. Where is that located?

A. That's in North -- North Haven, Connecticut.

Q. How were you paid by Bloom's?

A. Hourly, $9 an hour plus, mileage.

Q. Do you remember what your wage rate was at Eli's?

A. My wage? I think it was -- I think it was eleven.

Q. Do you remember what your reimbursement for mileage was at Eli's?

MR. ANDREWS: Objection.

A. About $0.35 maybe.

Q. What about at Bloom's?

A. Bloom's -- I don't remember Bloom's.

[Page 15]

T. Jackson

Q. Can you just briefly describe your educational background?

A. I graduated from twelfth grade.

Q. From where?

A. Twelfth grade, high school.

Q. High school?

A. Uh-huh.

Q. What year?

A. 2000 -- I'm sorry. '87, 1987.

Q. What high school was that?

A. Lincoln High School.

Q. Where is that located?

A. Yonkers, New York.

Q. Are you currently married?

A. Yes, I am.

Q. What's your husband's name?

A. Delroy McNeil.

Q. How long have you been married to your husband?

A. It's now five years.

Q. Any prior marriages?

A. Yes.

Q. To whom?

A. Scott Fields.

[Page 16]

T. Jackson

Q. Fields?

A. Fields, yes.

Q. When were you married to Scott Fields?

A. I don't remember the year. I was twenty-six. I can't do the math right now.

Q. How long were you married to Scott Fields?

A. Eight years.

Q. Do you have any children?

A. Yes, I do.

Q. How many children?

A. One.

Q. Boy or girl?

A. Girl.

Q. What is her name?

A. Ashley Owens.

Q. Is she a child from Scott Fields?

A. No.

Q. From Delroy McNeil?

A. No.

Q. Do you know her father's name?

A. Yes, James Owens.

Q. What is her date of birth?

A. Her date of birth is 3/15/88.

[Page 17]

T. Jackson

Q. Does she currently reside with you?

A. Yes, she does.

Q. Does anyone else reside with you besides your daughter?

A. My nephew.

Q. Is that Mr. Acklin?

A. Yes.

Q. Mr. Acklin's your nephew?

A. Yes.

Q. Do you have any relationship to Cecilia Jackson?

A. That is my sister.

Q. Have you ever been deposed before?

A. No.

Q. Have you ever been involved in a lawsuit before?

A. No.

Q. Now I'm going to show you a document that's been previously marked for identification as Defendant's Exhibit 13 on September 20, 2013, and I'm going to ask if you've ever seen that document before today (handing).

A. This one, no.

[Page 18]

T. Jackson

(Whereupon, Notice of EBT was marked as Defendant's Exhibit 48, for identification, as of this date.)

**Q.** Just looking back at Defendant's 13, when you say that you haven't seen "this one", have you seen another version of this document?

MR. ANDREWS: Objection.

A. Another version of this one?

**Q.** Yes.

A. No.

**Q.** Do you see your name in the caption of this document?

A. This one, yes.

**Q.** Do you understand that you're a plaintiff --

A. Yes, I am.

**Q.** -- in an action?

Do you understand what your claims are in this action?

A. Yes, I do.

**Q.** What do you understand your claims to be?

A. My wages.

**Q.** What do you mean by that?

[Page 19]

T. Jackson

A. This is pertaining to our wages that we weren't paid for overtime.

**Q.** Now I'm showing you a document that's been marked for identification as Defendant's Exhibit 48 (handing).

I'm going to ask if you've seen that document before today.

A. No, not this one.

**Q.** I'm now showing you what's been marked for identification as Defendant's Exhibit 4 on September 17, 2013 (handing).

I'm going to ask if you've seen that document before today.

A. No.

**Q.** I'm now showing you what's been marked for identification as Defendant's Exhibit 5 on September 17, 2013, and I'm going to ask if you've ever seen that document before today (handing).

A. No.

**Q.** Did you provide any documents to your attorneys regarding your claims in this action?

A. Yes.

**Q.** Do you know what you produced?

[Page 20]

T. Jackson

A. A number of things, my manifests, my schedule.

**Q.** Anything else?

A. That's all I can remember right now.

**Q.** Are manifests different than schedules?

A. Yes.

**Q.** What is your understanding of what a manifest is?

A. A manifest has all the customers' names and address that I deliver to.

**Q.** Names and addresses?

A. Yes.

**Q.** Did you receive manifests when you were performing work as a driver for Late Night?

A. Did I receive -- yes, I received manifests.

MR. ANDREWS: Objection.

**Q.** How frequently did you receive manifests?

A. Excuse me?

**Q.** How frequently did you receive manifests?

A. Every day.

**Q.** What would be on the schedule you

[Page 21]

T. Jackson

referred to earlier?

A. The schedule had the time that I was supposed to be there.

**Q.** When would you receive a schedule?

A. I only received a schedule one time.

**Q.** Have you heard of the company Late Night Express Courier Services, Inc.?

A. Late Night Express is on my check.

**Q.** If I refer to Late Night, being Late Night Express Courier Services, Inc., for the remainder of the deposition, would you know what I'm referring to?

MR. ANDREWS: Objection.

A. Late Night --

**Q.** If I abbreviate the term Late Night to refer to Late Night Express Courier Services, Inc. for purposes of simplicity in this deposition, will you understand that whenever I say Late Night, that means Late Night Express Courier Services, Inc.?

A. Late Night Express --

MR. ANDREWS: Objection.

A. -- is on my check.

(Whereupon, a recess was taken

American Stenographic
Telephone:718-291-6600 www.Americansteno.com

[Page 22]

T. Jackson

at this time.)

Q. You said Late Night Express appeared on your checks?

A. On my checks, yes.

Q. What checks are you referring to?

A. The checks that I get from Fresh Diet.

Q. Do you know what the relationship is between the Late Night Express and The Fresh Diet?

MR. ANDREWS: Objection.

A. I really don't know.

Q. Is it your understanding that when you performed work you performed work for The Fresh Diet?

A. Yes.

Q. What work did you perform for The Fresh Diet?

A. I was a delivery driver.

Q. From when?

A. From -- I'm not good with dates. Summer of 2007.

Q. Until when?

A. Summer of 2011.

Q. Do you remember the month you started?

[Page 23]

T. Jackson

A. Started? June maybe.

Q. Do you remember the month you ended?

A. Anywhere from July to August.

Q. How did your relationship with The Fresh Diet end?

A. How did it end?

Q. Yes.

A. My mom was diagnosed with breast cancer.

Q. Did you resign?

A. No.

MR. ANDREWS: Objection.

A. I asked for a leave of absence, and then during the time I was on leave, they took my route.

Q. Who did you ask for leave of absence?

A. Syed.

Q. What did he say?

A. Okay. That I had to train somebody to do my route.

Q. Did you train anybody?

A. Yes, I did.

Q. Who?

A. His name is Gene. Kimble, I think, is his last name.

[Page 24]

T. Jackson

Q. How did you train him?

A. What do you mean?

Q. You said you trained him.

A. Yes.

Q. Gene Kimble?

A. Yes.

Q. What did that entail?

A. I would -- when we go into the facility, I would show him where to pick up his bags, show him how to fill out the manifests, take him out on my route with me, show him where -- where it is he had to go, the different stops that he had to go to.

Q. Did there come a time that you asked to return to be a driver?

A. I was supposed to only be out for a month.

Q. Did you ever ask to come back?

A. Yes, I did.

Q. Who'd you ask?

A. Syed.

Q. What'd he say?

A. He -- he refused to let me come back on the same route, which he told me that I would

[Page 25]

T. Jackson

come back on.

Q. Did he offer you another route?

A. He offered me, if I'm not mistaken, Jersey and also, I think, Long Island.

Q. What'd you say?

A. I told him that he promised me that I would get Connecticut.

Q. Did you refuse to take those routes?

A. I didn't refuse to take them. I just told him that he -- that he told me that he was going to put me back on Connecticut. I didn't refuse anything, no.

Q. Did you ever go back to working as a driver?

A. No.

Q. Why not?

A. Because he didn't give me back Connecticut.

Q. When you started performing work as a driver, where was The Fresh Diet located?

A. When I started? In New Jersey.

Q. Do you know if it was a store front or a kitchen?

A. It was -- it was like a catering hall

[Page 26]

T. Jackson

that had a kitchen in the back.

**Q.** Do you know the name of the catering hall?

A. No, I don't.

**Q.** Do you know the city it was located in?

A. Lyndhurst, something like that. I don't really remember. I think it was Lyndhurst.

**Q.** How did you hear about the position?

A. A friend.

**Q.** Who?

A. Oh, boy. What was her name? I don't remember her name. I don't remember her name.

**Q.** Do you know if that person was working as a driver?

A. Yes, she was.

**Q.** Do you remember what she told you?

A. When she introduced me to the job?

**Q.** Yes.

MR. ANDREWS: Objection.

A. She just -- she was doing a route, and she -- I started because she wanted me to split the route with her to make it easier for her because she did a second job. So I started out doing half of the route with her.

[Page 27]

T. Jackson

**Q.** Where was that route?

A. Connecticut and Westchester. Connecticut and New York.

**Q.** Did you have a job at the time you started?

A. When I started? Yes.

**Q.** Where was that?

A. PCF.

**Q.** What were you doing for PCF at that time?

A. Paper delivery.

**Q.** How long had you been working for PCF?

A. At that time, I was there a couple months.

**Q.** Where was PCF located?

A. In Elmsford, New York.

**Q.** Elmsford?

A. Elmsford, yeah.

**Q.** Do you know the address?

A. No.

**Q.** Do you know if they're still there?

A. I don't know.

**Q.** What hours were you performing work for PCF?

[Page 28]

T. Jackson

A. PCF was same thing as the Connecticut one. It's 2:00 to 6:00 Monday through Friday and 2:00 to -- 2:00 to 8:00 Saturday and Sunday.

**Q.** A.m.?

A. Yes.

**Q.** Did you ever stop performing work for PCF?

A. Yes.

**Q.** When?

A. When the work at Fresh Diet became too much for me to handle because the routes -- the routes became bigger, so I didn't have time to get over to PCF.

**Q.** Do you know what month you stopped doing both?

A. No, I don't know that.

**Q.** There was a period of time where you were performing deliveries for both PCF and The Fresh Diet?

A. Yes.

MR. ANDREWS: Objection.

**Q.** Do you know how many months that was?

A. It wasn't long.

[Page 29]

T. Jackson

**Q.** After you started performing deliveries for The Fresh Diet, did you ever hold another position at any other job during that time?

A. I did work for -- what's the name of the place? Oh, boy. Riverside Cardiology, I believe.

**Q.** A doctor's office?

A. Or -- no. It was -- no. At that time, no. I think I was doing Riverside and PCF together, and then I found out about Fresh Diet, and then I stopped Riverside and did PCF and Fresh Diet, I think.

**Q.** Just during the time you were performing deliveries for The Fresh Diet.

A. Right. It was just PCF.

**Q.** There wasn't any other position you held during the daytime or any other hours while you were performing delivery work for The Fresh Diet?

A. From what I can remember, no. From what I can remember, no.

**Q.** When you were splitting the route with your friend, did anyone at The Fresh Diet know about that?

[Page 30]

T. Jackson

MR. ANDREWS: Objection.

A. Yes, Syed.

Q. Had you met Syed at the time you started splitting the route with your friend?

MR. ANDREWS: Objection.

A. I met Syed when she took me there the very first day.

Q. What did Syed tell you about the position when you met with him the first day?

A. Just what it entailed, what your duties were.

Q. What was that?

A. To deliver Fresh Diet bags to residential customers.

Q. At the time you started, you did not have your own route; is that correct?

MR. ANDREWS: Objection.

A. Not in the beginning.

Q. How was the route split up?

MR. ANDREWS: Objection.

A. If I'm not mistaken, I think she did a Connecticut portion of it, and I did a New York portion.

Q. Can you explain what you would do on a

[Page 31]

T. Jackson

day that you were splitting the route with your friend and performing deliveries into New York?

MR. ANDREWS: Objection.

A. We go pick up the food. Sometimes it would be ready, sometimes it's not. If it's not, we would help, you know, do whatever's left to do, bag it up, bag tie it, put ice, whatever needed to be done at that time, and after we finished that, we collect the manifests and put our bags in the car and go do the deliveries.

Q. Were your deliveries, at that time, exclusively in New York?

A. At that time, yes.

Q. Do you know how many stops?

A. I did? No. Not at that time, no. I would say, if I had to guess, maybe fifteen.

Q. How were you paid?

A. Stops and miles.

Q. What was the payment per mile?

A. $0.53 a mile, a dollar a stop.

Q. I'm just focusing when it was in New Jersey for right now.

A. Okay.

[Page 32]

T. Jackson

Q. What time would you show up to the facility?

A. Different times.

Q. What would be the earliest you would show up?

A. The earliest, maybe around 3:00.

Q. What would be the latest?

A. The latest, maybe about 6:00.

Q. How would you know when to show up at 3:00 as opposed to 6:00?

A. Well, I would get a phone call or a text.

Q. From who?

A. From Syed.

Q. What would it say?

A. The food is --

MR. ANDREWS: Objection.

A. The food is ready.

Q. Is that how, typically, it worked every day for you to know when to --

A. No.

Q. -- show up to the facility?

A. Not every day, no.

MR. ANDREWS: Remember, let him

[Page 33]

T. Jackson

finish the question, and then answer.

A. Oh, I'm sorry. Not every day.

Q. If you didn't get a call or a text, what time would you show up?

MR. ANDREWS: Objection.

A. Anywhere between 3:00 and 6:00.

Q. If you showed up at 3:00, would meals be ready to be delivered at that time?

A. Not all the time.

Q. Sometimes?

A. Sometimes.

Q. If they were ready at 3:00, would you start deliveries then?

A. If they were ready at 3:00 -- if everything was ready at 3:00 and bagged, yes.

Q. Were there certain days of the week you would show up at 3:00 p.m. and certain days of the week you would show up at 6:00 p.m.?

A. It just varies.

Q. How long would it take you to perform deliveries at the time you were in New Jersey delivering to New York?

A. Was that before we split the route or after?

[Page 34]

T. Jackson

**Q.** At the beginning.

A. At the beginning when I started on a half a route, you want to know the time that we -- I finished?

**Q.** Yes.

A. It varies.

**Q.** The earliest you would be done.

A. Maybe 3:00.

**Q.** 3:00 a.m.?

A. Yes.

**Q.** What about the latest?

A. Maybe about 5:00, 6:00 in the morning.

**Q.** What would make it change that you would be done at 3:00 a.m. on some days compared to 5:00 or 6:00 a.m. on other days?

A. Depends on the miles and the stops.

**Q.** That was not always the same?

A. No, not all the time.

**Q.** Were there ever times where you would show up at 6:00 p.m. to start your deliveries and end at 3:00 a.m.?

MR. ANDREWS: Objection.

A. It's possible. It's possible depending on all the stops and the miles.

[Page 35]

T. Jackson

**Q.** Did you ever show up later than 6:00 p.m.? Again, focusing on the New Jersey facility right now.

A. I don't -- I don't know. I don't think so.

**Q.** When you got your own route, did the hours change?

MR. ANDREWS: Objection.

A. I would still come in around the same time, between 3:00 and 6:00.

**Q.** Would the times you would finish be different?

A. Depending on my hours and stops, my stops and my miles.

**Q.** Again, this is when you're in New Jersey, and now you have your own route. Okay?

A. Right.

**Q.** What would be the earliest you would be done at that time?

A. Anywhere from 3:00 in the morning.

**Q.** Until what time?

A. Until 5:00 or 6:00 in the morning.

**Q.** Where was your route when you had your

[Page 36]

T. Jackson

own route?

A. At that time, I started doing Connecticut and New York by myself. She quit.

**Q.** Would you perform stops in both Connecticut and New York in the same night?

A. Yes. At that time, yes.

**Q.** How many stops were there when you got your own route?

MR. ANDREWS: Objection.

A. It varies.

**Q.** What would be the minimum number of stops?

A. Minimum, maybe twenty, twenty-five.

**Q.** What about the maximum?

A. Maybe about thirty, thirty-five.

**Q.** How far did you live, driving time, from the New Jersey facility?

A. Maybe thirty, forty minutes depending on traffic.

**Q.** When you finished a route when you were working from the New Jersey facility, did you go back to the New Jersey facility?

A. Not New Jersey, no.

**Q.** Where would you go after you were done?

[Page 37]

T. Jackson

A. Home.

**Q.** Would you have the empty bags in your car?

A. Yes.

**Q.** Did you report to anyone at The Fresh Diet when you finished your route?

A. Sometimes Syed.

**Q.** Were there times that you did not report?

A. Sometimes, yes.

**Q.** What would make you report as opposed to not report on a given night?

A. Sometimes he would ask for us to report, and it depends on if there's any problems, maybe bad weather. It depends on whatever's going on during that time.

**Q.** There were times that nobody would have known from The Fresh Diet when you finished your route?

MR. ANDREWS: Objection.

A. At that time, I don't remember.

**Q.** Did the location of The Fresh Diet facility ever change from New Jersey to another location?

[Page 38]

T. Jackson

A. Yes.
Q. Where did it first change to during the time you were performing --
A. After New Jersey?
Q. After New Jersey.
A. Connecticut.
Q. Do you know where in Connecticut?
A. I don't remember the address, but I know it was Stamford.
Q. Did The Fresh Diet have its own kitchen at that location?
A. No.
Q. Was it similar to the catering place --
A. Yes.
Q. -- in New Jersey?
A. Yes.
Q. Did your duties change --
A. At that time, yes.
Q. How did they change?
A. At that time, we didn't have packers in the beginning, so we had to pack and sort out the food and put ice on them and bag ties.
Q. In New Jersey you had to do that?
A. No. We did it in New Jersey, but when

[Page 39]

T. Jackson

we moved from New Jersey to Connecticut, we didn't have any packers at all. In New Jersey, there were the people -- in the New Jersey kitchen, there were a few packers, so we would help them, but once we moved to Connecticut, there were no packers at all until maybe -- maybe a week or two after we got there.
Q. Then there were packers?
A. Then they started hiring packers.
Q. Going back to when you first started, do you know what other drivers there were working for The Fresh Diet at that time?
A. No. At that time, no.
Q. Do you recall any other drivers that were working other than you and your friend?
A. It was Kenneth. It was my nephew.
Q. Kenneth Chow?
A. Yes.
It was David Williams. It was a guy named Ken. There was a few other people, but I don't remember everybody's name.
Q. You moved to Connecticut.
Did your route change?
A. It got bigger.

[Page 40]

T. Jackson

Q. How did it get bigger?
A. Got more stops.
Q. What states were you performing deliveries in?
A. Still New York and Connecticut.
Q. Did the pay structure change?
A. No, not in Connecticut.
Q. But you got more stops?
A. I got more stops, yes.
Q. How many stops did you get when the facility moved to Connecticut?
A. I think I was -- at that time, I was getting anywhere between thirty or forty maybe.
Q. Did the hours change?
A. It was pretty much the same hours.
Q. They varied day to day?
A. Yes. Depending on what needed to be done, yes.
Q. How far away did you live, driving time, from the Connecticut facility?
A. Maybe forty or fifty minutes depending on traffic.
Q. You would still arrive sometime between 3:00 p.m. and 6:00 p.m.?

[Page 41]

T. Jackson

A. Yes.
Q. And be finished sometime between 3:00 a.m. and 6:00 a.m.?
A. Sometimes, yes.
Q. Were you ever done earlier than 3:00 a.m.?
A. I don't think so.
Q. Did you ever start later than 6:00 p.m.?
A. Yes.
Q. What was the latest you would start?
A. The latest? That varies. I don't have an answer for you.
Q. Would you ever start at 7:00 p.m.?
A. Sometimes.
Q. Would you ever start at 8:00 p.m.?
A. Sometimes.
Q. Would you ever start at 9:00 p.m.?
A. Sometimes.
Q. Would you ever start at 10:00 p.m.?
Again, we're just focused on the Connecticut location right now.
A. In Connecticut, I really don't know. It depends on whenever we finished packing up and putting everything in our car.

[Page 42]

T. Jackson

**Q.** Did you ever arrive at the Connecticut facility later than 6:00 p.m.?

A. No, I don't think so.

**Q.** Do you know when Fresh Diet moved from New Jersey to Connecticut?

A. Do I know a year?

**Q.** The year.

A. I don't know if it was between 2008 or 2009. I can't give you the date. I don't remember that.

**Q.** Did it ever move locations from Connecticut to another facility?

A. Connecticut to Brooklyn.

**Q.** Do you remember what year that happened?

A. Anywhere from 2009 to 2010.

**Q.** Do you remember the street address of the location in Brooklyn?

A. The first one was Siegel Street.

**Q.** Was there a second one?

A. Yes.

**Q.** Where was that?

A. I don't remember the exact address. I know it started with a B.

**Q.** Does Baltic sound familiar?

[Page 43]

T. Jackson

A. Sounds familiar.

**Q.** When the facility moved to the Siegel Street location --

A. Yes.

**Q.** -- did it have its own kitchen at that time?

A. At that time, yes, they had their own kitchen.

**Q.** Were there packers?

A. At that time, yes. The ones from Connecticut followed. Yes.

**Q.** Did your duties change when the location was moved to Siegel Street?

A. No, still help pack whenever needed, help put bag ties on, help sort out food, help -- whatever needed to be done on that day to get us out.

**Q.** Did the hours change when it was moved to the Siegel Street location?

A. In the beginning, no. Towards the middle is when I think they gave us a schedule.

**Q.** The middle of the time they were at the Siegel Street location?

A. At the Siegel Street location.

[Page 44]

T. Jackson

**Q.** How far were you living from the Brooklyn facility at the Siegel Street location?

A. I ended up moving to Brooklyn with them.

**Q.** How far of a drive was it?

A. Depending on traffic, I would say about fifteen, twenty minutes.

**Q.** Did you have the same route when it was moved to the Siegel Street location?

A. Pretty much, yes. We ended up switching routes at the Siegel Street. I got the New Jersey route that my nephew had, and he took the Connecticut route.

**Q.** Do you know how many stops the New Jersey route had?

A. I don't remember.

**Q.** Can you approximate?

A. Twenty-five to thirty-five. It was actually New Jersey and New York.

**Q.** This route made stops in both New Jersey and New York?

A. Yes.

**Q.** On the same night, you would make stops in both states?

[Page 45]

T. Jackson

A. Yes.

**Q.** Do you remember the cities that you delivered to in New Jersey?

A. It varies. I would say I remember Princeton because I did the -- I ended up doing the Philly drop-offs to Princeton. Allentown, I think. I don't remember all of the towns.

**Q.** Where were you delivering in New York?

A. New York was mainly Staten Island and Brooklyn.

**Q.** Did the route ever change again for you?

A. For me? After a while, I went back to Connecticut, yes.

**Q.** When was that?

Was Fresh Diet still in the Siegel Street location or Baltic when you started doing the Connecticut route again?

A. I don't remember. I don't remember.

**Q.** When you were doing the Connecticut route, was that more stops than the New Jersey/New York route?

A. I don't remember that either. I can't honestly tell you that.

MR. POLLACK: Can we take a

[Page 46]

T. Jackson

quick two-minute break?

MR. ANDREWS: Yes.

(Whereupon, a recess was taken at this time.)

**Q.** Going back to when you were in the Connecticut location, did you ever report back to the facility at the end of your route?

A. In Connecticut?

**Q.** Yes.

A. No.

**Q.** Would you ever report to anyone at The Fresh Diet that you had finished a delivery when they were at the Connecticut location?

A. Sometimes Syed.

**Q.** Sometimes you wouldn't?

A. Sometimes I wouldn't, no.

**Q.** When it was at the Siegel Street location, did you report back to the facility at the end of a route?

A. Yes, but I didn't -- I think that's when they started making us bring the bags back.

**Q.** Do you remember when that happened?

A. The date? No.

**Q.** The year?

[Page 47]

T. Jackson

A. Maybe 2010, 2009.

**Q.** When you say "they started making us bring the bags back," what do you mean? How did that happen?

A. Well, that happened -- that started because they were calling us to come in early because they didn't have enough bags, so we would have to come in earlier sometimes to bring in our empties. So then that's when they started coming up with you had to come back at the end of the night to bring the empties back.

**Q.** Did you do that?

A. Come back at the end of the night?

**Q.** Yes.

A. Yes, sometimes. Not all the time, sometimes.

**Q.** If you ever didn't bring the bags back at the end of the night, were you ever disciplined?

A. At that time -- at that time, no, because I lived close by, so I would bring them early the next day.

**Q.** Did you ever enter into any type of agreement with Late Night Express?

[Page 48]

T. Jackson

MR. ANDREWS: Objection.

A. With Late Night Express?

**Q.** Yes.

A. No.

(Whereupon, Late Night Express Independent Contractor Agreement was marked as Defendant's Exhibit 49, for identification, as of this date.)

**Q.** Now I'm going to show you a document that's been marked for identification as Defendant's Exhibit 49 (handing).

A. Okay.

**Q.** I'm going to ask you to look through that document and tell me if you've ever seen that before today.

A. This is the contract?

**Q.** I'm just asking if you've seen that document before today.

A. Yes.

**Q.** Is that your signature?

A. Yes, it is.

**Q.** Does your signature appear on the fourth page of the document?

A. No, that's not the fourth page.

[Page 49]

T. Jackson

MR. ANDREWS: He's asking you about this page (indicating).

THE WITNESS: Oh. Oh. Oh. Okay.

A. Yeah, that is the fourth page. Okay. Yes.

**Q.** On the --

A. Yes.

**Q.** -- document marked FD000780?

A. Yes.

**Q.** Does your signature appear on the following page, FD000781?

A. Yes.

**Q.** Does your signature appear on the document FD000782?

A. Yes. 782, yes.

**Q.** Do you know if you signed this document on or about October 10, 2010?

A. October 10th? Yes, that's the date that's here.

**Q.** Did you read this document before you signed it?

A. I read some of it, not all.

**Q.** What is your understanding of what this

[Page 50]

T. Jackson
document is?
MR. ANDREWS: Objection.
A. It's just telling us our responsibilities and duties and our requirements from Fresh Diet.
**Q.** Did you understand paragraph 11 of the document when you signed it?
A. Paragraph 11?
MR. ANDREWS: Objection.
A. Okay. Repeat that question.
**Q.** Did you understand that provision or that paragraph when you signed the document?
MR. ANDREWS: Objection.
A. At the time, no, I didn't read that part.
**Q.** Did you understand yourself to be an independent contractor of The Fresh Diet at the time you were performing deliveries?
MR. ANDREWS: Objection.
A. At that time, that's what Fresh Diet told us.
(Whereupon, Class action affidavit was marked as Defendant's Exhibit 50, for identification, as of

[Page 51]

T. Jackson
this date.)
**Q.** I'm now showing you what's been marked for identification as Defendant's Exhibit 50, and I'm going to ask if you've seen that document before today (handing).
A. Yes.
**Q.** What is your understanding of that document?
A. That one?
**Q.** Yes.
A. This is to -- this is pertaining to our wages and overtime that we didn't get paid for.
**Q.** Is this a copy of the affidavit you referred to earlier that you reviewed in preparation for today's deposition?
A. This is a copy of my affidavit, yes.
**Q.** Earlier, you said that you had reviewed your affidavit in preparation for today's deposition, correct?
A. Yes, mine. Yes.
**Q.** Is this a copy of the document you reviewed?
A. Yes, this looks like a copy of it.
**Q.** Is that your signature on the third page

[Page 52]

T. Jackson
of the document?
A. Yes, it is.
**Q.** Did you sign it on or about January 25, 2013?
A. Yes.
**Q.** How long have you been a Connecticut resident?
A. Two years now.
**Q.** Three years?
A. Two.
**Q.** Where did you live before Connecticut?
A. Brooklyn.
**Q.** Do you know the address?
A. I think it was 826 Thomas Boyland.
MR. ANDREWS: 826 --
THE WITNESS: Thomas Boyland.
MR. ANDREWS: Thomas Boyland Street?
THE WITNESS: I don't know if it's street or avenue. I just know -- it might be street.
**Q.** Was it an apartment?
A. Yes.
**Q.** That was in Brooklyn?

[Page 53]

T. Jackson
A. Yes.
**Q.** How long did you reside there?
A. Maybe two years, three years. Maybe two years.
**Q.** Was that one of the places you were living when you were performing work as a driver for The Fresh Diet?
A. Yes.
**Q.** Did you live in any other places during the time you were performing deliveries as a driver?
A. Before Brooklyn?
**Q.** Before Brooklyn.
A. Yonkers, New York.
**Q.** Do you remember the address there?
A. 12 Convert, C-O-N-V-E-R-T.
**Q.** That was in Yonkers?
A. Yes.
**Q.** Was that an apartment?
A. Yes.
**Q.** Do you remember the apartment number?
A. I just know it's first floor.
**Q.** Any other residences at the time you were performing work as a delivery driver?

[Page 54]

T. Jackson

A. I think that's it.

Q. Were you ever living --

A. I think I did live on -- I think I did live on Robbin Street, I think. Yeah, I did live there for a little while with my sister.

Q. Were you ever living in Connecticut at the time you were performing work as a driver for The Fresh Diet?

A. Yes, towards the end.

Q. Turning your attention to paragraph 3 of Defendant's 50 --

A. Paragraph 3?

Q. 3.

A. On the second page?

Q. On the second page, yes.

Do you see the sentence that says "My responsibilities as a driver/food delivery employee for the defendants consisted exclusively of showing up at The Fresh Diet's Brooklyn facilities, receiving instructions as to my delivery routes, obtaining prepared meals, and personally delivering them to The Fresh Diet's customers".

Do you see that sentence?

[Page 55]

T. Jackson

A. Okay. Right here (indicating). Yes. Yes.

Q. When it says you received instructions as to the delivery routes, what does that mean?

A. Okay. We pick up the manifest. If there's any key pickups, any changes on where the customers want us to leave their bags, anything pertaining to the route, he -- Syed would give us the information.

Q. Would he give it to you verbally, or was it written?

A. Sometimes it was written, sometimes it was verbally.

Q. If it was written, where would it be located?

A. He would give us a piece of paper, like an e-mail.

Q. The second sentence of that third paragraph says, "After completing my meal deliveries, I would have to return to The Fresh Diet's Brooklyn facilities to report back, complete required paperwork, and return empty bags".

Do you see that sentence?

[Page 56]

T. Jackson

A. Yes.

Q. What paperwork were you required to complete?

A. The manifest.

Q. When did you complete that?

A. Mainly, I would complete it after I finished the route.

Q. What information would you have to provide?

A. How many bags I brought back, how many pieces of ice I brought back.

Q. You wouldn't do that until you finished the route?

A. I mainly wouldn't do that until I got back. I didn't really count the total until I got back.

Q. Did you ever fill out any information on the manifests?

A. Yes.

Q. What information was that?

A. The times, the pieces of ice, and the cooler bags that I brought back.

Q. When you say "the times," what do you mean by that?

[Page 57]

T. Jackson

A. The times that I reach each stop on my manifest.

Q. When would you record the times?

A. On my manifests? The times that I got there to the stops?

Q. Yes.

A. Yeah.

Q. Would you do that at the time that you arrived at the stop or at the time that you finished a stop?

A. I think mainly when I got there. Sometimes before, sometimes after depending.

Q. You would handwrite a time --

A. Yes.

Q. -- that you arrived?

A. Yes.

MR. ANDREWS: Remember, let him finish, and then answer.

Q. Did you ever hand that paperwork in to anyone?

A. Sometimes Syed.

Q. Were there times that you did not hand that paperwork in to Syed?

A. It depends on if he's there at the time

[Page 58]

T. Jackson

or not.

Q. If he was not there, would you hand it in to anyone?

A. No.

Q. What would you do with it?

A. Take it home with me.

Q. When did these requirements get implemented?

A. Which ones?

Q. To return to the facility, to report back, complete required paperwork, and return empty bags.

A. I don't have a specific date.

Q. This wasn't until after they were at Siegel Street?

A. Yes.

Q. Looking at paragraph 6, it says, "Throughout my employment, I often worked significantly in excess of forty hours a week, yet was never paid overtime compensation of one and half times my regular rate of pay".

Do you see that?

A. Yes.

Q. What do you mean by that statement?

[Page 59]

T. Jackson

A. Meaning I did more than forty hours a week, and I never got paid for the overtime.

Q. You were paid for mileage and stops, correct?

A. Yes.

Q. How many hours did you work?

MR. ANDREWS: Objection.

A. I really don't know. On a week, anywhere from sixty to eighty maybe.

Q. How would you come up with that number?

A. Sometimes, like I said, we would come in and have to help bag, put on bag ties, separate the food, sort out the food, whatever needed to be done that day. Sometimes, you know, the food wasn't ready. Sometimes everything was not bagged. Different things. Sometimes they didn't have ice, they had to run out and get ice. Sometimes they didn't have enough bags. Depending on what was going on that day.

Q. Were there ever times that the food was ready and packed in a meal bag with a bag tie for you to simply deliver?

A. Yeah, there was.

Q. When The Fresh Diet was located at the

[Page 60]

T. Jackson

Siegel Street location, what times would you arrive at the facility?

MR. ANDREWS: Objection.

A. At Siegel?

Q. At Siegel.

A. Anywhere between 3:00 and 6:00 until we got a regular schedule.

Q. When you got a regular schedule, what time were you showing up to the facility?

A. If I'm not mistaken, I think my time was between 6:00 or 6:30, something like that.

Q. Do you remember when that schedule was implemented?

A. No, I don't remember.

Q. After the schedule was implemented, would you show up between 6:00 and 6:30 every night?

MR. ANDREWS: Objection.

A. Yes, pretty much.

Q. You would never show up later?

A. No. I don't believe so, no.

Q. Do you know if other drivers showed up later?

A. Everybody had their different times to

[Page 61]

T. Jackson

be there.

Q. Do you know if any drivers were scheduled to come in later than 6:30 p.m.?

A. Yeah, there were drivers that were scheduled later than me. Yes.

Q. Do you know the names of any of those drivers?

A. No, I can't tell you that.

Q. After the schedule was implemented, what was the earliest you would begin performing deliveries?

MR. ANDREWS: Objection.

A. The actual deliveries?

Q. The actual deliveries.

A. That varies.

Q. The earliest.

A. Maybe 6:30, 7:00.

Q. What about the latest?

A. That varies.

Q. What could be the latest that it would be?

A. What could be the latest?

Q. What was the latest it would be?

A. For me, 2:00 in the morning.

[Page 62]

T. Jackson

Q. You would start?

A. I started at 2:00 in the morning.

Q. When you started at 2:00 in the morning, do you remember how many times that happened?

A. That happened once.

Q. Other than that one occasion, would you ever show up at 1:00 in the morning?

A. No.

Q. Midnight?

A. No. Show up to pick up my bags? No.

Q. What was the latest, other than that one occasion, that you would start performing deliveries?

MR. ANDREWS: Objection.

A. That varies. 10:00, 9:00. It depends on what needed to be done that day.

Q. 10:00 p.m. or 9:00 p.m.?

A. Yeah.

Q. What was the earliest you would be done with your deliveries?

A. Earliest?

Q. Now we're focused on the Siegel Street location.

A. The earliest? The earliest, maybe 3:00

[Page 63]

T. Jackson

or 4:00 depending on how many stops and miles I have for the night.

Q. What about the latest?

A. Anywhere from 5:00 to 6:00 in the morning.

Q. Did you have a regular last stop when you were performing deliveries from the Siegel Street location?

A. Not really, depends on who's on for the night. The -- the manifest changes, so, you know, depends on who I deliver to that night, that particular night. So it varies.

Q. Were the hours the same at the Baltic Street location?

A. Pretty much, yeah.

Q. Looking at paragraph 7 of Defendant's 50, it says, "During my employment with the defendants, I interacted with other drivers/food delivery employees on a daily basis, and know that my own experiences were typical of how these employees were supervised and compensated".

Do you see that sentence?

A. Yes.

[Page 64]

T. Jackson

Q. What other drivers are you referring to in that paragraph?

A. My nephew, my sister, David, Kenneth, and other people.

Q. When you say --

A. Bryant, Fernando. There's more. I don't remember everybody.

Q. How do you know that your own experiences were typical of how the other employees were supervised and compensated?

A. We pretty much all did the same thing. If we came in and the bags wasn't ready, we pitched in and helped pack it and put bag ties on. Whatever needed to be done that day, we did.

Q. Do you know the routes that everybody else drove?

A. There were different routes for different people, so I don't -- I don't know who drove what at what time.

Q. Did you know how long it took anyone else to complete their route?

A. I really don't know that.

Q. Did you ever show up late after the

[Page 65]

T. Jackson

schedule was implemented?

MR. ANDREWS: Objection.

A. I don't think so.

Q. Did you ever take any vacation between --

A. No.

MR. ANDREWS: Let him finish.

Q. -- 2007 and 2011?

A. No, never took a vacation.

Q. Did you ever take a sick day?

A. Did I ever take a sick day?

Q. Were you ever sick during 2007 --

A. Yes, I was.

Q. If you were sick, did you perform deliveries that night?

A. Sometimes.

Q. Were there times that you did not perform deliveries because you were sick?

A. Depends on what the problem was.

Q. Was there ever a time that you did not show up to work to perform deliveries?

A. One night I didn't show up because I had burnt my leg, so I had to call and tell him that I burnt my leg so I could go to the

[Page 66]

T. Jackson

emergency room and get that taken care of. Another time, I sprained my foot, so I had to go to the emergency room, get that taken care of. When I found out my mother had breast cancer, the day she had surgery.

**Q.** Did you use your own car when you performed deliveries?

A. Yes, I did.

**Q.** What car did you have in 2007?

A. At that time, I think I had a Sable, I think.

**Q.** What's that?

A. Sable.

**Q.** What --

A. Is it a Mercury Sable? Mercury Sable. I think that's the name of it.

**Q.** Did you have different cars between --

A. Yes, I did.

**Q.** How many different cars?

A. I had a Mercury Sable, and then I had a van that was a -- I forgot what kind of van it was. It was red. I forgot. And then I had a Ford Windstar, which is the van that I have now.

[Page 67]

T. Jackson

**Q.** Did you have --

A. It was three cars in all.

**Q.** Did you own those cars?

A. Yes, they were mine.

**Q.** Do you have insurance for the cars?

A. Yes, I do.

**Q.** Who paid for the insurance?

A. I did.

(Whereupon, Manifests were marked as Defendant's Exhibit 51, for identification, as of this date.)

(Whereupon, a recess was taken at this time.)

**Q.** I'm now going to show you a document that's been marked as Defendant's Exhibit 51, which are Bate stamp numbered FD003415 to FD004192, and they've been represented to us as documents that set forth the number of hours you worked to support your claims in the complaint, and I'm going to ask you if you've seen those documents before today (handing).

MR. ANDREWS: Objection.

A. Yes.

**Q.** Does your handwriting appear on any of

[Page 68]

T. Jackson

those documents?

A. Yes.

MR. ANDREWS: You can take the rubber band off if you want.

**Q.** You said yes?

A. Yes.

**Q.** Wherever the handwriting appears, is it your handwriting?

I'm going to ask you to take your time.

A. Some of them, yes. Some of them, no.

MR. ANDREWS: If you need to take time, that's a lot of paper, so don't rush.

**Q.** I'm going to need you to tell me --

A. Which ones are mine?

**Q.** -- which ones have your handwriting.

You can see it's double-sided, so take your time.

A. This one looks like my handwriting (indicating).

MR. ANDREWS: Why don't you read the number? Can you read that number?

THE WITNESS: Yes.

A. It's FD003468.

[Page 69]

T. Jackson

**Q.** For that document, you say it may contain your handwriting?

A. It looks like my handwriting. Yes, I think this is my handwriting.

MR. ANDREWS: Speak up so she can record all of this.

A. It looks like -- that one looks like my handwriting.

**Q.** You're referring to FD003468?

A. Yes.

**Q.** Is it your handwriting on 003469?

A. 3469? 69? What did you say, 003479?

**Q.** No, 69.

MR. ANDREWS: Here, this page (handing).

A. It looks like my handwriting.

**Q.** Do you know if it's your handwriting?

A. I really can't say for sure. It looks like it though. It looks like it.

MR. ANDREWS: Just for the record, she's reading from FD003470. It's just the opposite page of that.

A. That looks like my handwriting (indicating).

T. Jackson

Q. You're referring to FD003479?
A. This one is FD003479?
Q. That is your handwriting?
A. Yes, it looks like that. Yeah, it looks like that's mine.
That looks like my handwriting (indicating). This is FD003481.
Q. What about on 3482?
A. Yes, that looks like my handwriting also.
Q. Let's take a quick second and look at FD003481 to 003482.
A. Okay.
Q. Is that a sample of a manifest you were referring to earlier in your --
A. Yes.
Q. -- deposition?
A. Yes.
Q. Does that contain the time you were referring to that you would insert on a manifest?
A. Yes.
Q. That indicates the time you would have made a drop-off for that particular customer?

T. Jackson

A. Yeah.
Q. Do you see that it says "May 24, 2010"?
A. Yes.
Q. There are nineteen stops for that route for that --
A. For that day, yes.
Q. -- day, right?
What time does it indicate?
Go ahead. Take your time.
A. This looks like eighteen stops. This looks like eighteen stops.
Q. That's a sample of a manifest you would receive?
A. Yes.
Q. Would that be a complete route for the night of May 24, 2010?
A. Yes.
Q. Does that indicate the time you would have made your first delivery?
A. Yes.
Q. What time is that?
A. 10:19.
Q. Is that what you're referring to on the first row on the document FD003481?

T. Jackson

A. Yes, it's the first stop.
Q. 10:19 p.m.?
A. Yes.
Q. On the following page, being 3482, does that indicate the time of the last stop?
A. Yes.
Q. What time is that?
A. Oh, actually not. I didn't do this one.
Q. Meaning you didn't do the --
A. I didn't -- I performed it, but I must have forgotten to put in the time.
Q. The time before that for the last stop says 3:25.
A. Yes.
Q. Is that a.m.?
A. A.m., yes.
Q. The first delivery was made at 10:19 p.m.?
A. The first delivery, yes.
Q. The second to last --
A. That's not when I started though.
Q. The first delivery was made at 10:19 --
A. The first delivery.
Q. -- p.m.?

T. Jackson

A. Yes.
Q. Do you know how far Bloomfield, Connecticut is from the Brooklyn facility?
A. If I had to guess, I would say two, two and a half hours.
Q. Do you know if Fresh Diet was located in Siegel Street --
A. At this time?
Q. -- on May 24, 2010?
MR. ANDREWS: Wait. Let him finish.
A. I don't know.
Q. It may have been in Connecticut at that time?
MR. ANDREWS: Objection.
A. I don't think so. I think we were in Brooklyn at this time, 2010. I think we were in Brooklyn at the time.
Q. Getting back to when the last delivery was completed, you say that the last one is blank, correct?
A. Yes.
Q. The one before that was done at 3:25 a.m.?

T. Jackson

A. Yes.
Q. That was in Norwalk, Connecticut?
A. Norwalk, yes.
Q. Do you know how far Norwalk, Connecticut was from the Brooklyn facility?
A. Anywhere from an hour to an hour and a half.
Q. Just moving on in Defendant's 51, I just want to get to the next set where you recognize that it's definitely your handwriting.
A. This is my handwriting (indicating).
Q. Now we're referring to FD003483?
A. Yes.
Q. Is that your handwriting on FD003484?
A. Yes.
Q. Does this indicate your manifest for May 23, 2010?
A. Yes.
Q. On the first row, do you see where it says "9:21"?
A. Yes.
Q. Does that mean that the first delivery you made --
A. Was at 9:21.

T. Jackson

Q. P.m.?
A. Yes.
Q. That was in Rocky Hill, Connecticut?
A. Yes.
Q. Do you know how far Rocky Hill, Connecticut is from the Brooklyn facility?
A. About two hours.
Q. Looking at FD003484, does that last row indicate the last stop you would have made for the May 23, 2010 route?
A. Yes.
Q. What time does that say?
A. 2:40.
Q. Is that 2:40 a.m.?
A. Yes.
Q. If you could, just keep looking for the next set where you definitively recognize your handwriting.
A. This one looks like my handwriting here, this one (indicating).
Q. Now we're referring to --
A. FD003487.
Q. Is your handwriting also on FD003488?
A. Yes.

T. Jackson

Q. Looking at FD003487, is that a route your received for May 14, 2010?
A. Yes.
Q. For eleven stops?
A. Yes.
Q. What time does it say the first delivery was made?
A. At 10:28 p.m.
Q. What time does it say the last delivery was made?
A. No, this is not right.
Q. Looking at 003487, is that a complete manifest for one night?
A. Okay. Which one?
Q. 3487.
A. I don't think this is a complete -- I don't think so.
Q. How many stops are indicated?
A. It says eleven stops here. It says eleven.
Q. How many customers are listed on that one sheet, being FD003487?
MR. ANDREWS: Objection.
A. One, two, three, four, five, six, even,

T. Jackson

eight, nine, ten, eleven on this one.
Q. What time does it say that the drop-off was for the last customer listed on that page?
MR. ANDREWS: Objection.
A. On this page, 1:52 a.m.
Q. You said that you also recognized your handwriting on the document FD003488?
A. Yes.
Q. Do you recognize your handwriting on FD003489?
A. Yes.
Q. This page (indicating).
A. Oh, I'm sorry. On this one, yes.
Q. That's your handwriting?
A. Yes.
Okay. So this is part of this one (indicating).
Q. Is 003488 to 003489 a manifest you would have received for May 16, 2010?
MR. ANDREWS: Objection.
A. Yes.
Q. Is that a complete manifest you would have received for that night?
MR. ANDREWS: Objection.

[Page 78]

T. Jackson

A. Yes.

Q. Now you're looking at FD003490?

A. Yes.

Q. Is the complete manifest for May 16, 2010 contained on FD003488 through 003490?

A. Yes.

Q. What time does it indicate the first drop-off was made?

A. 8:48 a.m. P.m. Sorry. P.m.

Q. What time does it indicate that the last delivery was made?

A. 2:25. Yeah, 2:25 a.m.

Q. That last stop was in Darien, Connecticut?

A. Yes. No. No. The last stop would have been New Canaan it looks like. It looks like New Canaan.

Q. What time is it at New Canaan?

A. 2:42.

Q. A.m.?

A. 2:42 a.m.

Q. Is there a reason the New Canaan was the last stop as opposed to Darien, Connecticut on

[Page 79]

T. Jackson

that night?

MR. ANDREWS: Objection.

A. If I'm not mistaken, I think New Canaan is before -- New Canaan is between -- if I'm not mistaken, New Canaan would be between -- okay. I think maybe I did a mistake here. Maybe that was supposed to be a one (indicating). Maybe that was supposed to be a one.

MR. ANDREWS: Read the page number.

A. The page number is FD003489. I think I might have made a mistake and put a two, and it was supposed to be a one.

Q. Meaning 1:42 a.m.?

A. Yes.

Q. Getting back to when the last stop would have been made for the May 16, 2010 route, what time would that have been?

MR. ANDREWS: Objection.

A. 2:25 a.m.

Q. In Darien, Connecticut?

A. Yes.

This one looks like my handwriting

[Page 80]

T. Jackson

(indicating).

MR. ANDREWS: Make sure you read the page numbers when you identify documents.

A. It's FD003491 and FD003492.

Q. Looking at 3491, does that indicate what the first stop would have been for the May 17, 2010 route?

A. Yes.

Q. What time was that?

A. 10:20.

Q. P.m.?

A. Uh-huh.

Q. Does that indicate when the last --

A. Yes.

Q. -- delivery was made?

What time was that?

A. 4:09 a.m.

Q. Is that in Darien, Connecticut?

A. Yes.

I think it might have been -- I think I might have did more stops than this because for some reason I put twenty-nine up there (indicating).

[Page 81]

T. Jackson

MR. ANDREWS: Read the page number.

A. FD003491. I think I might have done more stops than what it's saying on here, the twenty-three, because I got a twenty-nine there (indicating). So I think I might have did twenty-nine stops that day instead of twenty-three. I just don't know where the rest of the manifest is.

Q. There's nothing indicating when the other stops would have been other than what's on the manifest, correct?

MR. ANDREWS: Objection.

A. There must be another part, so --

Q. Let's go ahead and just --

A. This one would be the same thing (indicating). This is FD003493. I think this might have been more stops also because I got a thirty-two in the corner.

Q. Is that your handwriting on FD003493?

A. Yes, that's my handwriting.

Q. 3494?

A. Yes.

Q. And 3495?

[Page 82]

T. Jackson

A. Yes.

These two are together (indicating).

**Q.** Is that your handwriting on 3497?

A. No, but this does look like my husband's handwriting.

**Q.** Who is your husband?

A. Delroy McNeil.

**Q.** He performed --

A. No. Sometimes he would go with me.

**Q.** He would go with you?

A. Yes.

**Q.** He would fill out the manifest?

MR. ANDREWS: Objection.

A. Yes. It looks like he filled this one out for me.

**Q.** Would he ever take any of the meals to the doors when he was with you?

A. Yes, sometimes he did.

**Q.** How often did he go with you?

A. I can't really answer that.

**Q.** Every week?

Would he go with you once a night?

MR. ANDREWS: Objection.

A. No, more than that.

[Page 83]

T. Jackson

**Q.** More than that?

A. Uh-huh.

**Q.** Three nights a week?

MR. ANDREWS: Objection.

A. I can't be specifically sure how many nights.

**Q.** Would he be with you the entire time?

MR. ANDREWS: Objection.

A. Of the route?

**Q.** Yes.

A. The entire time that I'm on the route?

**Q.** Yes.

A. Yes.

**Q.** Did he go to the facility with you?

A. Yes.

**Q.** Did Syed ever see him?

A. Yes.

**Q.** Did Syed ever tell you you can't have your husband --

A. No.

**Q.** -- performing deliveries with you?

A. No.

**Q.** Did anyone else ever go with you?

A. I don't remember. I don't think so.

[Page 84]

T. Jackson

**Q.** Did your daughter ever go?

A. With me? No. No, I don't think she ever went with me.

**Q.** You recognize that to, perhaps, be your husband's handwriting?

A. Yes.

**Q.** We're looking at 3497?

A. Yes.

**Q.** Do you recognize that on 3498?

A. Yes.

**Q.** Do you recognize the handwriting on 3499?

A. Yes, that also looks like my husband's writing, and on 3500.

MR. ANDREWS: FD003500.

A. This looks like his handwriting on FD003501.

Do you want me to keep going?

**Q.** Let's just skip a few here.

MR. ANDREWS: You want to skip a whole bunch?

MR. POLLACK: Yes.

**Q.** Just getting back where you recognized your handwriting and the time entry on that

[Page 85]

T. Jackson

manifest, that would indicate the first delivery made, correct?

A. Yes.

**Q.** The last entry would indicate the last delivery made?

A. Yes.

MR. ANDREWS: Objection.

**Q.** The time of the last delivery made, correct?

MR. ANDREWS: Objection.

A. Yes, pretty much.

**Q.** Do you recognize your handwriting on --

A. On this one? Yes.

**Q.** -- on 3723?

A. Yes.

**Q.** Is that your handwriting on 3729?

A. Yes.

**Q.** Do you recognize your handwriting on 3752?

A. Yes.

**Q.** Do you recognize your handwriting on 3753?

A. Yes.

**Q.** Do you know if 3752 to 3753 represents

[Page 86]

T. Jackson

one route for November 28, 2010?

A. I don't know.

**Q.** Do you see that it says seventeen stops?

A. Yes.

**Q.** On 3752, correct, it says seventeen stops?

A. Yes, this says seventeen stops (indicating).

**Q.** On 3753, there's a handwritten notation saying sixteen.

Do you see that?

A. Yes.

**Q.** Do you know what that would mean?

A. I don't remember.

**Q.** If you see --

A. Maybe that -- maybe it was -- I think it was sixteen stops because this is crossed out (indicating).

**Q.** You're referring to the ninth row on 3752?

A. Yeah.

I'm not sure if this is part of that or not (indicating). This doesn't have a date on it.

[Page 87]

T. Jackson

**Q.** Fair enough.

Starting on 3755, can you just flip through the document and let me know when you see your handwriting and a complete delivery route for a given day?

MR. ANDREWS: Objection.

A. Could you repeat that?

**Q.** Starting on this page --

A. Right.

**Q.** -- which is 3755 --

A. Yes.

**Q.** -- I want you to go through it until you see your handwriting and a complete route for a given night.

MR. ANDREWS: Objection.

A. This looks -- this is my handwriting but -- this is FD003757, but I got the number twenty-one. There's a number twenty-one up here, so I don't (indicating) -- I don't remember if it was twenty-one stops or if it was seventeen stops.

**Q.** Let's move on.

A. That's my handwriting (indicating).

**Q.** You're referring to 3769?

[Page 88]

T. Jackson

A. 3769, yes. Yes, this is my handwriting.

This is my handwriting, but it doesn't look like a full route (indicating).

MR. ANDREWS: You have to speak up and identify the page numbers.

A. FD003776 and FD003775 looks like my handwriting.

**Q.** Do you know if 3775 and 3776 make up one route?

A. No. No. Actually, this would be the back of this one (indicating). Okay. This would be the back, I think, of this one (indicating).

**Q.** Do you believe that 3776 to 3777 is one route?

MR. ANDREWS: Objection.

A. No, I don't think so. I don't think so. They have the same stops here as the same stops here (indicating).

**Q.** Did you give these to your attorney?

A. Yes, I did.

**Q.** Where do you have them?

A. The originals?

**Q.** Yes.

[Page 89]

T. Jackson

A. The originals, my attorney has.

**Q.** You gave them to your attorney you said --

A. Yes.

**Q.** -- correct?

A. Uh-huh.

**Q.** Do you have a hard copy of them, or are they on a computer?

A. No. I have the actual -- well, my lawyer has the actual manifests.

**Q.** You gave them all to your lawyer?

A. Yes, all the ones that I had.

**Q.** Did you explain what they were?

A. Yeah. I told him they were my manifests.

**Q.** Looking at 3777, do you see where it says "January 9, 2011"?

A. Right.

**Q.** And 3775 shows January 10, 2011.

Do you see that?

A. Yes.

**Q.** These are two different manifests, correct?

A. It looks like it, yes.

[Page 90]

T. Jackson

Q. Do you know if 3776 is the other part of one of those two manifests?

MR. ANDREWS: Objection.

A. I think this is a whole different manifest because it has the same stops, see, 35 Overhill Road (indicating).

Q. Is on 377 --

A. Oh. Wait. Wait. Wait.

MR. ANDREWS: Make sure you read what page number. Otherwise, we'll never understand what page you're referring to.

THE WITNESS: Okay.

A. FD003777.

Q. That's the beginning part of a route for January 9 --

A. Right.

Q. -- 2011, correct?

A. Right.

Q. Do you know --

A. It looks like the beginning. Let me change that. It looks like the beginning.

Q. It says fourteen stops, correct?

A. Yes.

[Page 91]

T. Jackson

Q. Are fourteen stops contained on that one page?

A. One, two, three, four, five, six, seven, eight, nine, ten. No. That says ten.

This is different because it has the same stops here on FD003776 as they do on FD003777 (indicating). See on --

Q. On 3776?

A. Yes, are on --

Q. 3777 --

A. Yes.

Q. -- the same addresses?

A. So I think that's two different manifests.

Q. I'm not going to ask you to guess.

Again, just trying to go through when you could see a completed route between one, two, or three pages for the next night that contains your handwriting or your husband's handwriting.

A. FD003783 and FD003782 looks like it's a complete manifest.

Q. Is that for the November 16, 2010 route?

A. Yes.

[Page 92]

T. Jackson

Q. When would the first delivery have been made on that route?

A. Looks like 8:12.

Q. P.m.?

A. P.m., yes.

Q. When was the last delivery?

MR. ANDREWS: Objection.

A. Looks like 3:54 a.m.

MR. ANDREWS: We should take a short break. It doesn't have to be this second, but we've been going for over an hour.

THE WITNESS: Okay.

Q. On 3782 to 3783, the deliveries are put in a certain order; is that correct?

A. This is the order that they gave it to me in, that Syed gave it to me in.

Q. Did you follow that order?

A. Not on this one.

Q. Did you tell Syed that you changed the order in which you delivered the meals that night?

MR. ANDREWS: Objection.

A. Any time he didn't put it in the correct

[Page 93]

T. Jackson

order, yes.

Q. What do you mean?

A. Meaning -- meaning I would usually start from the furthest stop and work my way down to the closest stop. So this looks like he got it all mixed up. It's not -- it's not in the order that it's normally done in.

Q. From furthest away to closest --

A. Right.

Q. -- to the Brooklyn facility?

A. Right.

Q. You decided the order in which you were to deliver them?

MR. ANDREWS: Objection.

A. It's -- usually, it's in correct order when I get my manifest from him. It's usually the furthest city from the Brooklyn kitchen, and I work my way back down to the Brooklyn kitchen.

So it looks like the furthest one on here was -- furthest one here looks like it could have been the Glastonbury stop, I think (indicating).

Q. You're looking on 3783?

[Page 94]

T. Jackson

A. Yeah, this is 3783.

I don't know what happened here. Okay. It looks like -- okay.

Q. I'll ask this.

If you ever didn't deliver in the order that it was contained on the manifest, did you have to tell Syed?

A. Yes.

Q. What would you tell him?

A. If it wasn't in the order that it's normally done in, I would let him know.

Q. You would let him know?

A. Yeah.

Q. What would you let him know?

A. I would tell him that it's not in its correct order.

Q. What would he say?

MR. ANDREWS: Objection.

A. I don't know.

Q. Did he tell you that you have to do it on the order that it's on the manifest?

MR. ANDREWS: Objection.

A. No, he didn't tell me that I had to do it on this order because he didn't really know

[Page 95]

T. Jackson

Connecticut the way I did.

Q. You were able to decide where to --

A. Put it in the correct order.

Q. You were able to make that decision?

MR. ANDREWS: Objection.

A. Yes.

Q. Did that happen on more than one occasion?

A. Depending on a manifest. I don't know how they -- the manifest wasn't always in its correct order. Sometimes it was, sometimes it wasn't.

MR. POLLACK: Why don't we take a break?

(Whereupon, a recess was taken at this time.)

Q. Is that your handwriting on the document FD003854?

A. Yes.

Q. Is that your handwriting on the back of the page on 3855?

A. Yes.

Q. Does 3854 to 3855 represent one route?

A. Yes.

[Page 96]

T. Jackson

Q. Is that a route for April 12, 2010?

A. Yes.

Q. What time does it indicate that the first delivery was dropped off?

A. The first delivery was at 8:06.

Q. P.m.?

A. P.m.

Q. That was in North Brunswick, New Jersey?

A. Yes.

Q. What time does it indicate the last delivery was made?

A. Staten Island at 1:14.

Q. A.m.?

A. A.m., yes.

Q. That's the second to last row?

A. Yes.

Q. Again, does this indicate that you went out of order between the last two stops?

A. Yes.

Q. Did you make that decision on your own?

MR. ANDREWS: Objection.

A. I don't remember. I don't recall this one.

Q. If you ever went out of the order on the

[Page 97]

T. Jackson

manifest, were you disciplined by Syed Hussain?

MR. ANDREWS: Objection.

A. If I ever went out of order? If I ever went out of order, he would know.

Q. He wouldn't know?

MR. ANDREWS: He would know is what she said.

Q. He would know?

A. He would know, yeah.

Q. He would know?

A. He would know.

Q. Were you ever disciplined if you went out of order?

MR. ANDREWS: Objection.

A. No. I don't recall that. No.

Q. How would he know that you went out of the order?

A. How would he know that I went out of order?

Q. Yes.

A. I'm trying to figure out what happened that day that I did that.

MR. ANDREWS: Mr. Pollack has asked you a question. You don't need to

[Page 98]

T. Jackson

look at this document to answer it.
A. Can you repeat that?
MR. POLLACK: Can you repeat it?
(Whereupon, the record was read by the reporter.)
A. How would he know if I went out of the order? If I had to go out of the order, then I would -- I don't know that right now. I don't know.
Q. Would you call him and tell him that you're going out of the order on a manifest?
MR. ANDREWS: Objection.
A. Sometimes. It depends on whatever problem was that night.
I mean, there was times where we had bad weather, maybe -- you know, the situation changes from day to day, you know. It depends on what the weather is like, if he takes something off the manifest, if he puts something on the manifest. Depends on, you know, the situation for that night, that particular day.
Q. Were there times where you did not tell him that you went out of order until after you

[Page 99]

T. Jackson

had completed the route?
MR. ANDREWS: Objection.
A. Were there times? I don't remember. Probably so.
Q. Did you take any breaks during the time you performed deliveries?
A. Did I take any breaks? I might have stopped and got coffee or something to eat.
Q. Would you take a break for any other reason?
A. To go to the bathroom --
Q. To get gas?
A. -- get coffee.
Yeah, gas, get something to eat, something to snack on.
Q. Did you ever go into a restaurant to eat?
A. To sit down and eat?
Q. Yes.
A. No.
Q. Would you ever call Syed to tell him that you were going to get something to eat?
A. No.
Q. Would you call him and tell him you were

[Page 100]

T. Jackson

going to get gas?
A. No.
Q. You wouldn't call him if you were taking a break during the time you were performing deliveries?
MR. ANDREWS: Objection.
A. If I was going for something to eat or going for gas or going to the bathroom, no.
Q. Did you ever seek reimbursement for any expenses you incurred during the time you were performing deliveries?
A. The only reimbursement that we got was our tolls.
Q. Did you have any other source of income between 2007 and 2011 besides the payments you received for the work you performed as a driver for The Fresh Diet?
A. When I worked at PCF, which was at the beginning of me starting with Fresh Diet.
Q. Any other times?
A. Not that I can recall.
Q. Were taxes ever withheld from your payments from Late Night?
A. Was taxes ever taken out of my check?

[Page 101]

T. Jackson

Q. Yes.
A. No, they were never taken out of my check. I got a 1099.
Q. You got a 1099?
A. Yes.
(Whereupon, 2010 1099 form was marked as Defendant's Exhibit 52, for identification, as of this date.)
(Whereupon, 2010 1099 form was marked as Defendant's Exhibit 53, for identification, as of this date.)
(Whereupon, 2011 1099 form was marked as Defendant's Exhibit 54, for identification, as of this date.)
Q. I'm now showing you what's been marked for identification as Defendant's Exhibit 52 (handing).
Is that a copy of a 1099 you would have received?
A. The top one is mine (indicating).
Q. The top one?
A. Yes.
Q. Does that reflect the compensation you received from Late Night for the year 2010?

[Page 102]

T. Jackson

MR. ANDREWS: Objection.

A. The tolls is in here. The tolls that we were reimbursed from is in this figure (indicating).

Q. Do you see the sum, $64,300?

A. Yes. Tolls were included.

Q. Is it your testimony that you received less than that for the deliveries you performed?

A. Yes.

Q. Do you know approximately how much --

A. No.

Q. -- the tolls were?

A. No.

MR. ANDREWS: Let the question be asked first.

Q. Looking at Defendant's 53, do you recognize that document (handing)?

A. It's the same one as 52.

Q. The top of 52?

A. Yes.

Q. Looking at Defendant's 54, do you recognize that document (handing)?

A. Yes.

[Page 103]

T. Jackson

Q. What is that document?

A. This is my 1099.

Q. For what year?

A. 2011.

Q. Does that reflect the compensation --

A. No. This also has the tolls in it.

Q. The $28,890 has tolls included?

A. Yes.

Q. How do you know that?

A. Whenever we had to give them receipts for the tolls, it was never a separate check. They always put it in the one check that we received weekly. Whatever we were reimbursed for never came in two checks. It was one check. It was never a separate check that says this is for your tolls and this is what we made for the week.

Q. How did you pay the tolls?

A. I paid the polls out of my pocket.

Q. Did you have an E-ZPass?

A. Not all the time.

Q. Whatever you spent out of your pocket for the tolls, you were paid back for?

A. Yes.

[Page 104]

T. Jackson

MR. ANDREWS: Objection.

Q. Did you file tax returns in 2007?

A. Yes.

Q. 2008?

A. Yes.

Q. 2009?

A. Yes.

Q. 2010?

A. Yes.

Q. 2011?

A. Yes.

Q. Do you have copies of those tax returns?

A. I think I might have gave my lawyer those. I gave him what I had.

Q. To the extent you haven't given them to your lawyer and you still have them in your possession, I'm making a request for any tax returns filed between 2007 and 2011.

A. If I have them?

Q. Yes.

A. You want to see them?

Q. Yes.

MR. ANDREWS: That's for Yale and I to work out. We'll talk about

[Page 105]

T. Jackson

that later.

THE WITNESS: Okay.

Q. Do you know if you claimed any compensation you received from Late Night on those tax returns?

MR. ANDREWS: Objection.

A. Did I claim any compensation? You have to explain that more. I don't understand what you're trying to say.

Q. You filed tax returns you said --

A. Right.

Q. -- for each year that you performed deliveries as a driver --

A. Right.

Q. -- for Late Night, correct?

A. Right.

MR. ANDREWS: Objection.

Q. Who prepared the tax returns?

A. The tax person that I went to that year.

Q. Was it the same person each year?

A. Not always, no.

Q. Was it an individual or a firm in 2007?

A. I don't know. Might have been a firm.

Q. Like an H&R Block?

[Page 106]

T. Jackson

MR. ANDREWS: Objection.

A. I don't know who it was, but it might have been a firm.

**Q.** Do you know if you ever gave the 1099 forms to the person who prepared your tax returns?

A. I gave them a copy of what I got from Fresh Diet.

**Q.** Do you know if any expenses were deducted on the tax returns?

A. If any expenses were deducted? Yes, I think so.

**Q.** Do you know what expenses?

A. I think it was my mileage.

**Q.** Anything else?

A. My daughter.

**Q.** I'm just talking relating to expenses incurred as a driver.

A. I don't know what else. I don't remember. Mainly, it was my mileage.

**Q.** Do you remember if you filed them quarterly or at the end of the year?

A. I filed at the end of the year.

**Q.** Did you ever receive any type of

[Page 107]

T. Jackson

benefits from The Fresh Diet?

A. No. I -- no.

**Q.** Do you know the name Judah Schloss?

A. Judah?

**Q.** Or Judah.

A. Judah, yeah.

**Q.** Who do you know him to be?

A. Judah's the boss.

**Q.** The boss of what?

A. Fresh Diet.

**Q.** Have you ever personally interacted with him?

A. Not really, just to say hi maybe.

**Q.** Do you know the name Zaimi Duchman?

A. Yes.

**Q.** Who do you know Zaimi Duchman to be?

A. One of the bosses from Fresh Diet.

**Q.** Have you ever personally interacted with Mr. Duchman?

A. Just to say hi.

**Q.** Did you maintain a cell phone at the time you were performing deliveries as a driver for The Fresh Diet?

A. Yes.

[Page 108]

T. Jackson

**Q.** Yes?

A. Yes.

**Q.** Did you ever communicate by text message with Syed on that cell phone?

A. Yes.

**Q.** What would you text Syed about?

MR. ANDREWS: Objection.

A. Different things.

**Q.** Would you ever text if you completed your delivery?

A. Sometimes.

**Q.** Do you still have the cell phone that you used to text with Syed?

A. At that time? No, it was a different cell phone.

**Q.** You don't have it anymore?

A. No, I don't have that cell phone.

**Q.** When did you last have that cell phone?

A. I don't know.

**Q.** Do you know if it was before July 2012?

A. I don't know.

**Q.** Were you ever advised by your attorneys to preserve all relevant information in your possession concerning your claims in this

[Page 109]

T. Jackson

action?

A. To preserve? Can you explain that further?

**Q.** Did you ever receive any instruction from your attorney to preserve or not destroy information --

A. To save whatever --

MR. ANDREWS: I object to the form of that question to the extent it calls for disclosure of attorney client privileged information. Perhaps, if the question's asked differently, it wouldn't request disclosure of that communication.

**Q.** Have you preserved all information relevant to the claims in this action?

A. Have I saved --

**Q.** Saved, yes.

A. -- anything?

**Q.** Saved everything.

A. I don't recall saving anything, no.

MR. POLLACK: Pending the production of the additional documents requested at the deposition, I have no

[Page 110]

T. Jackson

further questions.

MR. ANDREWS: I have just a couple minutes of follow-up questions.

EXAMINATION BY

MR. ANDREWS:

**Q.** Ms. Jackson, do you recall, in addition to everything else you've testified to today, there being occasional driver meetings?

A. Yes.

**Q.** Who was in charge of those driver meetings?

A. Syed.

**Q.** How frequently were those driver meetings held?

A. When we got to Brooklyn, quite frequently.

**Q.** Where were the driver meetings held?

A. Siegel Street.

**Q.** Can you describe where in Siegel Street they were held?

A. Upstairs in his office.

**Q.** In Syed's office?

A. Yes.

**Q.** Were all the drivers present at these

[Page 111]

T. Jackson

meetings?

A. Pretty much, yes.

**Q.** Do you recall what was typically discussed at these meetings?

A. Different things.

**Q.** Do you recall when these meetings were held during the day?

A. Usually, before we start our route, before we went out.

**Q.** Earlier, Mr. Pollack asked you if you recognized a certain handwriting on the manifest, and you testified that you recognized your husband's handwriting --

A. Yes.

**Q.** -- on some of the pages.

Do you recall that?

A. Yes.

**Q.** You also testified that, at times, your husband road along with you when you --

A. Yes.

**Q.** -- delivered food.

Do you recall that testimony?

A. Yes.

**Q.** Did your husband actually do your work

[Page 112]

T. Jackson

for you when he was with you?

A. No. He mainly went along as company, to keep me company.

MR. ANDREWS: I have no further questions.

CONTINUED EXAMINATION BY

MR. POLLACK:

**Q.** You testified that that was your husband's handwriting on the manifest, correct?

A. Yes.

**Q.** Did he also actually, physically, ever bring a bag to a customer's door?

A. Sometimes, yes.

MR. POLLACK: Thank you. I have no further questions.

(Time Noted: 4:42 p.m.)

________________________

TERESA JACKSON

Subscribed and sworn to before me this ___ day of __________, 2013.

______________________________

Notary Public

[Page 113]

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Teresa Jackson | Yale Pollack | 4, 112 |
| | Peter J. Andrews | 110 |

E X H I B I T S

| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| 48 | Notice of EBT | 18 |
| 49 | Late Night Express Independent Contractor Agreement | 48 |
| 50 | Class action affidavit | 50 |
| 51 | Manifests | 67 |
| 52 | 2010 1099 form | 101 |
| 53 | 2010 1099 form | 101 |
| 54 | 2011 1099 form | 101 |

REQUESTS FOR PRODUCTION

| DESCRIPTION | PAGE |
|---|---|
| Independent contractor agreement with PCF | 9 |
| Tax returns filed between 2007 and 2011 | 104 |

[Page 114]

CERTIFICATE

I, MELISSA KAHANE, hereby certify that the Examination Before Trial of TERESA JACKSON was held before me on the 2nd day of October, 2013; that said witness was duly sworn before the commencement of her testimony; that the testimony was taken stenographically by myself and then transcribed by myself; that the party was represented by counsel as appears herein;

That the within transcript is a true record of the Examination Before Trial of said witness;

That I am not connected by blood or marriage with any of the parties; that I am not interested directly or indirectly in the outcome of this matter; that I am not in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of Ocotber, 2013.

__________________________

MELISSA KAHANE

[Page 115]

ERRATA SHEET

PAGE/LINE CORRECTION

A

**abbreviate** 21:16
**ability** 6:9,12,19
**able** 95:3,5
**absence** 23:13 23:16
**Acklin** 1:4 17:7
**Acklin's** 17:9
**action** 4:23 18:18,20 19:23 50:23 109:2,17 113:13
**actual** 61:14,15 89:10,11
**addition** 110:7
**additional** 109:24
**address** 4:10 20:11 27:20 38:9 42:17,23 52:14 53:16
**addresses** 20:12 91:13
**administer** 3:15
**advised** 108:23
**affidavit** 7:6 50:24 51:14,17 51:19 113:13
**afternoon** 4:14 9:18
**AGREED** 3:3,8 3:13
**agreement** 9:3,4 9:9 47:25 48:7 113:12,22
**ahead** 71:10 81:16
**ALC** 1:8
**alcohol** 6:16
**Allentown** 45:7
**amount** 11:22
**Andrews** 2:8 5:7 5:20 6:6 8:13 8:18,20,24 9:5 9:24 10:2,20 10:22 13:11,14 14:2,22 18:8 20:18 21:14,23 22:11 23:12 26:20 28:23 30:2,6,18,21 31:4 32:18,25 33:6 34:23 35:9 36:10 37:21 46:3 48:2 49:2 50:3 50:10,14,20 52:16,18 57:18 59:8 60:4,19 61:13 62:15 65:3,8 67:23 68:4,12,22 69:6,15,21 73:11,16 76:24 77:5,21,25 79:3,11,21 80:3 81:2,14 82:14,24 83:5 83:9 84:16,21 85:8,11 87:7 87:16 88:5,17 90:4,10 92:8 92:10,24 93:15 94:19,23 95:6 96:22 97:3,7 97:15,24 98:13 99:3 100:7 102:2,16 104:2 104:24 105:7 105:18 106:2 108:8 109:9 110:3,6 112:5 113:5
**answer** 5:9,14 5:16 6:8 8:19 8:20,23 33:2 41:13 57:19 82:21 98:2
**answering** 5:12
**anybody** 23:21
**anymore** 108:17
**apartment** 4:12 52:23 53:20,22
**appear** 48:23 49:12,15 67:25
**appeared** 22:3
**appears** 68:8 114:10
**approximate** 44:18
**approximately** 102:12
**April** 96:2
**arrive** 40:24 42:2 60:3
**arrived** 57:10,16
**Ashley** 16:17
**asked** 23:13 24:15 97:25 102:17 109:13 111:11
**asking** 4:21 48:18 49:2
**attention** 54:11
**attorney** 2:5 88:21 89:2,3 109:6,11
**attorneys** 2:11 3:4 19:23 108:23
**August** 23:4
**authorized** 3:15
**avenue** 52:21
**a.m** 9:20,21,25 10:2 28:6 34:10,15,16,22 41:4,4,7 72:16 72:17 73:25 75:15 77:6 78:11,14,22,23 79:16,22 80:19 92:9 96:14,15
**a/k/a** 1:11

B

**B** 42:24 113:7
**back** 18:5 24:19 24:24 25:2,12 25:14,18 26:2 36:23 39:11 45:13 46:6,7 46:19,22 47:4 47:11,12,14,18 55:22 56:11,12 56:16,17,23 58:12 73:20 79:18 84:24 88:12,13 93:19 95:21 103:24
**background** 15:3
**bad** 37:16 98:16
**bag** 31:8,8 38:23 43:16 59:13,13 59:22,22 64:14 112:13
**bagged** 33:16 59:17
**bags** 24:10 30:14 31:11 37:3 46:22 47:4,8 47:18 55:8,24 56:11,23 58:13 59:19 62:11 64:13
**Baltic** 42:25 45:17 63:15
**band** 68:5
**Barron** 10:16
**basis** 63:21
**Bate** 67:17
**bathroom** 99:12 100:9
**beginning** 13:4 30:19 34:2,3 38:22 43:21 90:16,22,23 100:20
**Behalf** 1:5
**believe** 29:7 60:22 88:15
**benefits** 107:2
**bigger** 28:14 39:25 40:2
**birth** 16:24,25
**blank** 73:22
**Block** 105:25
**blood** 5:24,25 114:14
**Bloomfield** 73:3
**Bloom's** 14:6,7,8 14:14,24,25,25
**boss** 107:9,10
**bosses** 107:18
**boy** 16:14 26:12 29:6
**Boyland** 52:15 52:17,18
**break** 46:2 92:11 95:15 99:10 100:5
**breakfast** 13:22
**breaks** 99:6,8
**breast** 23:9 66:5
**briefly** 15:2
**bring** 46:22 47:4 47:10,12,18,22 112:13
**Brooklyn** 42:14 42:18 44:3,5 45:11 52:13,25 53:13,14 54:21 55:22 73:4,18 73:19 74:6 75:7 93:11,18 93:19 110:16
**brought** 56:11 56:12,23
**Brunswick** 96:9
**Bryant** 1:4 64:7
**bulk** 11:20,22
**bunch** 84:22
**burnt** 65:24,25
**B-L** 14:10
**B-L-O-O-M-S** 14:9

C

**C** 2:2 4:2 114:1 114:1
**call** 32:12 33:4 65:24 98:11 99:22,25 100:4
**calling** 47:7

**calls** 109:11
**Canaan** 78:18 78:19,20,24 79:4,5,6
**cancer** 23:9 66:6
**caption** 18:12
**car** 31:11 37:4 41:25 66:7,10
**Cardiology** 29:6
**care** 66:2,4
**cars** 66:18,20 67:3,4,6
**catering** 1:11,12 25:25 26:3 38:14
**Cecilia** 1:4 17:12
**cell** 107:22 108:5 108:13,16,18 108:19
**certain** 10:17 33:17,18 92:16 111:12
**certification** 3:5
**certify** 114:3
**change** 34:14 35:8 37:24 38:3,18,20 39:24 40:7,15 43:13,19 45:12 90:23
**changed** 92:21
**changes** 55:7 63:11 98:18
**charge** 110:11
**check** 8:5 21:9 21:24 100:25 101:4 103:12 103:13,16,16
**checks** 22:4,5,6 22:7 103:15
**child** 16:18
**children** 16:10 16:12
**Chow** 1:3 39:18
**cities** 45:3
**city** 10:5 26:6 93:18
**claim** 105:8
**claimed** 105:4
**claims** 4:22 18:19,22 19:23 67:20 108:25 109:17
**Class** 50:23 113:13
**client** 109:11
**close** 47:22
**closest** 93:6,9
**coffee** 99:9,14
**collect** 31:10
**come** 24:15,19 24:24 25:2 35:10 47:7,9 47:11,14 59:11 59:12 61:4
**coming** 47:11
**commencement** 114:7
**commercial** 11:6 11:10,11,13,17
**communicate** 108:4
**communication** 109:15
**company** 21:7 112:3,4
**compared** 34:15
**compensated** 63:23 64:11
**compensation** 8:8 58:21 101:24 103:6 105:5,8
**complaint** 67:21
**complete** 55:23 56:4,6,7 58:12 64:23 71:16 76:13,17 77:23 78:5 87:5,14 91:23
**completed** 73:21 91:18 99:2 108:10
**completing** 55:20
**computer** 89:9
**concerning** 108:25
**connected** 114:14
**Connecticut** 4:13 10:4,14 12:19 14:13 25:8,12,19 27:3,4 28:2 30:23 36:4,6 38:7,8 39:2,6 39:23 40:6,8 40:12,21 41:22 41:23 42:2,6 42:13,14 43:12 44:14 45:14,18 45:20 46:7,9 46:14 52:7,12 54:7 73:4,14 74:3,5 75:4,7 78:16,25 79:23 80:20 95:2
**considered** 8:16
**consisted** 54:19
**contain** 69:3 70:20
**contained** 78:6 91:2 94:7
**contains** 91:20
**CONTINUED** 112:7
**contract** 48:17
**contractor** 8:17 9:4,8 48:7 50:18 113:12 113:22
**Convert** 53:17
**cooler** 56:23
**copies** 104:13
**copy** 9:8 51:14 51:17,22,24 89:8 101:19 106:8
**corner** 81:20
**CORP** 1:10,12
**correct** 30:17 51:20 59:5 73:22 81:13 85:3,10 86:6 89:6,24 90:19 90:24 92:16,25 93:16 94:17 95:4,12 105:16 112:10
**CORRECTION** 115:2
**counsel** 114:10 114:18
**count** 56:16
**couple** 7:22 12:25 27:14 110:4
**Courier** 1:10 21:8,11,17,21
**court** 1:2 3:17 5:12,15
**crossed** 86:18
**currently** 7:14 15:15 17:2
**customer** 70:25 77:4
**customers** 20:10 30:15 54:24 55:8 76:22
**customer's** 112:13
**CV** 1:8
**C-O-N-V-E-R-T** 53:17

**D**

**D** 113:1
**daily** 10:15 63:20
**Darien** 78:15,25 79:23 80:20
**date** 7:23 13:9 16:24,25 18:4 42:10 46:24 48:9 49:20 51:2 58:14 67:12 86:24 101:9,12,15
**dates** 14:4 22:21
**daughter** 17:5 84:2 106:17
**David** 1:4 39:20 64:4
**day** 9:13 10:24 20:24 30:8,10 31:2 32:21,24 33:3 40:17,17 43:17 47:23 59:15,20 62:17 64:15 65:11,12 66:6 71:7,8 81:8 87:6 97:23 98:18,18 98:23 111:8 112:23 114:5 114:20
**days** 9:11,11 33:17,18 34:15 34:16
**daytime** 29:18
**decide** 95:3
**decided** 93:13
**decision** 95:5 96:21
**deducted** 106:11 106:12
**Defendant** 1:19
**defendants** 1:14 2:11 54:19 63:19
**Defendant's** 17:21 18:3,5 19:5,11,17 48:8,12 50:24 51:4 54:12 63:18 67:11,16 74:9 101:8,11 101:14,17 102:18,23 113:9
**definitely** 74:11
**definitively** 75:18
**deliver** 7:19

10:13,23 11:11 12:2,5 20:11 30:14 59:23 63:12 93:14 94:6
**delivered** 8:11 10:17 13:22,23 13:23 33:9 45:4 92:22 111:22
**deliveries** 11:17 12:17 28:20 29:2,15 31:3 31:12,13 33:14 33:22 34:21 40:5 50:19 53:11 55:21 61:12,14,15 62:14,21 63:8 65:16,19,22 66:8 83:22 92:15 99:7 100:6,12 102:9 105:14 107:23
**delivering** 7:20 10:12 11:23 33:23 45:9 54:23
**delivery** 10:19 14:3 22:19 27:12 29:19 46:13 53:25 54:18,22 55:5 63:20 71:20 72:18,20,23,24 73:20 74:23 76:7,10 78:13 80:17 85:3,6,9 87:5 92:2,7 96:5,6,12 108:11
**Delroy** 15:18 16:20 82:8
**depending** 34:24 35:14 36:19 40:18,22 44:7 57:13 59:20 63:2 95:10
**depends** 13:22 34:17 37:15,16 41:24 57:25 62:16 63:10,12 65:20 98:14,18 98:21
**deposed** 17:14
**deposition** 3:14 4:16 6:23 7:10 21:12,19 51:16 51:20 70:18 109:25
**derived** 8:8
**describe** 15:2 110:20
**DESCRIPTION** 113:9,21
**destroy** 109:6
**diagnosed** 23:9
**Dickerman** 4:12
**Diet** 1:9,10,10,11 1:12 22:7,10 22:15,18 23:6 25:21 28:12,21 29:3,12,13,15 29:20,24 30:14 37:7,19,23 38:11 39:13 42:5 45:16 46:13 50:6,18 50:21 53:8 54:9 59:25 73:7 100:18,20 106:9 107:2,11 107:18,24
**Diet's** 54:20,24 55:22
**different** 11:16 20:6 24:13 32:4 35:13 59:17 60:25 64:19,20 66:18 66:20 89:23 90:5 91:6,14 108:9,15 111:6
**differently** 109:13
**dinner** 13:23
**directly** 114:16
**disciplined** 47:20 97:2,13
**disclosure** 109:11,14
**discussed** 111:5
**DISTRICT** 1:2 1:2
**doctor's** 29:8
**document** 17:19 17:23 18:7,13 19:4,8,14,19 48:10,15,19,24 49:10,16,18,22 50:2,8,13 51:6 51:9,22 52:2 67:15 69:2 71:25 77:8 87:4 95:18 98:2 102:19,24 103:2
**documents** 6:22 19:22 67:19,22 68:2 80:5 109:24
**doing** 26:21,25 27:10 28:16 29:10 36:3 45:6,18,20
**dollar** 31:22
**Dolowich** 1:20 2:11
**door** 11:23 112:13
**doors** 82:18
**double-sided** 68:18
**drive** 12:22 44:6
**driver** 20:15 22:19 24:16 25:15,21 26:15 53:8,12,25 54:8 100:17 105:14 106:19 107:23 110:9 110:11,14,18
**drivers** 39:12,15 60:23 61:3,5,8 64:2 110:25
**drivers/food** 63:20
**driver/food** 54:18
**driving** 36:17 40:20
**dropped** 96:5
**drop-off** 70:25 77:3 78:10
**drop-offs** 45:7
**drove** 64:18,21
**drugs** 6:15
**Duchman** 1:13 107:15,17,20
**duly** 4:3 114:6
**duties** 30:11 38:18 43:13 50:5
**d/b/a** 1:11

**E**

**E** 2:2,2 4:2,2 113:1,7 114:1 114:1
**earlier** 21:2 41:6 47:9 51:15,18 70:16 111:11
**earliest** 32:5,7 34:8 35:20 61:11,17 62:20 62:22,25,25
**early** 47:7,23
**easier** 26:23
**eat** 99:9,15,18,19 99:23 100:8
**EBT** 18:2 113:10
**educational** 15:3
**effect** 3:16
**eight** 16:9 77:2 91:5
**eighteen** 71:11 71:12
**eighty** 59:10
**either** 45:23
**eleven** 14:19 76:5,20,21 77:2
**Eli's** 12:11,18,24 13:6,8,17,21 13:25 14:17,21
**Elmsford** 27:17 27:18,19
**emergency** 66:2 66:4
**employ** 114:18
**employed** 7:14 7:16 12:8
**employee** 54:19
**employees** 63:20 63:22 64:11
**employment** 13:5 58:19 63:18
**empties** 47:10,12
**empty** 37:3 55:23 58:13
**ended** 13:8 23:3 44:5,11 45:6
**entail** 24:8
**entailed** 30:11
**enter** 47:24
**entire** 83:8,12
**entry** 84:25 85:5
**ERRATA** 115:1
**ESQ** 2:8,13
**everybody** 60:25 64:8,17
**everybody's** 39:22
**exact** 7:23 42:23
**Examination** 1:17 4:6 110:5 112:7 113:3 114:4,12
**examined** 4:5
**example** 6:7 11:24
**excess** 58:20
**exclusively**

31:14 54:20
**Excuse** 20:21
**Exhibit** 17:21 18:3 19:6,11 19:17 48:8,12 50:25 51:4 67:11,16 101:8 101:11,14,17
**expenses** 100:11 106:10,12,14 106:18
**experiences** 63:21 64:10
**explain** 30:25 89:14 105:9 109:3
**Express** 1:9,10 1:12 21:8,9,11 21:17,20,22 22:3,9 47:25 48:3,6 113:11
**extent** 104:16 109:10
**E-L-I** 12:13
**e-mail** 55:18
**E-ZPass** 103:21

**F**

**F** 114:1
**facilities** 54:21 55:22
**facility** 24:9 32:3 32:23 35:4 36:18,22,23 37:24 40:12,21 42:3,13 43:3 44:3 46:8,19 58:11 60:3,10 73:4 74:6 75:7 83:15 93:11
**Fair** 87:2
**familiar** 42:25 43:2
**far** 12:20 36:17 40:20 44:2,6 73:3 74:5 75:6
**father's** 16:22
**FD000780** 49:10
**FD000781** 49:13
**FD000782** 49:16
**FD003415** 67:17
**FD003468** 68:25 69:10
**FD003470** 69:22
**FD003479** 70:2 70:3
**FD003481** 70:8 70:13 71:25
**FD003483** 74:13
**FD003484** 74:15 75:9
**FD003487** 75:23 76:2,23
**FD003488** 75:24 77:8 78:6
**FD003489** 77:11 79:13
**FD003490** 78:3
**FD003491** 80:6 81:4
**FD003492** 80:6
**FD003493** 81:18 81:21
**FD003500** 84:16
**FD003501** 84:18
**FD003757** 87:18
**FD003775** 88:7
**FD003776** 88:7 91:7
**FD003777** 90:15 91:8
**FD003782** 91:22
**FD003783** 91:22
**FD003854** 95:19
**FD004192** 67:18
**February** 13:8
**Fernando** 1:3 7:12 64:7
**Fields** 15:25 16:2,3,4,8,18
**fifteen** 12:21 31:18 44:8
**fifty** 40:22
**figure** 97:22
102:4
**file** 2:14 104:3
**filed** 104:19 105:11 106:22 106:24 113:23
**filing** 3:5
**fill** 24:11 56:18 82:13
**filled** 82:15
**finish** 5:11 6:7 33:2 35:12 57:19 65:8 73:12
**finished** 31:10 34:5 36:21 37:7,19 41:3 41:24 46:13 56:8,13 57:11
**finishes** 5:8
**firm** 2:4 105:23 105:24 106:4
**first** 4:3 30:8,10 38:3 39:11 42:19 53:23 71:20,25 72:2 72:18,20,23,24 74:20,23 76:7 78:9 80:8 85:2 92:2 96:5,6 102:17
**five** 15:21 76:25 91:4
**FL** 1:10,11,11,12 1:12
**flip** 87:3
**floor** 53:23
**flower** 14:3,8
**focused** 41:21 62:23
**focusing** 31:23 35:3
**follow** 92:19
**followed** 43:12
**following** 49:13 72:5
**follows** 4:5
**follow-up** 110:4
**food** 31:5 32:17 32:19 38:23 43:16 59:14,14 59:16,21 111:22
**foot** 66:3
**force** 3:16
**Ford** 66:24
**forgot** 11:9 66:22,23
**forgotten** 72:12
**form** 3:9 101:7 101:10,13 109:10 113:15 113:16,17
**forms** 106:6
**forth** 67:19
**forty** 12:2,3 36:19 40:14,22 58:20 59:2
**found** 29:11 66:5
**four** 76:25 91:4
**fourteen** 90:24 91:2
**fourth** 48:23,25 49:6
**frequently** 20:19 20:22 110:14 110:17
**Fresh** 1:9,10,10 1:11,12 22:7,9 22:14,17 23:5 25:21 28:12,21 29:3,12,13,15 29:19,24 30:14 37:6,19,23 38:11 39:13 42:5 45:16 46:13 50:6,18 50:21 53:8 54:9,20,24 55:21 59:25 73:7 100:18,20 106:9 107:2,11 107:18,24
**Friday** 9:16
10:24 11:12 28:3
**Fridays** 11:2
**friend** 26:10 29:24 30:5 31:3 39:16
**front** 25:23
**full** 88:4
**further** 3:8,13 109:4 110:2 112:5,16
**furthest** 93:5,9 93:18,21,22

**G**

**gap** 13:5
**gas** 99:13,15 100:2,9
**Gene** 23:24 24:6
**gestures** 5:17
**getting** 40:14 73:20 79:18 84:24
**girl** 16:14,15
**give** 11:24 13:9 25:18 42:10 55:10,11,17 88:21 103:11
**given** 10:24 37:13 87:6,15 104:16
**Glastonbury** 93:23
**go** 1:11 24:9,13 24:14 25:14 31:5,11 36:23 36:25 65:25 66:4 71:10 81:16 82:10,11 82:20,23 83:15 83:24 84:2 87:13 91:17 98:8 99:12,17
**goes** 12:5
**going** 4:20,21 9:7 17:19,22 19:7,13,18

25:12 37:17
39:11 46:6
48:10,14 51:5
59:20 67:15,21
68:10,15 84:19
91:16 92:12
98:12 99:23
100:2,8,9,9
**Gonzo** 1:20 2:11
**good** 4:14 22:21
**GRAB** 1:11
**grade** 15:4,6
**graduated** 15:4
**guess** 31:18 73:5
91:16
**guy** 39:20
**GUZMAN** 1:5

**H**

**H** 113:7
**half** 26:25 34:4
58:22 73:6
74:8
**hall** 25:25 26:4
**Hamden** 10:6
12:19,20
**hand** 5:17 57:20
57:23 58:3
114:20
**handing** 17:24
19:6,12,20
48:12 51:6
67:22 69:16
101:18 102:19
102:24
**handle** 28:13
**handwrite** 57:14
**handwriting**
67:25 68:8,9
68:17,20 69:3
69:4,5,9,12,17
69:18,24 70:4
70:7,10 74:11
74:12,15 75:19
75:20,24 77:8
77:10,15 79:25
81:21,22 82:4

82:6 84:6,12
84:17,25 85:13
85:17,19,22
87:5,14,17,24
88:2,3,8 91:20
91:21 95:18,21
111:12,14
112:10
**handwritten**
86:10
**happen** 47:5
95:8
**happened** 42:15
46:23 47:6
62:5,6 94:3
97:22
**hard** 89:8
**HARMAN** 2:4
**Haven** 4:13
10:14 14:12
**hear** 8:14 26:9
**heard** 21:7
**held** 1:19 29:17
110:15,18,21
111:8 114:5
**Hello** 4:15
**help** 31:7 39:6
43:15,16,16,17
59:13
**helped** 64:14
**hereunto** 114:19
**Hernandez** 1:3
7:12
**hi** 107:14,21
**high** 15:6,7,11
15:12
**higher** 12:6
**Hill** 75:4,6
**hiring** 39:10
**hold** 29:3
**HOLDINGS**
1:11
**home** 37:2 58:7
**honestly** 45:24
**hour** 14:15 74:7
74:7 92:13
**hourly** 8:6 13:18

14:15
**hours** 9:14 13:20
27:24 29:18
35:8,14 40:15
40:16 43:19
58:20 59:2,7
63:14 67:19
73:6 75:8
**husband** 15:20
82:7 83:20
111:20,25
**husband's** 15:17
82:5 84:6,14
91:20 111:14
112:10
**Hussain** 1:12
97:2
**H&R** 105:25

**I**

**ice** 31:8 38:23
56:12,22 59:18
59:19
**identification**
17:21 18:4
19:5,11,17
48:9,11 50:25
51:4 67:12
101:9,12,15,17
**identify** 80:4
88:6
**impact** 6:5,12
**impair** 6:18
**implemented**
58:9 60:14,16
61:10 65:2
**included** 102:7
103:8
**income** 100:15
**incurred** 100:11
106:19
**independent**
8:17 9:4,8 48:7
50:18 113:11
113:22
**Index** 1:8
**indicate** 71:9,19

72:6 74:17
75:10 78:9,12
80:7,15 85:2,5
96:4,11,18
**indicated** 76:19
**indicates** 70:24
**indicating** 49:3
55:2 68:21
69:25 70:8
74:12 75:21
77:13,18 79:9
80:2,25 81:7
81:11,18 82:3
86:9,19,24
87:20,24 88:4
88:12,14,20
90:7 91:8
93:24 101:21
102:5
**indirectly**
114:16
**individual**
105:23
**Individually** 1:5
1:12,13,13
**influence** 6:15
**information**
55:10 56:9,18
56:21 108:24
109:7,12,16
**insert** 70:21
**instruction**
109:5
**instructions**
5:18 54:21
55:4
**insurance** 67:6,8
**interacted** 63:19
107:12,19
**interested**
114:16
**introduced**
26:18
**involved** 17:16
**Island** 25:5
45:10 96:13
**it'll** 12:3

**J**

**J** 2:8 4:2 113:5
**Jackson** 1:4,4,18
4:9,14 5:1 6:1
7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1,12
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1,7
111:1 112:1,20
113:4 114:4
**James** 16:23
**January** 52:5
89:18,20 90:17
**Jersey** 25:5,22

31:24 33:22
35:3,17 36:18
36:22,23,24
37:24 38:5,6
38:16,24,25
39:2,3,4 42:6
44:13,16,20,21
45:4 96:9
**Jersey/New**
45:22
**JLC** 1:8
**job** 26:18,24
27:5 29:4
**JUANY** 1:5
**Judah** 1:13
107:4,5,6,7
**Judah's** 107:9
**July** 23:4 108:21
**June** 23:2

**K**

**K** 4:2
**KAHANE** 114:3
114:23
**Kaufman** 1:20
2:11
**keep** 5:20 8:13
13:11,15 75:17
84:19 112:4
**Ken** 39:21
**Kenneth** 1:3
39:17,18 64:4
**key** 55:7
**Kimble** 23:24
24:6
**kind** 66:22
**kitchen** 25:24
26:2 38:11
39:5 43:6,9
93:18,20
**know** 5:2 7:24
8:16 10:7,23
13:20 16:22
19:25 21:12
22:8,12 25:23
26:3,6,14
27:20,22,23

28:16,18,24
29:24 31:7,16
32:10,21 34:4
35:5 38:8,9
39:12 41:23
42:5,7,9,24
44:15 49:18
52:14,20,21
53:23 59:9,15
60:23 61:3,7
63:12,21 64:9
64:17,20,22,24
69:18 73:3,7
73:13 74:5
75:6 81:9
85:25 86:3,14
87:4 88:9 90:2
90:21 94:3,12
94:13,15,20,25
95:10 97:5,6,7
97:9,10,11,12
97:17,19 98:7
98:9,10,17,18
98:22 102:12
103:10 105:4
105:24 106:3,5
106:10,14,20
107:4,8,15,17
108:20,21,22
**known** 37:19

**L**

**L** 3:1
**late** 1:9 13:24
20:15 21:7,9
21:10,11,15,16
21:17,20,20,22
22:3,9 47:25
48:3,6 64:25
100:24 101:25
105:5,16
113:11
**latest** 32:8,9
34:12 41:11,12
61:19,21,23,24
62:12 63:4
**LATTIMORE**

1:5
**lawsuit** 17:16
**lawyer** 7:11
89:11,12
104:14,17
**leave** 23:13,14
23:16 55:8
**left** 31:8
**leg** 65:24,25
**Let's** 70:12
81:16 84:20
87:23
**Lincoln** 15:12
**line** 4:20
**listed** 76:22 77:4
**little** 54:6
**live** 36:17 40:20
52:12 53:10
54:4,5,6
**lived** 47:22
**living** 44:2 53:7
54:3,7
**LLP** 1:21 2:11
**located** 10:3
12:18 14:11
15:13 25:21
26:6 27:16
55:16 59:25
73:7
**location** 37:23
37:25 38:12
41:22 42:18
43:4,13,20,24
43:25 44:4,10
45:17 46:7,14
46:19 60:2
62:24 63:9,15
**locations** 42:12
**long** 7:20 12:24
15:19 16:7
25:5 27:13
28:25 33:21
52:7 53:3
64:22
**look** 48:14 70:12
82:5 88:4 98:2
**looking** 18:5

58:18 63:17
75:9,17 76:2
76:13 78:3
80:7 84:8
89:17 93:25
102:18,23
**looks** 51:24
68:20 69:4,8,8
69:17,19,20,24
70:5,5,7,10
71:11,12 75:20
78:18,18 79:25
82:15 84:14,17
87:17 88:7
89:25 90:22,23
91:22 92:4,9
93:6,21,22
94:4
**lot** 68:13
**lunch** 13:23
**Lyndhurst** 26:7
26:8

**M**

**maintain** 107:22
**making** 46:22
47:3 104:18
**manifest** 20:9,10
55:6 56:5 57:3
63:11 70:15,22
71:13 74:17
76:14 77:19,23
78:5 81:10,13
82:13 85:2
90:6 91:23
93:17 94:7,22
95:10,11 97:2
98:12,20,21
111:13 112:10
**manifests** 20:2,6
20:14,17,20,23
24:11 31:11
56:19 57:5
67:10 89:11,16
89:23 90:3
91:15 113:14
**March** 7:25 12:8

12:9
**marked** 17:20
18:3 19:5,10
19:16 48:8,11
49:10 50:24
51:3 67:11,16
101:8,11,14,16
**Marquis** 1:4
4:18
**marriage** 114:15
**marriages** 15:22
**married** 15:15
15:19 16:4,7
**math** 16:6
**matter** 114:17
**maximum** 36:15
**McNeil** 15:18
16:20 82:8
**meal** 55:20
59:22
**meals** 33:8 54:23
82:17 92:22
**mean** 8:10 18:25
24:3 47:4 55:5
56:25 58:25
74:23 86:14
93:3 98:16
**meaning** 59:2
72:10 79:16
93:4,4
**means** 21:20
**medications**
5:23 6:2,11
**meetings** 110:9
110:12,15,18
111:2,5,7
**MELISSA** 114:3
114:23
**Mercury** 66:16
66:16,21
**message** 108:4
**met** 30:4,7,10
**MICHAEL** 1:5
**middle** 43:22,23
**Midnight** 62:10
**mile** 31:21,22
**mileage** 13:19

14:15,21 59:4 106:15,21
**miles** 31:20 34:17,25 35:15 63:2
**mine** 51:21 67:5 68:16 70:6 101:21
**minimum** 36:12 36:14
**minutes** 12:21 36:19 40:22 44:8 110:4
**mistake** 79:7,14
**mistaken** 25:4 30:22 60:11 79:4,6
**mixed** 93:7
**mom** 23:9
**Monday** 9:15 10:24 11:12 28:3
**Mondays** 11:2
**month** 7:24 22:25 23:3 24:18 28:16
**months** 7:22 12:25 27:15 28:24
**morning** 9:19,20 34:13 35:22,24 61:25 62:3,4,8 63:6
**mother** 66:5
**move** 42:12 87:23
**moved** 39:2,6,23 40:12 42:5 43:3,14,19 44:10
**moving** 44:5 74:9

**N**

**N** 2:2 3:1 4:2 113:1
**name** 4:8 14:5 15:17 16:16,22 18:12 23:24,25 26:3,12,13,13 29:5 39:22 66:17 107:4,15
**named** 39:21
**names** 20:10,12 61:7
**need** 68:12,15 97:25
**needed** 31:9 40:18 43:15,17 59:14 62:17 64:15
**nephew** 4:18 17:6,9 39:17 44:13 64:4
**never** 58:21 59:3 60:21 65:10 90:12 101:3 103:12,15,16
**New** 1:2,21,22 1:24 2:7,7,12 2:12 4:4,12 10:14,15,15 15:14 25:22 27:4,17 30:23 31:3,14,24 33:22,23 35:3 35:17 36:4,6 36:18,22,23,24 37:24 38:5,6 38:16,24,25 39:2,3,4 40:6 42:6 44:13,16 44:20,20,21,22 45:4,9,10,22 53:15 78:18,19 78:20,24 79:4 79:5,6 96:9
**News** 10:15
**newspaper** 7:19 10:8
**newspapers** 7:21 8:9
**night** 1:9 13:24 20:15 21:7,9 21:10,11,15,16 21:17,20,20,22 22:3,9 36:6 37:13 44:24 47:12,14,19,25 48:3,6 60:18 63:3,11,12,13 65:16,23 71:17 76:14 77:24 79:2 82:23 87:15 91:19 92:23 98:15,22 100:24 101:25 105:5,16 113:11
**nights** 83:4,7
**nine** 77:2 91:5
**nineteen** 71:5
**ninth** 86:20
**nods** 5:17
**normally** 93:8 94:12
**North** 14:12,12 96:9
**Norwalk** 74:3,4 74:5
**Notary** 1:23 4:4 112:25
**notation** 86:10
**Noted** 112:17
**Notice** 1:19 18:2 113:10
**November** 86:2 91:24
**number** 8:10 20:2 36:12 53:22 59:11 67:19 68:23,23 79:12,13 81:3 87:18,19 90:11
**numbered** 67:17
**numbers** 80:4 88:6
**NY** 1:10,10,10

**O**

**O** 3:1 4:2
**oath** 3:15
**object** 109:9
**Objection** 8:18 9:5 10:20,22 14:2,22 18:8 20:18 21:14,23 22:11 23:12 26:20 28:23 30:2,6,18,21 31:4 32:18 33:6 34:23 35:9 36:10 37:21 48:2 50:3,10,14,20 59:8 60:4,19 61:13 62:15 65:3 67:23 73:16 76:24 77:5,21,25 79:3,21 81:14 82:14,24 83:5 83:9 85:8,11 87:7,16 88:17 90:4 92:8,24 93:15 94:19,23 95:6 96:22 97:3,15 98:13 99:3 100:7 102:2 104:2 105:7,18 106:2 108:8
**objections** 3:9
**obtaining** 54:22
**occasion** 62:7,13 95:9
**occasional** 110:9
**Ocotber** 114:20
**October** 1:22 49:19,20 114:5
**offer** 25:3
**offered** 25:4
**office** 29:8 110:22,23
**officer** 3:15
**offices** 1:20
**Oh** 14:3 26:12 29:6 33:3 49:4 49:4,4 72:9 77:14 90:9
**okay** 4:24 5:3,6 5:10,22 9:20 10:2 13:13,16 23:19 31:25 35:18 48:13 49:5,6 50:11 55:2,6 70:14 76:15 77:17 79:7 88:12 90:14 92:14 94:3,4 105:3
**once** 39:6 62:6 82:23
**ones** 43:11 58:10 68:16,17 89:13
**opposed** 32:11 37:12 78:25
**opposite** 69:23
**order** 92:16,17 92:19,22 93:2 93:8,13,16 94:6,11,17,22 94:25 95:4,12 96:19,25 97:4 97:5,14,18,20 98:8,8,12,25
**originals** 88:24 89:2
**outcome** 114:17
**Overhill** 90:7
**overtime** 19:3 51:13 58:21 59:3
**Owens** 16:17,23

**P**

**P** 2:2,2 3:1
**pack** 38:22 43:15 64:14
**packed** 59:22
**packers** 38:21 39:3,5,7,9,10 43:10
**packing** 41:24
**page** 48:24,25

49:3,6,13
51:25 54:15,16
69:15,23 72:5
77:4,6,13
79:11,13 80:4
81:2 87:9 88:6
90:11,12 91:3
95:22 113:3,9
113:21
**pages** 91:19
111:16
**PAGE/LINE**
115:2
**paid** 8:4 10:7
11:20 13:17
14:14 19:3
31:19 51:13
58:21 59:3,4
67:8 103:20,24
**paper** 10:10,10
10:12 11:17,22
27:12 55:17
68:13
**papers** 8:9,10,11
10:13,17,23
11:9
**paperwork**
55:23 56:3
57:20,24 58:12
**paragraph** 50:7
50:9,13 54:11
54:13 55:20
58:18 63:17
64:3
**part** 50:16 77:17
81:15 86:23
90:2,16
**particular** 63:13
70:25 98:23
**parties** 3:4
114:15
**party** 114:9
**pause** 6:8
**pay** 11:25 12:5,6
40:7 58:22
103:19
**payment** 31:21

**payments**
100:16,24
**PC** 2:4
**PCF** 7:17,18,21
8:4,17 9:4,11
10:3 13:6 27:9
27:10,13,16,25
28:2,9,15,20
29:10,13,16
100:19 113:22
**Pending** 109:23
**people** 39:4,21
64:5,20
**perform** 22:17
33:21 36:5
65:15,19,22
**performed**
22:14,14 66:8
72:11 82:9
99:7 100:17
102:10 105:13
**performing**
20:15 25:20
27:24 28:8,20
29:2,14,19
31:3 38:4 40:4
50:19 53:7,11
53:25 54:8
61:11 62:13
63:8 83:22
100:5,12
107:23
**period** 28:19
**person** 26:14
105:20,21
106:6
**personally** 54:23
107:12,19
**Persons** 1:6
**pertaining** 19:2
51:12 55:9
**Peter** 2:8 113:5
**Philly** 45:7
**phone** 32:12
107:22 108:5
108:13,16,18
108:19

**physically**
112:12
**pick** 24:10 31:5
55:6 62:11
**pickups** 55:7
**piece** 55:17
**pieces** 56:12,22
**pills** 5:24,25
**pitched** 64:14
**pizzeria** 12:15
**place** 29:6 38:14
**places** 53:6,10
**plaintiff** 1:18
18:16
**Plaintiffs** 1:7 2:5
**please** 4:8,11 5:2
5:11,14
**plus** 14:15
**pocket** 103:20
103:23
**Pollack** 2:13 4:7
9:7,25 45:25
84:23 95:14
97:24 98:4
109:23 111:11
112:8,15 113:4
**polls** 103:20
**portion** 30:23,24
**position** 26:9
29:4,17 30:10
**possession**
104:18 108:25
**possible** 34:24
34:24
**Post** 10:14,15
**pounds** 11:21
**preparation**
6:23 7:9 51:16
51:19
**prepared** 54:22
105:19 106:6
**present** 110:25
**preserve** 108:24
109:3,6
**preserved**
109:16
**pressure** 5:24,25

**pretty** 11:3
40:16 44:11
60:20 63:16
64:12 85:12
111:3
**previously** 17:20
**Princeton** 45:6,7
**prior** 7:2,3 15:22
**privileged**
109:12
**Probably** 99:5
**problem** 5:6
65:20 98:15
**problems** 37:15
**produced** 19:25
**production**
109:24 113:19
**promised** 25:7
**provide** 19:22
56:10
**provision** 50:12
**Public** 1:23 4:4
112:25
**purposes** 21:18
**pursuant** 1:19
**put** 25:12 31:8
31:11 38:23
43:16 59:13
64:14 72:12
79:14 80:24
92:15,25 95:4
103:13
**puts** 98:20
**putting** 41:25
**p.m** 1:23 9:17,21
9:24 33:18,19
34:21 35:3
40:25,25 41:9
41:14,16,18,20
42:3 61:4
62:18,18 72:3
72:19,25 75:2
76:9 78:11,11
80:13 92:5,6
96:7,8 112:17

**Q**

**quarterly**
106:23
**question** 3:10
4:25 5:5,8,9,12
5:15 8:23 33:2
50:11 97:25
102:16 109:10
**questioning** 4:21
**questions** 4:22
6:10,13,19
110:2,4 112:6
112:16
**question's**
109:13
**quick** 46:2 70:12
**quit** 36:4
**quite** 110:16

**R**

**R** 2:2 4:2 114:1
**range** 10:21
**rate** 11:16 12:5,6
13:18 14:16
58:22
**reach** 57:2
**read** 49:22,24
50:15 68:22,23
79:11 80:3
81:2 90:10
98:5
**reading** 69:22
**ready** 31:6 32:19
33:9,13,15,16
59:16,22 64:13
**really** 22:12 26:8
41:23 56:16
59:9 63:10
64:24 69:19
82:21 94:25
107:14
**reason** 78:24
80:24 99:11
**recall** 39:15
96:23 97:16
100:22 109:22
110:7 111:4,7
111:17,23

**receipts** 103:11
**receive** 8:6 11:16 20:14,16,19,22 21:5 71:14 106:25 109:5
**received** 20:16 21:6 55:4 76:3 77:20,24 100:17 101:20 101:25 102:8 103:14 105:5
**receiving** 54:21
**recess** 21:25 46:4 67:13 95:16
**recognize** 74:10 75:18 77:10 84:5,10,12 85:13,19,22 102:19,24
**recognized** 77:7 84:24 111:12 111:13
**record** 4:8,10 8:21,25 57:4 69:7,22 98:5 114:12
**red** 66:23
**refer** 21:10,17
**referred** 21:2 51:15
**referring** 21:13 22:6 64:2 69:10 70:2,16 70:21 71:24 74:13 75:22 86:20 87:25 90:13
**reflect** 101:24 103:6
**refuse** 25:9,10 25:13
**refused** 24:24
**regarding** 4:22 19:23
**Registers** 10:14
**regular** 58:22
60:8,9 63:7
**reimbursed** 102:4 103:14
**reimbursement** 14:20 100:10 100:13
**relating** 106:18
**relationship** 17:11 22:8 23:5
**relevant** 108:24 109:17
**remainder** 21:12
**remember** 13:10 14:4,5,16,20 14:25 16:5 20:5 22:25 23:3 26:8,13 26:13,17 29:21 29:22 32:25 37:22 38:9 39:22 42:11,15 42:17,23 44:17 45:3,5,8,19,19 45:23 46:23 53:16,22 57:18 60:13,15 62:5 64:8 83:25 86:15 87:21 96:23 99:4 106:21,22
**repeat** 50:11 87:8 98:3,4
**rephrase** 5:4
**report** 37:6,10 37:12,13,14 46:7,12,19 55:22 58:11
**reporter** 5:13,16 98:6
**represent** 95:24
**represented** 67:18 114:10
**represents** 85:25
**request** 104:18 109:14
**requested** 109:25
**REQUESTS** 113:19
**required** 55:23 56:3 58:12
**requirements** 50:6 58:8
**reserved** 3:10
**reside** 17:2,4 53:3
**residence** 12:20
**residences** 53:24
**resident** 52:8
**residential** 11:6 11:10 30:15
**resign** 23:10
**respective** 3:4
**respond** 6:9,13 6:19
**responsibilities** 50:5 54:18
**rest** 81:9
**restaurant** 99:17
**return** 24:16 55:21,23 58:11 58:12
**returns** 104:3,13 104:19 105:6 105:11,19 106:7,11 113:23
**review** 6:22,25 7:2,5
**reviewed** 51:15 51:18,23
**right** 4:18 6:16 9:17 16:6 20:5 29:16 31:24 35:4,19 41:22 55:2 71:8 76:12 87:10 89:19 90:18,20 93:10,12 98:9 105:12,15,17
**Riverside** 29:6 29:10,12
**road** 90:7
111:20
**Robbin** 54:5
**Rocky** 75:4,6
**room** 66:2,4
**route** 23:15,20 24:12,25 25:3 26:21,23,25 27:2 29:23 30:5,17,20 31:2 33:24 34:4 35:7,17 35:25 36:2,9 36:21 37:7,20 39:24 44:9,13 44:14,16,21 45:12,18,21,22 46:8,20 55:9 56:8,14 64:23 71:5,16 75:11 76:2 79:19 80:9 83:10,12 86:2 87:6,14 88:4,10,16 90:16 91:18,24 92:3 95:24 96:2 99:2 111:9
**routes** 25:9 28:13,14 44:12 54:22 55:5 64:17,19
**row** 71:25 74:20 75:9 86:20 96:16
**rubber** 68:5
**run** 59:18
**rush** 68:14

**S**

**S** 2:2 3:1,1 4:2,2 113:7
**Sable** 66:11,14 66:16,16,21
**sample** 70:15 71:13
**Saturday** 11:14 28:4
**Saturdays** 9:16 9:21 11:4
**Saturday/Sun...** 11:15
**save** 109:8
**saved** 109:18,19 109:21
**saving** 109:22
**saying** 81:5 86:11
**says** 54:17 55:4 55:20 58:18 63:18 71:3 72:14 74:21 76:20,20 86:4 86:6,8 89:18 90:24 91:5 103:16
**schedule** 20:3,25 21:3,5,6 43:22 60:8,9,13,16 61:10 65:2
**scheduled** 61:4,6
**schedules** 20:6
**Schloss** 1:13 107:4
**school** 15:6,7,11 15:12
**Scott** 15:25 16:4 16:7,18
**sealing** 3:5
**second** 26:24 42:20 54:15,16 55:19 70:12 72:21 92:12 96:16
**see** 18:12 54:17 54:25 55:25 58:23 63:24 68:18 71:3 74:20 83:17 86:4,12,16 87:5,14 89:17 89:21 90:6 91:8,18 102:6 104:22
**seek** 100:10

**seen** 17:23 18:6 18:7 19:7,13 19:19 48:15,18 51:5 67:22
**sentence** 54:17 54:25 55:19,25 63:24
**separate** 59:13 103:12,16
**September** 17:22 19:12,18
**series** 4:22
**Services** 1:10 21:8,11,17,21
**set** 67:19 74:10 75:18 114:19
**seven** 91:4
**seventeen** 86:4,6 86:8 87:22
**sheet** 76:23 115:1
**short** 92:11
**show** 17:19 24:10,11,12 32:2,6,10,23 33:5,18,19 34:21 35:2 48:10 60:17,21 62:8,11 64:25 65:22,23 67:15
**showed** 33:8 60:23
**showing** 19:4,10 19:16 51:3 54:20 60:10 101:16
**shows** 89:20
**sick** 65:11,12,13 65:15,19
**Siegel** 42:19 43:4,14,20,24 43:25 44:3,10 44:12 45:17 46:18 58:16 60:2,5,6 62:23 63:9 73:8 110:19,20

**sign** 9:3 52:4
**signature** 48:21 48:23 49:12,15 51:25
**signed** 3:14,16 49:18,23 50:8 50:13
**significantly** 58:20
**similar** 4:20 38:14
**Similarly** 1:6
**simplicity** 21:18
**simply** 59:23
**sister** 17:13 54:6 64:4
**sit** 99:19
**Situated** 1:6
**situation** 98:17 98:22
**six** 76:25 91:4
**sixteen** 86:11,18
**sixty** 12:3 59:10
**skip** 84:20,21
**snack** 99:16
**soft** 13:14
**somebody** 23:19
**sorry** 11:7 15:10 33:3 77:14 78:11
**sort** 12:15 38:22 43:16 59:14
**sound** 42:25
**Sounds** 43:2
**source** 100:15
**SOUTHERN** 1:2
**speak** 7:9,12 69:6 88:5
**speaking** 5:13
**specific** 13:9 58:14
**specifically** 83:6
**spell** 12:12
**spent** 103:23
**split** 26:22 30:20 33:24

**splitting** 29:23 30:5 31:2
**spoken** 13:15
**sprained** 66:3
**Stamford** 38:10
**stamp** 67:17
**start** 33:14 34:21 41:9,11,14,16 41:18,20 62:2 62:13 93:4 111:9
**started** 22:25 23:2 25:20,22 26:22,24 27:6 27:7 29:2 30:4 30:16 34:3 36:3 39:10,11 42:24 45:18 46:22 47:3,6 47:11 62:3,4 72:22
**starting** 87:3,9 100:20
**State** 1:23 4:4,8 4:10
**statement** 58:25
**Staten** 45:10 96:13
**states** 1:2 40:4 44:25
**stenographica...** 114:8
**STIPULATED** 3:3,8,13
**stop** 28:8 31:22 57:2,10,11 63:7 72:2,6,13 75:10 78:15,17 78:25 79:18 80:8 93:5,6,23
**stopped** 28:16 29:12 99:9
**stops** 24:13 31:16,20 34:17 34:25 35:14,15 36:5,8,13 40:3 40:9,10,11

44:15,21,24 45:21 57:6 59:4 63:2 71:5 71:11,12 76:5 76:19,20 80:23 81:5,8,12,19 86:4,7,8,18 87:21,22 88:19 88:19 90:6,24 91:2,7 96:19
**store** 25:23
**street** 1:21 2:6 2:12 4:12 42:17,19 43:4 43:14,20,24,25 44:3,10,12 45:17 46:18 52:19,21,22 54:5 58:16 60:2 62:23 63:9,15 73:8 110:19,20
**structure** 11:25 40:7
**Subscribed** 112:22
**sugar** 5:25
**Suite** 1:21 2:6,12
**sum** 102:6
**Summer** 22:21 22:24
**Sunday** 11:14 28:5
**Sundays** 9:16,22 11:4
**supervised** 63:22 64:11
**support** 67:20
**supposed** 21:4 24:17 79:8,9 79:15
**sure** 5:14 69:19 80:3 83:6 86:23 90:10
**surgery** 66:6
**switching** 44:11
**sworn** 3:14,17

4:3 112:22 114:6
**Syed** 1:12 23:17 24:22 30:3,4,7 30:9 32:15 37:8 46:15 55:9 57:22,24 83:17,19 92:18 92:21 94:8 97:2 99:22 108:5,7,14 110:13
**Syed's** 110:23

**T**
**T** 3:1,1 4:2 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1

100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:7 114:1,1
**take** 5:13,16,17 8:14 24:11 25:9,10 33:21 45:25 58:7 65:5,11,12 68:4,10,13,18 70:12 71:10 82:17 92:10 95:14 99:6,8 99:10
**taken** 1:18 21:25 46:4 66:2,4 67:13 95:16 100:25 101:3 114:8
**takes** 98:19
**talk** 104:25
**talking** 9:17 106:18
**tax** 104:3,13,18 105:6,11,19,20 106:6,11 113:23
**taxes** 100:23,25
**tell** 30:9 45:24 48:15 61:9 65:24 68:15 83:19 92:21 94:8,10,16,21 94:24 98:11,24 99:22,25
**telling** 50:4
**tells** 8:22
**ten** 12:21 77:2 91:5,5
**Teresa** 1:4,18 4:9 5:7 112:20 113:4 114:4
**term** 21:16
**testified** 4:5 110:8 111:13 111:19 112:9
**testimony** 102:8 111:23 114:7,8
**text** 32:13 33:4 108:4,7,10,14
**Thank** 112:15
**thing** 28:2 64:12 81:17
**things** 20:2 59:17 108:9 111:6
**think** 6:2,11 10:9 14:18,18 23:24 25:5 26:8 29:10,13 30:22 35:5 40:13 41:8 42:4 43:22 45:8 46:21 52:15 54:2,4,4 54:5 57:12 60:11 65:4 66:11,12,17 69:5 73:17,17 73:18 76:17,18 79:4,7,13 80:22,22 81:4 81:7,18 83:25 84:3 86:17 88:13,18,18 90:5 91:14 93:23 104:14 106:13,15
**third** 51:25 55:19
**thirty** 36:16,19 40:14
**thirty-five** 36:16 44:19
**thirty-two** 81:20
**Thomas** 52:15 52:17,18
**three** 52:10 53:4 67:3 76:25 83:4 91:4,19
**tie** 31:8 59:22
**ties** 38:23 43:16 59:13 64:14
**time** 3:10 5:14 21:3,6 22:2 23:14 24:15 27:5,11,14 28:14,19 29:4 29:9,14 30:4 30:16 31:9,13 31:15,17 32:2 33:5,9,10,22 34:4,19 35:11 35:21,23 36:3 36:7,17 37:17 37:22 38:4,19 38:21 39:13,14 40:13,20 43:7 43:8,11,23 46:5 47:16,21 47:21 50:15,19 50:21 53:11,24 54:8 57:9,10 57:14,25 60:10 60:11 64:21 65:21 66:3,11 67:14 68:10,13 68:19 70:20,24 71:9,10,19,22 72:6,8,12,13 73:9,15,18,19 75:13 76:7,10 77:3 78:9,12 78:20 79:20 80:11,18 83:8 83:12 84:25 85:9 92:25 95:17 96:4,11 99:6 100:5,11 103:22 107:23 108:15 112:17
**times** 10:15 32:4 34:20 35:12 37:9,18 56:22 56:24 57:2,4,5 57:23 58:22 59:21 60:2,25 62:5 65:18 98:16,24 99:4 100:21 111:19
**today** 5:23 6:10 6:13,20 7:2,2,3 17:23 19:8,14 19:19 48:16,19 51:6 67:22 110:8
**today's** 6:23 7:10 51:16,19
**told** 24:25 25:7 25:11,11 26:17 50:22 89:15
**tolls** 100:14 102:3,3,7,14 103:7,8,12,17 103:19,24
**top** 101:21,22 102:21
**total** 56:16
**towns** 45:8
**traffic** 36:20 40:23 44:7
**train** 23:19,21 24:2
**trained** 24:4
**transcribed** 114:9
**transcript** 114:11
**trial** 1:17 3:11 114:4,12
**true** 114:11
**truthfully** 6:9,13 6:19
**try** 5:4 13:11,15
**trying** 91:17 97:22 105:10
**Turning** 54:11
**twelfth** 15:4,6
**twenty** 36:14 44:8
**twenty-five** 36:14 44:19
**twenty-nine** 80:24 81:6,8
**twenty-one** 87:19,19,21
**twenty-six** 16:6
**twenty-three** 81:6,9
**two** 39:8 52:9,11 53:4,4 73:5,5 75:8 76:25 79:14 82:3 89:23 90:3 91:4,14,19 96:19 103:15
**two-minute** 46:2
**type** 9:3 47:24 106:25
**typical** 63:22 64:10
**typically** 32:20 111:4

**U**

**U** 3:1
**Uh-huh** 15:8 80:14 83:3 89:7
**understand** 4:25 5:5,18 18:15 18:19,22 21:19 50:7,12,17 90:12 105:9
**understanding** 20:8 22:13 49:25 51:8
**UNITED** 1:2
**Upstairs** 110:22
**use** 66:7
**usually** 93:4,16 93:17 111:9

**V**

**vacation** 65:5,10
**van** 66:22,22,24
**varied** 40:17
**varies** 33:20 34:7 36:11 41:12 45:5 61:16,20 62:16

63:13
**vary** 10:11
**verbally** 5:15
   55:11,14
**version** 18:7,9
**voice** 5:20 8:14
   13:12,15
**Voluck** 1:20
   2:11

**W**

**wage** 8:6 14:16
   14:18
**wages** 18:24
   19:2 51:13
**wait** 5:7,11 6:8
   73:11 90:9,9,9
**waived** 3:6
**want** 34:4 55:8
   68:5 74:10
   84:19,21 87:13
   104:22
**wanted** 26:22
**warrant** 10:17
   10:18
**wasn't** 28:25
   29:17 58:15
   59:16 64:13
   94:11 95:11,13
**way** 93:5,19 95:2
**weather** 37:16
   98:17,19
**week** 9:12 33:17
   33:19 39:8
   58:20 59:3,9
   82:22 83:4
   103:18
**weekly** 103:14
**went** 45:13 84:4
   96:18,25 97:4
   97:5,13,17,19
   98:7,25 105:20
   111:10 112:3
**weren't** 19:3
**West** 2:6
**Westchester**
   27:3

**we'll** 90:11
   104:25
**we're** 9:17 41:21
   62:23 74:13
   75:22 84:8
**we've** 92:12
**whatever's** 31:7
   37:16
**What'd** 12:16
   24:23 25:6
**WHEREOF**
   114:19
**WHITE** 1:4
**William** 1:21
   2:12
**Williams** 1:4
   39:20
**Windstar** 66:24
**withheld** 100:23
**witness** 4:2 5:10
   5:22 13:13,16
   49:4 52:17,20
   68:24 90:14
   92:14 105:3
   113:3 114:6,13
   114:19
**work** 9:11 12:24
   13:24 20:15
   22:14,14,17
   25:20 27:24
   28:8,12 29:5
   29:19 53:7,25
   54:8 59:7
   65:22 93:5,19
   100:17 104:25
   111:25
**worked** 13:20
   32:20 58:19
   67:20 100:19
**working** 25:14
   26:14 27:13
   36:22 39:12,16
**wouldn't** 46:16
   46:17 56:13,15
   97:6 100:4
   109:14
**writing** 84:15

**written** 55:12,13
   55:15

**X**

**x** 1:3,15 113:1,7

**Y**

**Yale** 2:13 5:8
   104:24 113:4
**yeah** 12:7,23
   27:19 49:6
   54:5 57:8
   59:24 61:5
   62:19 63:16
   70:5 71:2
   78:14 86:22
   89:15 94:2,14
   97:10 99:15
   107:7
**year** 15:9 16:5
   42:7,8,15
   46:25 101:25
   103:4 105:13
   105:20,21
   106:23,24
**years** 15:21 16:9
   52:9,10 53:4,4
   53:5
**Yonkers** 15:14
   53:15,18
**York** 1:2,21,22
   1:24 2:7,7,12
   2:12 4:4 10:15
   10:15 15:14
   27:4,17 30:23
   31:3,14 33:23
   36:4,6 40:6
   44:20,22 45:9
   45:10,22 53:15
**YS** 1:11,12

**Z**

**Zaimi** 1:13
   107:15,17

**$**

**$0.12** 10:9,18
**$0.15** 10:9,18

**$0.30** 12:3
**$0.35** 14:23
**$0.40** 12:4
**$0.53** 31:22
**$28,890** 103:8
**$64,300** 102:6
**$9** 14:15

**0**

**003469** 69:12
**003479** 69:13
**003482** 70:13
**003487** 76:13
**003488** 77:19
**003489** 77:19
**003490** 78:7
**055611-0002**
   2:14
**06511** 4:13

**1**

**1:00** 62:8
**1:14** 96:13
**1:42** 79:16
**1:48** 1:23
**1:52** 77:6
**10** 49:19 89:20
**10th** 49:20
**10:00** 41:20
   62:16,18
**10:19** 71:23 72:3
   72:19,23
**10:20** 80:12
**10:28** 76:9
**100** 1:21 2:12
**10019** 2:7
**10038** 1:22 2:12
**101** 113:15,16,17
**104** 113:23
**1099** 101:4,5,7
   101:10,13,19
   103:3 106:5
   113:15,16,17
**11** 50:7,9
**110** 113:5
**112** 113:4
**12** 1:8 53:17

96:2
**13** 17:21 18:5
**14** 76:3
**16** 77:20 78:6
   79:19 91:24
**17** 19:12,18 80:9
**18** 113:10
**190** 10:25
**1987** 15:10

**2**

**2** 1:22
**2nd** 114:5,20
**2:00** 9:15,16,17
   9:20,21 28:3,4
   28:4 61:25
   62:3,4
**2:25** 78:14,14
   79:22
**2:40** 75:14,15
**2:42** 78:21,23
**20** 17:22
**200** 2:6 11:13
**2000** 15:10
**2007** 22:22 65:9
   65:13 66:10
   100:16 104:3
   104:19 105:23
   113:23
**2008** 42:9 104:5
**2009** 42:10,16
   47:2 104:7
**2010** 42:16 47:2
   49:19 71:3,17
   73:10,18 74:18
   75:11 76:3
   77:20 78:6
   79:19 80:9
   86:2 91:24
   96:2 101:7,10
   101:25 104:9
   113:15,16
**2011** 22:24 65:9
   89:18,20 90:19
   100:16 101:13
   103:5 104:11
   104:19 113:17

113:23
**2012** 13:2,3 108:21
**2013** 1:22 8:2 12:8,9 13:2,4,8 17:22 19:12,18 52:5 112:23 114:6,20
**21** 4:12
**215** 1:21 2:12
**23** 74:18 75:11
**24** 71:3,17 73:10
**240** 11:5
**25** 52:5
**250** 10:25 11:5
**28** 86:2

**3**

**3** 4:12 54:11,13 54:14
**3/15/88** 16:25
**3:00** 32:7,11 33:7,8,13,15 33:16,18 34:9 34:10,15,22 35:11,22 40:25 41:4,7 60:7 62:25
**3:25** 72:14 73:25
**3:54** 92:9
**3469** 69:13
**3482** 70:9 72:5
**3487** 76:16
**3491** 80:7
**3494** 81:23
**3495** 81:25
**3497** 82:4 84:8
**3498** 84:10
**3499** 84:13
**35** 90:7
**3500** 84:15
**3723** 85:15
**3729** 85:17
**3752** 85:20,25 86:6,21
**3753** 85:23,25 86:10
**3755** 87:3,11
**3769** 87:25 88:2
**377** 90:8
**3775** 88:9 89:20
**3776** 88:9,15 90:2 91:9
**3777** 88:15 89:17 91:11
**3782** 92:15
**3783** 92:15 93:25 94:2
**3854** 95:24
**3855** 95:22,24

**4**

**4** 19:11 113:4
**4:00** 63:2
**4:09** 80:19
**4:42** 112:17
**4339** 1:8
**48** 18:3 19:6 113:10,11
**49** 48:8,12 113:11

**5**

**5** 19:17
**5:00** 34:13,16 35:24 63:5
**50** 50:25 51:4 54:12 63:18 113:13,13
**500** 11:15
**51** 67:11,16 74:9 113:14
**52** 101:8,17 102:20,21 113:15
**53** 101:11 102:18 113:16
**54** 101:14 102:23 113:17
**57th** 2:6

**6**

**6** 58:18
**6:00** 9:15,20 28:3 32:9,11 33:7,19 34:13 34:16,21 35:3 35:11,24 40:25 41:4,9 42:3 60:7,12,17 63:5
**6:30** 60:12,17 61:4,18
**67** 113:14
**69** 69:13,14

**7**

**7** 63:17
**7:00** 41:14 61:18
**782** 49:17

**8**

**8:00** 9:16,21 28:4 41:16
**8:06** 96:6
**8:12** 92:4
**8:48** 78:11
**826** 52:15,16
**87** 15:10

**9**

**9** 89:18 90:17 113:22
**9:00** 41:18 62:16 62:18
**9:21** 74:21,25
**900** 2:6