# Trial Transcript

J7P6HERH

1   UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

2   ------------------------------x

3   FERNANDO HERNANDEZ, et al.,

4               Plaintiffs,

5             v.                   12 CV 4339(ALC)

6   THE FRESH DIET, et al.,

7               Defendants.

8   ------------------------------x
                              New York, N.Y.

9                              July 25, 2019
                              10:00 a.m.

10  Before:

11                HON. ANDREW L. CARTER, Jr.

12                              District Judge

13                      APPEARANCES

14  EDGAR M. RIVERA, ESQ.

15       Attorney for Plaintiffs

16  BRONSTEIN, GEWIRTZ & GROSSMAN
       Attorneys for Defendants

17  BY:  EDWARD N. GEWIRTZ

18

19

20

21

22

23

24

25

J7P6HERH

1          (Case called)

2          THE COURT:  Good morning.  We're here for a bench

3     trial on the sole issue of liquidated damages.  I have seen the

4     direct by way of affidavit for the defendants.  I wanted to

5     confirm the plaintiffs are not affirmatively calling any

6     witnesses or putting forth any affidavits; is that correct?

7          MR. RIVERA:  Yes, your Honor.  We won't be calling any

8     witnesses.  However, I do intend to cross-examine defendant

9     witnesses.  As a matter of housekeeping, I would like to know

10    if I can go a little bit outside of the direct during the cross

11    or whether I should just recall them to the stand in the

12    case-in-chief?

13         THE COURT:  You can go a little bit outside of the

14    direct on cross.

15         The defendants have submitted affidavits for their

16    direct testimony so let's have plaintiff's counsel call one of

17    the defendants for cross-examination.

18         MR. RIVERA:  We will call Zaimi Duchman.

19         MR. GEWIRTZ:  Your Honor, if I can note my objection

20    for the record for him going outside the direct testimony on

21    the cross-examination.

22         THE COURT:  To be clear obviously, defense counsel,

23    you may object to any question that you feel is inappropriate

24    or irrelevant.  While the affidavits are brief, they certainly

25    encompass a lot in terms of liquidated damages and knowledge.

J7P6HERH                         Duchman - cross

1    I am not sure how much of this will be outside of the scope,

2    but we'll see.

3              THE DEPUTY CLERK:  Remain standing.

4     SCHER DUCHMAN,

5         called as a witness by the Plaintiffs,

6         having been duly affirmed, testified as follows:

7    CROSS-EXAMINATION

8    BY MR. RIVERA:

9    Q.  Let's focus on the time period when you first started Fresh

10   Diet.  I believe in your affidavit that is when you were

11   discussing with your attorney David Willig and the accountants

12   Arie Harel and Issac Salver.

13             It is your testimony that Mr. Willig was the attorney

14   that attempted to find out whether the drivers were exempt; is

15   that correct?

16   A.  Willig was probably later on.  There was probably some

17   discussions.  I would say we're talking about just in 2006 when

18   we first started, which was only in Florida.  It would have

19   been the accountant that I had a brief discussion with about

20   how to classify drivers.

21   Q.  And what was that accountant's name?

22   A.  Issac Salver.

23   Q.  When was the first time that you discussed anything

24   regarding the driver's classification with Mr. Willig?

25   A.  I couldn't tell you exactly.  It was so long ago.  I would

1   assume some time -- some time between the years 2009 or '08 and

2   2010 maybe.

3   Q.   In 2006 the only person who you relied on to determine

4   whether the drivers were exempt would be Issac Salver?

5   A.   I wouldn't say relied on him.  Again, this was only about

6   Florida, and it was my understanding that there was no question

7   that these drivers were independence contractors.  I had a

8   brief discussion with him where he verified my understanding of

9   independent contractors.

10  Q.   What did you do to determine that the drivers were

11  independent contractors?

12  A.   Just some brief research on the Internet and just my

13  understanding that they drive their own cars so they are

14  independent contractors.  They do other jobs so they are

15  independent contractors.  They can do other routes so they are

16  independent contractors.  You know, I think something that I

17  always thought was Fed Ex is independent contractors and they

18  are driving a Fed Ex truck, then my drivers who are not driving

19  their own cars are definitely independent contractors.

20  Q.   Do you know what websites you visited on the website?

21  A.   I do not.

22  Q.   Do you recall what, if any, legal authorities you relied

23  onto come to the factors that you just explained?

24  A.   I do not.

25  Q.   Focusing just on 2006, besides you and Issac Salver, is

J7P6HERH                    Duchman - cross

1    there anybody else who contributed to the decision as to

2    whether the drivers were classified correctly?

3    A.  Not that I can recall.

4    Q.  In 2006 were you the sole owner of the Fresh Diet?

5    A.  On paper, yes.

6    Q.  Did Late Night Express, Inc. exist in 2006?

7    A.  I don't remember the exact date when it was formed, but it

8    was definitely some time in the beginning.  So I would assume

9    so.

10   Q.  Moving now to 2009, 2010.  What did you discuss with

11   Mr. Willig about Fresh Diet's classification of their drivers?

12   A.  I can't remember specific -- any specifics.  I just

13   remember that we had brief discussions at times with Mr. Willig

14   who was outside -- yeah, he didn't work for us.  He was outside

15   counsel.  Just in general probably that, you know, these

16   drivers were independence contractors and there is no issue.  I

17   don't remember any specifics.

18   Q.  Do you recall why you contacted Mr. Willig?

19   A.  I didn't contact him.  I mean, he was outside counsel for a

20   few things and it was -- I just remember having discussions

21   about this specific independent contractor discussion.

22   Q.  Do you recall what he was advising the Fresh Diet on around

23   that time?

24   A.  I know there was an accident at some point so it could have

25   been about that.  Some legal matter.

1  Q.  Anything else?

2  A.  Not that I can recall.

3  Q.  Is it your testimony today that Issac Salver, David Willig,

4  and yourself discussed whether the drivers were independent

5  contractors at some point between 2006 and 2010?

6          MR. GEWIRTZ:  I object to the to form.  His testimony

7  is --

8          THE COURT:  Hold on.  Please restate the question.

9          MR. RIVERA:  Okay.

10 Q.  So the time period is between 2006 and 2010.  Is it your

11 testimony then that you discussed the classifications of

12 drivers with Issac Salver and David Willig?

13 A.  Yes.  At some point I discussed it with them in general.

14 Q.  Did you always know that you had discussed the issue with

15 them?

16          MR. GEWIRTZ:  Object to the form.

17          THE COURT:  Overruled.

18          MR. GEWIRTZ:  I am not sure what it means.

19          THE COURT:  Overruled.

20 A.  I would think I always knew that, yes.

21 Q.  Do you remember being deposed in this action?

22 A.  Yeah, I was deposed in 2013.

23 Q.  Do you remember being asked at that deposition -- and the

24 line number is -- I will put this on the screen.  The page

25 number 155.

```
 1              Do you recall being asked -- line 19:
 2    "Q.  Do you recall whether anyone explained to you at any point
 3    why the delivery drivers should be considered independent
 4    contractors?
 5    "A.  I do not."
 6              Do you recall being asked that question and giving
 7    that answer?
 8    A.  I don't recall, but obviously that is what happened.
 9    Q.  So contrary to your testimony at your deposition, you do
10    know that you discussed the issue of the drivers'
11    classification with Isaacs Salver and David Willig; correct?
12              MR. GEWIRTZ:  Objection.
13              THE COURT:  Sustained as to form.
14    A.  I had --
15              THE COURT:  That's sustained as to form.
16              MR. RIVERA:  Okay.
17    Q.  Now, sitting here today, do you recall that you discussed
18    why the drivers should be considered independent contractors
19    with Issac, Salver and David Willig?
20    A.  I don't recall if they told me why they should be
21    classified as independent contractors.  I definitely
22    discussed -- recall discussing in general that they are
23    independent contractors.
24    Q.  So there is a difference between talking about why they
25    were independent contractors and discussing with them that they
```

1  were independent contractors; correct?

2  A.  I cannot speak to what I was thinking or answering six

3  years ago, but it just could be that I didn't think about it at

4  that point.

5  Q.  There was a point where you were discussing with attorneys,

6  accountants, and insurance companies the Fresh Diet's business

7  practices; correct?

8  A.  I don't recall having any discussions with any insurance

9  companies.

10  Q.  Do you recall discussing with either insurance companies,

11  accountants, or attorneys health insurance of drivers?

12  A.  No.

13  Q.  What about the tax implications of classifying the drivers

14  as independent contractors?

15  A.  I didn't have those discussions that I can recall.

16  Q.  Do you recall discussing with them unemployment insurance

17  benefits?

18  A.  I don't -- no, I don't recall that.

19  Q.  Do you recall discussing disability benefits?

20  A.  I know that there was some issue with a Bryan White and I

21  was asked to get on a phone call at a point, but that was the

22  extent of my involvement that I can recall.

23  Q.  Did you discuss with them paid sick leave for drivers?

24  A.  I don't recall discussing that.

25  Q.  Do you recall the context in which the subject of

J7P6HERH                        Duchman - cross

1    classification came up?

2    A.  I don't.

3    Q.  Could it have been in the context of tax treatment?

4    A.  I don't think so.

5    Q.  Could it have nothing to do with overtime?

6    A.  No, I don't think so.

7    Q.  You've been a business owner in the past; correct?

8            THE COURT:  Let me have the last question and answer

9    read back.

10           (Record read)

11           THE COURT:  I want to make sure --

12           MR. GEWIRTZ:  I object to --

13           THE COURT:  Hold on.  Hold on.

14           Why don't you rephrase those questions.  I am just not

15   sure in terms of the record what that means.

16           MR. RIVERA:  Sure.

17           THE COURT:  Why don't you rephrase that question.

18   Q.  You don't recall whether the issue of driver classification

19   was brought up in the context of taxes; right?

20   A.  I don't believe it was brought up in context of anything.

21   I think it was they are independent contractors.

22   Q.  So the issue of driver classification was not brought up in

23   the context of overtime rules; correct?

24   A.  There was no issue to be brought up.  They were independent

25   contractors.

J7P6HERH                         Duchman - cross

1    Q.  You weren't seeking advice in other words into whether you

2    were paying them overtime correctly?

3    A.  I wasn't taking any advice.

4    Q.  I believe my last question was that you have been a

5    business owner in the past; correct?

6    A.  In the past from today, or from when are we talking about?

7    Q.  From the present, yes.

8    A.  Of course, I was a business owner of Fresh Diet.

9    Q.  Do you agree that companies save money by hiring

10   independent contractors rather than employees?

11            MR. GEWIRTZ:  Objection.

12            THE COURT:  I will allow it.

13   A.  I have no idea.

14   Q.  Do you understand that independent contractors aren't

15   entitled to overtime?

16   A.  I understand that today.

17   Q.  Do you understand independent contractors are not entitled

18   to health insurance?

19   A.  I understand that today.

20   Q.  In 2006 did you not understand that?

21   A.  In 2006 our company didn't have health insurance for W-2

22   employees.

23   Q.  Did you understand that independent contractors wouldn't be

24   receiving health insurance in 2006?

25   A.  No.  It didn't even enter my mind.  It wasn't anything that

J7P6HERH                    Duchman — cross

1    I thought about in 2006 or any time probably until it was in

2    the news with Obama Care.

3    Q.   Do you understand that a business doesn't pay payroll taxes

4    for independent contractors' compensation?

5              MR. GEWIRTZ:  Objection.

6              THE COURT:  Overruled.

7    A.   Today I understand that.

8    Q.   In 2006 did you understand that?

9    A.   Nope.

10   Q.   Let's focus now on 2009, 2010 and communications with David

11   Willig.

12             Did you ask Mr. Willig what he needed from you in

13   order to evaluate the drivers' classification under

14   wage-an-hour law?

15   A.   I did not ask him anything.  So to clarify, this was very

16   brief discussions that it came up where a company's lawyer or

17   accountant or CFO or CPA all agreed that the drivers were

18   independent contractors.  There wasn't any lengthy

19   conversations.  I didn't seek their advice.  It was in a

20   meeting and it was probably just a very, very brief discussion

21   where it was there is nothing even to discuss here -- they are

22   independent contractors.

23   Q.   Did they ask you for any information in order for them to

24   determine whether they were independent contractors or not?

25   A.   No.  They --

J7P6HERH                        Duchman - cross

1           MR. GEWIRTZ:  Objection.

2           THE COURT:  Overruled.

3  A.  They knew the information.  They didn't need to ask me

4  anything.  They knew the business we were in and how the

5  drivers operated.

6  Q.  Is it your understanding that they based their

7  determination on the general industry standard?

8           MR. GEWIRTZ:  Objection.

9           THE COURT:  Overruled.

10 A.  Yes.  My understanding is that they based their decision on

11 the litmus test and the fact that the drivers drove their own

12 car, made their own schedules, brought their spouses with them,

13 brought their children with them, did paper deliveries at the

14 same time, potentially delivered other food at the same time,

15 etc., etc.

16 Q.  Did you share with them that -- and this is at any point in

17 Fresh Diet's existence, whether it was back in 2006, 2009 up

18 until the bankruptcy.  Did you ever share with Mr. Willig or an

19 accountant that the Fresh Diet had policies that affected the

20 drivers, one of those policies being returning --

21          MR. GEWIRTZ:  Objection.

22          THE COURT:  Stop.

23          What was the last part?

24          MR. RIVERA:  Returning manifests.

25          THE COURT:  I will allow it.

1          MR. GEWIRTZ:  He mentioned --

2          THE COURT:  I will allow it.

3          MR. GEWIRTZ:  I don't know anything about a

4    bankruptcy.  I am not sure it is factual--

5          THE COURT:  Overruled.

6    A.  I knew nothing about returning manifests.

7    Q.  Did you discuss -- again, I am talking about attorney or

8    accountant -- policies regarding the driver's returning of

9    coolers?

10   A.  I knew nothing about returning of coolers.

11   Q.  Did you share with them any policies concerning returning

12   bags?

13   A.  I knew nothing about returning bags.  The bags actually

14   were not returned from my understanding.  The bags were kept

15   and brought back by the drivers whenever they came into work.

16   Q.  Did you share with -- again, attorney or accountant -- that

17   Fresh Diet had policies for the drivers to sign in when they

18   began and ended their shifts?

19   A.  I knew nothing about drivers signing in.

20   Q.  Did you share with attorneys or accountants policies

21   concerning how drivers performed deliveries?

22   A.  I knew nothing about that.

23   Q.  Did you share with them that drivers were in communication

24   as they did their routes with the New York manager Syed

25   Hussain.

1   A.  I don't recall sharing that information ever.

2   Q.  Did you share with the accountants or attorneys that Fresh

3   Diet had owned vehicles and that they would allow drivers to

4   use them to make the deliveries?

5   A.  They would know that themselves.

6   Q.  But you didn't share that with them?

7   A.  I -- I don't know.  My understanding is that drivers that

8   drove our vehicles were W-2.  If there was a point that they

9   weren't, that could have been something that I didn't know.

10   Q.  Okay.  Did you ever share with them that drivers were

11   helping to bag food in the kitchen before they started their

12   route?

13   A.  I never knew that that would ever happened.  So there would

14   be no way I would have shared that information.

15   Q.  And you don't know what, if any, research any lawyer or

16   accountant did to help determine whether the drivers were

17   classified correctly; correct?

18   A.  I don't know.

19   Q.  You can't say sitting here today any specific statutes that

20   they relied on?

21   A.  I cannot say that.

22   Q.  Any cases that they relied on?

23   A.  I cannot say that.

24   Q.  Orders that they relied on?

25   A.  Again, you are saying they relied on it.  I mean, it was

1   again a fact that they were independent contractors if the

2   point of adding them to my affidavit was that they verified

3   that they were correctly labeled as independent contractors.

4   It was not something I sought out, Hey, can we make them

5   independent contractors.  It was, Hey, they are independent

6   contractors.  Is that good?  Of course it is good.  Pretty much

7   end of discussion.

8   Q.  In your affidavit that you submitted in anticipation of

9   this bench trial, you testified that plaintiffs filled out form

10  1099s; is that correct?

11  A.  Yes, that was my understanding.

12  Q.  Is it your understanding that they filled out form W-9s and

13  that the company would then issue form 1099s?

14  A.  I don't know the semantics of it.  It is my understanding

15  that they signed independent contractors agreements and they

16  were given whatever forms to go along with that.  I believe it

17  to be 1099s, but I could be mistaken.

18  Q.  Regardless of whether it was a Form W-9 or Form 1099, it is

19  correct that Fresh Diet provided the drivers that form;

20  correct?

21  A.  That is my understanding.

22  Q.  And that Fresh Diet instructed them to fill out the tax

23  forms; correct?

24  A.  I don't know.

25  Q.  What titles did you hold with Fresh Diet?

J7P6HERH                    Duchman - cross

1     A.  What titles did I hold?

2     Q.  Correct.

3     A.  I was the CEO and then I was chairman of the board.

4     Q.  Was it your decision to hire David Willig as outside

5     counsel?

6     A.  Yes, I guess so.

7     Q.  Was it your decision to hire accountants Arie Harel and

8     Issac Salver as Fresh Diet's accountants?

9     A.  Yep.

10    Q.  As the CEO and chairman of Fresh Diet, you ultimately have

11    control over who Fresh Diet hires; correct?

12          MR. GEWIRTZ:  Objection, calls for a legal conclusion.

13          THE COURT:  Overruled.

14          You may answer.

15    A.  Just to clarify, I was chairman of the board only from 2013

16    until 2014.  I definitely did not do any hiring then.

17    Q.  Let's focus on 2006 to 2013 when you were the CEO.

18    A.  Well--

19          THE COURT:  Hold on.  There is not a question for you.

20    Q.  When you were the CEO of the Fresh Diet, you had the

21    ability, whether you exercised it or not, to make hiring

22    decisions; correct?

23    A.  I would say depending on the department, I guess.

24    Q.  There was no one who would stop you from hiring someone you

25    wanted; correct?

J7P6HERH                    Duchman - redirect

1  A.  I cannot recall hiring anyone after the executives.  So I

2  wouldn't really know.

3  Q.  Did you hire Richard Silverman?

4  A.  Yes.  He is the executive.

5  Q.  Did you hire Mordy Loksen?

6  A.  No.

7  Q.  Who did?

8  A.  I would say either the CEO Juda or Richard Silverman, the

9  CFO.  I don't remember the exact hire dates.

10  Q.  You brought in Juda Schlass; correct?

11  A.  I don't know what "brought in" means.

12  Q.  You hired Mr. Schlass; correct?

13  A.  Mr. Schlass was a partner.  So I am not really sure how to

14  clarify that.  He basically started the business with me.

15  Q.  Did you hire Yosef Schwartz?

16  A.  Same thing.  He was a partner who started a business with

17  me.

18          MR. RIVERA:  No further questions.

19          THE COURT:  Any redirect?

20          MR. GEWIRTZ:  A little bit, yes.

21  REDIRECT EXAMINATION

22  BY MR. GEWIRTZ:

23  Q.  Mr. Duchman, did Fresh Diet Late Night have any W-2

24  employees at all?

25  A.  Of course.

J7P6HERH                          Duchman - recross

1  Q.  And approximately how many W-2 employees did the company

2  have?

3  A.  Hundreds.

4  Q.  And with respect to deliveries that were made in New York,

5  were you involved in the minutia of how deliveries were made in

6  New York?

7  A.  I wasn't involved at all.  I lived in Miami the entire

8  time.  My focus was on sales and marketing.  I had two partners

9  that were focused on operations.  My partner Josef Schwartz

10 moved to New York to handle operations.  And if I came to New

11 York, I didn't even -- people used to say you -- when I came

12 Josef would say, Come to the kitchen and check it out, because

13 I would literally stay in the office and work on sales and

14 marketing and growing the business.

15 Q.  Prior to this case being brought against yourself and

16 others, did anybody complain to you -- a New York driver --

17 that he or she were working overtime hours and not being paid

18 for them?

19 A.  Never.  I never had anyone come over to me, not a driver,

20 not a manager to complain about anything related to the hours

21 or overtime.

22         MR. GEWIRTZ:  No more questions for him.

23         THE COURT:  Okay.

24 RECROSS-EXAMINATION

25 BY MR. RIVERA:

1    Q.  You testified that no one came to you to complain about

2    hours or overtime; correct?

3    A.  Correct.

4    Q.  Are you aware of anyone raising any complaints about hours

5    or overtime with anybody at Fresh Diet?

6    A.  I am not.

7              MR. RIVERA:  No further questions.

8              THE COURT:  The witness is excused.

9              (Witness excused)

10             THE COURT:  Let's have the next witness take the stand

11   for cross-examination.

12    JUDA SCHLASS,

13        called as a witness by the Plaintiffs,

14        having been duly affirmed, testified as follows:

15   CROSS-EXAMINATION

16   BY MR. RIVERA:

17   Q.  Regarding the classification of the drivers, is it your

18   testimony that Fresh Diet followed the industry standards?

19             MR. GEWIRTZ:  Objection.

20             THE COURT:  Overruled.

21   A.  From my knowledge, yes.

22   Q.  And how do you know that?

23   A.  I was aware that other companies, our competitors or also

24   the drivers that they were using for deliveries were classified

25   that way.  I know that because when we begin -- when we started

1    the business in New York and had taken over the existing

2    company Balance for Life, the drivers -- the delivery drivers

3    were classified that way.  So we just continued.

4    Q.  Do you have any other reason besides what you just

5    testified about to believe that Fresh Diet's classification was

6    following industry standards?

7              MR. GEWIRTZ:  Objection.

8              THE COURT:  Overruled.

9    A.  What do you mean the industry standard, like, other diet

10   delivery companies or I am not sure?

11   Q.  I will rephrase it.

12             You testified that you believed that Fresh Diet was

13   following the same classification as your competitors in

14   similar industries; is that correct?

15   A.  Yes.

16   Q.  Do you have any other reason to believe that you were

17   following these standards besides that?

18   A.  I knew that we have -- we had lawyers and accountants in

19   the company that were educated on labor laws and that sort of

20   thing.  So I would imagine that they knew the classification.

21   Q.  Did you participate in any of these discussions with these

22   lawyers?

23   A.  Not that I recall.

24   Q.  Do you recall the names of these lawyers who have knowledge

25   of labor laws?

1    A.  Well, I knew David Willig and I know that there were some

2    lawyers from the KDV law firm.  I just don't know which ones

3    or --

4    Q.  Let start with David Willig.

5            How do you know that he is knowledgeable about

6    wage-an-hour laws?

7    A.  My take is that as a lawyer, he has the capacity to

8    research.  Maybe if he is not -- if he doesn't specialize in

9    labor law, he would know where to look and gather information

10   about it.  So I don't know what he specialized in; but I figure

11   he has knowledge in all these areas.

12   Q.  Moving on to KDV, it is true that you retained them in and

13   around September of 2011; correct?

14   A.  Yeah.  I believe it was around that time, yes.  I don't

15   remember exactly.

16   Q.  So Fresh Diet couldn't have relied on any advice from KDV

17   prior to September 2011; correct?

18   A.  Yeah.  I mean, if we hired them in September 2011, then I

19   don't think we had any advice before that.

20   Q.  What titles did you hold with Fresh Diet?

21   A.  I know I was chef and at some point I think my only

22   official title was maybe chief operating officer or director of

23   operations.

24   Q.  As COO who did you report to?

25   A.  I would report -- the dynamics and the structure wasn't

1   that I needed to report to anyone above me, but I would report

2   to, I guess, Zaimi or Yos or I could be reporting to Richard

3   Silverman or any of the other executives.

4   Q.  Are you saying that you and the other executives were more

5   or less on the same level?

6   A.  Yeah, probably.

7   Q.  So you and Richard, you don't report to him and he doesn't

8   report to you?

9   A.  Right.

10  Q.  Does or did Mordy Loksen report to you?

11  A.  No.

12  Q.  Who did Mordy Loksen report to?

13  A.  I am not sure.

14  Q.  Did Sandy Orneals report to you?

15  A.  Yeah, she did report to me at times.

16  Q.  Yosef Schwartz, were the two of you on the same level or

17  did he report to you?

18  A.  We would be on the same level.

19  Q.  Do you know Amber Williams?

20  A.  No.

21  Q.  Does that name mean anything to you?

22  A.  Amber Williams?

23  Q.  Amber Williams.

24  A.  I have no recollection of that name.

25  Q.  Do you recall her applying for unemployment insurance

1    benefits some time around summer of 2011?

2            MR. GEWIRTZ:  Objection.

3            THE COURT:  I will allow it.

4    A.  I have -- still have no idea who she is.

5    Q.  Do you recall receiving a notice from the New York

6    Department of Labor concerning her application for unemployment

7    insurance benefits?

8    A.  Still don't know who she is.  So I have no -- no knowledge

9    of anything regarding her.

10   Q.  I am going to show you a document that was produced by your

11   attorneys during the litigation.

12   A.  Okay.

13           MR. GEWIRTZ:  Your Honor, I would object.  I don't

14   believe any documents were shown that were --

15           THE COURT:  Overruled.

16           MR. GEWIRTZ:  Okay.

17   Q.  Let me know when the document appears on your screen.

18   A.  Yes, it's here.

19           MR. GEWIRTZ:  I believe the social security number

20   should be redacted.

21           THE COURT:  Hold on.  Hold on.

22           What is your objection, counsel?

23           MR. GEWIRTZ:  I am saying I don't believe -- I believe

24   they should redact the social security number on the document.

25           THE COURT:  There is no jury here.  That's fine.  This

J7P6HERH                    Schlass - cross

 1   is not being admitted into evidence at this point.

 2   Q.  At the top of this document, you can see the seal of New

 3   York; correct?

 4   A.  Yes.

 5   Q.  You can see on the seal it says Department of Labor;

 6   correct?

 7   A.  Yeah.

 8   Q.  You can see that it is addressed to Late Night Express;

 9   correct?

10   A.  Yes.

11   Q.  I would like you to take a second and read -- well, strike

12   that.

13           Do you recall ever seeing this document before today?

14   A.  No.

15   Q.  Do you have any idea how this document ended up with your

16   attorneys?

17   A.  I have no idea.

18   Q.  Please take a second to review pages 1, 2, and 3.  When you

19   are ready, I will scroll down for you and I will ask you a

20   couple questions about these three pages.

21           THE COURT:  Hold on a second.  Let's have a quick side

22   bar off the record.

23           (Side bar; off-the-record discussion)

24   BY MR. RIVERA:

25   Q.  So you never saw that document from the Department of Labor

1    that was just shown to you; correct?

2    A.  I don't recall ever seeing that.

3    Q.  Do you know who Andrew Spence is?

4    A.  No.

5    Q.  Do you recall his applying for unemployment insurance

6    benefits around September 2011?

7             MR. GEWIRTZ:  Objection.

8             THE COURT:  Overruled.

9    A.  I don't know who he is.

10   Q.  Do you recall The Fresh Diet retaining the law firm of

11   Kaufman Dolowich & Voluck to represent them at the Department

12   of Labor?

13   A.  I don't recall the exact circumstances and reasons for the

14   retainment of KDV.  I know generally it was related to -- to

15   labor issues.

16   Q.  I am going to show you a letter that was addressed to you

17   from KDV.  Let me know when you see it.

18             On this letter on the top right is KDV's letterhead;

19   right?

20   A.  Yes.

21   Q.  And a little below that is the date that this letter was

22   sent, September 14th, 2011; correct?

23   A.  Yeah.

24   Q.  On the left of that it is addressed to you, correct, Juda

25   Schlass?

J7P6HERH                        Schlass - cross

1    A.  Correct.

2    Q.  In reviewing the content of this letter, this was for the

3    retention of legal services; correct?

4    A.  Correct.

5            MR. RIVERA:  At this point I would like to move this

6    into evidence as Plaintiff's Exhibit 1 as a true copy of the

7    retention letter sent to KDV to Late Night.

8            THE COURT:  Any objection?

9            MR. GEWIRTZ:  I can't see the whole letter so I would

10   like to see the whole letter before I can make a determination.

11           I would like a little bit of voir dire on this.

12           THE COURT:  You have to speak up.

13           MR. GEWIRTZ:  I would like to ask a few questions on

14   voir dire to see if -- I don't believe he has laid a foundation

15   for its admissibility yet.

16           THE COURT:  Hold on a second.

17           I think they are handing you a paper copy of the

18   letter so you can see the entire letter.

19           Have you seen the letter now?

20           MR. GEWIRTZ:  I have seen it.  It's not signed by

21   Mr. Schlass.

22           THE COURT:  I am not asking you that.  I am asking

23   have you seen it.  If you want to ask questions, you can.  If

24   you want to voir dire on this, you can.

25           MR. GEWIRTZ:  Okay.  If I could ask some questions.

1      THE COURT:  Go ahead.

2   VOIR DIRE

3   BY MR. GEWIRTZ:

4   Q.  Mr. Schlass, do you recall whether you ever seen this

5   letter before?

6   A.  I don't recall.

7      MR. GEWIRTZ:  I object to its admissibility.  He has

8   no recollection of seeing this letter before.  He has testified

9   and there is no --

10      THE COURT:  Okay.

11      MR. GEWIRTZ:  -- no foundation.

12      THE COURT:  Plaintiff, what is your position on that?

13      MR. RIVERA:  I can provide foundation.

14      THE COURT:  Go ahead.

15      Before you do that, can you put the letter back up.

16      MR. RIVERA:  Sure.  I was going to pull up another

17   document.

18      THE COURT:  Scroll up a little bit.

19      MR. RIVERA:  Sure.

20      THE COURT:  Not that far up.

21      Insofar as the contents of the letter -- hold on right

22   there.  Go up to the next page.

23      MR. RIVERA:  I am sorry, your Honor.

24      THE COURT:  Go down to the next page.

25      Let's have a quick side bar.  We don't need the court

1    reporter.

2              (Side bar; off-the-record discussion)

3    BY MR. RIVERA:

4    Q.  I am going to try this again.

5              THE COURT:  Okay.

6    BY MR. RIVERA:

7    Q.  You submitted an affidavit -- strike that.

8              You brought suit against KDV alleging malpractice;

9    correct?

10   A.  Yeah.

11   Q.  As part of that lawsuit, you submitted an affidavit;

12   correct?

13   A.  Yeah.

14   Q.  You submitted that affidavit on November 28th, 2017;

15   correct?

16   A.  If it says so.

17   Q.  I am going to show you the affidavit now.

18             Before I do, your testimony was that you didn't recall

19   receiving that retention letter that I showed you earlier

20   correct?

21   A.   Correct.

22   Q.  Is this your affidavit that you submitted?  I am directing

23   your attention to paragraph five.  That paragraph states on or

24   about September 14th, 2011, in my capacity as COO of The Fresh

25   Diet, I received from defendant Kaufman Dolowich & Voluck, LLP,

1    a retention of services letter, a true and correct copy of

2    which is attached hereto as Exhibit 1.

3              That is what you put in your affidavit; correct?

4    A.  Yes.

5    Q.  Directing your attention to the last page you signed this

6    affidavit; correct?

7    A.  Yes.

8    Q.  Is your memory as to whether you received that retention

9    letter refreshed?

10   A.  Yeah.  I mean, I am not disputing that I received it.  I

11   just don't remember when I got it or the circumstances.

12   Q.  Do you recall why Fresh Diet retained KDV?

13   A.  I know it was a labor-related matter.  I don't know if it

14   was -- I don't recall if it was related to a driver or an

15   employee or --

16   Q.  It was related to unemployment insurance benefits; correct?

17   A.  I don't know.

18   Q.  It was because an individual alleged they were entitled to

19   receive unemployment insurance benefits; correct?

20   A.  I don't know.

21   Q.  Let's take a look at your affidavit again.

22   A.  Paragraph six of your affidavit reads:  The current legal

23   issues referenced in the retention of service letter was an

24   administrative matter before the New York State Department of

25   Labor, Unemployment Insurance Division, which had been brought

J7P6HERH                        Schlass - cross

1   by an individual who alleged he -- there is a typo here --

2   alleged he entitled to receive unemployment insurance benefits.

3   True and correct copy of a letter dated September 11th, 2011,

4   from the New York State Department of Labor detailing the

5   claims and that administrative proceeding is attached hereto as

6   Exhibit 2.

7           Does that refresh your recollection as to what was

8   happening between Fresh Diet and the Department of Labor at

9   that time?

10  A.  No.

11  Q.  Reading your own affidavit, you still don't know what

12  services KDV was providing for Fresh Diet?

13  A.  No, no.  I know what they were doing, but I don't recall --

14  you asked me if I remember the specifics around the time of

15  this September 11th, 2011?  Is that what you are asking me if I

16  remember, like --

17  Q.  Strike that question or withdrawn.

18          Are you saying that you don't know who that individual

19  is referenced in paragraph six?

20  A.  No, I don't.

21  Q.  I will show you one more document.

22          Taking a look at the first page of this decision from

23  the Department of Labor, do you recall seeing this before?

24  A.  I don't.

25  Q.  You never seen this before in your life?

1   A.  I don't recall seeing this.

2   Q.  Do you see the top where it says that this was filed as

3   part of a lawsuit in New York County?

4   A.  Where is that?

5   Q.  Filed in New York County Clerk, 11-28-2017.

6            Do you see that?

7   A.  Oh, yeah.  At the top of the page, yeah.

8   Q.  This was filed as part of your affidavit in that action;

9   correct?

10  A.  If it says so.

11  Q.  So you have seen this document before today; correct?

12  A.  Yeah.

13  Q.  And after receiving this document, you retained KDV to

14  retain Fresh Diet; right?

15  A.  Sorry.  Can you say that again?

16  Q.  After you received this document, which is dated

17  September 8, 2011, you retained KDV to represent The Fresh

18  Diet; correct?

19  A.  Yeah.  I mean, again, I don't remember the timeline and

20  circumstances receiving this and then retaining them.  I know

21  there were other individuals like Mordy Loksen and I don't know

22  other executives in the company who had originally initiated

23  the discussion with KDV.  They were aware of any of the legal

24  or labor issues.  And I entered into the picture in the

25  retention stage of having to sign in my capacity retaining

1    them, but I definitely was not aware -- I don't recall being

2    aware at the time of the specific issue why we were hiring them

3    or who the person was.

4    Q.  You reviewed this decision from the Department of Labor;

5    correct?

6    A.  When?

7    Q.  Around the time that it was received, September 2011?

8    A.  Possibly.  I don't know.  It has been many years.  I don't

9    recall specifically reviewing this.  I may have reviewed it.

10   Maybe not.  I don't recall right now what happened then.

11   Q.  I am directing your attention to the third paragraph from

12   the bottom of the letter that states:  This information

13   indicates you exercised or reserve the right to exercise

14   sufficient supervision, direction and control over the claimant

15   services to establish an employee-employer relationship.

16   Therefore, it is our determination that the claimant was your

17   employee.

18          You hired KDV to try to reverse that determination;

19   correct?

20          MR. GEWIRTZ:  Objection.

21          THE COURT:  Overruled.

22   A.  I was just reading that.

23          Can you ask me that question again?

24   Q.  Sure.  You hired KDV in order to try to reverse that

25   determination; correct?

1    A.  Yeah, very likely.

2    Q.  In 2011 after having received this decision, you didn't

3    interview any drivers about facts to figure out if they were

4    properly classified, did you?

5    A.  Me, no.

6    Q.  As far as you know nobody at Fresh Diet did that; correct?

7    A.  I don't know.

8    Q.  You didn't do any studies or surveys to determine what the

9    drivers were actually doing; correct?

10   A.  Personally, I didn't do any.

11   Q.  You don't have any knowledge of anyone at Fresh Diet --

12   A.  I don't know if anyone did anything.

13   Q.  Obviously the practice of classifying drivers as exempt or

14   independent contractors didn't change?

15   A.  In 2011?

16   Q.  Or at any point after September 2011.

17   A.  I think it did change at some point.  I just don't know

18   when and for whom.

19   Q.  Was there a point in Fresh Diet's history that its drivers

20   were classified as employees?

21   A.  I think so.

22   Q.  What makes you believe that?

23   A.  Well, I knew that -- I don't recall the times, but I know

24   that, you know, probably after this lawsuit was filed around

25   that time I know there were some drivers who were W-2 employees

1    depending on the specific work they were doing.  Again, I don't

2    remember specifics.  I believe that there was some change.  I

3    just don't know when or how.  And if there wasn't even change,

4    I could be wrong.  It is just I was out of the -- the company

5    in 2013.  It continued on for a couple years.  After that I may

6    have heard something about change, but I cannot really point to

7    a specific thing but --

8    Q.  In March 2012 -- now we are getting away from this exhibit.

9    In March 2012 you learned for the first time that certain

10   drivers used by the Fresh Diet were contemplating initiating

11   litigation against the Fresh Diet; correct?

12   A.  I don't remember that.

13   Q.  Okay.  Again, I am going to show you your affidavit.

14   A.  Again, I am not saying it didn't happen.  You are asking

15   what happened in March of that year.  I don't remember today.

16   Obviously I learned that the drivers were intending on filing a

17   lawsuit.  I don't remember when that happened.  It could have

18   been March.  I am not arguing about it.  I just don't remember

19   today if it was March or an earlier date or a later date.

20   Q.  But in the affidavit that you submitted in 2017, you did

21   know that around March 2012 drivers were contemplating filing a

22   lawsuit against Fresh Diet?

23   A.  Yes, if I just said that then I obviously recall that now.

24   Q.  That lawsuit was about unpaid overtime; correct?

25   A.  Correct.

```
 1    Q.  At that time in March 2012, neither you nor anyone in Fresh

 2    Diet changed the practice at classifying drivers; correct?

 3    A.  I definitely didn't.

 4    Q.  And neither you nor anybody at Fresh Diet took any steps to

 5    find facts to determine whether the drivers were properly

 6    classified; correct?

 7    A.  I definitely didn't.

 8    Q.  Earlier you said that there were other drivers who had

 9    applied for unemployment insurance benefits; correct?

10    A.  Earlier.

11    Q.  It's true that drivers for Fresh Diet had applied for

12    insurance benefits; correct?

13    A.  Yes, I said that.

14    Q.  Do you recall Juany Guzman, a Fresh Diet driver, applying

15    for unemployment insurance benefits?

16    A.  No.

17    Q.  You don't recall the Department of Labor issuing a decision

18    finding that he was an employee?

19    A.  I don't recall that.

20              MR. RIVERA:  I have no further questions.

21              THE COURT:  Any redirect?

22              MR. GEWIRTZ:  Yes, your Honor, a little bit.

23    REDIRECT EXAMINATION

24    BY MR. GEWIRTZ:

25    Q.  Mr. Schlass, once KDV was hired to represent you --
```

1  represent the Fresh Diet, did you rely on them for legal advice

2  concerning the workers at issue in this lawsuit?

3  A.   Yeah.  I believe they were hired for that purpose, and I

4  believe that it was the HR department or the accounting or they

5  were communicating with KDV on any of the issues they were

6  retained for.

7  Q.   Okay.  And did KDV tell you that these workers were

8  employees and that you had to change the way you were paying

9  them?

10 A.   No, they did not.

11 Q.   Did KDV take a position and defend that these were properly

12 classified workers and what you were doing was defendable in

13 the lawsuit?

14 A.   Yes.

15 Q.   And to your knowledge was a motion for summary disposition

16 of the case made in what you sought before a trial that these

17 were employees of the Fresh Diet?

18 A.   I don't remember that.  It sounds about right.

19 Q.   Do you know whether or not there was a motion for summary

20 judgment made in the case?

21 A.   Yes.

22 Q.   Do you know the outcome of that motion?

23 A.   It was denied.

24 Q.   So in your own understanding is it correct to say that even

25 the court had an issue as to whether or not these were properly

1    classified workers prior to a trial being had?

2              MR. RIVERA:  Objection.

3              THE COURT:  Sustained.

4              Go ahead.

5              MR. GEWIRTZ:  I have no more questions.

6              THE COURT:  Anything else?

7    RECROSS-EXAMINATION

8    BY MR. RIVERA:

9    Q.  You don't have any idea what KDV did to reach the

10   conclusion that the drivers were properly classified; correct?

11   A.  Correct.

12             MR. RIVERA:  No further questions.

13             THE COURT:  The witness is excused.

14             (Witness excused)

15             THE COURT:  I believe that is all of the testimony, is

16   that correct, counsel for plaintiff?

17             MR. RIVERA:  That's correct.

18             THE COURT:  Counsel for defense?

19             MR. GEWIRTZ:  Yes, your Honor.

20             THE COURT:  Let's do this:  I will try to get this

21   turned around relatively quickly.  Let's have each side submit

22   findings of fact and conclusions of law.  Let's have plaintiff

23   submit proposed findings of fact and conclusions of law.  Let's

24   have both sides submit them two weeks from today and then each

25   side can respond to the other side's proposed findings of fact

1    and conclusions of law two weeks after that.  Let's have each

2    side submit their initial proposed findings of fact and

3    conclusions of law on August the 14th.

4              MR. GEWIRTZ:  Your Honor --

5              THE COURT:  August 8th.

6              MR. GEWIRTZ:  Now that you changed it, the 14th I have

7    a friend getting married.  You changed it to the 8th so...

8              THE COURT:  Yes, August 8th.

9              The response to the other side's proposed findings of

10   fact and conclusions of law should be submitted by August 22nd.

11             Anything else from plaintiffs today?

12             MR. RIVERA:  No, nothing from plaintiffs.

13             THE COURT:  Anything else from defendants today?

14             MR. GEWIRTZ:  I suppose I will argue in my findings of

15   fact and conclusions of law?

16             THE COURT:  Yes.

17             What did you say?

18             MR. GEWIRTZ:  Whatever it is, I will put it in my

19   findings of fact and conclusions of law.

20             THE COURT:  Thank you.

21             We're adjourned.

22                               o0o

23

24

25

```
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    SCHER DUCHMAN

4    Cross By Mr. Rivera  . . . . . . . . . . . . . 3

5    Redirect By Mr. Gewirtz  . . . . . . . . . . .17

6    Recross By Mr. Rivera  . . . . . . . . . . . .18

7    JUDA SCHLASS

8    Cross By Mr. Rivera  . . . . . . . . . . . . .19

9    Redirect By Mr. Gewirtz  . . . . . . . . . . .35

10   Recross By Mr. Rivera  . . . . . . . . . . . .37

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```